# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### Atlanta Division

|  |  |  |
|---|---|---|
| **ITT CORPORATION and XYLEM INC.,** | ) | |
| | ) | |
| *Plaintiffs/Counterclaim-Defendants,* | ) | |
| | ) | |
| **v.** | ) | **No. 1:11 Civ. 3669-WSD** |
| | ) | |
| **XYLEM GROUP, LLC,** | ) | |
| | ) | |
| *Defendant/Counterclaim-Plaintiff.* | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION OF
## PLAINTIFFS/COUNTERCLAIM-DEFENDANTS
## TO EXCLUDE THE OPINIONS OF ROBERT A. HUTCHINS, CPA,
## AS TO A REASONABLE ROYALTY

Robert J. Shaughnessy (*pro hac vice*)
Emmet T. Flood (*pro hac vice*)
Sarah F. Teich (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005
202-434-5564 (phone)
202-434-5029 (facsimile)
bshaughnessy@wc.com
eflood@wc.com
steich@wc.com

Gregory S. Brow (Bar No. 086422)
E. Claire Carothers  (Bar No. 702045)
McKENNA, LONG & ALDRIDGE LLP
303 Peachtree Street, N.E., Suite 5300
Atlanta, Georgia 30308-3265
(404) 527-4361 (phone)
(404) 527-4198 (facsimile)
gbrow@mckennalong.com
ccarothers@mckennalong.com

October 1, 2012

## **TABLE OF CONTENTS**

FACTUAL BACKGROUND ...................................................................................2

A.    Origins of this Dispute .........................................................................2

B.    Hutchins' Reasonable Royalty Analysis ..............................................2

ARGUMENT ....................................................................................................8

I.    Hutchins' Opinion Does Not Fit this Case Because the Law Does Not Permit a "Reasonable Royalty" Premised on the Grant of Perpetual Rights to the Alleged Infringer and the Trademark Owner's Surrender of the Mark ..................................................................................................9

II.    Hutchins' Assumption About When the Hypothetical Negotiation Would Have Taken Place Is Contrary to XG's Binding Admissions ...........................13

III.    Hutchins' Opinion Is Unreliable Because He Has Failed to Obtain Basic Information About the Asset He Is Valuing – XG's Mark ................................16

IV.    Hutchins' Derivation of His "Royalty Range" Is Not Based on Relevant Data or the Application of a Reliable Methodology ...........................................19

    A.    Derivation of the Top Value – 0.60% ....................................................19

    B.    Derivation of the Bottom Value – 0.20% ...............................................22

CONCLUSION ................................................................................................25

EXHIBITS

    1    Declaration of Robert N. Yerman, CPA

    2    July 14, 2011 letter from ITT Residential and Commercial Water to Customer

    3    July 20, 2011 letter from James M. Slattery to Ann D. Davidson and Jenny Schiavone

4      Expert Report of Robert A. Hutchins (June 20, 2012)

5      Deposition of Robert A. Hutchins (August 30, 2012)

6      Excerpts of Deposition of Hal Scott Weinstein (June 29, 2012) and errata sheet

Defendant/Counterclaim-Plaintiff Xylem Group, LLC ("XG") has proffered the expert opinion of Robert A. Hutchins, CPA, as to the "reasonable royalty" that Plaintiffs/Counterclaim-Defendants ITT Corporation and Xylem Inc. (collectively, "Xylem Inc.") should pay to XG as a remedy for their alleged infringement of XG's trademark XYLEM.  In an accompanying motion for summary judgment, we explain that a reasonable royalty is not a legally viable remedy on the undisputed facts here.  In the present motion, we show that, even if a reasonable royalty were a permissible remedy, Mr. Hutchins' opinion is inadmissible under Fed. R. Evid. 702.  That opinion does not "fit" the issues in dispute and will not assist the trier of fact.  In addition, the opinion is not based on reliable or relevant data and is not the product of a reliable method.  The opinion is speculative and is ultimately based on nothing more than Mr. Hutchins' unexplained – and unexplainable – assertions.

This motion is supported by, among other evidence, the Declaration of Robert N. Yerman, CPA (Ex. 1).  On the assumption that XG will oppose this motion, Xylem Inc. respectfully requests that the Court hold an evidentiary hearing to assist in the resolution of disputed issues of fact.  *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).

# FACTUAL BACKGROUND

## A.      Origins of this Dispute

ITT is an industrial conglomerate.  In January 2011, its board of directors approved a plan to spin off its water and wastewater technology business ("ITT Water Business") as an independent, publicly-traded company.  On July 14, 2011, ITT publicly announced that the new name of the ITT Water Business was "Xylem Inc."  Complaint (Oct. 26, 2001, Dkt. 1) ¶ 12; Ex. 2.  The spin-off was completed on October 31, 2011.

Six days after the July 14 announcement, XG's counsel sent a letter to ITT. Ex. 3.  The letter observed that ITT "is using our client's mark 'XYLEM' for its water treatment business," and charged that ITT thereby was at that time infringing XG's registered trademark for bathroom furniture and fixtures.  XG demanded "that ITT immediately stop using the mark 'XYLEM' in connection with any type of publication . . . or any goods related to the water treatment business."  In October 2011, Xylem Inc. filed this action seeking a declaratory judgment of non-infringement.  XG thereafter asserted counterclaims for infringement.

## B.      Hutchins' Reasonable Royalty Analysis

XG has proffered Mr. Hutchins as an expert on monetary remedies.  He submitted an expert report, Ex. 4, and has been deposed, Ex. 5.  A portion of his

2

report relates to the computation of Xylem Inc.'s U.S. revenues and profits.  Ex. 4 at 13-14.  Xylem Inc. does not seek to exclude his testimony on that subject at this point.  The bulk of the report relates to Hutchins' "'Reasonable Royalty' Analysis." *Id.* at 14-34.  This motion relates to the opinions in that portion of the report.

Hutchins notes that XG has never licensed its XYLEM mark to anyone and, in fact, has a policy of ***not*** licensing the mark.  *Id.* at 26.  Nevertheless, he bases his analysis on the construct of a "hypothetical negotiation" occurring between the parties before the infringement began.  The reasonable royalty is the amount that Xylem Inc. supposedly would have agreed to pay XG for use of the mark XYLEM as a result of that negotiation, based on the assumption that, without a license, any use of the mark by Xylem Inc. would infringe XG's rights.  *Id.* at 14-15.

As to the timing of the hypothetical negotiation, Hutchins says it is "reasonable . . . to assume" the negotiation would have occurred in late October 2011, immediately before ITT completed the spin-off of the ITT Water Business as Xylem Inc.  *Id.* at 15; Ex. 5 at 87-88.  As for the nature of the license that Hutchins purports to be valuing, he says the outcome of the hypothetical negotiation would have been that XG either conveyed the XYLEM mark to Xylem Inc. outright or (what is economically the same thing) gave Xylem Inc. a perpetual exclusive license, with XG agreeing in either case to abandon the name and adopt a new

3

name.  Ex. 4 at 25, 34; Ex. 5 at 135-36, 184.  The transaction would have entailed a

"full transfer of the economic value of the mark to Xylem Inc." *Id.* at 184.

Hutchins begins his analysis by addressing what he calls the "Market

Approach" to valuation, which is "based upon comparable sales or licensing

transactions."  Ex. 4 at 16.  He quickly admits that he was "not able to identify any

comparable transactions." *Id.*  But he then goes on to consider three transactions in

2010 in which the ITT Water Business acquired companies, including their entire

trademark portfolios.  In connection with each transaction, ITT assigned a value to

the trademark portfolio involved (ranging from $42 million to $49 million). *Id.* at

17.  Using those values, Hutchins derives the "implied royalty rates" that those val-

ues represent, expressed as a percentage of expected revenues for each company

acquired. *Id.* at 18-20.  Those rates range from 5.105% to 0.628%. *Id.* at 20.

Having done all this, Hutchins readily concedes that the three trademark

acquisition transactions are ***not*** comparable to the hypothetical negotiation over

XG's mark that he seeks to simulate.  Ex. 5 at 111.  Those deals involved multiple

marks (dozens in some cases) rather than just one; the companies involved were

large, and their marks (some of which dated back decades) were well-known in

their respective markets; and ITT received outright ownership of the marks, not

4

just a license.  Ex. 4 at 20; Ex. 5 at 116, 123.  Yet, as explained below, the royalty rates that Hutchins derived from those deals play a critical role in his opinion.

Next, employing what he calls the "Income Approach," Hutchins calculates that the values assigned to the trademark portfolios acquired in the three deals imply that those trademarks can be expected to account for 2.7% of Xylem Inc.'s total future income.  Ex. 4 at 22.  He acknowledges that this figure does not "directly" bear on the value of the XYLEM mark, and that it merely acts as a "reasonableness check" on his opinion – any royalty rate pertaining to XYLEM should represent "significantly less" than 2.7% of Xylem Inc.'s expected income.  Ex. 5 at 138.

Hutchins then presents a lengthy discussion of the "*Georgia-Pacific* factors." Under the federal patent statute, a patent owner upon proving infringement is entitled to damages of not less than "a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  In *Georgia-Pacific Corp. v United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), the court set forth a list of fifteen factors relevant to the determination of a reasonable royalty under that provision.  Those factors have been widely applied in patent cases, and, although the Lanham Act says nothing about reasonable royalty as a remedy, a small number of courts have referred to them in trademark cases.  In his report, Hutchins marches through the factors and opines as to whether each one tends to increase, decrease,

or have no effect on the hypothetically negotiated royalty rate.  Ex. 4 at 22-32.  The *Georgia-Pacific* factors are not themselves the source of any data about appropriate royalty rates.  Rather, Hutchins obtains a range of plausible royalty rates from other sources (explained below) and then uses the *Georgia-Pacific* factors to determine where within that range the appropriate royalty should fall.  Ex. 5 at 172.

This brings us to Hutchins' "Royalty Rate Conclusion." This part of his report, which covers less than two pages, Ex. 4 at 32-34, "reconcil[es]" the information compiled in the rest of the report.  Ex. 5 at 127. 141.

First, he derives what he deems a "reasonable royalty range."  For the top end of his range, he notes that in the three 2010 transactions in which the ITT Water Business acquired trademark portfolios, the minimum "implied" royalty rates ranged between 0.63% and 1.5% of revenue.  "In my opinion, a rate slightly below 0.63 percent serves as a conservative approximation of the high end of the reasonable royalty range.  As such, I will set the maximum rate for the hypothetical negotiations at 0.60 percent."  Ex. 4 at 33.  That is the entirety of the explanation in his report as to why he sets 0.60% as the top end of the range.

As for the bottom end of his range, Hutchins states:

In my opinion, the value of the '362 Trademark to Xylem Inc. should . . . exceed the $15 million Xylem Inc. spent on rebranding and marketing between Q3 2011 and Q1 2012.  [¶]  Based on this framework, I prepared a calculation using the Relief from Royalty Approach to arrive at [the] mini-

6

> mum reasonable rate that still resulted in an average value that was reason-
> ably higher than the $15 million Xylem Inc. has already invested in rolling
> out the name. The details of my analysis are contained in Exhibits 7.1 to
> 7.8. In my opinion, the minimum royalty rate used in connection with the
> hypothetical negotiation would have been 0.20 percent, which results in an
> average total value of $27.9 million.

*Id.* at 33. Hutchins does not explain why the rate – 0.20% – that yields a value of
$27.9 million should be the minimum rate. His Exhibits 7.1 to 7.8 certainly do not
provide an answer. The calculations there ***assume*** a royalty rate of 0.20%. The
report does not explain why either 0.20% or $27.9 million are appropriate figures.

Having come up with the high and low ends of his royalty range, Hutchins
deploys his analysis of the *Georgia-Pacific* factors to determine where within that
range the royalty for the XYLEM mark should be set. "Overall, in my opinion, my
analysis of the *Georgia-Pacific* factors would suggest a royalty rate in the higher
end of the above ranges. [¶] . . . . [I]n my opinion, the party's [sic] would have
concluded that a royalty rate of 0.45 percent was reasonable." Ex. 4 at 34. He
concludes that, applying the 0.45% rate to Xylem Inc.'s expected U.S. revenue
over the (perpetual) life of the mark, the present value of the license is $45 million.
*Id.* Applying that rate to Xylem Inc.'s U.S. revenue just for the period November
2011 through June 2012, yields a royalty obligation of $4.24 million. *Id.* at 2.[1]

---

[1]    XG has trademark rights only in the U.S. and its territories. Over 60% of
Xylem Inc.'s revenue comes from outside the U.S. Hutchins acknowledges that

## ARGUMENT

Rule 702 and the holding of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which the Rule largely codifies, require the proponent of expert opinion to show that (1) the opinion will assist the trier of fact to determine a fact in issue, and (2) the expert's data and methodology are reliable and reliably applied. Fed. R. Evid. 702; *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004); *Rosen v. Protective Life Ins. Co.*, 817 F. Supp. 2d 1357, 1384 (N.D. Ga. 2011). The first showing, often termed the requirement of "fit," demands that the expert opinion be both legally and factually relevant to an issue in dispute. "Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation and citation omitted). Similarly, an opinion not "based on sufficient facts and data" does not assist the trier of fact. Fed. R. Evid. 702(b). To be reliable, an expert opinion must be based on specialized *knowledge* and not on the expert's belief or speculation, and inferences must be derived using valid methods. *Daubert*, 590 U.S. at 592-93. Those methods must be articulable; an opinion based on the expert's unexplained "judgment" is not reliable. A court should exclude "opinion evidence that is connected to

---

any royalty in this case would apply only to Xylem Inc.'s U.S. revenue. In arriving at the values noted in the text, Hutchins assumes that ***all*** of the company's U.S. revenue is from "infringing sales" and is subject to the royalty obligation.

existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) .

We focus on four fatal flaws in Hutchins' opinion.  (1) The hypothetical negotiation he conjures rests on a legally impermissible assumption about the rights conveyed.  (2) His assumption about the timing of the negotiation is contrary to XG's own judicial admissions that define the issues in this case.  Thus, his opinion, even if it were the product of a reliable analysis, has nothing to do with any real issue in this case.  And in fact his analysis is woefully unreliable.  (3) He did not obtain critical information about the asset he purports to be valuing – XG's XYLEM mark.  (4) The "royalty range" he derives, which is the heart of his analysis, is tied to the data he cites by nothing more than his *ipse dixit*.  Those data provide no reliable basis for his royalty range.  As a result, his application of the *Georgia-Pacific* factors to arrive at a rate within that range is a meaningless exercise – a choice from within a range of unreliable numbers is itself unreliable.

## I.  Hutchins' Opinion Does Not Fit this Case Because the Law Does Not Permit a "Reasonable Royalty" Premised on the Grant of Perpetual Rights to the Alleged Infringer and the Trademark Owner's Surrender of the Mark.

As noted, Hutchins' opinion rests on the notion that, in the hypothetical negotiation, Xylem Inc. would receive the full economic value of XG's XYLEM mark in perpetuity, and XG would agree to surrender use of the mark forever and

adopt a different mark.  In other words, Xylem Inc. would in effect buy XG's

trademark.  That is the consideration to which he seeks to assign a value.

The problem – a dispositive one – is that the law does not allow a court-

ordered royalty to be premised on the grant of perpetual rights to the alleged

infringer.  "The imposition of a compulsory license, permitting the infringer to

continue by paying a court-determined royalty to the trademark owner is not a

proper remedy."  5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR

COMPETITION ("McCarthy") § 30:85 (4th ed. 2012).  The Third Circuit addressed

this issue in *A&H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d

Cir. 1999) (*en banc*).  The trial court had permitted the defendant to continue using

the infringing mark (with a disclaimer), but required it to pay the plaintiff a royalty

on both past and future sales.  *Id*. at 208.  The Third Circuit held that there was no

legal basis for an award of ***future*** royalties:  "A royalty is a measure of damages

for past infringement, often used in patent cases and in the context of trade secrets,

but its use in trademark has been atypical.  Neither party has proffered, nor have

we found, any case in which a court both ordered a royalty award and continued to

permit the infringer to use a disputed trademark, which is the effect of the district

court order here."  *Id.*  In the thirteen years since *A&H* was decided, no court has

endorsed a damages theory premised on a royalty for perpetual use of a trademark.

The royalty that Hutchins comes up with is even more alien to the law than the one in *A&H*.  The royalty in *A&H* at least assumed that the plaintiff trademark owner would continue to use its mark concurrently with the defendant.  By contrast, Hutchins posits a licensing negotiation in which the trademark owner, XG, not only confers a license on Xylem Inc. but also gives up its mark and adopts a new one.  He recognizes that surrender of the mark would impose costs on XG (which would need to develop a new mark) and would therefore cause it to demand a higher royalty rate than it otherwise would.  Ex. 4 at 25-26; Ex. 5 at 187-88.  But a court has no authority to order a trademark owner to surrender its mark, or to order the defendant to pay the owner to do so.  A hypothetical licensing negotiation premised on the defendant's paying not only for a license to use the mark but also for the plaintiff to find another mark has no more legal basis than a hypothetical negotiation in which the defendant has to pay the plaintiff not only for a license but also for the plaintiff to surrender its office building and get a new one.

It is no answer for Hutchins to say that he has calculated a royalty ***rate***, and that this rate can be applied just to Xylem Inc.'s U.S. revenues before a finding of infringement to arrive at a purely retrospective remedy.  The difficulty is that the legally impermissible features are "baked into" the rate because of Hutchins' assumptions about the consideration exchanged in his hypothetical negotiation.

Ex. 4 at 25-26.  That consideration involves not only (a) Xylem Inc. effectively getting perpetual ownership of the mark but also (b) XG abandoning the mark in perpetuity and adopting a new mark.  Some portion of the royalty rate – Hutchins cannot say how much – is attributable to the second part of this package.  Even if limiting application of the rate to Xylem Inc.'s pre-trial revenues would arguably change the effective license from "perpetual" to "finite," it would not change the fact that the rate compensates XG for its ***perpetual*** surrender of the mark.

To put the matter in more concrete terms:  Let us assume that after trial the factfinder were to hold Xylem Inc. liable for infringement and award XG a royalty calculated as 0.45% of Xylem Inc.'s U.S. revenue up to that point.  XG would leave the courthouse still owning its XYLEM mark and possessing the unfettered right to use it in perpetuity.  ***Yet the rate that was the basis for its royalty award was calculated on the assumption that XG would surrender the mark and adopt a new one.***  (And, of course, XG also would have had use of the mark during the past period covered by the royalty award, contrary to Hutchins' premise.)  Hutchins' rate would necessarily overcompensate XG in some unknowable amount.

In short, the royalty that Hutchins derives does not fit any issue in this case.  The Court cannot make Xylem Inc., in effect, buy XG's trademark outright, but

that is the only transaction Hutchins has valued.  His opinion is unhelpful to the trier of fact in deciding any real remedy issue and therefore should be excluded.

## II.   Hutchins' Assumption About When the Hypothetical Negotiation Would Have Taken Place Is Contrary to XG's Binding Admissions.

An expert opinion that rests on a demonstrably incorrect factual premise cannot possibly assist the trier of fact and should be excluded.  *E.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996); *Go Medical Indus. Pty., Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1317 (N.D. Ga. 2003) (excluding expert damages opinion based on hypothetical market because "at least one of [the expert's] key assumptions . . . is simply wrong"), *aff'd*, 471 F.3d 1264 (Fed. Cir. 2006).  Hutchins' opinion rests on a clearly erroneous assumption about when the hypothetical negotiation would take place.

Hutchins' opinion depends crucially on the assumption that the hypothetical negotiation between the parties would have occurred in late October 2011 (just before Xylem Inc. began operating as a freestanding company) rather than on or about July 14, 2011 (when XYLEM was unveiled as the name of the company). Ex. 5 at 87-88.  That assumption is critical, as he recognizes, because by late October, more than three months after the name announcement, Xylem Inc. had spent millions of dollars on "rebranding" costs to effect and publicize the name change (on the way to spending $15 million by the end of the first quarter of 2012).

Ex. 4 at 15-16, 33.  Those rebranding costs are a key driver of Hutchins' opinion because his "royalty range" is based on his view that the bottom number in the range must be "reasonably higher" than the rebranding costs through early 2012. *Id.* at 33.  He admits that it would not be appropriate to consider all of those costs if the hypothetical negotiation were deemed to occur in July 2011.  Ex. 5 at 103.

In patent cases, it is settled that the date of the hypothetical negotiation for purposes of determining a reasonable royalty is the date the alleged infringement began.  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993).  The point has never been contested and decided in any trademark case, but we assume (as Hutchins does) that the rule in trademark cases is the same as in patent cases. When the alleged infringement began is a question of law.  *Id.* at 869.

Here, there is no question as to when XG contends Xylem Inc. began the alleged infringement.  The Complaint narrates the relevant facts in Paragraph 15:

> On July 20, 2011, following ITT's announcement that Xylem Inc. would own and operate the water technology business after its spin-off from ITT, counsel for ***Defendant sent a letter to ITT asserting that Plaintiffs' use of the mark XYLEM infringes Defendant's registered mark*** because such use ***is likely to cause confusion*** or mistake or to deceive consumers into believing that Defendant is associated with Plaintiffs.  The letter demanded that Plaintiffs ***immediately stop using the mark XYLEM*** in connection with publications and goods related to "water treatment" worldwide.

Complaint ¶ 15 (emphasis added).  Thus, as the Complaint characterized XG's grievance, XG asserted in its July 20 letter that Xylem Inc.'s use of the mark ***as of***

14

*that time* "infringes" – present tense – XG's mark, and demanded that Xylem Inc. "immediately stop" using that name.  In response, ***XG admitted Paragraph 15 without qualification***.  Answer (Dec. 12, 2011, Dkt. 13) ¶ 15.  Moreover, in its Counterclaims, XG alleges that public confusion was caused by Xylem Inc.'s "announced use" of XYLEM and not just its "actual use":   "The announced use of the Xylem name for the spinoff Xylem Inc., and the actual use of the XYLEM name and trademark, has caused actual confusion among those in the trade." Amended Counterclaims (Sept. 25, 2012, Dkt. 67) ¶ 58.  These are binding judicial admissions by XG that the alleged infringement of which it complains began with the name announcement in July 2011, not with the completion of the spin-off in October.  "[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them."  *Cooper v. Meridian Yachts, Ltd.*, 575 11th Cir. 1151, 1178 (11th Cir. 2009) (internal quotation and citation omitted).  Expert opinion must fit the issues in the case, which are defined by the pleadings.  Here, XG's pleadings conclusively declare that this case is about alleged infringement that began in July 2011.

Hutchins' reliance on the wrong date for his hypothetical negotiation is a major and incurable defect.  *See, e.g.*, *De Lage Landen Op. Servs., LLC v. Third Pillar Sys., LLC*, No. 09-2439, 2011 WL 1771044 (E.D. Pa. May 9, 2011) (exclud-

15

ing expert opinion on reasonable royalty resting on factually unsupported assumption about date of alleged trade secret misappropriation).  He recognizes that the circumstances facing the parties were "materially different" in mid-July 2011 than in late October (because as of mid-July Xylem Inc. had not yet made significant expenditures to effect and promote the name change to XYLEM), Ex. 5 at 166; that, although he has not done the analysis, those differences would undoubtedly cause a royalty rate premised on a July negotiation date to be lower than 0.45%, *id.* at 166, 228-29.  Hutchins has "put the rabbit in the hat" by placing the hypothetical negotiation at a date when Xylem Inc. had already spent substantial sums in reliance on its July decision to adopt XYLEM as its name – sums that he says go to form the low end of his royalty range.  Because his opinion does not fit the issues in this case, defined by XG's binding admissions, his opinion should be excluded.

## III.   Hutchins' Opinion Is Unreliable Because He Has Failed to Obtain Basic Information About the Asset He Is Valuing – XG's Mark.

Hutchins acknowledges that his determination of a reasonable royalty  is an attempt to place a value on an asset, namely, XG's XYLEM mark.  Ex. 5 at 82.  Yet, in forming his opinions, he did not bother to obtain the most basic information bearing on the value of that mark.

He did not make any inquiry into how "strong" XG's mark is – how well known the mark is in its market as a designation of origin.  *Id.* at 84.  Nor did he

16

investigate how well known XG's mark was or is in the (different) markets in which the ITT Water Business operated and Xylem Inc. now operates.  *Id.* at 124. He says he reviewed XG's financial statements and saw some reference to XG's marketing and PR expenditures, but he could not recall those amounts at his deposition, *id.* at 82, and understandably so, since those expenditures play no role in his analysis.  As Mr. Yerman explains, "Marketplace strength is not simply a factor in the value of a trademark – it is the essence of such value."  Ex. 1 ¶ 7.  One cannot reliably place a value on a mark without knowing and considering the facts bearing on its recognition and strength.  *Id.* ¶¶ 8-9.

Most egregiously, Hutchins made no effort to determine the value of the XYLEM mark *in XG's hands*.  It is an economic truism, as he realizes, that the value of any single asset owned by a firm cannot exceed the value of the firm as a whole.  Ex. 5 at 129-30.  That necessarily means that the value of XG's trademark cannot exceed the overall value of XG as a company, *id.* at 130, and so the value of XG as an entity forms an upper bound on any possible value attributable to the trademark.  But Hutchins did not attempt to investigate XG's value.  *Id.* at 130-31. He brushes aside that omission by saying "I don't think it's . . . that relevant to the hypothetical negotiation between the two parties in this instance."  *Id.* at 131.

17

If he had bothered to inquire, he would have found that XG's total company value in 2011 was only in the range of approximately $600,000 to $3.2 million. Ex. 1 ¶ 13.  That range is corroborated by the fact that in 2009 or 2010, two outside investors purchased a one-third equity interest in XG for a total of $1 million.  Ex. 6 at 169-73 (& errata sheet).  That implied a total value for the company of about $3.0 million.  Ex. 1 ¶ 14.  At the time of the hypothetical negotiation (whether in July or October 2011), Xylem Inc. ***could have purchased XG outright*** for no more than about $5 million (the value of the company plus a control premium), thereby obtaining full ownership of XG's XYLEM mark along with all of its other assets. *Id.* ¶ 13.  Oblivious to these facts, Hutchins opines that the parties in their hypothetical negotiation would have valued perpetual exclusive rights to the mark at $45 million – 14 times more than XG's total value – and that a license for even just ten months would have been valued at substantially more than XG's value.

Hutchins' failure to consider, let alone adequately explain, the facts that expose this economically absurd result "renders his entire analysis unreliable" and "completely out of the realm of possibility."  *Id.* ¶ 15.  "An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported."  *Nebraska Plastics, Inc. v. Holland Colors Am., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005); *accord Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1254 (11th Cir. 2010).

**IV.    Hutchins' Derivation of His "Royalty Range" Is Not Based on Relevant Data or the Application of a Reliable Methodology.**

As explained above, Hutchins' derivation of his "royalty range" is the core of his analysis.  That range provides the point of departure for his application of the *Georgia-Pacific* factors to arrive at a specific royalty rate within that range.  Both ends of his range are based on irrelevant information and unreliable methodology.

**A.    Derivation of the Top Value – 0.60%**

In his report, Hutchins devotes only one conclusory sentence to how he selects the top end of his royalty range.  Ex. 4 at 33.  In his deposition, he uses more words but is no less conclusory.  *See* Ex. 5 at 212-17.  He testifies that he chose a rate of 0.60% because it was "slightly below" the lowest of the "implied" royalty rates he derived from the ITT Water Business's 2010 acquisitions of three trademark portfolios.  *Id.* at 212.  As noted, he readily concedes that the marks involved in those deals were not comparable to XG's XYLEM mark for many reasons.  Ex. 4 at 20; Ex. 5 at 111, 116, 123.  Then how does he justify relying on data drawn from those transactions?  "[I]t's – a data point that I have available as an indication of value and prices that ITT and [Xylem Inc.] were placing and paying for trademarks."  *Id.* at 213-14.  When confronted with the fact that those other deals each involved multiple strong trademarks, quite unlike a hypothetical negotiation over XYLEM, he deflects the issue by asserting that he accounted for

19

those differences by "conservative[ly]" selecting a rate just below the lowest of the

implied royalty rates from those deals.  *Id.* at 212.

Hutchins' opinion on this score is hopelessly unreliable, as Mr. Yerman

spells out.  Ex. 1 ¶ 17-24.  With respect to the determination of reasonable royalties

in the patent field, which Hutchins purports to be emulating here, Ex. 4 at 14-15,

the Federal Circuit has made clear that an expert opinion based on amounts paid

for **other** patents does not pass muster under *Daubert* unless those other patents are

closely comparable to the patent-in-suit.  "[T]here must be a basis in fact to associ-

ate the royalty rates used in prior licenses to the particular hypothetical negotiation

at issue in the case."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317

(Fed. Cir. 2011).  The proponent of the reasonable royalty theory "ha[s] the burden

to prove that the [prior] licenses were sufficiently comparable."  *Lucent Tech., Inc.

v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct.

3324 (2010).  The same reasoning applies here.  Hutchins admits that the

trademark portfolios involved in the 2010 deals are **not** comparable to XYLEM.

Ex. 5 at 111.  The only connection he can point to between those deals and the

hypothetical negotiation over XYLEM is that they all involve the ITT Water

Business, which is no relevant connection at all.  To say that one set of transactions

involving a particular company *ipso facto* provides a value benchmark for others is

an absurd notion.  Ex. 1 ¶ 22; *See Lucent*, 580 F.3d at 1328 (rejecting expert's royalty opinion that relied on defendants' prior licenses for "PC-related patents").

Hutchins' attempt to rationalize his use of the data from the 2010 deals confirms the unreliability of his reasoning.  He maintains that any problems caused by the lack of comparability between the 2010 transactions and the hypothetical negotiation over XYLEM are solved by his using, as the top number of his royalty range, a number slightly lower than the lowest of the implied royalty rates from the 2010 deals.  Ex. 5 at 212.  But that is like estimating the weight of a fourth grader by weighing a group of NFL linemen; the complete lack of comparability between the subject and the reference group is scarcely resolved by selecting a value a bit below the weight of the lightest lineman.  The low end of a range of irrelevant values is still an irrelevant value.  Ex. 1 ¶ 23; *Joiner*, 522 U.S. 146 (expert opinion is inadmissible when the "analytical gap" between data and opinion is too great).

Even if Hutchins would be justified in believing that a reasonable royalty for XYLEM could be ***no higher than*** the lowest royalty implied by the 2010 deals, he offers no coherent explanation of why the top end of his range for XYLEM should be ***just below*** the range derived from the 2010 deals.  Ex. 1 ¶ 24.  When asked why he arrives at 0.60% rather than, say, 0.50% or some other number less than the 0.63% minimum from the 2010 transactions, his response is:  "[T]he reason I

21

elected to use the 0.6 is based on the implied royalty rate analysis I conducted and the fact that those were the minimum values that -- that were derived from that calculation.  So I wanted to try and keep it close to – as close to that range of data points as I had available to me." Ex. 5 at 217; *see also id.* at 216.  This is perfectly circular reasoning – he kept his top number close to 0.63% because he wanted to keep his top number close to 0.63% – and a textbook example of inadmissible *ipse dixit*.  *See Joiner*, 522 U.S. at 146.

### B.     Derivation of the Bottom Value – 0.20%

As explained *supra* at 6-7, Hutchins obtains the low end of his royalty range by selecting the rate that, when applied to Xylem Inc.'s expected U.S. revenue stream over the life of the XYLEM mark, yields a total value of $27.9 million. That rate turns out to be 0.20%.  He selects $27.9 million because it is "reasonably higher than the $15 million Xylem Inc. has already invested in rolling out the name." Ex. 4 at 33.  He views Xylem Inc.'s expenditures on the name as "a floor on market value" for the mark, Ex. 5 at 160, and "assum[es]" that Xylem Inc. will continue to invest in the mark beyond the $15 million it spent through early 2012, *id.* at 156.  This derivation of the 0.20% figure is fatally unreliable.

First, Hutchins' opinion that Xylem Inc.'s expenditures on the XYLEM mark represent the floor on the mark's value has no reliable basis.  Ex. 1 ¶ 27.  He

surmises that a company will not spend money on an asset unless it expects to at least recoup its investment through future profits, *ergo*, the XYLEM mark must be worth at least what Xylem Inc. has spent and will spend to effect and promote its name change.  Ex. 5 at 160-61.  This reasoning "has no reliable basis in intellectual property valuation theory or practice."  Ex. 1 ¶ 27.  Hutchins admits that Xylem Inc.'s name change was not an effort to boost profits but a concession to reality; the company had no choice but to change its name in connection with the spin-off.  Ex. 5 at 147.  In any event, a random glance at the *Wall Street Journal* shows that managerial hopes do not reliably translate into realized value.  If Hutchins were correct, then there would never be such a thing as a losing investment.  For this reason, professionals who value intellectual property eschew the "cost approach" to valuation except in circumstances not present here.  Ex. 1 ¶ 27.  The notion that promotional expenditures will predictably be recouped through future profits has also been rejected in court.  *Gillette Co. v. Wilkinson Sword, Inc.*, No. 89 CV 3586 (KMW), 1992 WL 30938 at *5 (S.D.N.Y. Feb. 3, 1992) (there is "no basis for concluding" that "every time a defendant spends x amount on an advertising campaign, it will enjoy profits of at least x amount on the resulting sales").

Second, Hutchins does not say in his report, and is unable to explain in his deposition, how he comes up with the value of $27.9 million, other than to say it is

an amount greater than $15 million.  *See* Ex. 5 at 141-65.  When pressed as to how

he gets the $27.9 million figure and the 0.20% royalty rate that produces it, he

again resorts to *ipse dixit*:

> [I]t's my opinion that the minimum value associated with the brand should
> exceed the $15 million that was incurred in rebranding cost up through the
> second quarter of 2012.
> . . . .
>
> Q   Why do you think the -- the minimum royalty rate should generate a
> value higher than the costs incurred to date in rebranding?  [Objection
> omitted]
>
> A   . . . [T]he 15 million only represents the investment to date in the brand,
> so it's the costs incurred to date.  It doesn't represent what the value of the
> brand is going to be from additional investments going forward, and the –
> the expected revenue, projected revenues of Xylem Inc. moving forward as
> well, in addition to the other factors I discussed earlier.

*Id.* at 146-48.  At this point Hutchins admits he has no idea what Xylem Inc.'s

"additional investments" in the brand are going to be.  *Id.* at 150.  The examination

resumes:

> Q   . . . [W]hy did you pick a royalty rate that got you to 27.9 instead of a
> royalty rate that got you to 23 or a royalty rate that got you to 17 or a royalty
> rate that got you to 280?  [Objection omitted]
>
> A   . . . [I]n my opinion, that would have been a reasonable starting point for
> the parties, the 0.2 percent, based on the rebranding cost and based on what
> the -- the value that a 0.2 percent royalty rate converts to.
>
> Q   Forgive me, but it sounds like you're saying I picked 0.2 percent because
> 0.2 percent seemed reasonable.  I want to know the basis as an expert for

your reasoning to arrive at 0.2 percent as opposed to a lower figure or a higher figure.

A   Well, the -- the basis for that was because, in my opinion, the minimum royalty rate should be set at a value that is in excess of the rebranding cost.

*Id.* at 153-54.  It would be difficult to imagine a clearer example of an expert just saying in effect, "Trust me; I'm an expert."  *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1347 (N.D. Ga. 2003) ("*Daubert* case law has indicated that such an assertion, which seems based more on intuition than on scientific reasoning, is insufficient.")

\*   \*   \*

Because Hutchins has no reliable basis for either the high end or the low end of his range of royalty rates, his subsequent application of the *Georgia-Pacific* factors to select 0.45% as the "correct" rate for this case is necessarily unreliable as well.  Ex. 1 ¶ 29.  When applied to reliable data inputs, consideration of those factors can be a reliable methodology for determining a reasonable royalty, but, as the saying goes:  Garbage in, garbage out.  Arithmetic is a reliable methodology too, but if one is making calculations about the real world and uses numbers without a reliable basis in reality, arithmetic will yield unreliable results.  So it is here.

## CONCLUSION

For the reasons stated, the Court should grant the Motion and exclude Robert Hutchins' opinions as to a reasonable royalty.

Respectfully submitted,
For ITT Corp. & Xylem Inc.,


/s/ Gregory S. Brow
Gregory S. Brow


Robert J. Shaughnessy (*pro hac vice*)           Gregory S. Brow (Bar No. 086422)
Emmet T. Flood (*pro hac vice*)                  E. Claire Carothers  (Bar No. 702045)
Sarah F. Teich (*pro hac vice*)                  McKENNA, LONG & ALDRIDGE LLP
WILLIAMS & CONNOLLY LLP                           303 Peachtree Street, N.E., Suite 5300
725 Twelfth St., N.W.                             Atlanta, Georgia 30308-3265
Washington, DC 20005                              (404) 527-4361 (phone)
202-434-5564 (phone)                              (404) 527-4198 (facsimile)
202-434-5029 (facsimile)                          gbrow@mckennalong.com
bshaughnessy@wc.com                               ccarothers@mckennalong.com
eflood@wc.com
steich@wc.com


Dated:       October 1, 2012


26

## <u>CERTIFICATE OF FONT</u>

This is to certify that the foregoing Memorandum in Support of Motion of Plaintiffs/Counterclaim-Defendants to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty was prepared using the font Times New Roman with a size of 14 points, and was double-spaced, in accordance with Local Rule 5.1(C).

<u>/s/ Gregory S. Brow</u>
Gregory S. Brow

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 1, 2012, a true and correct copy of the fore-going Memorandum in Support of Motion of Plaintiffs/Counterclaim-Defendants to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty and supporting exhibits were served upon the following counsel of record electronically and by first class mail:

**For Defendant/Counterclaim-Plaintiff Xylem Group, LLC:**

Stephen T. LaBriola, Esq.
Christina M. Baugh, Esq.
Fellows LaBriola LLP
Suite 2300, South Tower
Peachtree Center
225 Peachtree Street, N.E.
Atlanta, GA 30303-1731

Gerard F. Dunne, Esq.
Joseph A. Dunne, Esq.
Law Office of Gerard F. Dunne, P.C.
41 Union Square West
Suite 1125
New York, New York 10003

/s/ Gregory S. Brow
Gregory S. Brow

28