# Exhibit 1

**Memorandum in Support of Motion of Plaintiffs/
Counterclaim-Defendants to Exclude the Opinions of
Robert A. Hutchins, CPA, as to a Reasonable Royalty**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
Atlanta Division

| | |
|---|---|
| ITT CORPORATION and XYLEM INC., | ) |
| | ) *FILED UNDER SEAL* |
| *Plaintiffs/Counterclaim-Defendants,* | ) |
| | ) |
| v. | ) No. 1:11 Civ. 3669-WSD |
| | ) |
| XYLEM GROUP, LLC, | ) |
| | ) |
| *Defendant/Counterclaim-Plaintiff.* | ) |
| | ) |

DECLARATION OF ROBERT N. YERMAN, CPA, IN SUPPORT
OF PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF ROBERT
A. HUTCHINS, CPA, AS TO A "REASONABLE ROYALTY"

I, Robert N. Yerman, CPA, under penalty of perjury, declare as follows:

1.     I have been asked by counsel for Plaintiffs to provide this declaration in support of Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a "Reasonable Royalty." I have personal knowledge of the facts stated herein, and all opinions set forth herein are stated to a reasonable degree of professional certainty. I am competent to testify to the facts and opinions stated herein.

2.     I am a Managing Director in the Washington office of AlixPartners, LLP, a global business-advisory firm offering comprehensive services in enterprise

improvement, corporate turnaround and restructuring, financial advisory services, and information management services.   I am a senior financial executive with over 25 years of experience in domestic and international litigation and valuation, forensic investigations, financial consulting, and auditing and accounting.  I have extensive experience as a consultant and expert witness in intellectual property, contractual, securities and regulatory, and other matters, and as an audit partner for domestic and international entities.  I have testified as an expert witness in patent, trade secret, trademark, copyright, valuation, dealer termination, post-acquisition, regulatory, securities, and numerous other matters.  Additionally, I have lectured at university, bar and accounting seminars and at accounting and law firm presentations.

3.     I am a certified public accountant (CPA).  Previously, I was the Senior Managing Director in charge of the Washington office and National Director of the Intellectual Property practice of LECG, LLC, an international economics, accounting and finance advisory firm.   Before that, I headed up Coopers & Lybrand's Intellectual Property and General Litigation practice in the Mid-Atlantic Region and, prior to that, was a Partner in Charge and Senior Audit Partner and Associate National Director of the Communications and Retail and Distribution Industries for Deloitte & Touche.  I was a participant in the U.S. Presidential Executive

2

Exchange Program as the Special Executive Assistant to the Inspector General at the U.S. Department of Housing and Urban Development. A copy of my resume is attached to this declaration as Attachment A. A list of my testimony over the last four years is attached hereto as Attachment B.

4.     I have extensive experience in valuing patents, trademarks, and other intellectual property, both in litigation and outside of litigation. I am very familiar with the methods used by professionals in the field to value intellectual property.

5.     I have reviewed Mr. Hutchins' report in this case and his deposition taken on August 30, 2012. I have also reviewed the documents listed in Attachment C.

6.     In this declaration, I address two major areas of deficiency in Mr. Hutchins' analysis: (1) his failure to consider relevant facts bearing on the valuation of the XYLEM trademark owned by Xylem Group, LLC ("XG") at the time of a hypothetical negotiation between the parties in 2011; and (2) his derivation of a "reasonable royalty range" bracketed by the values 0.60% at the high end and 0.20% at the low end (in both cases with the values representing a percentage of Xylem Inc.'s allegedly infringing U.S. revenue).

3

## A.    Failure to Consider Facts Bearing on Value

7.     Mr. Hutchins' "reasonable royalty" analysis is, as he recognizes, an effort to assign a value to an asset, specifically, XG's XYLEM trademark (sometimes referred to as the '362 Trademark). A trademark derives its value through its owner's use and promotion of the mark that leads to marketplace recognition and acceptance of the mark – often referred to as "strength" – as a designation of origin for the owner's goods or services. Marketplace strength is not simply a factor in the value of a trademark – it is the essence of such value. Although there is not a quantitative relationship between advertising expenditures and the value of a trademark that is featured in such advertising, there certainly is a qualitative relationship; the greater the promotional support for a mark, the more likely the mark is to have substantial value.

8     When assessing the value of a trademark, I and other professionals in the field typically investigate the trademark owner's advertising and promotional efforts and the degree of marketplace recognition and acceptance of the mark. For instance, when ITT's outside accounting firms assessed the value of (among other assets) the trademark portfolios acquired by ITT in 2010 from YSI, Godwin Pumps, and Nova Analytics (transactions that Mr. Hutchins considers in his

4

report), the firms' reports indicate that they interviewed ITT management to ascertain the degree of recognition that the marks have in the marketplace.

9.   In his deposition, Mr. Hutchins testified that he did not make any inquiry into how strong XG's XYLEM mark is in XG's market. (Deposition at 84) He also did not investigate how well known XG's mark was in the markets served by the former ITT Water Business, now Xylem Inc. (Deposition at 124)   Although he says he saw some mention in XG's financial statements of its marketing and public relations spending, he does not refer to those expenditures in his report, and they seem to have played no role in his analysis. Without analyzing the strength of XG's mark in the relevant markets and the degree of effort the owner has devoted to promoting that mark, Mr. Hutchins lacked basic information that generally is important to a reliable trademark valuation opinion.

10.   Even more fundamental an omission is Mr. Hutchins' failure to consider the value of XG's XYLEM mark in the context of XG's overall business value. As he recognizes, the value of any single asset owned by a firm cannot exceed the value of the firm as a whole. (Deposition at 129-30) That means that the value of XG's trademark cannot exceed the overall value of XG as a company. In other words, the value of XG as an entity forms an upper limit on any possible value attributable to the trademark. However, Mr. Hutchins did not attempt to

5

investigate XG's value, claiming that he did not believe such an inquiry would be relevant. (Deposition at 130-31) This is a major lapse in valuation methodology.

11.     Information produced in discovery shows that in 2011, XG had total net revenues of approximately $7.7 million and a net loss of more than $200,000 (including a "net ordinary" loss of approximately $160,000). (Xylem Group 007954-956) For calendar year 2012, XG currently projects net revenues of approximately $8.2 million and net income of approximately $220,000. (Xylem Group 007933-941.)

12.     A firm's value is equal to the sum of the value of its monetary, tangible, and intangible assets. Thus, by deducting the value of the firm's monetary and tangible assets from the total enterprise value, one can determine the value of its total intangible assets. Put another way, a firm's intangible assets represent a portion of the firm's total value. In this matter, therefore, the value of the allegedly infringed '362 Trademark represented a portion of XG's value at the time of the hypothetical negotiation, in addition to its monetary, tangible, and other intangible assets. These other intangible assets that contribute to its value may include, among other things, trade secrets, patents, proprietary information, functional and aesthetic features of the products, designs, drawings, and other artistic works,

6

customer lists, customer relationships, pricing, convenience, and management and employee competencies.

13.    I have analyzed the XG financial records produced in discovery for purposes of estimating a range of values for the company.  Utilizing XG's current projected 2012 profits, relevant risk factors, and information from the deposition testimony of XG's CEO, I have determined that the total value of XG in 2011, utilizing the Income Approach ranges from approximately $600,000 to approximately $3.2 million.  See Attachment D, Attachment E.   At that valuation, an outside party could purchase the entire company for not more than $3.2 million plus a control premium (which premium I estimate would be no more than about $1.8 million), or no more than about $5.0 million.

14.    In 2009 or 2010, two outside investors, Rick Snyder and Randy Metcalf, purchased a portion of XG's equity.  Specifically, according to XG's CEO, Mr. Snyder and Mr. Metcalf collectively purchased 33% of XG for $1 million. (Deposition Testimony of Hal Weinstein, 6/29/12, pp. 169-173, and errata sheet) That transaction implies a total firm value of approximately $3.0 million at the time of the purchase.  The value implied by this transaction corroborates the range of values discussed in the preceding paragraph.

15.    The enterprise values cited in the preceding two paragraphs represent the value of the entire company.  Clearly, there are other value drivers creating a significant portion of XG's value besides the '362 Trademark.  Therefore, to conclude, as Mr. Hutchins does, that Xylem Inc., or any other third party, would have paid $45 million for the full economic value of XG's XYLEM mark, or over $4 million for just ten months' use of the mark, is not only incorrect, but completely out of the realm of possibility.  In a hypothetical transaction, a party wishing to obtain the XYLEM mark could have purchased the entire company, including the trademark, outright for no more than about $5.0 million.  Mr. Hutchins' failure to consider the facts that entail these results renders his entire analysis unreliable.

**B.    Derivation of the "Reasonable Royalty Range"**

16.    Mr. Hutchins derives the top and bottom values of his reasonable royalty range through separate routes, neither one of which is methodologically sound or reliable.  I will address them separately.

**1.    Derivation of the Top Value – 0.60%**

17.    Mr. Hutchins identified three acquisitions by the ITT Water Business that "required the sellers' trademarks to be valued." (Report at 17)  Specifically, he reviewed ITT's 2010 purchases of Nova Analytics, Godwin Pumps, and YSI, each of which had developed multiple product brands over a period of time.  Based on

8

the values ITT assigned to all the trademarks acquired, he "attempted to 'reverse engineer' what the potential royalty rate could be for these three acquisitions based upon the disclosed value conclusions and by employing the so-called Relief from Royalty Approach." (Report at 19)  His conclusion on the value of the trademarks is that "the minimum estimated royalty rates ranged from 0.63 percent to 1.50 percent, while the maximum ranged from 2.05 percent to 5.11 percent." (Report at 20)

18.    Having done this, in his deposition Mr. Hutchins acknowledges that the trademarks that ITT acquired in the three transactions noted above were not and are not comparable to XG's XYLEM trademark for valuation purposes. (Deposition at 111)  That is a correct statement and, indeed, an understatement. The trademarks involved in the three acquisitions are not remotely comparable to XYLEM, and those transactions have no apparent relevance to any valuation of XYLEM.  The three acquisitions involved not just a single trademark but portfolios consisting of numerous trademarks that were developed over many years and were primarily product brands well known in their respective markets.  Those portfolios are not comparable to the XYLEM mark as used by either XG (a trade name and trademark for a small, seven-year-old business with minuscule advertising and promotional expenditures) or by Xylem Inc. (a new corporate name of lesser marketplace importance and value than product brands).

9

19.     With regard to the maximum rate in his royalty range, Mr. Hutchins
states that, in his opinion, "a rate slightly below 0.63 percent" – the lowest of the
royalty rates he "reverse engineered" from the three transactions – "serves as [a]
conservative approximation of the high end of the reasonable royalty range."
(Report at 33)

20.     Mr. Hutchins' use of data drawn from clearly non-comparable transac-
tions to establish the top end of his royalty range is inconsistent with proper valua-
tion methodology and renders his derivation of that value inherently unreliable.

21.     If one is going to rely on marketplace transactions as a benchmark for
value, those other transactions must involve a subject matter that is comparable to
the one at issue.  Using the trademark valuations derived from the Nova Analytics,
Godwin Pumps, and YSI acquisitions as benchmarks for the value of the XYLEM
mark makes no more sense (and yields a no more reliable result) than using the
COCA-COLA trademark as a benchmark.

22.     The only connection Mr. Hutchins can point to between the three
acquisitions and the hypothetical negotiation over XYLEM is that they all involve
the ITT Water Business, which is no relevant connection at all.  Companies,
especially firms of ITT's size, engage in many different intellectual property trans-
actions involving assets of differing levels of importance for differing purposes.

10

There is no basis for suggesting that one set of trademark transactions involving a particular company necessarily provides a value benchmark for others involving the same company.

23. By no means does Mr. Hutchins eliminate the problems inherent in using non-comparable transactions by selecting, as the top of his royalty range, a value just below the lowest of the royalty rates he derived from the three ITT acquisitions. The low end of a range of economically irrelevant values is still an irrelevant value.

24. Even if Mr. Hutchins would be justified in believing that a reasonable royalty for XYLEM could not possibly be higher than the lowest royalty implied by the three transactions (a safe assumption, for the reasons noted above), he does not and cannot offer any reasoned explanation of why the top end of his range for XYLEM should be just "*slightly below*" the range derived from those transactions. When asked in his deposition why he arrives at 0.60% rather than 0.50% or some other number less than the 0.63% minimum from the 2010 transactions, his response is that he "wanted to try and keep it close to – as close to that range of data points as I had available to me." (Deposition at 217) This is entirely circular reasoning – he kept his top number close to 0.63% because he wanted to keep his top number close to 0.63%. In my experience, outside of litigation, no client, and

11

no neutral party relying on a valuation opinion, would accept circular reasoning of that sort from a valuation professional.

### 2.   Derivation of the Bottom Value – 0.20%

25.     With regard to the bottom value of his reasonable royalty range, Mr. Hutchins states that "the value of the '362 Trademark to Xylem, Inc. should also exceed the $15 million Xylem, Inc. spent on rebranding and marketing between Q3 2011 and Q1 2012." (Report at 33)  He then concludes, that "the minimum royalty rate used in connection with the hypothetical negotiation would have been 0.20 percent, which results in an average total value of $27.9 million." (Report at 33)

26.     I have reviewed the portion of his deposition (Deposition at 141-65) in which Mr. Hutchins was asked about the basis and derivation of his 0.20% figure, and I am unable to find any coherent explanation or any indication that Mr. Hutchins used any reliable methodology or reasoning process to arrive at that number.  His position seems to be that the $15 million that Xylem Inc. spent on re-branding through the first quarter of 2012 constitutes an absolute "floor" on the value of the mark, and that the bottom rate in the reasonable royalty range should be a rate sufficient to yield a value well in excess of $15 million – $27.9 million – over the life of the trademark when the rate is applied to Xylem Inc.'s U.S. revenues.

27.    The idea that Xylem Inc.'s re-branding expenses represent a "floor" on the value of the XYLEM mark – or, more generally, that the value of a trademark can never be less than the expenditures devoted to developing and promoting that mark – has no reliable basis in intellectual property valuation theory or practice.  Valuing an intellectual property asset based on the cost to develop it is known as the "cost approach" to valuation, and professionals in the field generally do not use that approach to value trademarks except in rare circumstances where there is no alternative (such as with a start-up business having no track record of earnings).  In his deposition, Mr. Hutchins suggests that a company will not invest funds in a trademark unless it expects to recoup that investment through future profits.  (Deposition at 160-61)  A moment's reflection will confirm that there are a great many situations where the value of an asset does not equal the expenditures on that asset, and that phenomenon holds true for intellectual property as with other assets.  Use of a cost approach to valuation is particularly unreliable here, because Xylem Inc. was required to adopt a new name in connection with its spin-off from ITT.  The re-branding effort was not an initiative to increase profits.

28.    Even if it were true that the $15 million in re-branding expenditures through early 2012 constitutes a "floor" on value, Mr. Hutchins offers no intelligible explanation as to why the lower bound of his reasonable royalty range should

13

be a rate sufficient to yield a value of $27.9 million, as opposed to some other number (lower or higher than $27.9 million) above $15 million. In his deposition, he simply repeats his conviction that the bottom rate should be 0.20% because that rate yields a value of $27.9 million. Again, this is not the sort of reasoning that would be accepted from a valuation expert outside of litigation.

### 3.    Impact on Mr. Hutchins' Opinion

29.    In sum, in deriving both the top and bottom values for his reasonable royalty range, Mr. Hutchins has failed to use relevant data or a reliable method-ology. Thus, the resulting value range is itself an unreliable basis for determining the value of the XYLEM mark. Mr. Hutchins purports to apply the so-called *Georgia-Pacific* factors to determine where, within his range, the appropriate royalty rate lies. When applied to reliable data inputs, use of the *Georgia-Pacific* factors can be a reliable and helpful methodology for determining a reasonable royalty, but application of those factors cannot compensate for unreliable data inputs. Thus, because of the deficiencies noted above, Mr. Hutchins' conclusion

that a royalty rate of 0.45% is the appropriate one in this case is itself inherently unreliable.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed in Washington, D.C. on September 27, 2012

Robert N. Yerman, CPA



**AlixPartners**
*When it really matters.*

ROBERT N. YERMAN
MANAGING DIRECTOR
(202) 756-9041
ryerman@alixpartners.com

**SUMMARY**

Mr. Yerman is a Managing Director in the Washington, DC office of AlixPartners, LLP.  He is a senior financial executive experienced in domestic and international litigation and valuation, forensic investigations, financial consulting, auditing and accounting.  He has extensive experience as a consultant and expert witness in intellectual property, forensic, contractual, securities, antitrust, and regulatory matters and as an audit partner for domestic and international entities and has testified in federal, state and international jurisdictions as well as before domestic and international arbitral panels.  He has lectured at university, bar and CPA seminars and at accounting and law firm presentations.

Mr. Yerman is a certified public accountant (CPA).  He is a graduate of the City University of New York, majoring in biology and did his graduate studies at the City University of New York and Fairleigh Dickinson University in accounting and finance.  He was a Senior Managing Director and National Director of the Intellectual Property practice of LECG, LLC.  Previously, he led Coopers & Lybrand's intellectual property and general litigation practice in the mid-Atlantic region.  Prior to that, he was a partner in charge and senior audit partner for Deloitte & Touche. Mr. Yerman was a participant in the U.S. Presidential Executive Exchange Program where he was the special executive assistant to the Inspector General at the U.S. Department of Housing and Urban Development.

**PRESENT POSITION**

ALIXPARTNERS, LLP, 2011 to present
Managing Director

- Consultation and expert testimony in intellectual property and complex commercial disputes.
- Valuation and strategic consultation.
- Forensic investigations of U.S. and multi-national entities.

**PROFESSIONAL EXPERIENCE**

LECG, LLC, 1998 to 2011
Senior Managing Director

National Director – Intellectual Property Practice
Managing Director – Washington, DC Office

- Consultation and expert testimony in intellectual property and complex commercial disputes.
- Forensic investigations of U.S. and multi-national entities.
- Valuation and strategic consultation.
- Management of Washington DC office and national IP practice.

ATTACHMENT A

COOPERS & LYBRAND, 1993-1998
Managing Director
- Leader intellectual property and general litigation groups for Mid-Atlantic region.
- Litigation, strategic consulting, and expert witness services in complex commercial matters including patent, trademark, copyright and trade secrets, breach of contract, lost profits, franchise and exclusive dealers, securities, post acquisition disputes, predatory pricing and unjust enrichment matters.
- Forensic investigations of U.S. and multi-national entities.
- Assisted entities in merger and acquisition reviews and structuring of operations and transactions.

THE YERMAN GROUP, 1991-1992
Principal
- Provided litigation and strategic consulting services to Mid-Atlantic based entities.

DELOITTE & TOUCHE, 1969-1991
Partner in Charge, Client Services and Senior Audit Partner
- Responsible for ensuring that the highest quality services were provided to clients in the Mid-Atlantic region.
- Supervised audits and diverse consulting engagements for audit and non-audit clients, including international and domestic commercial companies, trade associations and government entities.
- Associate National Director for Communications and Retail Industries.

U.S. PRESIDENTIAL EXCHANGE EXECUTIVE, U.S. Department of Housing and Urban Development, 1975-1976
Special Executive Assistant to the Inspector General
- Responsibilities included review of the Inspector General's regional operations, use of independent public accountants for the examination of HUD issued and sponsored projects, and other special projects.
- Worked directly with government and private sector leaders, both domestic and international.

## EDUCATION

BA, Biology, CITY UNIVERSITY OF NEW YORK.

Accounting and Finance, CITY UNIVERSITY OF NEW YORK GRADUATE SCHOOL.

Accounting and Finance, FAIRLEIGH DICKINSON UNIVERSITY GRADUATE SCHOOL.

Certified Public Accountant (CPA)

**TEACHING EXPERIENCE**

Guest lecturer at George Washington University Graduate School of Publishing
Seminar and discussion leader for American Institute of Certified Public Accountants
Speaker at LECG, Coopers & Lybrand and Deloitte & Touche sponsored programs
Speaker at numerous Bar Association and Law Firm programs

**PROFESSIONAL MEMBERSHIPS**

American Institute of Certified Public Accountants
Greater Washington Society of Certified Public Accountants
New York State Society of Certified Public Accountants
American Bar Association, associate member
Economic Club of Washington
Council for Court Excellence
Association of Certified Fraud Examiners (past member)
Washington Airports Advisory Committee (past member)

**PUBLICATIONS AND SPEECHES**

"Spectrum Sciences and Software v. The United States", Intellectual Property Committee of the ABA Section of Public Contract Law, November 17, 2011, Washington D.C.

"Impact of Patent Purchase and Patent Reform on Enforcement Damages", July 22-23, 2009, IP Markets 2009, Chicago, IL.

"Choosing and Using Experts," November 16, 2006, BNA/ABA Patent Litigation Strategies Update, Washington, DC.

"Introduction to Intellectual Property Damages," June 10, 2003, LECG Summer Seminar, Washington, DC.

"Trade Secret Misappropriation," June 29, 2002, ABA Section of Intellectual Property Law, 2002 Summer IPC Conference, Philadelphia, PA.

"Analysis of the Estimated Production Cost Savings from Replacing the Dollar Note with the Dollar Coin," co-author, U.S. Congress, June 12, 2000.

"Preliminary Analysis of the Production Cost Savings from Replacing the Dollar Note with the Dollar Coin," co-author, U.S. Congress, April 10, 2000.

"The Economic Consequences of Trade Secret Misappropriation (A Practical Approach to the Determination of Damages)," February 2, 1999, District of Columbia Bar Association, Washington, DC.

"Damage Estimation: Incremental Cost Analysis," October 9, 1998, The Economic Analysis of Intellectual Property Damages, Chicago, IL.

"Admissible Evidence of Damages in Intellectual Property Cases," October 17, 1997, Virginia Association of Defense Attorneys, McLean, VA.

"Calculation of Economic Damages in Commercial Litigation Cases," February 21, 1996, Washington, DC.

**CASE EXPERIENCE**

**Intellectual Property**

Refuted claim for defendant in patent infringement matter in aircraft engine industry claiming lost profits, price erosion and reasonable royalties. Testified at deposition. Plaintiff's expert claim of $4 Billion excluded (90%).

Prepared claim for plaintiff in patent infringement matter in higher education field, claiming reasonable royalties. Testified at deposition.

Refuted claim for defendant in patent infringement matter in PET manufacturing industry. Testified at deposition.

Refuted claim for defendant in patent infringement matter in computer industry, claiming reasonable royalties. Testified at deposition.

Refuted claim for defendant in patent infringement matter in medical device industry.

Refuted claim for defendant in patent infringement matter in elevator industry, claiming lost profits and reasonable royalties. Testified at depositions. Plaintiff's expert claim excluded (95%).

Refuted preliminary claim for defendant in patent infringement matter in semi-conductor industry. Case settled.

Prepared claim for plaintiff in patent infringement matter in commercial vehicle industry, claiming reasonable royalties. Testified at deposition. Case settled.

Prepared claim for plaintiff in patent infringement matter in enterprise software industry, claiming reasonable royalties. Testified at deposition. Case Settled.

Refuted claim for defendant in patent infringement matter in commercial aviation industry claiming reasonable royalties and cost savings. Testified at deposition. Case settled.

Refuted claim for defendant in patent infringement matter in commercial aviation industry claiming reasonable royalties (on future sales) and price erosion. Testified at trial.

Prepared preliminary claim for plaintiff in patent infringement matter in computer industry. Case settled.

Prepared claim for plaintiff in patent infringement matter in enterprise software industry, claiming reasonable royalties. Case settled.

Prepared claim for plaintiff in method and design patent infringement matter in optical scanning industry, claiming reasonable royalties and unjust enrichment. Case settled.

Prepared claim for plaintiff in patent infringement matter in communications manufacturing industry, claiming reasonable royalties. Testified at trial.

Prepared claim for plaintiff in patent infringement matter in communications manufacturing industry, claiming reasonable royalties. Case settled.

Refuted claim for defendant in patent infringement matter in communications manufacturing industry, claiming reasonable royalties. Testified at deposition. Case settled.

Prepared claim for plaintiff in patent infringement matter in semi-conductor industry, claiming lost profits and reasonable royalties. Testified at deposition. Case settled.

Prepared claim for plaintiff in patent infringement matter in well stimulation industry, claiming lost profits and reasonable royalties. Testified at trial.

Prepared claim for plaintiff in patent infringement matter in spinal medical device industry, claiming lost profits and reasonable royalties. Testified at trial.

Prepared claim for plaintiff in patent infringement matter in software industry, claiming lost profits and reasonable royalties.  Case settled.

Prepared valuation of patent relating to printing and labeling industry.

Prepared claim for plaintiff in patent infringement matter in copier industry, claiming reasonable royalties.  Testified at trial.

Prepared valuation of design patent relating to sporting and camping equipment.  Testified at trial.

Refuted preliminary claim for defendant in patent infringement matter in pharmaceutical industry.  Case settled.

Refuted claim for defendant in patent infringement matter in semi-conductor industry, claiming lost profits, reasonable royalties and price erosion.  Case settled.

Prepared claim for plaintiff in patent infringement matter in computerized conveyor industry, claiming lost profits, price erosion and reasonable royalties, and alter ego issues.  Testified at trials.

Prepared preliminary claim for plaintiff in patent infringement matter in telecommunications industry, claiming lost profits and reasonable royalties.  Case settled.

Prepared profitability analysis for defendants in patent infringement matter in PET manufacturing industry, demonstrating maximum available reasonable royalty.  Testified at trial.

Conducted a royalty compliance analysis for licenser in game industry to determine if licensee complied with the terms of the license agreement.

Prepared claim for plaintiff in patent infringement matter in business forms industry, claiming reasonable royalties.  Testified at trial.

Refuted claim for defendant in patent infringement matter in flooring industry, claiming lost profits and price erosion.  Testified at trial.

Prepared preliminary claim for plaintiff in patent infringement matter in semi-conductor industry, claiming reasonable royalties.  Case settled.

Prepared claim for plaintiff in patent infringement matter in textile manufacturing industry claiming lost profits.

Analyzed and determined basis for reasonable royalty in pharmaceutical industry.

Prepared valuation of patents for entity in pharmaceutical industry.

Prepared valuation of patent relating to technology in semi-conductor industry.

Prepared claim for plaintiff in trade secrets matter in data analytics industry, claiming unjust enrichment.

Prepared claim for plaintiff in trade secrets and copyright matter in software intelligence industry, claiming unjust enrichment.  Case settled.

Refuted claim for defendant in trade secrets matter in manufacturing industry.

Refuted claim for defendant in trade secrets matter in computer industry, claiming just enrichment. Testified at deposition.

Prepared claim for plaintiff in trade secrets matter in software industry, claiming lost profits. Testified at deposition.  Case settled.

Refuted claim for defendant in trade secrets matter in software industry, claiming reasonable royalties.

Refuted claim for defendant in trade secrets matter in software industry, claiming irreparable harm.

ATTACHMENT A

Prepared claim for plaintiff in trade secrets matter in flooring industry, claiming lost profits and unjust enrichment. Testified at deposition. Case settled.

Refuted claim for defendant in trade secrets matter in telecommunications industry, claiming a reasonable royalty. Testified at deposition. Case settled.

Prepared claim for plaintiff in trade secrets matter in semi-conductor industry, claiming unjust enrichment. Case settled.

Refuted claim for defendant in trade secrets matter in telecommunications industry, claiming unjust enrichment. Testified at deposition. Case settled.

Prepared claim for plaintiff in trade secrets matter in defense industry, claiming unjust enrichment. Testified at deposition. Case settled.

Refuted claim for defendant in trade secrets matter in transportation industry, claiming lost profits. Testified at deposition. Case settled.

Refuted claim for defendant in trade secrets matter in software industry, claiming reasonable royalties. Testified at deposition. Case settled.

Refuted claim for defendant in trade secrets matter in boating industry, claiming a reasonable royalty and unjust enrichment. Testified at deposition. Case settled.

Prepared claim for plaintiff in trade secrets matter in computer industry, claiming lost profits. Testified at deposition. Case settled.

Refuted claim for defendant in trade secrets matter in transportation industry, claiming unjust enrichment. Case dismissed.

Prepared claim for plaintiff in trade secrets matter in software industry, claiming lost profits and unjust enrichment. Testified at deposition. Case settled.

Prepared claims for plaintiff in trade secrets matter in medical device industry, claiming lost profits and unjust enrichment. Testified at trial.

Prepared claim for plaintiff in trade secrets matter in medical device industry, claiming lost profits. Case settled.

Conducted investigation of compliance with trademark license agreement and possible fraud for international entity with operations throughout the world in consumer products industry.

Refuted claim for defendant in trademark and other intangible assets in pharmaceutical industry, in international arbitration, claiming expropriation of assets. Testified in The Hague.

Prepared multiple reports and analysis of non-compliance with license agreement and rebuttal of claim for lost profits in connection with international arbitration. Case settled.

Prepared claim for plaintiff in trademark matter in manufacturing industry, claiming unjust enrichment. Testified at deposition.

Prepared claim for plaintiff in trademark matter in fashion industry, claiming unjust enrichment. Testified at deposition.

Prepared claim for plaintiff in trademark matter in aviation industry, claiming unjust enrichment.

Prepared claim for plaintiff in trademark matter in hardware service business, claiming lost profits and unjust enrichment. Testified at deposition.

Prepared claim for plaintiff in trademark matter in telecommunication industry, claiming reimbursement for corrective advertising. Testified at deposition, case settled.

Prepared claim for plaintiff in trademark matter in publishing industry, claiming lost profits. Case settled.

ATTACHMENT A

Refuted claim for defendant in trademark matter in telecommunications industry, claiming reimbursement for corrective advertising.  Case settled.

Refuted claim for defendant in trademark matter in transportation industry, claiming unjust enrichment.  Case settled.

Conducted investigation of alleged trademark infringement in sporting industry.

Prepared claim for plaintiff in trademark matter related to usage of name on Internet.  Case settled.

Prepared preliminary claim for plaintiff in trademark matter in transportation industry, claiming unjust enrichment.  Case settled.

Refuted claim for defendant in trademark matter in service industry, claiming lost profits, reasonable royalties and unjust enrichment.  Case settled.

Prepared claim for plaintiff in trademark matter in medical device industry, claiming lost profits.  Case settled.

Refuted counterclaim by defendant in trademark matter in textile industry, claiming lost profits.  Case settled.

Refuted claim for defendant in copyright matter in software industry, claiming irreparable harm.

Prepared claim for plaintiff in copyright matter in flooring industry, claiming unjust enrichment.  Testified at deposition.  Case settled.

Prepared claim for plaintiff in copyright matter in software industry, claiming unjust enrichment.

Analyzed and determined reasonable royalty in copyright matter in entertainment industry for statutory arbitration proceedings.  Testified at CARP proceeding.

Prepared claim for plaintiff in copyright matter in apparel industry, claiming unjust enrichment.  Case settled.

Refuted claim for defendant in copyright matter in health care industry, claiming lost profits.  Testified at deposition.  Case settled.

Prepared claim for plaintiff in copyright infringement matter in software industry, claiming lost profits and statutory damages.  Testified at deposition.  Case settled.

Prepared claim for plaintiff in copyright infringement matter in publishing industry, claiming lost profits.  Case settled.

Refuted claim for defendant in copyright infringement matter in publishing industry, claiming reasonable royalties.  Testified at deposition.  Case settled.

### Franchise/Exclusive Dealer

Refuted claim for defendant in flooring industry in dealer dispute, claiming lost profits.  Testified at arbitration.

Prepared claim for plaintiff in commercial security industry in arbitration, claiming lost profits.  Case settled.

Prepared claim for plaintiffs in franchise infringement matter in services industry, claiming lost profits and value of business.  Testified at trial.

Refuted claim for defendant in communications industry in international exclusive dealer dispute, claiming lost profits.  Testified at deposition.  Case settled.

Refuted claim for defendant in manufacturing industry in exclusive dealer dispute in international arbitration, claiming lost profits.  Case settled.

**Breach of Contract**

Refuted claim for defendant in software industry, claiming lost value.

Refuted claim for defendant in real estate industry, claiming irreparable harm. Testified at deposition. Case settled.

Prepared claim for plaintiff in computer industry, claiming breach of contract.

Prepared claim for plaintiff in munitions industry, claiming lost profits. Testified at trial.

Prepared claim for plaintiff in manufacturing industry, claiming lost profits. Testified at trial.

Prepared claim for plaintiff in service industry, claiming lost profits and unjust enrichment. Testified at deposition.

Refuted claim for defendant in telecommunications industry, claiming lost profits.

Prepared claim for plaintiff in software industry, claiming lost profits and unjust enrichment. Testified at arbitration.

Prepared claim for plaintiff in flooring industry, claiming lost profits. Testified at deposition. Case settled.

Refuted claim for defendant in semi-conductor manufacturing industry, claiming lost profits. Testified at trial.

Refuted claim for defendant in pharmaceutical industry, claiming breach of contract. Case settled.

Refuted claim for defendant in manufacturing industry, claiming additional expenses and property damages. Case settled.

Prepared claim for plaintiff in consulting industry, claiming lost profits and unjust enrichment. Case settled.

Refuted claim for defendant in technology industry, claiming lost profits and liquidated damages. Testified at hearing.

Refuted claim for defendant in medical device industry, claiming lost profits. Case settled.

Prepared claim for plaintiff in consulting industry, claiming lost profits. Case settled.

Refuted claim for defendant in consulting industry, claiming multiple damages. Testified at deposition. Case settled.

Prepared claim for plaintiff in consulting industry, claiming lost profits due from breach of non-compete agreement. Case settled.

Prepared claim for plaintiff in agriculture industry, determining appropriate balance due from exclusive dealer. Testified at depositions. Case settled.

Prepared claim for plaintiff in Internet retailing industry, claiming reliance damages. Case settled.

Refuted claim for defendant in medical devices industry, claiming lost profits. Case settled.

Prepared claim for plaintiff in solid waste disposal industry, claiming lost revenues and increased expenses due to establishment of surcharge. Testified at deposition, case settled.

Refuted claim for defendant in attorney malpractice matter in beverage industry, claiming lost profits and loss of value of business. Testified at deposition, case settled.

Prepared claim for plaintiff in breach of contract matter in sports management industry, claiming lost profits. Testified at deposition, case settled.

Prepared claim for plaintiff in breach of contract matter in professional services industry, claiming lost profits. Testified at arbitration.

ATTACHMENT A

Refuted claim for defendant in cable television industry, demonstrating proper subscriber base and program coverage.

Prepared claim for plaintiff in breach of contract matter in services industry, claiming misrepresentation by defendant.

Prepared claim for plaintiff in breach of contract matter in services industry, demonstrating similarity of entities and piercing the corporate veil.

### Post Acquisition

Prepared claim for plaintiff in post-acquisition dispute in consulting industry.  Case settled.

Refuted claim for plaintiff in post-acquisition dispute in software industry claiming improper revenue recognition and other GAAP issues.  Case settled.

Prepared claim for defendant in post-acquisition dispute in waste treatment industry, claiming overpayment of purchase price.

Prepared claim for plaintiff in post-acquisition dispute in manufacturing industry, claiming overpayment of purchase price.  Testified at trial.

Prepared preliminary claim for plaintiff in post-acquisition dispute in services industry, claiming seller misrepresentations.

Refuted claim for defendant in squeeze out of acquisition in health care industry.  Testified at deposition, case dismissed.

Acted as arbitrator in post-acquisition dispute.  Rendered opinion on interpretation of purchase agreement.

### Antitrust

Assisted entity in biotechnology industry in profitability analysis and return on investment.

Assisted entity in analysis of merger specific efficiencies related to proposed merger.

Prepared claim for Federal Trade Commission in predatory pricing matter in consumer products industry.

Prepared claim for newspaper in Joint Operating Agreement filing with U.S. Department of Justice.

### Aviation

Prepared claim for plaintiff in airline industry claiming breach of contract.

Refuted claim made by a Ports Authority for increased airport fees.

Refuted claim for defendants in airline industry, claiming lost profits and diminished value of business.  Testified at deposition.  Case dismissed.

Contributed to the assessment of U.S. airports capital requirements for the Federal Aviation Authority for the period 1997-2002.

Refuted claim made by a Ports Authority for increased airport fees.  Testified at hearing, case settled.

Assisted a United Kingdom company in its purchase of a major portion of an U.S. airport.  Reviewed operating agreements, financial projections, and financing instruments.

Assisted the Metropolitan Washington Airports Authority (MWAA) when Dulles International and National Airports were spun off from Federal Government control.  Supervised and issued the initial and subsequent financial examinations and audits of MWAA.  Assisted in establishment of GAAP financial reporting and issuance of bonds.

Appointed by Governor of Maryland to serve on MWAA Advisory Committee, reviewing airport and aviation issues for management and Board of Directors.

**Other**

Refuted claim by plaintiff in pharmaceutical industry, claiming inappropriate governmental actions.

Conducted investigation of accounting for certain transactions.

Conducted investigation of appropriate behavior and accounting by officer of entity in technology industry.

Prepared claim for plaintiff in government contracting industry, claiming lost profits.

Refuted claim for defendant in cable industry, alleging non-arms length transaction.

Refuted claim for defendant in utility industry, claiming excessive onerousness and unforeseeability of operating results.

Prepared white paper for submission to Congress involving estimated cost savings resulting from introduction of U.S. $1 coin.

Refuted claim of industry practice and GAAP accounting. Testified at trial.

Refuted claim for defendant in leasing industry, claiming parent was alter ego of subsidiary. Testified at deposition.

Prepared claim for plaintiff in telecommunications industry, claiming lost profits and lost value of business. Testified at arbitration.

Refuted claim for defendant in accounting malpractice matter, claiming audits did not conform with generally accepted auditing standards. Case settled.

Prepared analysis for defendant in alleged fraudulent transaction in services industry.

Refuted claim for defendant in securities matter in computer industry, claiming inadequate disclosures and improper accounting. Case dismissed.

Refuted claim for defendant in medical devices industry in SEC investigation, for entity and its officers. Matter settled.

Refuted claim for defendant in regulatory matter involving travel industry, claiming commingling of funds and inadequate escrowing of funds.

Prepared claim for plaintiff in mortgage industry describing sham real estate transactions.

Refuted claim for defendant in securities industry, claiming improper termination. Matter settled.

Refuted claim for defendant in publishing industry, claiming improper valuation of goodwill. Testified at trial.

November 2011

ATTACHMENT B

# Expert Testimony of Robert N. Yerman Given Within the Past Four Years

| Case | At | | |
|---|---|---|---|
| | Deposition | Trial | Arbitration/ Hearing |
| **Trinity Industries** and **Texas A&M University** v. SPIG Industry and Selco Construction | X | | |
| **ITT Corp and Xylem Inc.** v. Xylem Group, LLC | X | | |
| **Bridgetree, Inc.** v. Red F Marketing | X | X | |
| Les Laboratoires Servier S.A.S. v. **The Republic of Poland** | | | X |
| Inventio AG v. **Otis Elevator Company** | X | | |
| Rolls-Royce PLC v. **United Technologies Corporation (d/b/a Pratt & Whitney)** | X | | |
| **Digital-Vending Services International, LLC** v. The University of Phoenix, Inc. | X | | |
| Lord & Taylor v. **Tyson's Corner Holdings** | X | | |
| Owens-Illinois, Inc. v. **BTR plc** | X | | |
| **Spectrum Sciences and Software** v. The United States | X | X | |
| **RBC Nice Bearings, Inc.** v. Peer Bearing Corporation | X | | |
| Convolve, Inc. and MIT v. **Compaq Computer Corporation** and Seagate Technology, LLC | X | | |
| **RBC Nice Bearings, Inc.** v. SKF USA | X | X | |
| **Creative Concepts Software, Inc. and iTek Services, Inc.** v. Mobiletech Solutions, Inc., et al. | X | | |

ATTACHMENT C

## Documents and Information Considered

**Pleadings**
Complaint, 10/26/11
Answer and Counterclaims, 12/12/11
Plaintiffs' Initial Disclosures, 1/11/12
Initial Disclosures of Defendant and Counterclaim Plaintiff Xylem Group, LLC, 1/11/12
Supplemental Initial Disclosures of Defendant and Counterclaim Plainitiff Xylem Group, LLC, 2/28/12
Xylem Group, LLC's Supplemental Response to Plaintiffs' First Interrogatories to Defendant, 3/26/12

**Depositions**
Hal Scott Weinstein (30(b)(6)), 10/19/11
Hal Scott Weinstein, 6/29/12

**Expert Reports**
Expert Report of Robert A. Hutchins, 6/20/12
Report of Erich Joachimsthaler, 6/20/12
Report of Michael B. Mazis, Ph.D., 6/20/12
Expert Report of Philip G. Hampton, II, 6/20/12
Report of Jake Schlicher, 6/19/12

**Conversations**
Peter Van Winkle
Geri McShane

**Documents Produced**

| Beginning Bates | Ending Bates |
| --- | --- |
| ITT0000002 | ITT0000008 |
| ITT0000086 | ITT0000105 |
| ITT0000107 | ITT0000108 |
| ITT0000154 | ITT0000217 |
| ITT0000266 | ITT0000270 |
| ITT0000276 | ITT0000276 |
| ITT0000392 | ITT0000392 |
| ITT0000596 | ITT0000596 |
| ITT0000611 | ITT0000611 |
| ITT0000614 | ITT0000614 |
| ITT0000664 | ITT0000665 |
| ITT0000761 | ITT0000761 |
| ITT0000794 | ITT0000796 |
| ITT0000837 | ITT0000839 |
| ITT0000879 | ITT0000895 |
| ITT0000991 | ITT0000994 |
| ITT0001117 | ITT0001118 |
| ITT0001126 | ITT0001126 |

## ATTACHMENT C

| | |
|---|---|
| ITT0001705 | ITT0001763 |
| ITT0001996 | ITT0001996 |
| ITT0003876 | ITT0003892 |
| ITT0003943 | ITT0003950 |
| ITT0004044 | ITT0004054 |
| ITT0004251 | ITT0004255 |
| ITT0004964 | ITT0004967 |
| ITT0005004 | ITT0005012 |
| ITT0005018 | ITT0005023 |
| ITT0005104 | ITT0005105 |
| ITT0005120 | ITT0005127 |
| ITT0005128 | ITT0005135 |
| ITT0005136 | ITT0005144 |
| ITT0005665 | ITT0005675 |
| ITT0005703 | ITT0005705 |
| ITT0009470 | ITT0009510 |
| ITT0014853 | ITT0015263 |
| Xylem Group 001015 | Xylem Group 001015 |
| Xylem Group 001032 | Xylem Group 001032 |
| Xylem Group 003529 | Xylem Group 003532 |
| Xylem Group 003541 | Xylem Group 003543 |
| Xylem Group 007933 | Xylem Group 007956 |

Xylem Residential & Commercial Water Sales to specific accounts 11/1/2011 - 3/31/2012

**Other**
Letter from James M. Slattery to Ann D. Davidson and Jenny Schiavone, 7/20/11
Letter from Robert J. Shaughnessy to James M. Slattery, 7/26/11
Letter from James M. Slattery to Robert J. Shaughnessy, 8/1/11
Xylem Investor & Analyst Day presentation, 10/13/11
Xylem Q3 2011 Earnings Release presentation, 11/21/11
Xylem Q4 2011 Earnings Release presentation, 2/28/12
Xylem Q1 2012 Earnings Release presentation, 5/3/12
Xylem 2011 Annual Report
Xylem Form 10-K for the period ended 12/31/11
Xylem Form 10-Q for the quarterly period ended 3/31/12
U.S. Trademark Registration No. 3,183,362
U.S. Trademark Application No. 85371193
U.S. Trademark Application No. 85386849
Ibbotson Associates, *Stocks, Bonds, Bills, and Inflation Valuation Edition 2011 Yearbook*
www.finance.yahoo.com
www.xyleminc.com
www.xylem.biz
www.novedades-agricolas.com
General reference material

## ATTACHMENT D

**Estimated Valuation of Xylem Group**
**Based on the Xylem Group 2012 Income Statement Projections**

| | "Projection"[1] | Actual and "Projection"[1] |
|---|---|---|
| **Income** | | |
| Freight income | $201,000 | $210,593 |
| 3D sales | 2,565,100 | 2,638,578 |
| Xylem sales | 5,790,000 | 5,887,168 |
| New Initiatives sales | 0 | 1,550 |
| Total sales | 8,355,100 | 8,527,295 |
| Sales returns and allowances | (173,700) | (188,628) |
| 3D sales discounts | (64,128) | (73,924) |
| Xylem sales discounts | (86,850) | (81,843) |
| New Initiatives sales discounts | 0 | 0 |
| Total sales discounts | (150,978) | (155,767) |
| Sales rebate | (202,650) | (208,176) |
| Total income | 8,028,773 | 8,185,316 |
| **Cost of sales** | | |
| 3D cost of goods sold | 1,757,886 | 1,792,255 |
| Xylem cost of goods sold | 1,976,790 | 2,002,111 |
| New Initiatives cost of goods sold | 0 | 522 |
| Total cost of goods sold | 3,734,676 | 3,794,888 |
| Other costs | 821,130 | 820,305 |
| Total cost of sales | 4,555,806 | 4,615,193 |
| Gross profits | 3,472,967 | 3,570,123 |
| Total operating expenses | 3,300,141 | 3,306,609 |
| Net ordinary income | 172,826 | 263,514 |
| Other income | | 36,097 |
| Other expense | (74,400) | (79,083) |
| Net income | $98,426 | $220,529 |
| **"Net ordinary income" as profit amount[2]** | | |
| Value based on 16.45% capitalization rate[3] | $1,050,611 | $1,601,911 |
| Value based on 7x multiple[4] | $1,209,779 | $1,844,601 |
| Value based on 12x multiple[4] | $2,073,907 | $3,162,173 |
| **"Net income" as profit amount[2]** | | |
| Value based on 16.45% capitalization rate[3] | $598,332 | $1,340,600 |
| Value based on 7x multiple[4] | $688,979 | $1,543,701 |
| Value based on 12x multiple[4] | $1,181,107 | $2,646,344 |

Notes:
1. Xylem Group 007933 - 7941.
2. Income amounts do not consider the effect of taxes.
3. See EXHIBIT 3.
4. Deposition testimony of Hal Weinstein, 6/29/12, pp. 160-161.

# ATTACHMENT E

## Estimated Valuation of Xylem Group
## Calculation of Capitalization Rate

| | |
|---|---:|
| Risk-free rate[1] | 2.48% |
| Equity risk premium[1] | 6.62% |
| Industry risk premium[2] | -1.32% |
| Size premium[3] | 11.77% |
| Discount rate estimate[4] | 19.55% |
| Long-term growth factor (inflation)[5] | 3.10% |
| Discount rate adjusted for growth (capitalization rate) | 16.45% |

Notes:

1. Ibbotson Associates, *Stocks, Bonds, Bills, and Inflation Valuation Edition 2011 Yearbook,* Appendix C.

2. Ibbotson Associates, *Stocks, Bonds, Bills, and Inflation Valuation Edition 2011 Yearbook,* Table 3-5 for SIC Code 504: Professional and Commercial Equipment and Supplies. Xylem Group reports their SIC Code as 5046.

3. Ibbotson Associates, *Stocks, Bonds, Bills, and Inflation Valuation Edition 2011 Yearbook,* Appendix C, Decile 10z.

4. A valuation of intangible assets may require an additional risk factor.

5. Ibbotson Associates, *Stocks, Bonds, Bills, and Inflation Valuation Edition 2011 Yearbook,* Table 2-1 (arithmetic mean).