# Exhibit 4

**Memorandum in Support of Motion of Plaintiffs/
Counterclaim-Defendants to Exclude the Opinions of
Robert A. Hutchins, CPA, as to a Reasonable Royalty**

# EXPERT REPORT OF
# ROBERT A. HUTCHINS

## IN THE MATTER OF

## ITT CORPORATION AND XYLEM, INC.
## V.
## XYLEM GROUP, LLC

(UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
CASE NO. 1:11-CIV.3669-JEC)

## JUNE 20, 2012

CONFIDENTIAL

ITT CORPORATION AND XYLEM, INC. V.
XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.0** | **EXECUTIVE SUMMARY** | **1** |
| 1.1 | MY ASSIGNMENT | 1 |
| 1.2 | MY BACKGROUND | 1 |
| 1.3 | SUMMARY OF PROCEDURES PERFORMED AND INFORMATION CONSIDERED | 2 |
| 1.4 | SUMMARY OF OPINIONS | 2 |
| **2.0** | **BRIEF OVERVIEW** | **3** |
| 2.1 | TRADEMARK REGISTRATION NUMBER 3,183,362 (THE "'362 TRADEMARK") | 3 |
| 2.2 | XYLEM | 4 |
| 2.3 | ITT CORPORATION | 5 |
| 2.4 | XYLEM, INC. | 5 |
| 2.5 | THE XYLEM, INC. SPIN-OFF | 6 |
| **3.0** | **TRADEMARK INFRINGEMENT DAMAGES** | **11** |
| **4.0** | **DAMAGES ANALYSIS** | **12** |
| 4.1 | XYLEM'S DAMAGES | 13 |
| 4.2 | XYLEM, INC.'S INFRINGING SALES AND INFRINGING PROFITS | 13 |
| **5.0** | **"REASONABLE ROYALTY" ANALYSIS** | **14** |
| 5.1 | DATE OF THE NEGOTIATIONS | 15 |
| 5.2 | NON-INFRINGING ALTERNATIVES | 15 |
| 5.3 | MARKET APPROACH | 16 |
| 5.4 | INCOME APPROACH | 20 |
| 5.5 | THE GEORGIA-PACIFIC FACTORS | 22 |
| 5.6 | ROYALTY RATE CONCLUSION | 32 |

| ITT CORPORATION AND XYLEM, INC. v. XYLEM, LLC |
| :---: |
| *EXPERT REPORT OF ROBERT A. HUTCHINS* |

| **1.0** | **EXECUTIVE SUMMARY** |
| :--- | :--- |

**1.1** **MY ASSIGNMENT**

I have been retained by Fellows LaBriola LLP, on behalf of its client Xylem Group, LLC ("Xylem" or "defendant") in the matter of ITT Corporation and Xylem, Inc. v. Xylem Group, LLC. I have been asked to analyze the monetary compensation Xylem is entitled due to the "violation of the Federal Lanham Act as authorized by 15 U.S.C. §1117" by ITT Corporation and/or Xylem, Inc.[1]

**1.2** **MY BACKGROUND**

I am a Managing Director with Navigant. I have been consulting with private and government clients and counsel on financial, accounting and economic issues for over nineteen years. During this period, I have gained substantial experience in a broad range of bankruptcy, commercial litigation, financial services, and intellectual property engagements. I have served as an expert witness, consultant or forensic accountant on numerous occasions. I have consulted on matters involving breach of contract, breach of fiduciary duty, director and officer misconduct, fraud, fraudulent conveyances, insolvency, patent infringement, preferences, trade secret misappropriation and trademark infringement. My curriculum vitae is attached hereto as Exhibit A.

I have been asked to testify as an expert witness on behalf of the Defendant. If called to testify as to the matters stated herein, I could and would do so competently. I have not authored any publications over the past 10 years. Exhibit A also contains a detailed listing of all my testimony during the past four years.

For services provided in this matter, Navigant is being compensated at my standard hourly rate of $535. My compensation is not contingent in any way on

---

[1] Answer and Counterclaims filed December 12, 2011 at page 24. It is also my understanding that Xylem is also seeking compensation due to the plaintiffs "violation of the New York laws pertaining to consumer protection and unfair competition as noted in the General Business Law §§ 349 and 350, and 360-m; as well as violations of Georgia law."

the conclusions or opinions I reach, the substance of any testimony I may provide, or the outcome of this litigation.

**1.3    SUMMARY OF PROCEDURES PERFORMED AND INFORMATION CONSIDERED**

In preparing this report, I have reviewed and analyzed both publicly available documents and documents produced in this litigation by the plaintiffs and the defendant.   The documents and information I relied upon in forming my opinions are referenced in the footnotes of this report and/or Exhibit B.

**1.4    SUMMARY OF OPINIONS**

For purposes of this report, I have assumed that the plaintiffs will be found liable for the allegations contained in the Answer and Counterclaims.  I have applied this assumption for purposes of calculating damages but have no opinion as to whether, in fact, the plaintiffs are liable.

The following is a summary of my opinions.  The bases for these opinions and other opinions are contained in the body of this report.

- Infringing operating profits range between **$9.7 million** and **$107.9 million** after apportioning manufacturing and operating costs for the period November 2011 through June 2012. - - *See Section 4.2*
- If the fact-finder concludes the appropriate measure of damages is a reasonable royalty, then a reasonable royalty in this matter would be equal to **0.45 percent** of infringing U.S. sales. - - *See Section 5.0*
- Based upon estimated U.S. infringing sales of $942.7 million[2] and a royalty rate of 0.45 percent, the monetary compensation due Xylem would be **$4.24 million** for the period November 2011 through June 2012.  This, however, assumes the Court grants the injunction requested by Xylem as of June 30, 2012.
- If an injunction is not granted and, instead, the fact finder concludes the appropriate remedy in this instance would be a fully paid up license

---

[2]       See Exhibit 1.1

granting Xylem, Inc. the exclusive rights to the Xylem mark, the compensation due Xylem would be no less than **$45 million**. - - *See Section 5.6*

| 2.0 | BRIEF OVERVIEW |

**2.1   TRADEMARK REGISTRATION NUMBER 3,183,362 (THE "'362 TRADEMARK")**

In December 2005, Xylem filed an application to register the name Xylem as a trademark.[3]  On July 12, 2006 Xylem agreed to amend the application to change the identification of goods to read as follows:[4]

> *"Bathroom and kitchen fixtures, namely, sinks, faucets, plumbing fittings, namely drains, bath drains, lavatory drains, vessel mounting rings, sink stops and sink riser tubes and lighting fixtures therefor, in International Class 11;*
>
> *Bathroom furniture, namely, vanities, shelves, medicine cabinets, countertops, and pedestals in International Class 20."*

On September 26, 2006, the Xylem mark was published in the United States Patent and Trademark Office's ("USPTO") Official Gazette.[5]  On December 12, 2006, the USPTO granted the '362 Trademark.[6]  In December 2011, Xylem removed lighting fixtures from the '362 Trademark in Class 11.[7]

The State of Georgia granted Registration Numbers T-25993, T-25994, T-25995 and T-25996 in Classes 13, 12, 30 and 32, respectively, with a registration date of November 21, 2011.[8]  The goods included in *Class 13* are identified as: "hardware and plumbing supplies and steamfitting supplies- for the products bathroom and

---

[3]     Trademark Principal Register, Registration Number 3,183,362
[4]     July 14, 2006 Examiner Amendment Correspondence
[5]     Notice of Publication, Mailing Date of September 6, 2006
[6]     Trademark Principal Register, Registration Number 3,183,362
[7]     Xylem Group 003541 - 3543
[8]     Xylem Group 003529 - 3532

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

kitchen fixtures, namely, faucets, plumbing fittings, drains, bath drains, lavatory drains, vessel mounting rings, sink tops and sink riser tubes."[9]

The goods included in *Class 12* are identified as: "construction materials- for the products bathroom and kitchen fixtures, namely drains, bath drains, lavatory drains, and sink riser tubes."[10] The goods included in *Class 30* are identified as: "crockery, earthenware and porcelain- for the products vitreous china sinks and vessel sinks."[11] The goods included in *Class 32* are identified as: "furniture and upholstery- for the products bathroom furniture, namely vanities, shelves, medicine cabinets, and pedestals."[12]

## 2.2   XYLEM

Xylem is a limited liability company based in Roswell, Georgia.  Xylem designs and sells "certain types of bathroom furniture and fixtures" including vanities, sinks, faucets and drains.[13]

Xylem owns the '362 Trademark and Georgia registration numbers T-25993 to T-25996.[14]  It is my understanding that the Xylem name and trademark have been used by Xylem since 2005.[15]  It is also my understanding that Xylem's products are marketed and sold under the Xylem brand name and trademark and that Xylem sells products throughout the U.S. and internationally.[16]  It is also my understanding that Xylem sells its products through wholesalers, dealers and retailers.[17]

---

[9]   Answer and Counterclaims at ¶51
[10]   Answer and Counterclaims at ¶52
[11]   Answer and Counterclaims at ¶53
[12]   Answer and Counterclaims at ¶54
[13]   Answer and Counterclaims at ¶4; http://www.xylem.biz/ [Last Accessed 06/18/2012]
[14]   ITT Corporation and Xylem, Inc. v. Xylem, LLC at ¶14; Answer and Counterclaims at ¶¶ 51 – 54; Trademark Principal Register, Registration Number 3,183,362
[15]   Answer and Counterclaims at ¶48; Trademark Principal Register, Registration Number 3,183,362
[16]   Answer and Counterclaims at ¶47
[17]   Answer and Counterclaims at ¶47

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

In 2011, Xylem reported net sales of $7.7 million and a net loss of over $210,000.[18] For the year 2012, Xylem is projecting net sales of $8.2 million and a net profit of over $220,000.[19]

## 2.3   ITT CORPORATION

ITT Corporation ("ITT") is organized under the laws of the State of Indiana, with its principal place of business in White Plains, New York. ITT is a global multi-industry high-technology engineering and manufacturing organization with operations in more than sixty countries. Prior to November 2011, its products and services focused on three main markets: global defense and security; water technology; and highly engineered industrial products. In 2010, ITT reported nearly $11 billion in revenue and $900 million in operating income.[20]

## 2.4   XYLEM, INC.

Xylem, Inc. ("Xylem, Inc." or "plaintiff") describes itself as a "world leader in the design, manufacturing, and application of highly engineered technologies for the water industry."[21] Xylem, Inc. operates in two segments: (1) Water Infrastructure and (2) Applied Water.

"The Water Infrastructure segment focuses on the transportation, treatment and testing of water, offering a range of products including water and wastewater pumps, treatment and testing equipment, and controls and systems . . . The Applied Water segment encompasses all the uses of water and focuses on the residential, commercial, industrial and agricultural markets. The segment's major products include pumps, valves, heat exchangers, controls and dispensing equipment."[22]

---

[18]   Xylem Group 0007945 - 7956
[19]   Xylem Group 0007933 - 7944
[20]   ITT Corporation 2010 Annual Report and Form 10-K at pages 2 and 12 of 124
[21]   Xylem, Inc. 2011 10-K at internal page 3
[22]   Xylem, Inc. 2011 10-K at internal page 4

According to Xylem, Inc., the water industry is "highly fragmented." In addition, the Water Infrastructure segment competes with a "large number of businesses" and competition focuses on "product performance, application expertise, design, quality, delivery and price." Competition in the Applied Water segment focuses on many of the same aspects as well as brand names.[23]

In 2011, Xylem, Inc. reported net sales of $3.8 billion and operating profits of $395 million.[24] For the years 2009 to 2011, between 34 and 36 percent of Xylem, Inc.'s total revenue were due to sales in the U.S.[25]

## 2.5   THE XYLEM, INC. SPIN-OFF

On January 11, 2011, the Board of Directors of ITT approved a plan to spin-off its water related businesses, ITT WCO, Inc. ("WCO"), into an independent publicly traded company.[26] WCO was incorporated in Indiana on May 4, 2011 and its principal executive offices are located in White Plains, New York.[27]

In connection with the spin-off, WCO "evaluated more than a thousand" potential names for the new company.[28] On June 2, 2011, WCO's external consultant Lippincott presented the "results of the full legal search, linguistic 'disaster' screen and URL audit conducted on the 7 preferred name candidates for the new water Company."[29] Ultimately, the seven choices were narrowed down to three names: (1) Xylem, (2) Fluance and (3) Vitance.[30]

---

23   Xylem, Inc. 2011 10-K at internal page 15
24   Xylem, Inc. 2011 10-K at internal page 32
25   Xylem, Inc. 2011 10-K at internal page 14
26   July 11, 2011 ITT WCO, Inc. Form 10-12B, Exhibit 99.1 at 2 of 251
27   July 11, 2011 ITT WCO, Inc. Form 10-12B, Exhibit 99.1 at 13 of 251.  WCO eventually changed its legal name to Xylem, Inc.
28   ITT0000837 – 0839 at 0838, 0839 [Emphasis in Original]
29   ITT0001705 - 1763
30   ITT0005018 – 5023 at 5018

According to the Lippincott presentation, the name Xylem was deemed a "Low/Medium risk."[31] However, according to the color scheme in a slide titled "Overall assessment General Availability for primary countries," the name Xylem was coded red for "High Difficulty" in the U.S. [32] Furthermore, in a more detailed assessment of the potential risk, Lippincott outlined in red Xylem's Class 11 registration of the '362 Trademark.[33] At the Lippincott meeting WCO's "senior leadership expressed a preference for XYLEM."[34]

As of June 14, 2011, Lippincott was "parallel-pathing both XYLEM and FLUANCE in terms of logo development and other communications planning."[35] Despite the dual track approach, Xylem, Inc. was "by far [the] top priority name" of Gretchen McClain, Xylem, Inc.'s President and CEO.[36]

During the name selection due diligence process, WCO, or its consultants or its outside counsel identified at least three prior users that presented a potential risk with respect to using the name Xylem.  One of the potential issues involved a Spanish company called Novedades Angricolas ("NA").  NA owned "trademark registrations in several countries (including the U.S.) for the mark XILEMA . . ."[37]

In a June 21, 2011 email from Frank Jimenez, Xylem, Inc.'s General Counsel, to Carles Prat, Baker McKenzie, Mr. Jimenez asked Mr. Prat for advice regarding how much NA might ask for in terms of compensation. Mr. Prat responded the price "very much depends on the parties' bargain.  The most expensive purchase I have made for a blocking trademark is 3 million euros, but on some other occasions there has been no price at all."[38]

---

[31] ITT0001705 – 1763 at 1710; See also an undated Baker & McKenzie presentation at ITT000154 - 0217
[32] ITT0001705 – 1763 at 1719
[33] ITT0001705 – 1763 at 1735
[34] ITT0003943 – 3950 at 3948
[35] ITT0004251 – 4255 at 4254
[36] ITT0004251 – 4255 at 4252
[37] ITT0004251 – 4255 at 4252 - 4253
[38] ITT0000266 -  0270 at 0266 - 0267

On or about June 21, 2011, Mr. Prat spoke with the CEO of NA. According to a summary of the conversation provided by Mr. Prat, NA would be "happy for you to use Xylem provided that you do not engage in irrigation and pesticide (I do not know the exact term in English) for agricultural, gardening and similar activities (he mentioned golf courses), I said I thought this would not be a problem and that I would discuss with you."[39] However, contrary to Mr. Prat's initial belief WCO did offer "products in irrigation, both for agriculture and for golf courses."[40]

On or about June 24, 2011 Mr. Prat had a follow-up conversation with NA's CEO. According to a summary of the conversation, NA's CEO "started out very pessimistic, but by the end of the conversation had softened a bit." An email on the same day from Mr. Jimenez encouraged the team to "get creative here – supply agreements on terms favorable to NA, for example."[41] On or about June 27, 2011, NA's CEO agreed to meet with representatives of WCO on Friday July 1, 2011 even though the CEO "repeated that he sees that there is no room for an agreement . . ." NA's CEO was also apparently "not familiar" with the name ITT.[42]

According to Mr. Jimenez, despite NA's CEO not being familiar with ITT, NA displayed one of its "pumps in its photos on-line!" Mr. Jimenez suggested to Mr. Prat that when he calls NA's CEO back, he should not mention that ITT manufactured "these brands," but instead "tell him that we think there might be opportunities to do business with him under terms favorable to him, and that we'd like to discuss this as well."[43]

On or about July 7, 2011 NA rejected WCO's "proposal of 150,000 euros."[44] Nonetheless, on or about July 13, 2011, NA and Water IP Holdings LLC

---

[39]   ITT0000266 - 0270 at 0267
[40]   ITT0000266 - 0270 at 0267
[41]   ITT0000002 – 0007 at 0004
[42]   ITT0000002 – 0007 at 0004
[43]   ITT0000002 – 0007 at 0003
[44]   ITT0001117 – 1118 at 1117

("WaterCo") entered into a Trademark Coexistence Agreement ("Coexistence Agreement"). It appears that Xylem Inc. intended to submit its trademark application in Spain using the WaterCo name instead of WCO or ITT.[45]

It is my understanding that the compensation under the Coexistence Agreement was schedule to be paid in two installments. The first tranche involved a €150,000 payment to NA by WaterCo within three days of execution of the agreement. The second tranche involved a €50,000 payment to NA by WaterCo, if NA was able to get its joint partner in Mexico to enter into a similar agreement within 365 days of execution of the Coexistence Agreement.[46] Thus, the total compensation payable under the Coexistence Agreement was €200,000.[47]

It also is my understanding that under the terms of the Coexistence Agreement, WaterCo would use the Xylem trade name and trademark "only within water-related businesses, but always with the exclusion of the irrigation and fertigation business (but not, for the avoidance of doubt, with the exclusion of water pumps or parts thereof suitable for the irrigation and fertigation business)." However, it is also my understanding that the parties agreed that WaterCo would be able to use its trade name and trademark "more generally as a company name, trade name, domain or any other type of business indicator." In other words, WaterCo, presumably through Xylem, Inc., would "conduct business throughout the world as 'Xylem' and that it will use the 'Xylem Sign' as a house brand on its websites, business cards, building signage, uniforms, promotional and training materials and other uses to which house brands are normally put . . ."[48]

Another prior user identified with respect to using the name Xylem involved an Indian company called Xylem RO Solutions ("XRS"). The issue related to the fact that XRS "might appear to hold certain common rights, as it appears that XRS is using XYLEM as a part of its trade name/domain name/email address and

---

[45]    ITT0004044 – 4054 at 4044; See also ITT0005004 - 5012

[46]    ITT0000879 – 0895 at 0885 and 0886

[47]    As discussed in more detail in Section 5.5, in my opinion, this agreement is of limited relevance with respect to establishing the value of the '362 Trademark.

[48]    ITT0000879 – 0895 at 0883

perhaps as a trade/service mark."[49]   On July 7, 2011, Mr. Jimenez requested the XRS's financial statements be pulled "immediately."   According to an email from Mr. Prat, XRS's sales "appear[ed] to be very low: some USD 1 – 10 million."[50]   It is my understanding that Xylem, Inc. elected not to approach XRS and did not enter into an agreement with XRS.

On July 14, 2011, ITT announced that "the new name for the future water company [would be] **Xylem** . . ."[51]   According to an internal ITT communication:[52]

> "To create the new names, we carefully considered input from across ITT. We talked to front line employees and our leadership teams across the business, and other key constituencies, including our customers, industry thought leaders and our Board of Directors. Over the last several months, in partnership with a leading branding agency that has years of experience in creating and launching new names and identities, we worked to refine the concepts and to create choices.

> During this process, we evaluated more than a thousand options for each company's name, comparing them against strategic and creative criteria, and passing them through rigorous legal and linguistic screenings. The results are strong names for both our future Water and Defense businesses that we think represent what we do today and what we hope to become.

> The name Xylem (zī-ləm) was chosen to represent our future water company. It is an actual term for the tissue in plants that provides for the natural transportation of water. The name also speaks to the ability to navigate from the root of a challenge to a positive outcome. Xylem highlights the future Water company's focus on nourishing the present and sustaining the future as engineers of a vital resource."

---

[49]   ITT0005665 – 5675 at 5667
[50]   ITT0001117 – 1118 at 1117
[51]   ITT0000837 – 0839 at 0838 [Emphasis in Original]
[52]   ITT0000837 – 0839 at 0838, 0839 [Emphasis in Original]

ITT CORPORATION AND XYLEM, INC. v. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

It is my understanding that the new Xylem name would not be used by ITT until the spin-off was complete.[53]  Shortly after the internal announcement was made, ITT and/or WCO employees started sending emails about the new name such as "I'm a little bit confused to find out that there are many Xylem companies on the net."[54] One of the companies identified by the employees was Xylem.

On July 20, 2011, counsel for the defendant notified ITT "that its intended spinoff to a company named Xylem Inc. would infringe the registered trademark of [Xylem] and likely confuse or cause confusion or mistake or to deceive customers into believing an association exists between" Xylem and Xylem, Inc.[55]

On October 5, 2011, ITT's Board of Directors gave final approval for the spin-off.[56]  On October 26, 2011, the plaintiffs filed a complaint against Xylem seeking a declaratory judgment that "their use of the trademark and name XYLEM in connection with the water technology business of Plaintiff ITT . . . does not infringe the Defendant's federally registered trademark XYLEM for bathroom furniture and fixtures."[57]

On October 31, 2011, ITT's spin-off of Xylem, Inc. was completed.  In connection with the spin-off the shareholders of ITT received one share of Xylem, Inc.'s stock for every share of ITT held as of October 17, 2011.[58]  On November 1, 2011, which was the first day the stock traded, Xylem, Inc.'s stock price closed at $27.31.[59]

## 3.0   TRADEMARK INFRINGEMENT DAMAGES

It is my understanding that upon the finding of infringement the trademark laws allow, subject to the principles of equity, the trademark owner to recover:

---

[53]   ITT0000837 – 0839 at 0838
[54]   ITT0000837 – 0839 at 0837; See also ITT0000994
[55]   Answer and Counterclaims at ¶68
[56]   ITT Corporation and Xylem, Inc. v. Xylem, LLC at ¶3
[57]   ITT Corporation and Xylem, Inc. v. Xylem, LLC at ¶1
[58]   Xylem, Inc 2011 10-K at internal page 3
[59]   Xylem Inc Closing Stock Price_11.1.2011.pdf

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

> *"(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party." (15 U.S.C. § 1117(a))*

It is also my understanding that "courts have recognized that where damages are difficult to measure, an appropriate measure of damages includes an 'approximation of the royalties' the defendant would have had to pay, 'had it recognized the validity of [the plaintiff's] claims.'"[60]

## 4.0   DAMAGES ANALYSIS

It is my understanding that discovery is still ongoing. Thus, I reserve the right to update my findings and analyses, where necessary, and especially in view of information not presently known to me including, but not limited to, any information revealed in ongoing fact discovery or new information presented by plaintiffs experts prior to or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding.

---

[60]    *Buzz Off Insect Shield, LLC v. SC Johnson & Son*, 606 F. Supp. 2d 571, 585 (M.D.N.C. 2009); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992)

---

**ITT Corporation and Xylem, Inc. v. Xylem, LLC**

*Expert Report of Robert A. Hutchins*

---

## 4.1   Xylem's Damages

I am currently unaware of any evidence that indicates that Xylem has lost sales due to Xylem, Inc.'s activities.  This is consistent with my understanding that Xylem and Xylem, Inc. do not directly compete against each other.  I am aware, however, that in at least twenty-one instances Xylem received a payment that was intended for Xylem, Inc., and in at least seven instances Xylem, Inc. received payments intended for Xylem.[61]  This payment confusion indicates that while the two parties might not directly compete one against the other, they at least sell some products through the same channels.[62]

In addition, it is my understanding that the plaintiffs' actions have presented obstacles to Xylem's expansion plans.  In fact, it is my understanding that Xylem was asked to carry pumps for another manufacturer, but had to turn down the offer because of the uncertainty related to the pending litigation.

## 4.2   Xylem, Inc.'s Infringing Sales and Infringing Profits

As discussed in Section 3.0, it is my understanding that the trademark owner has the burden of proving the infringers sales, and the infringer must prove all deductions from sales.  Since discovery is still ongoing, I have prepared several alternative calculations of infringing sales and infringing profits.  In each of my calculations I have attempted to exclude non-U.S. related sales since Xylem only has a trademark that covers the U.S. and its territories.

My sales and profit analyses also only cover the period November 1, 2011 through June 2012.  To estimate sales during the two month period ending December 31, 2011, I simply took total Q4 2011 sales and multiplied them by 2/3rd.  I have also assumed that Q2 2012 sales will at least be equal to Q1 2012 sales.  This appears to be a reasonable assumption given that Xylem, Inc. is expected to increase revenues by 3 to 5 percent in 2012 and the fact that between

---

[61]   Payment Confusion Summary.xlsx; ITT0009470 - 9510
[62]   See also "Xylem Residential & Commercial Water Sales to specific accounts 11/1/2011 – 3/31/2012;"

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

2009 and 2011, Q1 sales accounted for 22% of total annual sales, while Q2 accounted for 25%.[63]

The following table summarizes the various infringing sales and infringing profit calculations I performed.



|  | Estimated Infringing Sales | Estimated Infringing Profits |
|---|---|---|
| Total U.S. [1] | $942.7 Million | $107.7 Million |
| U.S. Residential | $84.8 Million | $9.7 Million |
| U.S. Water Infrastructure Segment [1] | $606.1 Million | $83.4 Million |
| U.S. Applied Water Segment [1] | $350.1 Million | $38.6 Million |

Notes:
[1] The sum of the Water Infrastructure and Applied Water segments does not total U.S. sales or profits
due to intercompany eliminations or deductions that are not specifically allocated to the segments.
*See for example, Xylem Inc. Form 10-K at internal page 90*

TABLE 1

The detailed calculations underlying the numbers reflected in Table 1 can be found in Exhibits 1.1 to 1.4.

## 5.0   "REASONABLE ROYALTY" ANALYSIS

In patent infringement cases one approach commonly used to determine a royalty rate and royalty damages involves evaluating what would have happened if the patent holder and the infringer had negotiated a license at the commencement of the infringement. This is often referred to as the "hypothetical negotiation."[64]

---

63   See Exhibit 2.6

64   *Lucent Technologies, Inc. et al. v. Microsoft Corporation et al.* 580 F.3d 1301, 1325 (Fed. Cir. 2009)

This construct assumes the parties will negotiate as willing participants with the objective of reaching agreement as to the terms of a license to the patent-in suit. The hypothetical negotiation also occurs under the pretext that the patent-in suit is valid, enforceable, and would be infringed by the products contemplated by the licensee.

I will rely upon this framework for estimating the royalties Xylem, Inc. "would have had to pay, 'had it recognized the validity of [Xylem's] claims.'"

## 5.1   DATE OF THE NEGOTIATIONS

It is my understanding that in patent infringement cases, the date of the hypothetical negotiation depends on the facts and circumstances of the case; however, it is generally the date of first infringement. In this instance, a reasonable date to assume the negotiations would have occurred is in October 2011.

## 5.2   NON-INFRINGING ALTERNATIVES

From an economic perspective, the value of a patent can be measured by the difference between it and the prior art and other non-patented features that contribute to profitability. As such, where they exist, the cost to the infringer of moving to an available non-infringing alternative to the patented technology "would tend to dominate any negotiation and greatly influence the expert's economic analysis of the remaining *Georgia-Pacific* factors."[65]

As discussed in Section 2.5, it is my understanding that prior to officially selecting the Xylem name, Xylem, Inc. was parallel tracking both Xylem and Fluance. As such, it appears that Xylem, Inc.'s next-best alternative would have been to switch to the Fluance name. However, during the last six months of 2011, Xylem, Inc. spent $13 million for rebranding and marketing.[66] Presumably a significant portion of these costs would have to be incurred again by Xylem,

---

[65]   Roman L. Weil, Michael J. Wagner and Peter B. Frank, *Litigation Services Handbook The Role of the Financial Expert*, 24-16 (3rd Edition) at 24-16

[66]   See Exhibit 2.7

ITT CORPORATION AND XYLEM, INC. v. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

Inc. if it switched names in late 2011. In addition, it is also not clear what affect, if any, a name change would have had on the timing of the consummation of the spin-off and whether any additional advisory fees would have been incurred as a result.

**5.3    MARKET APPROACH**

The Market Approach to valuing intangible assets derives a market value estimate based upon comparable sales or licensing transactions between unrelated parties. More specifically, the Market Approach uses two categories of analytical procedures to derive indications of value:[67]

1) *"The collection and analysis of market-derived empirical transaction data; that is, data regarding the sale or licensing of the subject intangible asset itself and of comparative intangible assets; and*

2) *An assessment of the current market conditions (i.e., the economic conditions that influence price) and of the changes in market conditions between the dates of the empirical transactional data and the date of the analysis."*

In general, the Market Approach involves an analysis of transactions involving technology comparable to the asset being evaluated in order to identify the types of terms the parties might have agreed to during the hypothetical negotiation. In an effort to identify potentially comparable transactions, I developed search terms to be run through licensing databases maintained by RoyaltySource® and RoyaltyStat®. These search terms included derivations of terms such as "water," "irrigation," "plumbing," "bathroom fixtures," "bathroom furniture" and "water pumps." I was not able to identify any comparable transactions from these efforts. However, as discussed in Section 2.5, I would note that Mr. Prat indicated that the most he has paid for a blocking trademark is €3 million.

While my third-party research efforts did not identify any comparable licensing transactions, Xylem, Inc., through its predecessor ITT, was involved in three

---

[67]    Reilly, Robert F. and Schweihs, Robert P., Valuing Intangible Assets, 1999, p. 102

ITT CORPORATION AND XYLEM, INC. v. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

separate acquisitions that required the sellers' trademarks to be valued. The following table summarizes the reported dollar value of the trademarks for each acquisition as well as what percentage of the purchase price was assigned to the trademarks.



|  | Nova Analytics | Godwin Pumps | YSI |
|---|---|---|---|
| Trademark Value | $42 Million | $46 Million | $49 Million |
| Percent of Purchase Price | 11 Percent | 8 Percent | 16 Percent |

*Source: See Exhibits 3.1 to 3.3*

TABLE 2

These acquisitions are discussed in more detail below.

### 5.3.1 NOVA ANALYTICS ("NOVA"):

Nova was acquired on March 23, 2010 for a purchase price of $385 million, net of cash acquired. Nova provides Xylem, Inc. "with analytical instrumentation brands and technologies, which when combined within our Water Infrastructure segment, provide our customers the ability to procure, from a single source, a full suite of transport, treatment and testing products and solutions." Nova is part of Xylem, Inc.'s Water Infrastructure segment.[68] Nova's revenues in 2009 were reported at $135 million.[69]

### 5.3.2 GODWIN PUMPS ("GODWIN")

Godwin was acquired on August 3, 2010 for a purchase price of $580 million, net of cash acquired. Godwin is part of Xylem, Inc.'s Water Infrastructure segment.[70] Godwin was founded in 1976 and was based in Bridgeport, N.J. Godwin "operates a U.S. rental fleet of more than 6,000 pumps at 26 equipment rental facilities and a network of approximately 50 distributors worldwide. Godwin's

---

[68]   Xylem, Inc. 2011 10-K at internal page 69
[69]   March 24, 2010 ITT Press Release
[70]   Xylem, Inc. 2011 10-K at internal page 67 and 68

2009 revenues were approximately $200 million, with full-year 2010 revenue projected to be about $235 million."[71]

"Godwin products are primarily used in construction, disaster recovery, flooding, heavy industry, marine use, mining, oil, gas and chemical extraction, refineries, temporary fire protection and water and wastewater transport. Customers include industrial plants, construction contractors, public utility wastewaters and clean water treatment and transportation facilities, oil, gas and chemical drilling outfits, and refineries."[72]

### 5.3.3  YSI INCORPORATED ("YSI"):

YSI was acquired on September 1, 2010 for a purchase price of $309 million, net of acquired cash.  YSI is part of Xylem, Inc.'s Water Infrastructure segment.[73] YSI reported 2010 global revenues of $101 million and employs 390 people at several facilities in the United States.[74]

YSI was founded in 1948 and "develops and manufactures sensors, instruments, software and data collection platforms for environmental and coastal water quality monitoring and testing. YSI also offers Life Sciences products including biochemical analyzers for bioprocess monitoring, food and beverage processing, and sports physiology. The main market areas are marine transportation, environmental and ocean research, oil and gas, aquaculture, road and traffic, and construction."[75]

### 5.3.4  IMPLIED ROYALTY RATES:

It is my understanding that Xylem's counsel has requested the production of the valuation reports underlying the trademark values disclosed in Xylem, Inc.'s public filings.  I would expect these reports would provide information that can be relied upon to derive or estimate a royalty rate for the acquired trademarks.  It

---

[71]     June 21, 2010 ITT Corporation 8-K, Exhibit 99.1

[72]     Xylem, Inc. 2011 10-K at internal page 9

[73]     Xylem, Inc. 2011 10-K at internal page 66 and 67

[74]     Xylem, Inc. August 22, 2010 Form 10-12B/A at 13 of 254

[75]     Xylem, Inc. 2011 10-K at internal page 11

is also my understanding that, notwithstanding a discovery request, Xylem, Inc. has not produced these valuation reports.

In the absence of these valuation reports, I have attempted to "reverse engineer" what the potential royalty rate could be for these three acquisitions based upon the disclosed value conclusions and by employing the so-called Relief from Royalty Approach. The Relief from Royalty Approach is based on the premise that the value of intellectual property can be measured by what the owner of the intellectual property would pay in royalties if it did not own the property and had to license it from a third party (i.e., the licensing costs avoided by virtue of owning the property). [76]

This method requires the determination of projected royalty payments, which are generally derived by applying a reasonable royalty "rate" to an appropriate royalty "base." Often the rate is a percentage applied to net revenues derived from products and/or services embodying the intellectual property, or in this case associated with the trademark in question. Thus, the royalty base is determined by projecting the expected revenues to be generated through the useful life of the intellectual property in question. In other cases, the royalty is expressed as a percentage of the cost savings or additional profits generated by processes based on intellectual property. In either case, the lump-sum fair market value of the intellectual property is calculated as the net present value of the royalty payments.

In this instance, however, I will use the reported value conclusion for the trademarks, the revenues of the acquired companies prior to acquisition and multiple growth rate and discount rate scenarios to derive an estimated royalty rate range.[77] In other words, I will attempt to back into the royalty rate based upon the reported value of the acquired trademarks. The details of these calculations can be found in Exhibits 4.1 to 6.9. The following table summarizes royalty rates derived from this analysis for each transaction.

---

[76]   Reilly, Robert F. and Schweihs, Robert P., *Valuing Intangible Assets*, 1999, pp. 152 - 153

[77]   Xylem, Inc.'s weighted average cost of capital ("WACC") in fiscal 2011 was 6.32 percent. Xylem, Inc.'s current WACC is 8.9 percent. [Source: Bloomberg]

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

| | Nova Analytics | Godwin Pumps | YSI |
|---|---|---|---|
| Minimum | 0.997% | 0.628% | 1.504% |
| Maximum | 3.250% | 2.050% | 5.105% |
| Mean | 1.965% | 1.240% | 3.049% |
| Median | 1.941% | 1.215% | 2.970% |

*Source: See Exhibits 4.1, 5.1 and 6.1*

TABLE 3

As the above table highlights, the minimum estimated royalty rates ranged from 0.63 percent to 1.50 percent, while the maximum ranged from 2.05 percent to 5.11 percent. In my opinion, the appropriate royalty rate range for the Xylem trademark would fall below the above minimum range for the following reasons.

- The companies acquired by Xylem Inc. had significantly larger revenue bases and had been in existence for longer periods of time relative to Xylem.
- Xylem, Inc. would be undertaking the cost and risk of developing and building the Xylem name on a global scale.
- Xylem, Inc. continues to use the trademarks acquired in the acquisitions of Godwin, YSI and Nova.

5.4   <u>INCOME APPROACH</u>

The Income Approach is based upon the premise that the value of an asset is derived from the economic benefits produced by that asset. In other words,

> *"[t]he income approach is based upon the economic principle of anticipation (sometimes also called the principle of expectation). In this approach, the value of the subject intangible asset is the present value of the expected economic income to be earned from the ownership of that*

*intangible asset. As the name of the principle implies, the investor anticipates the expected economic income to be earned from the investment in the subject intangible asset. This expectation of prospective economic income is converted to a present worth – that is, the indicated value of the subject intangible asset.*[78]

Under the accounting rules, the trademarks acquired by Xylem, Inc. discussed above were all initially recorded at their estimated fair value.[79]   Xylem, Inc. also deemed the acquired trademarks as indefinite-lived intangible assets.  Indefinite-lived intangible assets are not subject to annual amortization expense, but instead are subjected to annual impairment tests.[80]  Xylem, Inc. determined that no impairment of its indefinite-lived intangible assets existed as of December 31, 2011, which means the current values of the acquired trademarks were at least equal to their initially estimated fair value.[81]

As of December 31, 2011, Xylem, Inc. reported total indefinite-lived intangible assets of $141 million.  The three acquisitions discussed above accounted for $137 million of this total.  Since Xylem, Inc. did not take an impairment charge as of December 31, 2011 on its trademarks, the fair value or market value of the acquired trademarks was at least $137 million.  That is, the present value of the future economic income Xylem, Inc. expected to realize from exploiting the trademarks it acquired was at least $137 million.

Monetary assets (net working capital), tangible assets and intangible assets are the three basic elements that constitute a business and "it also can be said that their aggregate value equals the value of the business enterprise."[82] Furthermore, the earnings of business enterprise are derived from the

---

[78]   Reilly, Robert F. and Schweihs, Robert P., *Valuing Intangible Assets*, 1999, p. 113
[79]   Xylem, Inc. 2011 10-K at internal page 64
[80]   Xylem, Inc. 2011 10-K at internal pages 66 - 69
[81]   Xylem, Inc. 2011 10-K at internal page 71
[82]   Smith, Gordon V. and Russell L. Parr, *Intellectual Property Valuation, Exploitation, and Infringement Damages*, John Wiley & Sons, Inc. 2005, page 66

exploitation or use of these three elements.[83]  In general, the market value of a company reflects the present value of a company's expected future economic income.[84] Thus, the value attributable to a company's intangible assets due to the economic income they generate are a component of a company's market value.

One measure of company's value is its market capitalization, which is equal to its stock price times the number of shares outstanding.  As of November 1, 2011, Xylem, Inc.'s market capitalization was approximately $5.04 billion.[85] Therefore, Xylem, Inc. expected that its acquired trademarks would account for at least 2.7 percent of its total future economic income.[86]

While this does not suggest or indicate that Xylem, Inc. expects the use of the Xylem name will generate 2.7 percent of its total future economic income, it is evidence of the economic value that a trademark can provide to its owner.  In fact, even if the Xylem brand accounted for only 0.9 percent of Xylem, Inc.'s expected economic income the estimated market value of the mark would be approximately $45.4 million as of October 31, 2011.

## 5.5    THE GEORGIA-PACIFIC FACTORS

The *Georgia-Pacific Corp. v. United States Plywood Corp.*[87] case identifies fifteen factors (the "*Georgia-Pacific* Factors") that provide a conceptual framework to assist the fact finder in determining the royalty that would have resulted from a hypothetical negotiation between hypothetical licensor and a hypothetical licensee.  The hypothetical negotiation may be modified, upward or downward,

---

[83]    Smith, Gordon V. and Russell L. Parr, *Intellectual Property Valuation, Exploitation, and Infringement Damages,* John Wiley & Sons, Inc. 2005, page 71

[84]    Pratt, Shannon P., Reilly, Robert F. and Schweihs, Robert P., *Valuing a Business, The Analysis and Appraisal of Closely Held Companies,* 4th ed, McGraw-Hill, 2000, pp.152 - 154

[85]    $27.31 closing price times 184.57 million shares outstanding [See Xylem, Inc. Q3 2011 10-Q at cover page and Xylem Inc Closing Stock Price_11.1.2011.pdf]

[86]    $137 million divided by $5.04 billion

[87]    *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970); *see Automed Techs. v. Knapp Logistics & Automation, Inc.,* 382 F.Supp.2d 1368, 1371 (N.D. Ga. 2005) (Duffey, J.) (applying *Georgia-Pacific* factors to determine whether production of documents should be compelled)

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

based upon an assessment of the *Georgia-Pacific* Factors. While the *Georgia-Pacific* case involved a patent infringement dispute, most, if not all, of the Factors outlined in the decision would generally be applicable to a royalty rate analysis in a trademark infringement dispute. The following sections contain my analysis of all the *Georgia-Pacific* Factors.

### ROYALTIES RECEIVED ON THE PATENT

*Georgia-Pacific* Factor #1 states: *"The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."*

It is my understanding that in patent infringement cases an "established royalty" is a royalty that,

> . . .one, was agreed to prior to the infringement; two, was paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who use the invention or was paid by an exclusive licensee who had such a significant amount of sales volume as to indicate a general acquiescence in its reasonableness by those who use the invention; three, was not negotiated under threat of a lawsuit or in settlement of a lawsuit; and four, paid for comparable rights of activity under the patent.[88]

It is my understanding that the Xylem has not licensed its trademark to any third parties. As such, there is no established royalty rate.

Thus, *Georgia-Pacific* Factor #1 is *neutral* with respect to the hypothetically negotiated royalty rate.

---

[88]  *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 993 (Fed. Cir. 1989); See also, *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d at 1075, 1078 (Fed. Cir. 1983)

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

ROYALTIES PAID BY THE LICENSEE

*Georgia-Pacific* Factor #2 states: *"The rates paid by the licensee for the use of other patents comparable to the patent in suit."*

As discussed in Section 2.5, Xylem, Inc. and NA entered into a Coexistence Agreement in July 2011 that required Xylem, Inc. to pay up to NA €200,000.  In my opinion, for the reasons discussed below, this agreement is of limited relevance with respect to establishing the value of the '362 Trademark.

First, this agreement was entered into *prior* to the official announcement that WCO had adopted the Xylem name for its future water business.  In contrast, the hypothetical negotiation in this instance would have occurred several months after the announcement. Second, Xylem, Inc. incurred $13 million in rebranding and marketing costs during the last six months of 2011, while during the first six months it had spent $0.[89]  That is, after announcing its new name Xylem, Inc. incurred significant costs in rolling it out and these sunk costs would not have been a factor considered during the negotiations with NA.

Third, it is my understanding that under the terms of the Coexistence Agreement, Xylem, Inc. essentially agreed to not use the Xylem trade name or trademark in the irrigation and fertigation business.  However, Xylem, Inc. was still able to "conduct business throughout the world as 'Xylem' and that it will use the 'Xylem Sign' as a house brand on its websites, business cards, building signage, uniforms, promotional and training materials and other uses to which house brands are normally put . . ."[90]  This is a very different scenario than the current situation where, absent an agreement, Xylem would seek an injunction to block, among other things, Xylem, Inc.'s use of the "XYLEM name for any business enterprise that markets or sells products or services relating to plumbing supplies or water treatment."[91]  I have seen no evidence that NA was considering pursuing this option if it could not reach an agreement with Xylem,

---

[89]    See Exhibit 2.5
[90]    ITT0000879 – 0895 at 0883
[91]    Answer and Counterclaim at page 23

Inc. Furthermore, unlike Xylem, NA was not operating under the brand name Xilema or Xylem. The terms and compensation structure of a hypothetical license between Xylem and Xylem, Inc. would have to be structured differently than what was agreed to between Xylem, Inc. and NA.

Fourth, as Mr. Van Winkle observed, NA was "getting compensated for their opportunity loss to expand the use of Xilema which they have not expanded in 20 years."[92] Unlike NA, Xylem had been expanding over the last several years even despite the economic climate. It is also my understanding that Xylem has plans of continuing to grow its existing business and expanding into new markets.

Fifth, it is a Coexistence Agreement, not a license agreement.[93] NA did not grant Xylem, Inc. the right to use or exploit its intellectual property and vice-versa. The particular agreement at issue here would be structured such that Xylem, Inc. would be granted the right to use the '362 Trademark.

Thus, *Georgia-Pacific* Factor #2 is *neutral* with respect to the hypothetically negotiated royalty rate.

### TERMS OF THE LICENSE

*Georgia-Pacific* Factor #3 states: *"The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold."*

In order to eliminate future confusion and potential expansion issues, Xylem would be interested in granting an exclusive license to Xylem, Inc. as well agreeing to operate under a new brand name. In general, exclusive licenses are typically associated with higher royalty rates.[94] In addition, the territory covered

---

[92]   ITT0004964 – 4967 at 4964
[93]   See ITT0005703 – 5705 at 5703
[94]   Smith, Gordon V. and Russell L. Parr, *Intellectual Property Valuation, Exploitation, and Infringement Damages,* John Wiley & Sons, Inc. 2005, page 649

by license would be limited to the U.S. and its territories. Finally, Xylem would also have to consider the costs of developing and building a new brand name.

Thus, *Georgia-Pacific* Factor #3 tends to *increase* the hypothetically negotiated royalty rate.

## LICENSOR'S POLICY OF LICENSING OR NOT LICENSING OTHERS

*Georgia-Pacific* Factor #4 states: *"The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly."*

It is my understanding that Xylem has never licensed its trademark to a third party and its policy was to maintain its intellectual property rights by not licensing the '362 Trademark.

Thus, *Georgia-Pacific* Factor #4 tends to *increase* the hypothetically negotiated royalty rate.

## COMMERCIAL RELATIONSHIP BETWEEN THE PARTIES

*Georgia-Pacific* Factor #5 states: *"The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."*

It is my understanding that Xylem and Xylem, Inc. do not directly compete against one another for the same sale. However, it is also my understanding that the parties sell at least some products through the same distribution channels and in the same territories.[95]

---

[95] See "Xylem Residential & Commercial Water Sales to specific accounts 11/1/2011 – 3/31/2012;" See ITT0009470 - 9510

Thus, *Georgia-Pacific* Factor #5 tends to *reduce* the hypothetically negotiated royalty rate.

## SALES OF OTHER PRODUCTS

*Georgia-Pacific* Factor #6 states: *"The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales."*

I am not aware of any evidence that the '362 Trademark promotes sales of other Xylem, Inc. products or generates any derivative sales for Xylem.

Thus, *Georgia-Pacific* Factor #6 is *neutral* with respect to the hypothetically negotiated royalty rate.

## DURATION OF THE PATENT

*Georgia-Pacific* Factor #7 states: *"The duration of the patent and the term of the license."*

It is my understanding that in general trademarks have an indefinite life. Thus, the license agreement would remain in effect as long as Xylem, Inc. continued to use the '362 Trademark. As a result of the duration of the potential license agreement, in my opinion, the agreement would be structured as a fully paid-up license.

Thus, *Georgia-Pacific* Factor #7 tends to *reduce* with respect to the hypothetically negotiated royalty rate.

## PROFITABILITY/COMMERCIAL SUCCESS

*Georgia-Pacific* Factor #8 states: *"The established profitability of the product made under the patent; its commercial success; and its current popularity."*

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

Xylem reported a gross profit margin of 37.8 percent in 2011 and is projecting a gross profit margin of 43.6 percent in 2012.[96]  Xylem, Inc. reported a gross profit margin of 37.9 percent and 39.2 percent in Q4 2011 and Q1 2012, respectively.[97]

In response to a question from a research analyst during Xylem, Inc.'s Q4 2011 earnings release conference call, Ms. McClain commented that she had had the chance to discuss the new name with customers and the response had been "very, very positive."  Ms. McClain further added that customers were seeing a company "focused around the issues of water" and that while Xylem, Inc. would continue to use its existing legacy brands they intended to operate under the "backdrop of one company focused around water . . ."[98]

Thus, *Georgia-Pacific* Factor #8 would tend to *increase* the hypothetically negotiated royalty rate.

## UTILITY OR ADVANTAGES OF THE PATENT AND BENEFITS TO THOSE USING THE PATENT

*Georgia-Pacific* Factor #9 states: *"The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results;"*

*Georgia-Pacific* Factor #10 states: *"The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."*

Factor #9 does not appear to be relevant in this instance.  In terms of Factor #10, it is my understanding that Xylem promotes all of its products and its company under the '362 Trademark.

---

[96]     Xylem Group 0007933 - 7956
[97]     Q4 2011 Earnings Release dated February 28, 2012 at 22
[98]     http://edge.media-server.com/m/p/v5u3vdnw/lan/en_ at 35:10 - 35:43 [Webcast of Q4 2011 Earnings Release]

---

Thus, *Georgia-Pacific* Factors #9 and #10 are *neutral* with respect to the hypothetically negotiated royalty rate.

### USE OF THE PATENT MADE BY THE INFRINGER

*Georgia-Pacific* Factor #11 states: *"The extent to which the infringer has made use of the invention; and any evidence probative of that use."*

It is my understanding that Xylem, Inc. conducts business throughout the world as Xylem and markets most of its legacy products as a "Xylem brand."[99] Xylem, Inc. reported total worldwide sales of $1.93 billion and total U.S. sales of $591 million in Q4 2011 and Q1 2012.[100]

Thus, *Georgia-Pacific* Factor #11 would tend to *increase* the hypothetically negotiated royalty rate.

### PORTION OF PROFIT OR SELLING PRICE CUSTOMARY IN THE INDUSTRY

*Georgia-Pacific* Factor # 12 states: *"The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."*

As discussed in Section 5.3, I performed research to locate publicly available information related to trademark license agreements that could be comparable to the transaction at issue in this instance.  My research did not uncover any comparable licenses.  I am also not aware of any known recognized industry customs regarding the portion of profits attributable to trademarks in general.

Thus, *Georgia-Pacific* Factor #12 is *neutral* with respect to the hypothetically negotiated royalty rate.

---

[99]  See http://www.xyleminc.com/en-us/Pages/default.aspx; See http://www.xyleminc.com/en-us/brands/Pages/default.aspx [Last Accessed June 19, 2012]

[100]  Exhibit 1.1

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

## PORTION OF THE PROFIT ATTRIBUTABLE TO THE PATENT

*Georgia-Pacific* Factor #13 states: *"The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."*

Given that Xylem, Inc. had an established customer and revenue base while it was a part of ITT, I would expect that only a very small portion of its actual profits should be credited to its brand name. However, as Xylem, Inc. continues to invest in its brand name and position itself as "one company focused around water," I would expect that the portion attributable to its brand name would increase.

Thus, *Georgia-Pacific* Factor #13 tends to *reduce* the hypothetically negotiated royalty rate.

## OPINION OF QUALIFIED EXPERTS

*Georgia-Pacific* Factor #14 states: *"The opinion of qualified experts."*

This Factor includes by reference all of the opinions stated in this report. My specific opinion is summarized in my analysis of *Georgia-Pacific* Factor #15 below.

## THE ROYALTY ACCEPTABLE TO A PRUDENT LICENSOR AND LICENSEE

*Georgia-Pacific* Factor #15 states:

*The amount that a licensor (such as the patentee) and the licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

The following facts and circumstances discussed above would have influenced the hypothetical negotiations between the parties in October 2011.

- There was no established royalty for the '362 Trademark; and
- Xylem, Inc. had incurred $13 million in rebranding and marketing costs during the last six months of 2011; and
- Xylem, Inc. could have chosen its next-best alternative name, Fluance, and avoided infringing the '362 Trademark; and
- If Xylem, Inc. chose a new name, it would have incurred additional rebranding and marketing costs above and beyond the $13 million it had already spent in connection with promoting and rolling out the Xylem name; and
- Xylem and Xylem, Inc. were not direct competitors, but did share similar customers; and
- Xylem, Inc.'s customer base and revenue stream were already established prior to the spin-off and would not be adversely affected in the short-term by a name change; and
- The royalty base would be limited to U.S. sales; and
- Xylem, Inc.'s gross profit margin was 37.9 percent in fiscal 2010 and 38.6 percent for the nine months ended September 2011; and[101]
- Xylem, Inc.'s operating profit margin was 12.1 percent in fiscal 2010 and 13 percent for the nine months ended September 2011 excluding separation costs; and[102]
- Xylem, Inc. was expecting revenues to grow by 4 to 6 percent per year over the next five years and was expecting its operating margins to increase to between 14.5 percent and 15.5 percent; and[103]
- Xylem would agree to rebrand itself if it granted an exclusive license to Xylem, Inc.; and
- The minimum royalty rates from the three acquisitions discussed in Section 5.3 ranged between 0.63 percent and 1.50 percent.

---

[101]   Q3 2011 Form 10-Q at internal page 29 and Exhibit 2.3
[102]   Q3 2011 Form 10-Q at internal page 29 and Exhibit 2.3
[103]   October 13, 2011 Investor & Analyst Day presentation at 46

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

The following table summarizes the results of my analysis of *Georgia-Pacific* Factors 1 through 13.

| FACTOR | BRIEF DESCRIPTION | IMPACT ON ROYALTY |
|:---:|---|:---:|
| 1 | Royalties received on the patent | Neutral |
| 2 | Royalties paid by the licensee | Neutral |
| 3 | Terms of the license | Increase |
| 4 | Licensor's licensing policy | Increase |
| 5 | Commercial relationship between the parties | Reduce |
| 6 | Sales of other products | Neutral |
| 7 | Duration of the patent | Reduce |
| 8 | Profitability and commercial success | Increase |
| 9 | Utility or advantages of the patent | Neutral |
| 10 | Benefits to those using the patent | Neutral |
| 11 | Use of the patent made by the infringer | Increase |
| 12 | Portion of profit or selling price customary in the industry | Neutral |
| 13 | Portion of the profit attributable to the patent | Reduce |

## 5.6     ROYALTY RATE CONCLUSION

In attempting to establish a royalty rate that is probative of the value of the '362 Trademark at the time of the hypothetical negotiation, I have considered the facts and circumstances cited above and the results of my analysis of the Market Approach, the Income Approach, and the *Georgia-Pacific* factors.

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

My Market Approach analysis did not uncover any comparable licensing transactions that would indicate what the potential terms of an agreement would be. However, my analysis of the implied royalty rates based upon the trademark values assigned to the three companies acquired by Xylem, Inc., indicates that the minimum royalty rates ranged between 0.63 and 1.50 percent. In my opinion, a rate slightly below 0.63 percent serves as conservative approximation of the high end of the reasonable royalty range. As such, I will set the maximum rate for the hypothetical negotiations at 0.60 percent.

My Income Approach analysis indicated that Xylem, Inc. expected the Godwin, YSI and Nova trademarks would account for 2.7 percent of its future economic income. In my opinion, the value of the '362 Trademark as of the date of the hypothetical negotiation should be significantly less than 2.7 percent of Xylem, Inc.'s total expected economic income. In my opinion, the value of the '362 Trademark to Xylem, Inc. should also exceed the $15 million Xylem, Inc. spent on rebranding and marketing between Q3 2011 and Q1 2012.[104]

Based on this framework, I prepared a calculation using the Relief from Royalty Approach to arrive at minimum reasonable rate that still resulted in an average value that was reasonably higher than the $15 million Xylem, Inc. has already invested in rolling out the name. The details of my analysis are contained in Exhibits 7.1 to 7.8. In my opinion, the minimum royalty rate used in connection with the hypothetical negotiation would have been 0.20 percent, which results in an average total value of $27.9 million. In other words, the $27.9 million represents a fully paid up license.

In terms of the *Georgia-Pacific* factors, as the above table highlights, four of the factors suggest an increase to the rate, while three suggest a decrease and the remaining six are neutral. In my opinion, Factor 13, the portion of the profit attributable to the mark, and Factor 8, the extent of the use of the invention by Xylem, Inc., would be the most relevant economic factors considered by the party's as part of their evaluation of a potential rate. Factor 8 suggests a higher

---

[104]   See Exhibit 2.7

rate, while Factor 13 suggests a lower rate. In addition, Factor 3, the terms of the license, would play a key role in Xylem's evaluation of what would be an acceptable rate to them because the license agreement would require Xylem to rebrand itself. Overall, in my opinion, my analysis of the *Georgia-Pacific* factors would suggest a royalty rate in the higher end of the above ranges.

In summary, the reasonably royalty rate range used during the hypothetical negotiation would have been between 0.20 percent and 0.60 percent and the Georgia-Pacific factors support a rate towards the top end of the range. Based upon this information, in my opinion, the party's would have concluded that a royalty rate of 0.45 percent was reasonable.

As discussed above, the terms of the license agreement would grant Xylem, Inc. an exclusive license to the '362 Trademark and other applicable registrations Xylem owned. In addition, Xylem would agree to cease using the Xylem name as its brand name and for marketing purposes. These terms effectively assume that the party's would agree to a fully paid up license that would in essence transfer ownership of the mark to Xylem, Inc. In my opinion, based on a royalty rate of 0.45 percent, the minimum value of the '362 Trademark in this instance is $45 million. The details of this calculation are contained in Exhibits 8.1 to 8.8.

ITT CORPORATION AND XYLEM, INC. V. XYLEM, LLC

*EXPERT REPORT OF ROBERT A. HUTCHINS*

My opinions and findings are based upon the analysis and study of information and documents reviewed as of the date of this report. I reserve the right to supplement and/or amend the opinions expressed herein in response to positions taken by experts or by the plaintiff. I further reserve the right to amplify what is stated above, where necessary, and especially in view of information not presently known to me including but not limited to any information revealed in ongoing fact discovery or new information presented by plaintiff's experts prior to or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding. Furthermore, I expect to be involved in the preparation of demonstrative exhibits and other materials to illustrate my testimony at trial.

Respectfully submitted,

Robert A. Hutchins
on this Day, June 20, 2012



# Robert A. Hutchins, CPA[1]

**Rob Hutchins**
Managing Director

**Navigant Consulting**
1180 Peachtree Street, N.E.
Suite 1900
Atlanta, Georgia 30309
Phone:   (404) 575 – 3829 (Direct)
Fax:      (404) 602 – 4213

1801 K Street, N.W.
Washington, D.C. 20006
Phone:   (202) 973-4521
Fax:      (202) 973-2401

rhutchins@navigantconsulting.com

**Education and professional**
Certified Public Accountant
licensed in Georgia

Bachelor of Science, Accounting
Georgetown University

**Employment**
Navigant Consulting
2003 to present

InteCap, Inc.
1998 to 2003

Peterson Consulting
1992 to 1998

Medicus Healthcare Group
1990 - 1992

**Professional associations**
American Institute of CPAs

Georgia Society of CPAs

Rob Hutchins is a Managing Director with Navigant Consulting.   Rob has been consulting with private and government clients and counsel on financial, accounting and economic issues for over eighteen years. He has gained substantial experience in a broad range of bankruptcy, commercial litigation, financial services, and intellectual property engagements and has served as an expert witness, consultant or forensic accountant on numerous occasions.   He has consulted on matters involving breach of contract, breach of fiduciary duty, director and officer misconduct, fraud, fraudulent conveyances, insolvency, patent infringement, preferences, product liability, purchase price disputes, trade secret misappropriation and trademark infringement.

Rob has worked on disputes in a variety of industries including biotech, financial services, healthcare, internet, medical devices, pharmaceutical and telecommunications. In connection with these assignments, Rob has performed numerous forensic accounting investigations, lost profits studies, damage calculations, royalty rate analyses, fraud investigations and valuations.   He has also helped prepare a significant number of expert and rebuttal reports and has assisted counsel prepare for numerous depositions and trials.

In non-litigation matters, Rob has helped clients develop strategic and IP asset management business plans and design and implement both strategic and enforcement IP licensing programs.   He has also conducted numerous valuations of intellectual property assets in various industries and at various stages of development.   Furthermore, he has also helped clients in the analysis and development of royalty rates in connection with the financial structuring of license agreements.

Included below are selected examples of some of Rob's IP engagement experience.

---

[1]      Mr. Hutchins is a licensed CPA in the state of Georgia.  Neither Mr. Hutchins, nor Navigant Consulting provide audit, attest or public accounting services, in this or any state.



**LITIGATION ASSIGNMENTS**

- Served as the lead consultant in a patent infringement dispute in the pharmaceutical industry between a brand manufacturer and a generic company. The work involved an analysis of the historical performance of the patented product including its market share and pricing. Also prepared preliminary lost profits and reasonable royalty estimates and served as the expert in a mock jury exercise.

- Served as the lead consultant in a patent infringement dispute in the pharmaceutical industry between two brand manufacturers. The work initially involved modeling settlement options and risk exposure under multiple scenarios. Also provided consulting assistance during expert discovery and served as the expert in a mock jury exercise.

- Served as the lead consultant in a patent infringement dispute in the pharmaceutical industry between two brand manufacturers. The work has involved analyzing potential damages and settlement options under multiple scenarios.

- Served as the lead consultant in a patent infringement dispute in the pharmaceutical industry between a brand manufacturer and a generic company. The work involved analyzing the risk exposure of the generic firm, possible settlement options and the impact on the patent owner's cash flow if the generic company were allowed to enter the market prior to patent expiration. Additional work has involved analyzing the effect the litigation has had on the brand manufacturer's market value.

- Served as the expert in a patent infringement dispute between a maker of DJ equipment and a patent holding company. The work involved the analysis and calculation of a reasonable royalty rate and royalty damages.

- Served as the lead consultant in a patent infringement dispute between two competitors in the home lighting industry. The work involved the analysis and calculation of a reasonable royalty rate and royalty damages.

- Served as the expert in a patent infringement dispute between two competitors in the roofing industry. The work involved the analysis and calculation of a lost profits, a reasonable royalty rate and royalty damages.

- Served as the expert in a patent infringement dispute in the computer industry between computer resellers and a patent holding company. The work involved the analysis and calculation of a reasonable royalty rate and royalty damages.



- Served as the lead consultant in a patent and trademark infringement dispute between a licensor and its former licensee in the medical device industry. The work involved the calculation of lost profits and reasonable royalties and trademark damages based on a reasonable royalty rate.

- Served as the lead consultant in a patent infringement dispute involving printer resolution enhancement technology. The work involved a detailed analysis of product line and division financial statements and the quantification of global infringing product sales and convoyed sales and the calculation of a reasonable royalty.

- Served as the lead consultant in a patent infringement matter involving manufacturers of snow blowing equipment. The work involved responding to the plaintiff's lost profits, reasonable royalty and price erosion calculations and developing alternatives to said calculations.

- Served as the lead consultant in a patent infringement matter involving manufacturers of high-end office chairs. The work involved quantifying lost profits, reasonable royalty and price erosion damages.

- Served as the expert in a trade secrets misappropriation and breach of fiduciary duty matter. The allegations centered around a group of former employees who had allegedly used its former employer's trade secrets to help launch a competing firm. The work primarily involved quantifying lost profits incurred by the former employer.

- Served as the expert in a trade secrets misappropriation matter. The allegations involved a former employee who had allegedly misappropriated certain trade secrets related to antibodies and the potential use of those antibodies to treat specific diseases. The work involved an analysis of the potential damages attributable to the misappropriation.

- Served as the expert in a legal malpractice dispute. The allegations involved the failure of corporate counsel to adequately transfer certain intellectual property assets. The work involved an analysis of the value of the assets that were allegedly not transferred.

- Served as the lead consultant in a royalty dispute between a licensor and a licensee regarding the underpayment of royalties and the failure to maintain adequate records. The work included quantifying the amount of royalties underpaid and identifying and evaluating the adequacy of the royalty related records maintained by the licensee. Also analyzed the effectiveness and reasonableness of the licensee's royalty reporting system.



- Served as the lead consultant in a trade secret misappropriation dispute between a drug development company, one of its competitors and a university. The work involved the forensic reconstruction of nearly ten years of data in order to quantify the developmental cost of the trade secrets and the review of fifteen years worth of university license agreements.

- Engaged as the expert in a trademark infringement dispute in the telecommunications industry. The work included conducting a detailed analysis of the accounting records in order to quantify the relevant sales base.

- Served as the lead consultant in a trademark infringement dispute to value the trademark of a UK based executive recruiting firm. The work involved responding to the trademark owner's value assessment and preparing a separate value analysis to be used in settlement discussions.

- Served as the lead consultant in a trademark infringement dispute to value the trademark of a UK shopping mall. The work also involved analyzing the development costs incurred by the alleged infringer in rolling out its new brand.

### NON-LITIGATION ASSIGNMENTS

- Served as the lead consultant in the valuation of a portfolio of nutraceutical products. The portfolio included products at various stages of development and IP protection. The purpose of the valuation was to determine whether additional funds should be invested in order to complete the development of the portfolio.

- Served as the lead consultant in the valuation of a software product that had been internally developed by a global engineering firm. The software was to be spun out of the firm and contributed to an independent software company. Assisted in the negotiations with the acquiring company and with presentations to the seller's Board of Directors.

- Served as the lead consultant on a team assisting a small medical product manufacturer in its license negotiations with a major distributor. The work involved building various cash flow models to evaluate the financial structure of the proposed arrangement. The scenarios analyzed ranged from the manufacturer "going it alone" to the distributor acquiring it outright.

- Served as the lead consultant in the development of a detailed licensing program for a top 5 financial services firm and its portfolio of smartcard



and ATM security enhancement patents. The work involved a detailed review of the technology and the marketplace and a valuation of the patent portfolio. The portfolio included both issued and pending patents.

- Served as the lead consultant in the development of a business plan, valuation model and detailed pro-forma financial projections for an Internet appliance company and its related IP. The appliance was developed to send hard copy documents directly to email via a fax machine.

- Served as the lead consultant in the development of a business plan, valuation model and detailed pro-forma financial projections for an Internet software company. Also conducted a detailed analysis of industry pricing to help the software company develop a rate sheet.

- Served as the lead consultant in the development of a detailed licensing program for a company and its portfolio of interactive television patents. The work involved a detailed review of the technology and the marketplace and a valuation of the patent portfolio.

### PRESENTATIONS

- *"Evolution of Patent Infringement Damages,"* Patent Committee, Intellectual Property Law Section, State Bar of Georgia (May 2002)

- *"Practical Considerations in Presenting a Damages Case,"* Intellectual Property Owners Association 2002 Annual Meeting - Roundtable Discussion, (November 2002)

EXHIBIT A

## TESTIMONY EXPERIENCE OF ROBERT A. HUTCHINS

Mr. Hutchins has served as an expert witness and/or litigation consultant in a number of engagements requiring analysis of financial and economic issues, lost profits calculations and/or determinations of economic damages. A list of Mr. Hutchins testimony experience during the past four year is included herein.

| CASE | TYPE OF CASE | DATE OF TESTIMONY | TYPE OF TESTIMONY |
|---|---|---|---|
| Sinomab Bioscience Limited, Skytech Technology Limited, and Shui-on Leung v. Immunomedics | Trade Secret Misappropriation | January 2008 | Deposition – Court of Chancery of the State of Delaware in and for New Castle County |
| Simpliance Inc. and James V. Schuster v. William Bruce Davis, Esq. | Legal malpractice | January 2008 | Deposition – Hamilton County, Ohio Court of Common Pleas |
| AFC Enterprises, Inc. v. Cajun Operating Company | Intentional interference with contractual and business relations | June 2008 | Deposition – State Court of Fulton County, State of Georgia |
| Dwayne Glowner v. Muller Martini Mailroom Systems, Inc. | Patent infringement | May 2012 | Deposition – United States District Court For the Middle District of Florida |

# ITT CORPORATION ET AL
## V.
## XYLEM GROUP, LLC

*DOCUMENTS CONSIDERED*

| |
|---|
| Complaint filed October 26, 2011 |
| Answer and Counterclaim filed December 12, 2011 |
| ITT00005018-23 |
| ITT0005104-05 |
| ITT0000837-39 |
| ITT0000994 |
| ITT0000991-993 |
| ITT0001126 |
| ITT0001117-8 |
| ITT0005665-75 |
| ITT0000664-65 |
| ITT0004251-55 |
| ITT0005703-05 |
| ITT0000266-70 |
| ITT0000002-8 |
| ITT0000879-95 |
| ITT0000794-796 |
| ITT0000107 |
| ITT0004964-67 |
| ITT0000086-105 |
| ITT0005120-27 |
| ITT0005128-35 |
| ITT0005136-44 |
| ITT WCO, Inc. SEC Form 10-12B filed July 11, 2011 |
| Xylem, Inc. SEC Form 10-12B filed August 22, 2011 |
| Xylem, Inc. SEC Form 10-12B filed September 14, 2011 |
| Xylem, Inc. SEC Form 10-Q filed November 21, 2011 |
| Xylem, Inc. SEC Form 10-K filed February 28, 2011 |
| Xylem, Inc. SEC Form 10-Q filed May 3, 2012 |
| Xylem, Inc. Annual Report 2011 |
| BB&T Capital Markets Analyst Report May 23, 2012 |
| Ladenburg Thalmann Analyst Report May 8, 2012 |
| Xylem, Inc. Q1 2012 Earnings Conference Call - May 3, 2012 |
| Xylem, Inc. Company Profile and Financial Statements per Capital IQ |
| United States Patent and Trademark Office Examiner Amendment - July 14, 2006 |
| United States Patent and Trademark Office Notice of Publication - September 26, 2006 |
| Xylem, Inc. Investor & Analyst Day Presentation October 13, 2011 |
| Xylem, Inc. Q4 2011 Earnings Release Presentation - February 28, 2012 |
| Xylem, Inc. Q1 2012 Earnings Release Presentation - May 3, 2012 |
| Xylem Trademark Registration No. 3,183,362 - December 12, 2006 |
| Xylem, Inc. Closing Stock Price 11/1/2011 - Per Yahoo Finance |
| Gabelli & Company 22nd Annual Pump, Valve and Motor Symposium Presentation 2/9/2012 |
| KeyBanc Capital Markets Conference Presentation 5/30/2012 |

Exhibit B

ITT CORPORATION ET AL

V.

XYLEM GROUP, LLC

*DOCUMENTS CONSIDERED*

| |
|---|
| Complaint filed October 26, 2011 |
| Baker & McKenzie Invoices - June 7, 2011 |
| ITT0003876-92 |
| Lippincott Invoices: May 17, 2011 - February 29, 2012 |
| ITT0009470-9510 |
| Xylem Residential & Commercial Water Sales to specific accounts 11/1/2011 - 3/31/2012 |
| Xylem Group 0007933 - 7944 |
| Xylem Group 0007945 - 7956 |
| Payment Confusion Summary.xlsx |
| Supply House Times Magazine February 2012 |
| Supply House Times Magazine March 2012 |
| Supply House Times Magazine June 2011 |
| Supply House Times Magazine December 2011 |
| ITT0003943-50 |
| Xylem Group 003529-32 |
| ITT0000154 - 217 |
| ITT0001705 -1763 |
| ITT0004044-54 |
| ITT0005004-12 |
| Xylem Group 003541-43 |
| TM Web Chart.pdf |
| ITT Corp. SEC Form 8-K, Exhibit 99.1 filed June 21, 2010 |

Exhibit 1.1

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

## *XYLEM, INC. ESTIMATED  U.S. SALES AND OPERATING PROFIT Q4 2011 - Q2 2012*
### *In Millions ($)*

|  | Q4 2011 | Q1 2012 | Q2 2012[5] | Total |
|---|---|---|---|---|
| Xylem, Inc. Sales[1] | $1,003.0 | $925.0 | $925.0 | $2,853.0 |
| Percent Of U.S. Generated Sales[2] | 36% | 38% | 38% |  |
| U.S. Xylem, Inc. Sales[3] | $239.7 | $351.5 | $351.5 | $942.7 |
| Xylem, Inc. Operating Margin[4] | 12.0% | 11.2% | 11.2% |  |
| **U.S. Operating Profit** | $28.7 | $39.5 | $39.5 | $107.7 |

NOTES:

[1]See Exhibit 2.2

[2]See Exhibit 2.1

[3] Q4 2011 sales equal to total U.S. quarterly sales multiplied by 2/3 to reflect the fact that the spin-off was completed on October 31, 2011.

[4]See Exhibit 2.3

[5]Q1 2012 results used as a proxy for Q2 2012.

Exhibit 1.2

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

## XYLEM, INC. ESTIMATED TOTAL  U.S. RESIDENTIAL SALES AND OPERATING PROFIT

### In Millions ($)

|  | Q4 2011 | Q1 2012 | Q2 2012[6] | Total |
|---|---|---|---|---|
| Xylem, Inc. Sales[1] | $1,003.0 | $925.0 | $925.0 | $2,853.0 |
| Percent Of Residential Sales[2] | 9% | 9% | 9% | 9% |
| Xylem, Inc. Residential Sales | $90.3 | $83.3 | $83.3 | $256.8 |
| Percent Of U.S. Generated Sales[3] | 36% | 38% | 38% | |
| Xylem, Inc. U.S. Residential Sales[4] | $21.6 | $31.6 | $31.6 | $84.8 |
| Xylem, Inc. Operating Margin[5] | 12.0% | 11.2% | 11.2% | |
| U.S. Residential Sales Operating Profit | $2.6 | $3.6 | $3.6 | $9.7 |

NOTES:

[1] See Exhibit 2.2

[2] Xylem, Inc. 2/27/2012 Q4 2011 Earnings Release Presentation Page 11; Xylem, Inc. 5/3/2012 Q1 2012 Earnings Release Page 5.

[3] See Exhibit 2.1

[4] Q4 2011 sales equal to total quarterly U.S. Residential sales multiplied by 2/3 to reflect the fact that the spin-off was completed on October 31, 2011.

[5] See Exhibit 2.3

[6] Q1 2012 results used as a proxy for Q2 2012.

CONFIDENTIAL

Exhibit 1.3

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*XYLEM, INC. ESTIMATED TOTAL  U.S. WATER INFRASTRUCTURE SALES AND OPERATING PROFIT*

In Millions ($)

| | Q4 2011 | Q1 2012 | Q2 2012[5] | Total |
|---|---|---|---|---|
| Water Infrastructure Segment Sales[1] | $679.0 | $584.0 | $584.0 | $1,847.0 |
| Percent Of U.S. Generated Sales[2] | 36% | 38% | 38% | |
| U.S. Water Infrastructure Segment Sales[3] | $162.2 | $221.9 | $221.9 | $606.1 |
| Water Infrastructure Operating Margin[4] | 15.3% | 13.2% | 13.2% | 13.8% |
| **U.S. Water Infrastructure Operating Profit** | $24.9 | $29.2 | $29.2 | $83.4 |

NOTES:

[1] See Exhibit 2.5

[2] See Exhibit 2.1

[3] Q4 2011 sales equal to total quarterly U.S. Water Infrastructure sales multiplied by 2/3 to reflect the fact that the spin-off was completed on October 31, 2011.

[4] See Exhibit 2.5

[5] Q1 2012 results used as a proxy for Q2 2012.

Exhibit 1.4

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

### XYLEM, INC. ESTIMATED TOTAL  U.S. APPLIED WATER SALES AND OPERATING PROFIT

*In Millions ($)*

|  | Q4 2011 | Q1 2012 | Q2 2012[5] | Total |
|---|---|---|---|---|
| Applied Water Segment Sales[1] | $336.0 | $355.0 | $355.0 | $1,046.0 |
| Percent Of U.S. Generated Sales[2] | 36% | 38% | 38% |  |
| U.S. Applied Water Segment Sales[3] | $80.3 | $134.9 | $134.9 | $350.1 |
| Applied Water Operating Margin[4] | 9.2% | 11.6% | 11.6% | 11.0% |
| **U.S. Applied Water Operating Profit** | $7.4 | $15.6 | $15.6 | $38.6 |

NOTES:

[1] See Exhibit 2.5

[2] See Exhibit 2.1

[3] Q4 2011 sales equal to total quarterly U.S. Applied Water sales multiplied by 2/3 to reflect the fact that the spin-off was completed on October 31, 2011.

[4] See Exhibit 2.5

[5] Q1 2012 results used as a proxy for Q2 2012.

*CONFIDENTIAL*

Exhibit 2.1

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*XYLEM, INC. ANNUAL SALES 2009 - 2011 AND Q1 2012*

*In Millions ($)*

|  | FY 2009 | FY 2010 | FY 2011 | Q1 2012 |
|---|---|---|---|---|
| Xylem, Inc. Sales[1] | $2,849.0 | $3,202.0 | $3,803.0 | $925.0 |
| U.S. Xylem, Inc. Sales[2] | 956.0 | 1,125.0 | 1,363.0 | 351.5 |
| U.S. Revenue Percent Of Total Sales | 34% | 35% | 36% | 38% |

NOTES:

[1] See Exhibit 2.2

[2] FY 2009-2011 per Pages 13-14 of 2/28/2012 10-K. Q1 2012 per Page 33 of 5/3/2012 10-Q.

Exhibit 2.2

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*XYLEM, INC. P&L FY 2009 - 2011 AND Q4 2011 TO Q1 2012*
*In Millions ($)*

| | FY 2009 | FY 2010 | FY 2011 | Q4 2011 | Q1 2012 |
|---|---|---|---|---|---|
| Revenue | $ 2,849 | $ 3,202 | $ 3,803 | $ 1,003 | $ 925 |
| Cost of Revenue | 1,812 | 1,988 | 2,342 | 623 | 562 |
| Gross Profit | $ 1,037 | $ 1,214 | $ 1,461 | $ 380 | $ 363 |
| SG&A | $ 667 | $ 737 | $ 877 | $ 233 | $ 231 |
| R&D | 63 | 74 | 100 | 27 | 28 |
| Separation Costs | - | - | 87 | 20 | 5 |
| Restructuring Costs | 31 | 15 | 2 | - | - |
| Operating Income | $ 276 | $ 388 | $ 395 | $ 100 | $ 99 |
| Operating Income (Less Separation Costs) | 276 | 388 | 482 | 120 | 104 |
| Interest Expense | $ - | $ - | $ 17 | $ 15 | $ 14 |
| Other non-operating income | 1 | - | 5 | - | (1) |
| Income before taxes | $ 277 | $ 388 | $ 383 | $ 85 | $ 84 |
| Income Tax Expense | $ 14 | $ 59 | $ 104 | $ 33 | $ 21 |
| Net Income | $ 263 | $ 329 | $ 279 | $ 52 | $ 63 |

*Source(s): 2/28/2012 Xylem, Inc. 10-K; 2/27/2012 Q4 2011 Earnings Release Presentation; 5/3/2012 Xylem, Inc. 10-Q*

CONFIDENTIAL

Exhibit 2.3

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

## XYLEM, INC. P&L FY 2009 - Q1 2012
### (% Of Sales)

| | FY 2009 | FY 2010 | FY 2011 | Q4 2011 | Q1 2012 |
|---|---|---|---|---|---|
| Revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Revenue | 63.6% | 62.1% | 61.6% | 62.1% | 60.8% |
| Gross Margin | 36.4% | 37.9% | 38.4% | 37.9% | 39.2% |
| | | | | | |
| SG&A | 23.4% | 23.0% | 23.1% | 23.2% | 25.0% |
| R&D | 2.2% | 2.3% | 2.6% | 2.7% | 3.0% |
| Separation Costs | 0.0% | 0.0% | 2.3% | 2.0% | 0.5% |
| Restructuring Costs | 1.1% | 0.5% | 0.1% | 0.0% | 0.0% |
| Operating Margin | 9.7% | 12.1% | 10.4% | 10.0% | 10.7% |
| Operating Margin (Less Separation Costs) | 9.7% | 12.1% | 12.7% | 12.0% | 11.2% |
| | | | | | |
| Interest Expense | 0.0% | 0.0% | 0.4% | 1.5% | 1.5% |
| Other non-operating income | 0.0% | 0.0% | 0.1% | 0.0% | -0.1% |
| Income before taxes | 9.7% | 12.1% | 10.1% | 8.5% | 9.1% |
| Income Tax Expense | 0.5% | 1.8% | 2.7% | 3.3% | 2.3% |
| Net Income | 9.2% | 10.3% | 7.3% | 5.2% | 6.8% |

*Source: Exhibit 2.2*

CONFIDENTIAL

Exhibit 2.4

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

### *XYLEM, INC.  ANNUAL SEGMENT SALES 2009 - 2012*
*In Millions ($)*

|  | FY 2009 | | FY 2010 | | FY 2011 | |
|---|---|---|---|---|---|---|
|  | Water Infrastructure | Applied Water | Water Infrastructure | Applied Water | Water Infrastructure | Applied Water |
| Segment Sales | $1,651.0 | $1,254.0 | $1,930.0 | $1,327.0 | $2,416.0 | $1,444.0 |
| Percent of Total Segment Sales | 57% | 43% | 59% | 41% | 63% | 37% |
| Segment Operating Margin | 13.7% | 8.7% | 14.3% | 11.9% | 14.2% | 11.1% |
| Segment Operating Profit | $227.0 | $109.0 | $276.0 | $158.0 | $343.0 | $160.0 |

NOTES:

*Source(s): FY 2009 - 2010 per Xylem, Inc. Investor Presentation 10/13/2011 Page 38-39; FY 2011 per 2/28/2012 10-K Page 36 and 39.*

CONFIDENTIAL

Exhibit 2.5

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

## XYLEM, INC.  *QUARTERLY SEGMENT SALES* Q4 2011 – Q1 2012
*In Millions ($)*

| | Q4 2011 | | | | Q1 2012 | | | |
|---|---|---|---|---|---|---|---|---|
| | Water Infrastructure | Applied Water | Eliminations[3] | Total | Water Infrastructure | Applied Water | Eliminations[3] | Total |
| Segment Sales[1] | $679.0 | $336.0 | ($12.0) | $1,003.0 | $584.0 | $355.0 | ($14.0) | $925.0 |
| Percent of Total Segment Sales | 67% | 33% | | | 62% | 38% | | |
| Segment Operating Margin[2] | 15.3% | 9.2% | | 12.0% | 13.2% | 11.6% | | 11.2% |
| Segment Operating Profit | $104.0 | $31.0 | ($15.0) | $120.0 | $77.0 | $41.0 | ($14.0) | $104.0 |

| NOTES: |
|---|

[1] Q4 2011 per 2/27/2012 Q4 2011 Earnings Release Presentation Page 28; Q1 2012 per 5/3/2012 10-Q Pg. 23

[2] Q4 2011 per 2/27/2012 Q4 2011 Earnings Release Presentation Page 28; Q1 2012 per 5/3/2012 10-Q Page 30. Excludes separation costs.

[3] This is equal to the difference between consolidated sales and operating profit per Exhibit 2.2 and the total of Water Infrastructure and Applied Water segment sales and operating profit.

Exhibit 2.6

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*QUARTERLY REVENUE PROFILE (% OF FISCAL YEAR REVENUE)*

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2009-2011 Composite | 22% | 25% | 25% | 28% |

*Source: Xylem, Inc. 5/3/2012 Q1 2012 Earnings Release Presentation - Page 16*

*CONFIDENTIAL*

Exhibit 2.7

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

### *XYLEM, INC. QUARTERLY REBRANDING COSTS*
*In Millions ($)*

|  | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 | Q1 2012 |  | Total |
|---|---|---|---|---|---|---|---|
| Rebranding Costs | $0 | $0 | $3 | $10 | $2 |  | $15 |

*Source: Xylem, Inc. 2/27/2012 Q4 2011 Earnings Release Pg 21; Xylem, Inc. 5/3/2012 10-Q Pg. 9*

Exhibit 3.1

# ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*Purchase Price Allocation of Nova Analytics Acquisition*
*In Millions ($)*

| | | | Percentage of |
|---|---|---|---|
| Purchase Price | $ | 385 | Purchase Price |
| Assets acquired and liabilities assumed: | | | |
| Accounts Receivable | 16 | | 4% |
| Inventory | 29 | | 8% |
| Property, Plant, and Equipment | 14 | | 4% |
| Goodwill | 232 | | 60% |
| Intangible Assets | | | |
| Distributor Relationships | 112 | | 29% |
| Proprietary Technology | 10 | | 3% |
| **Trademarks** | **42** | | **11%** |
| Other current and non-current assets | 6 | | 2% |
| Deferred Income Taxes | (53) | | -14% |
| Other current and non-current liabilities | (23) | | -6% |
| Net Assets acquired | $ | 385 | |

*Source: Xylem, Inc. 10-K Filed 2/28/2012 - Page 69*

CONFIDENTIAL

Exhibit 3.2

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*Purchase Price Allocation of Godwin Pumps Acquisition*
*In Millions ($)*

| Purchase Price | | $   580 | Percentage of Purchase Price |
|---|---|---|---|
| Assets acquired and liabilities assumed: | | | |
|    Accounts Receivable | 44 | | 8% |
|    Inventory | 56 | | 10% |
|    Property, Plant, and Equipment | 82 | | 14% |
|    Deferred Income Taxes | 1 | | 0% |
|    Goodwill | 252 | | 43% |
|    Intangible Assets | | | |
|      Customer Relationships | 107 | | 18% |
|      Proprietary Technology | 14 | | 2% |
|      **Trademarks** | **46** | | 8% |
|    Other current and non-current assets | 7 | | 1% |
|    Other current and non-current liabilities | (29) | | -5% |
| Net Assets acquired | | $   580 | |

*Source: Xylem, Inc. 10-K Filed 2/28/2012 - Page 68*

Exhibit 3.3

## ITT CORPORATION ET AL V. XYLEM GROUP, LLC

*Purchase Price Allocation of YSI Corporation Acquisition*
In Millions ($)

| Purchase Price | | $ 309 | Percentage of Purchase Price |
|---|---|---|---|
| Assets acquired and liabilities assumed: | | | |
|    Accounts Receivable | 15 | | 5% |
|    Inventory | 15 | | 5% |
|    Property, Plant, and Equipment | 9 | | 3% |
|    Goodwill | 190 | | 61% |
|    Intangible Assets | | | |
|      Customer Relationships | 41 | | 13% |
|      Proprietary Technology | 35 | | 11% |
|      **Trademarks** | **49** | | **16%** |
|    Other current and non-current assets | 17 | | 6% |
|    Other current and non-current liabilities | (62) | | -20% |
| Net Assets acquired | | $ 309 | |

*Source: Xylem, Inc. 10-K Filed 2/28/2012 - Page 67*