# Exhibit 5

**Memorandum in Support of Motion of Plaintiffs/
Counterclaim-Defendants to Exclude the Opinions of
Robert A. Hutchins, CPA, as to a Reasonable Royalty**

Page 1

1                                              1

2            IN THE UNITED STATES DISTRICT COURT

       FOR THE NORTHERN DISTRICT OF GEORGIA

3

                    ATLANTA DIVISION

4

             NO. 1:11 Civ. 3669-WSD

5

6    _____

7    ITT CORPORATION and XYLEM INC.,

8            Plaintiffs,

9        vs.

10   XYLEM GROUP, LLC,

11           Defendant.

12   _____

13            VIDEOTAPED DEPOSITION OF

14              ROBERT A. HUTCHINS

15

16            Fellows LaBriola, LLP

              225 Peachtree Street, N.E.

17                 Suite 2300

                 Atlanta, Georgia

18

19

20              August 30, 2012

21

22

23   Reported by:

24   SHARON A. GABRIELLI, RPR

25   TSG Job No. 52928

## Page 2

ROBERT A. HUTCHINS

August 30, 2012
9:08 a.m.

Deposition of ROBERT A. HUTCHINS held at the offices of Fellows LaBriola, LLP, 225 Peachtree Street, Atlanta, Georgia, pursuant to agreement before Sharon A. Gabrielli, a Registered Professional Reporter in the State of Georgia.

--oOo--

## Page 3

ROBERT A. HUTCHINS

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

ROBERT SHAUGHNESSY, ESQ.
Williams & Connolly
725 Twelfth Street, N.W.
Washington, D.C. 20005

On behalf of the Defendant:
STEPHEN LaBRIOLA, ESQ.
CHRISTINA BAUGH, ESQ.
Fellows LaBriola
225 Peachtree Street, N.E.
Atlanta, Georgia 30303

--oOo--

## Page 4

ROBERT A. HUTCHINS
INDEX
EXAMINATION

Witness Name                                    Page

ROBERT A. HUTCHINS

By Mr. Shaughnessy ......................... 6

By Mr. LaBriola ............................ 245

By Mr. Shaughnessy ......................... 258

By Mr. LaBriola ............................ 261

By Mr. Shaughnessy ......................... 263

By Mr. LaBriola ............................ 267

EXHIBIT
Exhibit        Description         Page
Exhibit 90 Expert Report of Robert A. Hutchins    5
Exhibit 91 Printout of Bio for Rob Hutchins from  27
           Navigant Web Page

Exhibit 92 Document Bates stamped Xylem Group    258
           001015

--oOo--

## Page 5

ROBERT A. HUTCHINS
(WHEREUPON, Exhibit 90 was marked for identification.)
THE VIDEOGRAPHER:  This marks the beginning of Videotape number 1 in the deposition of Robert Hutchins in the matter ITT Corporation and Xylem Incorporated versus Xylem Group, LLC, The US District Court, Northern District of Georgia, Atlanta Division, Number 1:11CIV.3669-WSD.
This deposition is being held at 225 Peachtree Street, Atlanta, Georgia, on August the 30th, 2012.  The time on the video monitor, 9:08 a.m.
My name is Mike Brown from TSG Reporting, Incorporated, and I am the legal video specialist.  The court reporter is Sharon Gabrielli in association with TSG Reporting.
Would counsel please state your name for the record and whom you represent.
MR. SHAUGHNESSY:  Robert Shaughnessy for the plaintiffs.
MR. LaBRIOLA:  Stephen LaBriola for Xylem Group, and to my left is Christina

Page 6

1        ROBERT A. HUTCHINS
2    Baugh for Xylem Group as well.
3        THE VIDEOGRAPHER: Will the court
4    reporter please swear in the witness.
5        ROBERT A. HUTCHINS
6    having been first duly sworn, was deposed and testified
7    as follows:
8        EXAMINATION
9    BY MR. SHAUGHNESSY:
10   Q   Could you please tell us your full name?
11   A   Robert Alexander Hutchins.
12   Q   What is your age?
13   A   44.
14   Q   Okay. Mr. Hutchins, let me show you what's
15   been marked as Exhibit 90. Is that a copy of the
16   expert report you have submitted in this case?
17   A   It -- it looks like a complete copy, yes.
18   Q   Okay. Let me ask you to turn to Exhibit A,
19   which follows the numbered pages and is, as I can
20   construe it, basically a narrative résumé.
21   A   Okay, I'm there.
22   Q   Okay. It indicates you graduated from
23   Georgetown University; is that correct?
24   A   That is correct.
25   Q   What year did you graduate?

Page 7

1        ROBERT A. HUTCHINS
2    A   1990.
3    Q   Did you graduate in four years?
4    A   Yes.
5    Q   Okay. And let me quickly walk through your
6    employment history. It indicates you worked at Medicus
7    Healthcare Group from 1990 to 1992; is that correct?
8    A   That is correct.
9    Q   And in general, what did you do there?
10   A   I was a financial analyst for Medicus,
11   started out as a financial analyst and was eventually
12   promoted to a senior financial analyst.
13   Q   Where was that job located?
14   A   Oakland, California.
15   Q   What were the circumstances of your leaving
16   Medicus?
17   A   Moved back to Atlanta.
18   Q   Then did you immediately go to work for
19   Peterson Consulting after that?
20   A   There was about a four or five-month delay.
21   I was searching for a job before I started at Peterson.
22   Q   And did you work at Peterson, as this
23   indicates, from 1992 to 1998?
24   A   I did, yes.
25   Q   What were your responsibilities there?

Page 8

1        ROBERT A. HUTCHINS
2    A   I started out actually as a project employee.
3    Peterson was retained by the RTC, the Reservation Trust
4    Corporation, to manage several failed savings and
5    loans. And my -- I worked in the REO or the real
6    estate owned asset management group and helped manage
7    and sell foreclosed properties from the failed savings
8    and loans.
9        I was promoted -- I was hired full-time
10   shortly thereafter, started out as a staff consultant,
11   working on litigation assignments; you know, basically
12   doing document review, you know, building spreadsheets,
13   financial models, and then was promoted to senior
14   consultant, doing the same type of work with a little
15   bit more responsibility for oversight of staff
16   consultants. And then -- then I believe the next level
17   was executive consultant, which again, a lot of the
18   similar responsibilities but more supervisory roles or
19   supervisory responsibilities as well as, you know,
20   client-interfacing or client-facing opportunities.
21       If I recall correctly, my last position or
22   title at Peterson was principal, which was essentially
23   a -- a nonequity-type partner.
24   Q   In your capacity as a senior consultant,
25   executive consultant, and principal, did you devote

Page 9

1        ROBERT A. HUTCHINS
2    yourself exclusively to litigation work?
3    A   No. We did both -- I did both litigation and
4    nonlitigation.
5    Q   What proportion was litigation?
6    A   It's hard to estimate going back that far in
7    time, but I would say it varied by -- it certainly
8    varied by year; but overall, I would say the majority
9    of my time would have been focused on litigation
10   consulting projects.
11   Q   In your time at Peterson, were you ever
12   designated in your own name as an expert in litigation,
13   as a testifying expert or a would-be testifying expert?
14   A   I was, yes -- I was, yes.
15   Q   How many times?
16   A   At least once, maybe twice.
17   Q   What were the circumstances of your leaving
18   Peterson?
19   A   I was with the intellectual property group at
20   Peterson, and Peterson was bought by a company called
21   The Metzler Group, which eventually became Navigant
22   Consulting. And the group -- the partners in charge of
23   the intellectual property group at Peterson did not
24   want to participate in that transaction with Metzler
25   Group, so they spun their group out into a new company

Page 10

ROBERT A. HUTCHINS

1 called InteCap. And they raised venture capital money
2 to go out and acquire other IP boutique firms with the
3 initial or the expected plan of going public at some
4 point.
5    Q   During the time you were at Peterson, at what
6 point did you join the IP group?
7    A   It was -- it's hard to pinpoint exact time.
8 It was probably a slow transition over, you know,
9 several years. And even though I was more dedicated to
10 the IP group, I still did nonIP-related work.
11    Q   Exhibit A to your report indicates you were
12 with InteCap from 1998 to 2003; is that correct?
13    A   Yes, that is correct.
14    Q   What were your titles and responsibilities at
15 InteCap?
16    A   I believe my initial title at InteCap was
17 principal, which I think is the same title I left
18 Peterson with. And then eventually they restructured
19 the titles and positions, and I was a managing
20 director.
21        Again, a lot of the same responsibility in
22 terms of managing projects, you know, preparing expert
23 reports, leading project teams, you know, working with
24 clients, interfacing with clients and client

Page 11

ROBERT A. HUTCHINS

1 development.
2    Q   Was managing director the last title you had
3 at InteCap?
4    A   Yes, it was.
5    Q   Over the span of, I take it, about five years
6 that you were at InteCap, approximately what proportion
7 of your time was devoted to litigation-related work?
8    A   It's hard to pinpoint an exact figure, but I
9 would probably say a majority of it was related to
10 litigation consulting work.
11    Q   Were you in the IP group at InteCap or an IP
12 group at InteCap?
13    A   Well, InteCap was a -- they were an
14 IP-focused firm, so a lot of the work that I did,
15 InteCap did was IP related; but I also did general
16 commercial litigation, breach of contract work, you
17 know, I believe we did some -- I believe we did some
18 fraud investigations as well.
19        So it -- it certainly ran the gamut of
20 disputes and investigations, but, you know, the focus
21 of InteCap was certainly on the intellectual property
22 space.
23    Q   During your time at InteCap, were you ever
24 designated as a testifying expert in your own name?

Page 12

ROBERT A. HUTCHINS

1    A   I believe so, but actually I don't recall
2 specifically right now. If I was, it was maybe just
3 once or twice.
4    Q   What were the circumstances of your leaving
5 InteCap?
6    A   After the -- the dot-com bubble burst, and
7 the opportunity for InteCap to go public, that window
8 had essentially closed, Navigant went -- I'm sorry,
9 InteCap went through a restructuring. And they had
10 decided to close the Atlanta office, and they were
11 going to transfer me to their Chicago office; but at
12 the same time, some of my former colleagues at Peterson
13 who were now at Navigant heard I was willing to
14 relocate to another city outside of Atlanta and reached
15 out to me to -- reached out to me to see if I would be
16 interested in joining Navigant.
17    Q   And what was the other city you relocated to?
18    A   Washington, D.C.
19    Q   I take it you were reluctant to go to Chicago
20 but Washington was okay?
21    A   Actually, we were -- my wife and I were
22 looking forward to going to Chicago, maybe not so much
23 the winters, but we were -- we had several
24 opportunities to go there before, and it seemed like it

Page 13

ROBERT A. HUTCHINS

1 was finally moving to that direction. But the
2 opportunity with Navigant seemed like a -- better
3 opportunity for me.
4    Q   So I take it you've been at Navigant
5 continuously since 2003 to the present?
6    A   That's correct.
7    Q   At what point -- and I take it there was such
8 a point -- did you relocate back to Atlanta?
9    A   That was in November of 2007.
10    Q   What happened to cause you to do that or
11 allow you to do that?
12    A   The primary reason was to be able to spend
13 more time with my family, nieces and nephews, and as
14 well as my wife's parents were here. So it was -- I
15 would say it was more personal reasons than
16 business-related reasons.
17    Q   Did Navigant have an Atlanta office at the
18 time you initially joined the company?
19    A   Actually, they did not. It -- it opened up,
20 I think, three to four years after -- actually maybe
21 two or three years after I had started at Navigant.
22    Q   I observe that on Exhibit A -- well, first of
23 all, Exhibit A, I take it, is -- is not something that
24 you created specifically for this case but is a more

Page 14

ROBERT A. HUTCHINS

1
2  general document that you furnish to people in a
3  variety of circumstances; is that accurate?
4      A   That's correct.
5      Q   It -- it lists two business addresses for
6  you; one in Atlanta, and one at 1801 K Street in -- in
7  Washington.  Do you, in fact, spend any time in the
8  Washington office?
9      A   I do.
10     Q   What are the circumstances of your spending
11 time there?
12     A   I have several ongoing projects in the D.C.
13 area, so I'm up there working with clients.
14     Q   What proportion of your time do you spend in
15 Washington, you know, in the course of a year?
16     A   Initially, when I first transitioned to
17 Atlanta, it was -- I was almost in D.C. full-time, but
18 probably the last couple years it's been less than 10
19 percent of my time.
20     Q   When did you receive your CPA?
21     A   If I recall, I think I passed the exam in
22 1992 and received my -- my license in 1994.  I -- I
23 think that's right.
24     Q   What accounted for that gap in time?
25     A   There was a experience requirement that you

Page 15

ROBERT A. HUTCHINS

1
2  had to satisfy -- and actually, I'm sorry, I got the
3  dates wrong.  I believe I passed the exam in 1994 and
4  received my license in 1998.  And there was an
5  experience requirement you had to satisfy of five years
6  if you're not in public accounting in order to become a
7  licensed CPA.  And so I had to wait essentially that
8  five-year period in order to officially become a
9  licensed CPA.
10     Q   The experience -- the experience requirement
11 is five years of doing what, if you're not in public
12 accounting?
13     A   Essentially working in the accounting-related
14 field.
15     Q   So I take it your time at Medicus didn't
16 count toward the five-year requirement?
17     A   I was not working under the direction of a
18 CPA, so it -- I -- I did not think it would count.
19     Q   Okay.  Do you have any other licenses besides
20 the Georgia CPA?
21     A   No licenses, no.
22     Q   Have you ever been censured or disciplined by
23 any professional body?
24     A   No.
25     Q   Your Exhibit A indicates that your current

Page 16

ROBERT A. HUTCHINS

1
2  title at Navigant is managing director; is that
3  correct?
4      A   That is correct.
5      Q   And when did you assume that title?
6      A   Last November.
7      Q   November 2011?
8      A   Correct.
9      Q   Okay.  What was your title immediately before
10 you assumed the title of managing director?
11     A   Director.
12     Q   How long were you director?
13     A   From the time I joined Navigant in 2003 until
14 November of 2011.
15     Q   Can you explain to me, for lack of a better
16 term, the spectrum of titles that professionals at
17 Navigant have; you know, what's the entry-level person
18 called?  And, I mean, you -- you, to some extent,
19 narrated at least your experience with that when you
20 were at Peterson, the -- the hierarchy of titles.  What
21 is the hierarchy of titles among professionals at
22 Navigant?
23     A   Sure.  On the -- on the consulting side of
24 the business, the -- the entry-level position is called
25 an analyst.  And the next level is a consultant, and

Page 17

ROBERT A. HUTCHINS

1
2  then a senior consultant, a managing consultant,
3  consultant, associate director, director, and managing
4  director.
5          Then I will just add that the typical entry
6  position for a college graduate would be at the
7  consultant level, not the analyst level.
8      Q   So as -- as -- as a managing director, you've
9  achieved the highest possible title for professionals
10 at Navigant?
11     A   Yes.
12     Q   I take it, though, in the corporate
13 hierarchy, there are additional titles; is that
14 accurate?
15     A   That's accurate.
16     Q   Now, I'd like to talk about what percentage
17 of your work is related to litigation but break it into
18 a couple of different time frames.
19          First, focusing on the last five years, so I
20 guess that goes back to 2007 or thereabouts,
21 approximately what proportion of your work has related
22 to litigation, either being the testifying expert in
23 your own name or supporting others who are designated
24 as experts or -- or consulting behind the scenes for
25 parties to litigation?

Page 18

ROBERT A. HUTCHINS

1
2    A   It's always -- it's always hard to pinpoint a
3    number on these -- these types of questions; but in
4    general, I would say my dispute-related work has been
5    less than half of the time -- less than half my focus.
6    Q   For the past five years?
7    A   Yes.
8    Q   Okay.  In general, what does the other half
9    or somewhat more than half of -- of your time consist
10   of?
11   A   Investigations.
12   Q   And what sort of investigations do you
13   typically do?
14   A   Typically accounting and fraud
15   investigations.
16   Q   If I limited the temporal focus just to the
17   past year, would the proportions be about the same as
18   for the past five years?
19   A   I'd probably say the past year it's been more
20   heavily weighted to disputes versus investigations.
21   Q   Ballpark, what proportion would you say
22   involve disputes?
23   A   Probably 65 to 70 -- 70 percent of my time.
24   Q   Is that indicative of a move on your part to
25   focus more on litigation, or is that just the luck of

Page 19

ROBERT A. HUTCHINS

1
2    the draw of the year-to-year variation in workload?
3    A   I think it's more just the luck of the draw
4    and, you know, what -- what engagements we have going
5    on at the time that, you know, meet my skillset.
6    Q   At the bottom of the first page of Exhibit A,
7    the document states, "Included below are selected
8    examples of some of Rob's IP engagement experience."
9    Do you have different versions of this
10   narrative résumé that focus on subject matters apart
11   from intellectual property?
12   A   Yes, I do.
13   Q   And how many such versions are there?
14   A   I'm not sure exactly how many, but maybe two
15   or three.
16   Q   Two or three additional --
17   A   Yes.
18   Q   -- versions?
19   What subject matters do those versions relate
20   to, if not intellectual property?
21   A   One would be focused more on forensic
22   accounting investigations; one would be more on
23   general, you know, nonIP commercial litigation, and one
24   might just be more of a general CV that combines the IP
25   experience and the general commercial litigation

Page 20

ROBERT A. HUTCHINS

1
2    experience and the general forensic accounting
3    investigation experience.
4    Q   In the narrative description of your
5    litigation assignments that appears on the second,
6    third, and fourth pages of Exhibit A, some of the
7    bullet points say you served as consultant or lead
8    consultant, and others say you served as the expert in
9    various disputes.  I -- I take it there's a difference
10   between those two formulations, correct?
11   A   Yes.
12   Q   And am I correct in inferring that when you
13   say you served as the expert, that means you were the
14   professional within Navigant, or perhaps earlier
15   employers, that was either designated as the testifying
16   expert or was expected to be designated as the
17   testifying expert in due course; is that accurate?
18   A   That's accurate.
19   Q   And when it indicates you were a
20   consultant -- it seems to say "lead consultant" more
21   than anything -- in those instances, you were
22   supporting another professional in your firm who, in
23   turn, was designated as the testifying expert?
24   A   It could be either an -- an internal person
25   or an external person.

Page 21

ROBERT A. HUTCHINS

1
2    Q   But in -- in any event, when you were lead
3    consultant, you were, in a sense, behind the scenes,
4    in -- in terms of the visibility of -- of the adversary
5    in the dispute; is that accurate?
6    A   That's fair.
7    Q   Nowadays, and let's define nowadays as the
8    last year, do you still work on some engagements where
9    you're acting as the consultant in this nomenclature
10   rather than the expert?
11   A   Yes, I do.
12   Q   And what proportion of your dispute-related
13   work involves you acting as consultant as opposed to an
14   expert?
15   A   I would say -- estimate the large majority of
16   it would involve me serving in a consulting capacity as
17   opposed to an expert capacity.
18   Q   Do you typically support other Navigant
19   experts as opposed to, say, academics or people who
20   aren't affiliated with Navigant?
21   A   I would say typically people are not
22   affiliated with Navigant; or alternatively, not
23   directly supporting an external expert but serving as a
24   consultant for the outside law firm.
25   Q   I think you indicated earlier that when you

Page 22

ROBERT A. HUTCHINS

1 were at Peterson, you were designated as an expert in
2 litigation at least once; and at InteCap, perhaps one
3 or two times. Is -- is that fair?
4      A   Now you say -- I think it -- I can recall --
5 actually, no, that's fair, yes.
6      Q   Could you ballpark the number of occasions in
7 your time at Navigant when you've been acting as an
8 expert, in your nomenclature, in a dispute?
9      A   I'd probably estimate between six to ten
10 times. That might be a little high.
11     Q   Is it fair to say that your acting as an
12 expert in disputes is a relatively small proportion of
13 the total time you've spent at Navigant over the past
14 nine years?
15     A   Yes.
16     Q   When was the first time that you actually
17 testified orally in a litigation, either in court or in
18 a deposition?
19     A   I believe it would have been 1996.
20     Q   That was during your time at Peterson?
21     A   Yes.
22     Q   What type of case was that?
23     A   It in- -- involved the bankruptcy of a
24 telecommunications company, and if I recall, the

Page 23

ROBERT A. HUTCHINS

1 subject matter of my testimony was with respect to the
2 breach -- breach of fiduciary duties by the directors
3 and officers, and effectively the -- the damages
4 associated with that.
5      Q   In the -- let's call it six to ten times
6 you've acted as an expert during your tenure at
7 Navigant, approximately -- or, even better, exactly,
8 even if you can give it to me, how many times have you
9 played that role in a trademark infringement case?
10     A   I don't recall any -- any times while at
11 Navigant.
12     Q   What about at InteCap or at Peterson?
13     A   Just scanning through my CV, there are at
14 least four references to trademark infringement matters
15 I was involved with, and they -- I would think they
16 would have predated my time at Navigant.
17     Q   I -- I came up with the same number and also
18 observed that in three of them you indicate your role
19 was either -- was as lead consultant, and in -- in one,
20 which is on the fourth piece of paper within Exhibit A,
21 you say that you served as the expert in a trademark
22 infringement dispute in the telecommunications
23 industry; is -- is that accurate?
24     A   Yes.

Page 24

ROBERT A. HUTCHINS

1      Q   Tell me about the -- the case in which you
2 served as an expert in the trademark infringement
3 dispute.
4      A   If I recall, I think that was in 1998, 1999
5 time frame, so I don't recall a lot of details about
6 that.
7      Q   Um-hmm.
8      A   But it -- I believe it involved companies
9 that had resold tele- -- telecommunications equipment.
10 And one of the companies was using the trademark of the
11 other company, and my task, as summarized here, was to
12 quantify the -- the infringing sales.
13     Q   Did you conduct any sort of reasonable
14 royalty analysis in that matter?
15     A   I do not believe so.
16     Q   In the other three trademark cases that you
17 apparently have worked on as a consultant, in any of
18 those, did you develop or contribute to any sort of
19 reasonable royalty analysis?
20     A   I think the last two references to trademark
21 infringement disputes, those would have involved
22 evaluation based on what's referred to as the relief
23 from royalty approach, which is -- incorporates a -- a
24 reasonable royalty rate analysis.

Page 25

ROBERT A. HUTCHINS

1      Q   Both of those cases seem to indicate they
2 involved UK-based companies; is that your recollection?
3      A   Yes.
4      Q   And were you operating under or was -- were
5 the parties in the case operating under UK law or US
6 law?
7      A   I don't recall.
8      Q   Is it fair to say that this case that we're
9 here for today is -- is the first case in which you,
10 acting as an expert in your own name, have conducted a
11 reasonable royalty analysis in a trademark infringement
12 case?
13     A   In a trademark infringement case, yes.
14     Q   In the one trademark matter in which you
15 served as an expert in your own name, and realizing it
16 was more than a decade ago, did you give a deposition
17 or testify in court, to your recollection?
18     A   I do recall giving a deposition, yes.
19     Q   The last page of Exhibit A, it lists cases in
20 which you've testified in the past four years. Just a
21 simple point, am I correct none of them was a trademark
22 infringement case?
23     A   That's correct, yes.
24     Q   In any of those four cases, did you offer a

Page 26

ROBERT A. HUTCHINS

1 reasonable royalty analysis?
2
3    A   Yes, in the last case, the Dwayne Glowner
4 versus Muller Martini.
5    Q   I see in your listing of the cases in the
6 left-hand column, you -- you bold one of the parties'
7 names.  Is that the party that you served in your
8 capacity as an expert in that case?
9    A   That was the party that would have retained
10 Navigant through its outside counsel.
11    Q   Okay.  So in -- in that Muller Martini case,
12 you offered opinions on behalf of the defendant; is
13 that correct?
14    A   Yes.
15    Q   Were -- were there counterclaims, such that
16 the defendant was, in some respects, functionally a
17 plaintiff?
18    A   No.
19    Q   Okay.  So what -- in -- in general, what was
20 the nature of your reasonable royalty opinion or
21 analysis in that case?
22    A   Well, I analyzed and responded to the expert
23 report put forth by Dwayne Glowner's expert, and I also
24 prepared an -- an affirmative analysis of what a
25 reasonable royalty rate would be, consistent with the

Page 27

ROBERT A. HUTCHINS

1
2 same framework I used in this matter.
3    Q   I take it you came up with a reasonable
4 royalty number that was lower than the other side's
5 reasonable royalty number?
6    A   Yes.
7    Q   Did you prepare a report in that case?
8    A   I did.
9    Q   Which lawyer or law firm retained you in that
10 case?
11    A   It was Schiff Hardin.
12    Q   Do you recall the specific lawyer?
13    A   You know, the -- the name is actually
14 escaping me right now.
15    Q   Your Navigant web page lists your industry
16 specialization as financial services in
17 telecommunications; is that correct?
18    A   I haven't looked at it in a while, but I -- I
19 do think that's correct.  I thought there was more on
20 there also, but...
21    Q   Okay.  All right.  Let me show you what I
22 have.
23 (WHEREUPON, Exhibit 91 was marked for
24 identification.)
25    Q   (BY MR. SHAUGHNESSY)  Let me show you Exhibit

Page 28

ROBERT A. HUTCHINS

1
2 91, and this did not print out in a very elegant way,
3 but the -- the relevant pages of the last three pieces
4 of paper, and the second to last one is the one that
5 has the heading "Industry Specialization."  Do you see
6 that?
7    A   Yes.
8    Q   And is it correct that it lists financial
9 services in telecommunications only?
10    A   It does, but the paragraph, the second
11 paragraph of my bio lists several more industries.
12    Q   Do you have any prior experience in the
13 plumbing supply or water technology industries?
14    A   Not that I can recall.
15    Q   Have you personally ever done any work for
16 Mr. LaBriola's law firm?
17    A   I have not, no.
18    Q   Do you know if any of your colleagues at
19 Navigant's Atlanta office have?
20    A   Not that I'm aware of.
21    Q   Okay.  How did you and Mr. LaBriola connect?
22    A   If I recall, Mr. LaBriola -- LaBriola had
23 worked with Bill Jennings, who is no longer with
24 Navigant, and Bill got me involved in this case because
25 he did not have the level of experience in the

Page 29

ROBERT A. HUTCHINS

1
2 intellectual property field that I did.
3    Q   Where is Mr. Jennings based or what -- what
4 company does he work at?
5    A   He is currently with Alvarez & Marsales.
6    Q   Is he in Atlanta?
7    A   Yes.  Or I should say the last I heard he
8 was.
9    Q   Have you spoken to Mr. Jennings since you got
10 involved in this case?
11    A   He left Navigant after I got involved, so
12 there would have been conversations when I was still
13 here.  Since he left, I think I had one phone call with
14 him.
15    Q   So let me just make sure I have the
16 chronology correct.  When he referred Mr. LaBriola to
17 you, Mr. Jennings was at Navigant?
18    A   Yes.
19    Q   And what was your understanding of his prior
20 relationship with Mr. LaBriola or his law firm?
21    A   I don't recall, other than they seemed to
22 have worked together on some project.
23    Q   But then Mr. Jennings, as often happens in
24 firms, including law firms, I -- after getting the
25 initial contact, identified you as a more appropriate

Page 30

ROBERT A. HUTCHINS

1 ROBERT A. HUTCHINS
2 professional to work on the matter; is that fair?
3     A   That's fair.
4     Q   And then after that, Mr. Jennings left
5 Navigant?
6     A   Yes.
7     Q   And in the -- the one subsequent conversation
8 you referred to with Mr. Jennings, did any of the
9 discussion involve this case?
10    A   No.
11    Q   When on the calendar did you first get
12 contacted about this case, and -- and realizing the
13 first contact apparently was from Mr. Jennings rather
14 than Mr. LaBriola?
15    A   I believe it was late March 2012.
16    Q   And was the first contact from Mr. Jennings?
17    A   Yes.
18    Q   Have-I-got-a-case-for-you type of thing?
19    A   Yes.
20    Q   What did Mr. Jennings tell you in that
21 initial conversation?
22    A   I don't recall the specifics, but in -- in
23 general, it was -- was a trademark dispute, and he
24 provided me with a copy of -- I think it was a -- the
25 declaratory judgment action.

Page 31

1 ROBERT A. HUTCHINS
2     Q   And did you and he have any discussion about
3 whether you, in fact, were an appropriate professional
4 to work on the matter?
5     A   No.
6     Q   Was -- was it Mr. Jennings asking you to work
7 on the matter or telling you to work on the matter?
8         MR. LaBRIOLA:  Objection as to form.
9         THE WITNESS:  I would probably
10 characterize that he would -- was more asking
11 if I would be interested in working on the
12 matter.
13    Q   (BY MR. SHAUGHNESSY)  And I take it you
14 answered in the affirmative?
15    A   Yes.
16    Q   When on the calendar was your first
17 communication with Mr. LaBriola or anyone at his law
18 firm?
19    A   It would have been shortly after Mr. Jennings
20 reached out to me about the opportunity.
21    Q   And was that first contact a -- a meeting
22 or --
23    A   Yes.
24    Q   -- a phone call?  Yeah.
25    A   It was a meeting.

Page 32

ROBERT A. HUTCHINS

1 ROBERT A. HUTCHINS
2     Q   You came here?
3     A   Correct.
4     Q   And in that initial meeting, what facts were
5 you told about the case?
6     A   You know, I don't recall anything specific
7 other than really what was outlined in -- in the
8 complaint, in terms of there was a spin-off of ITT's
9 water business, they were using the Xylem name, and
10 they had filed suit or a counterclaim against Xylem
11 Inc.
12    Q   When were you formally retained?
13    A   I don't recall, but it would have been
14 shortly thereafter that initial meeting.
15    Q   Summarize for me, if you will, your
16 subsequent course of dealing with Mr. LaBriola or his
17 colleagues in terms of providing information to you or
18 directing you to sources of information?
19        MR. LaBRIOLA:  Let me just place a
20 cautionary objection on the record.  The Rule
21 of 702 and 703 governs what is confidential
22 and what is not, so I ask that you not reveal
23 attorney discussions that are nonfactual in
24 nature.
25        THE WITNESS:  Could you read back the

Page 33

1 ROBERT A. HUTCHINS
2 question, please?
3        (Whereupon, the record was read by the
4 court reporter as follows:
5        "QUESTION:  Summarize for me, if you
6 will, your subsequent course of dealing with
7 Mr. LaBriola or his colleagues in terms of
8 providing information to you or directing you
9 to sources of information.")
10       THE WITNESS:  I would say in general, I
11 would have requested information that I
12 thought would be relevant, as well as done my
13 own research with public -- publicly
14 available information, particularly given the
15 fact that -- the fact discovery was still
16 ongoing.
17    Q   (BY MR. SHAUGHNESSY)  Were you provided with
18 any documents that Mr. LaBriola or his colleagues on
19 their own motion thought you should have?
20    A   I don't recall.  I think most of it was based
21 on request and discussions.
22        THE COURT REPORTER:  Requested
23 discussions?
24        THE WITNESS:  I'm sorry, request and
25 discussions.

9

Page 34

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  Q  (BY MR. SHAUGHNESSY)  In the course of your
3  work from the time you were retained up to the time you
4  signed your expert report, did you talk to anyone at
5  Xylem Group itself?
6  A  The only conversation I had with
7  representatives -- representatives of Xylem Group would
8  have been at that initial meeting with Mr. LaBriola.
9  Q  Who were the attendees at that meeting?
10  A  Hal Weinstein, and I believe the CFO or
11  controller.
12  Q  Mr. McVicker; does that ring a bell?
13  A  It sounds familiar, yes.
14  Q  What factual information did Mr. Weinstein
15  provide to you?
16  A  In general, he would have described a lot of
17  the same information that was outlined in the
18  counterclaim, as well as one of his points of emphasis
19  was the -- how this affecting -- how this trademark
20  dispute is affecting Xylem Group's ability and plans to
21  expand.
22  Q  Tell me everything you can recall that
23  Mr. Weinstein said on that subject.
24  A  The only thing I recall specifically sitting
25  here right now was a discussion about having to turn

Page 35

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  away -- or not pursue or go forward with an opportunity
3  to sell -- I believe it was plumbing supplies.
4  Q  Any particular sort of plumbing supplies?
5  A  I don't recall any specificity.
6  Q  Did you make notes of your discussion with
7  Mr. Weinstein or the -- other person from Xylem
8  Group?
9  A  I don't believe so, not at that meeting.
10  Q  Okay.  If I understood you correctly, that
11  was your one and only meeting with anyone from Xylem
12  Group; is that correct?
13  A  That's correct.
14  Q  Did you have telephone conversations
15  subsequently with anyone from Xylem Group?
16  A  No.
17  Q  How long was the initial meeting?
18  A  Maybe an hour to an hour and a half.
19  Q  I take it Mr. LaBriola was there?
20  A  Yes.
21  Q  Was Ms. Baugh there as well?
22  A  Yes.
23  Q  Were there any other attendees besides
24  yourself?
25  A  Mr. Jennings was there.

Page 36

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  Q  I take it he was still with Navigant at that
3  point?
4  A  Correct.
5  Q  Exhibit B to your report is a two-page chart
6  that is entitled "Documents Considered"; is that
7  correct?
8  A  Yes, it is.
9  Q  And I think you -- you say in -- in the body
10  of your report that the documents you considered are --
11  are listed either or both on Exhibit B or in the
12  footnotes to your report; is that correct?
13  A  That is correct, yes.
14  Q  So I noticed, for instance, that there was
15  some documents that were cited in footnotes that
16  weren't listed on Exhibit B.  I mean, is that
17  consistent with your understanding?
18  A  Yes.
19  Q  Okay.  So between the footnotes and Exhibit
20  B, we should have a list of everything that you
21  considered; is that fair?
22  MR. LaBRIOLA:  Objection, just in terms
23  of timing.  You're talking about as of the
24  date of this report?
25  Q  (BY MR. SHAUGHNESSY)  Right, as of the date

Page 37

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  of the report.
3  A  I would say that's fair with the caveat that
4  a lot of the -- the analysis is based on my general
5  experience --
6  Q  Understood.
7  A  -- and other, you know, reference materials
8  that aren't specifically cited in here, but...
9  Q  Well, let me rephrase it, then.
10  As to case-specific materials, the footnotes
11  and Exhibit B cover everything you considered up to the
12  time you signed the report; is that fair?
13  A  That's fair.
14  Q  I think you indicated earlier that you made
15  various requests to counsel for materials relating to
16  your analysis; is that correct?
17  A  That's correct.
18  Q  And what were the requests you made; I mean,
19  if not word for word, which I don't expect, generically
20  what sort of things did you ask for?
21  A  I mean, in -- in general, they would have
22  been the typical type of documents I would have
23  requested, as well as based on my understanding of the
24  facts, the documents that would have supported those
25  facts as well.

Page 38

ROBERT A. HUTCHINS

1   ROBERT A. HUTCHINS
2   Q   Did you ask to see documents relating to ITT
3   Corporation's internal deliberations about whether to
4   adopt the name Xylem?
5   A   I did, yes.
6   Q   And how was that relevant to your analysis?
7   A   Just to understand the process they went
8   through for selecting the final name as opposed to
9   other alternatives.
10   Q   Did counsel for Xylem Group ever offer you
11   access to the entire database of materials produced in
12   the case?
13   A   I don't believe I requested that.
14   Q   I take it they didn't offer on their own
15   motion either?
16   MR. LaBRIOLA: Objection, and -- and
17   please do not discuss communications with
18   counsel of that nature. I think that's an
19   inappropriate question.
20   MR. SHAUGHNESSY: Not if he answers no.
21   Q   (BY MR. SHAUGHNESSY) Are you -- are you
22   declining to answer?
23   MR. LaBRIOLA: Well, you're asking --
24   you're asking for nonfactual communications
25   with counsel. If you want to rephrase the

Page 39

ROBERT A. HUTCHINS

1   ROBERT A. HUTCHINS
2   question, that's fine.
3   Q   (BY MR. SHAUGHNESSY) Let me put it this way:
4   Whether it was offered on counsel's own motion or -- or
5   requested by you, you, in fact, didn't obtain access to
6   the entire database of materials produced in the case,
7   correct?
8   A   I did not, that's correct.
9   Q   In doing your work, did you count on counsel
10   to give you an objective picture of the facts in the
11   case?
12   MR. LaBRIOLA: Objection.
13   You can answer.
14   THE WITNESS: Yes, as -- as I always do,
15   as well as based on my review of the
16   documents that would support those facts.
17   Q   (BY MR. SHAUGHNESSY) And did you count on
18   counsel not to cherry pick documents that were
19   favorable to Xylem Group?
20   A   I would have relied upon them to select
21   documents that were relevant to my request.
22   Q   Both favorable to Xylem Group and not
23   favorable to Xylem Group, correct?
24   A   Correct.
25   Q   At -- at what point on the calendar did you

Page 40

ROBERT A. HUTCHINS

1   ROBERT A. HUTCHINS
2   conclude that the reasonable royalty relevant to this
3   case was $45 million?
4   MR. LaBRIOLA: Objection as to form.
5   THE WITNESS: Well, I -- I concluded
6   that the -- as an alternative measure of
7   damages, the reasonable royalty rate to
8   use -- to use to calculate this alternative
9   measurement was 0.45 percent or less than a
10   half of 1 cent.
11   And then I did a secondary calculation,
12   which applied under the scenario where the
13   fact finder as I describe in my report
14   concludes that there will be no injunction,
15   and then took this 0.45 percent royalty rate,
16   applied it to Xylem Inc.'s US projected
17   revenue stream to calculate what the -- the
18   value of the mark to both parties would have
19   been, and that's how I arrived at the -- the
20   $45 million figure.
21   And that was essentially an
22   approximation of what the -- the damages
23   would be in a scenario where a license is
24   granted over the life of the patent. And --
25   Q   (BY MR. SHAUGHNESSY) Trademark, correct?

Page 41

ROBERT A. HUTCHINS

1   ROBERT A. HUTCHINS
2   A   I'm sorry.
3   THE COURT REPORTER: I'm sorry, say that
4   again.
5   Q   (BY MR. SHAUGHNESSY) Okay. Trademark,
6   correct?
7   A   Trademark, yes, I apologize.
8   Q   Well, then let me reask it. At -- at what
9   point on the calendar did you conclude that the
10   appropriate royalty rate was 0.45 percent?
11   A   That would have been -- I couldn't pinpoint a
12   specific moment in time, but it certainly would have
13   been towards the end of -- near the end of when my
14   report was finalized.
15   Q   So, say, a week before June 20th, which was
16   the date of your report, a week before June 20th, you
17   were still undecided or hadn't yet reached a conclusion
18   about what the appropriate royalty rate would be?
19   A   Absolutely, I can't come to a conclusion
20   until I have all the facts and the analysis completed.
21   Q   Did your analysis occur primarily in the week
22   preceding the submission of the report?
23   MR. LaBRIOLA: Objection as to form.
24   THE WITNESS: I don't recall exactly
25   when it started, but it was the -- a few-week

Page 42

ROBERT A. HUTCHINS

1
2     process, if I recall.
3     Q   (BY MR. SHAUGHNESSY)  Your rate for this case
4     is $535, correct, per hour?
5     A   Yes.
6     Q   How does that rate compare with the rate
7     charged by the other managing directors in Navigant's
8     IP group?
9     A   I don't know.
10    Q   You don't see bills for engagements that
11    would show what other professionals charge to clients?
12    A   I only see bills that I work on.
13    Q   And do those bills ever show the rates for
14    other managing directors?
15    A   Yes, sometimes, yes.
16    Q   And have you observed how those rates compare
17    to your own rate?
18    A   I mean, it -- it varies.  Sometimes it's
19    higher; sometimes it's lower.
20    Q   How many hours did you devote to this matter
21    up to the time you submitted your expert report?
22    A   I don't recall specifically, but I believe 60
23    or 70 hours.
24    Q   Did any other professionals at Navigant
25    assist you on your report or the analysis leading up to

Page 43

ROBERT A. HUTCHINS

1     it?
2
3     A   Yes.
4     Q   What are their names or -- I'm assuming
5     there's more than one.  Tell -- tell me the name of
6     everyone who helped you, put it that way.
7     A   I believe there's only one other person who
8     assisted me, and his name was Tim Varner, V-A-R-N-E-R.
9     Q   What is his title?
10    A   Senior consultant.
11    Q   Approximately how many hours did he put in up
12    to the time the report was submitted?
13    A   I don't recall specifically, but I would
14    estimate it's in the same range as my -- the number of
15    hours I put in.
16    Q   What about since you prepared your report;
17    how much time have you put in relating to this matter?
18    A   Excluding today, I'd say probably around ten
19    hours.
20    Q   And does that include some time to prepare
21    for this deposition?
22    A   Yes.
23    Q   What have you done to prepare for the
24    deposition?
25    A   Excuse me.  In general, I read my report, I

Page 44

ROBERT A. HUTCHINS

1
2     read Mr. Yerman's report again.  I reviewed
3     Mr. Yerman's deposition.  I also reviewed the
4     deposition of Hal Weinstein -- Weinstein, sorry.  I
5     also reviewed the 30(b)(6) deposition of John
6     Schlicher.  I also reviewed the purchase price
7     allocation reports that were produced after my report
8     and I believe on the same day that Mr. Yerman's report
9     was produced.
10    Q   Anything else?
11    A   I reviewed the July 2011 -- 2011 letter to
12    Xylem Inc. from Mr. Slattery.  And I reviewed the NA
13    agreement.  And I also reviewed some of the documents
14    that I listed in the documents considered list.  I
15    think in general that's -- that's a fair summary of
16    what I looked at.
17    Q   A moment ago you said you've put in
18    approximately ten hours on this matter since your
19    report.  Is it accurate to say that all of that
20    approximately ten hours is -- is captured in preparing
21    for this deposition?
22        MR. LaBRIOLA:  Objection as to form.
23        THE WITNESS:  I would say the majority
24    of it was, yes.
25    Q   (BY MR. SHAUGHNESSY)  Do you know how much

Page 45

ROBERT A. HUTCHINS

1
2     Navigant has billed either to Mr. LaBriola's firm or to
3     Xylem Group directly in this case?
4     A   It -- approximately $41,000.
5     Q   What about accrued but unbilled time; what
6     does that come to, approximately?
7     A   Today, maybe 4 to 5,000.
8     Q   Have Navigant's bills been paid in accordance
9     with the terms of the engagement?
10    A   Yes.
11    Q   Have you ever done any work for my law firm,
12    Williams and Conley?
13    A   No, I don't believe so, no.
14    Q   Have you ever worked with any lawyers from my
15    firm, even if your nominal client was someone else?
16    A   Yes, I have.
17    Q   Tell me about that.
18    A   One of the investigations I'm involved with,
19    a --
20    Q   And I should say I mean I don't expect you to
21    give me confidential information, just generalities
22    and --
23        MR. LaBRIOLA:  Oh, speak at will --
24    Q   (BY MR. SHAUGHNESSY)  And just tell me who
25    you've dealt with and what your general dealings with

Page 46

ROBERT A. HUTCHINS

1 him or her or they have been.

2 A   Steven Sorenson represents, as far as I

3 understand it, one of the investors; I'm just trying to

4 make sure I don't say anything that's confidential --

5 Q   Sure.

6 A   -- in a special purpose entity that is

7 missing significant amounts of funds.

8 Q   And generically, who are you working for in

9 that matter?

10 A   The chief restructuring officer.

11 MR. SHAUGHNESSY: Okay. I'm about to

12 switch topics. I think this is a good time

13 to take a break.

14 THE VIDEOGRAPHER: Going off the record.

15 The time is 10:13.

16 (Whereupon, there was a brief recess.)

17 THE VIDEOGRAPHER: Back on the record.

18 The time is 10:27.

19 Q   (BY MR. SHAUGHNESSY) Mr. Hutchins, earlier I

20 asked you if you had spoken to anyone from Xylem Group,

21 and you told me about the meeting at which

22 Mr. Weinstein and one other person was present. Do you

23 recall that?

24 A   Yes.

Page 47

ROBERT A. HUTCHINS

1 Q   Have you spoken to anyone else to gather

2 facts or to learn information relevant to this case,

3 a -- apart from counsel?

4 A   No.

5 Q   For instance, have -- have you spoken to any

6 of Xylem Group's other testifying experts? I could

7 name them for you if that would -- would help, but if

8 you haven't spoken to them at all, it's probably not

9 necessary.

10 A   I have not.

11 Q   Turning to the substance, is it correct that

12 Exhibit 90, your expert report, is a complete statement

13 of your opinions in this case and the bases of those

14 opinions?

15 A   As of the date of the report, yes.

16 Q   Okay. Have you revised or modified your

17 opinions since you submitted the report?

18 A   No.

19 Q   Okay. So putting those two answers together,

20 is it fair to say that Exhibit 90 is a complete

21 statement of your opinions and their bases up to the

22 present time?

23 MR. LaBRIOLA: Objection as to form.

24 THE WITNESS: That's fair, other than,

Page 48

ROBERT A. HUTCHINS

1 you know, the -- the damages, calculations

2 will need to be updated over time.

3 Q   (BY MR. SHAUGHNESSY) To account for Xylem

4 Inc.'s financial performance, correct?

5 A   Yes.

6 Q   Any -- any other factors that, in your view,

7 would necessitate revision or updating of your

8 opinions?

9 A   Not that I'm aware of right now, no.

10 Q   Let's start at the beginning, page 1 under

11 the heading of "Assignment," you wrote, quote, "I have

12 been asked to analyze the monetary compensation Xylem

13 is entitled due to the violation of the Federal Lanham

14 Act," and then it goes on.

15 And I -- I note that as you use the term in

16 your report, Xylem means Xylem Group, correct?

17 A   That's correct, yes.

18 Q   You say you were asked to analyze the

19 monetary compensation that Xylem Group is due. Before

20 you embarked on that mission, did you first determine

21 whether Xylem Group has suffered some economic injury

22 that, in turn, needs to be quantified?

23 A   I'm not sure if I follow that question.

24 Q   Well, would -- would you agree with me that

Page 49

ROBERT A. HUTCHINS

1 before one gets to the issue of compensation in a

2 lawsuit, there first has to be a determination that the

3 party seeking compensation has, in fact, suffered some

4 injury, correct?

5 A   I -- I applied the standards in the statute

6 to measure the monetary compensation.

7 Q   My question is did you conduct a preliminary

8 analysis of whether Xylem Group has, in fact, suffered

9 any economic injury as a result of Xylem Inc.'s

10 conduct?

11 MR. LaBRIOLA: Objection as to form.

12 THE WITNESS: I did not conduct a

13 preliminary analysis, no.

14 Q   (BY MR. SHAUGHNESSY) Did you consider and

15 rule out the possibility that even if there has been

16 trademark infringement by Xylem Inc., Xylem Group is

17 entitled to no compensation?

18 A   It's my understanding under the statute

19 they're -- you measure the damages based on the

20 defendant's profits or the plaintiff's lost profits.

21 Q   Okay. And where does reasonable royalty fall

22 in that scheme?

23 A   Well, it's my understanding that that's an

24 alternative measure of damages, as I explain in my

Page 50

ROBERT A. HUTCHINS

1       ROBERT A. HUTCHINS
2   report, when damages are difficult to measure.
3       Q   But did you entertain the possibility that
4   even if there was an infringement, the damages in this
5   case could be precisely zero?
6       A   Well, I state in my report that the --
7   there's no evidence that Xylem suffered any lost
8   profits, so I did consider that, but I prepared a
9   calculation of damages based on Xylem Inc.'s profits.
10      Q   Can you imagine a trademark infringement case
11  in which there is a finding of infringement but the
12  plaintiff is entitled to no damages?
13          MR. LaBRIOLA:  Objection as to form.
14          THE WITNESS:  I believe I -- I've heard
15      of that, yes.
16      Q   (BY MR. SHAUGHNESSY) In what circumstances
17  would that situation exist?
18      A   Sitting right now, I don't recall what
19  the specific facts of those cases were.
20      Q   Did you start with the assumption that Xylem
21  Group, if an infringement is found, is entitled to some
22  amount of compensation, and the only question is
23  quantifying that amount of compensation?
24      A   I assume there was infringement, as I state
25  in my report, and then I went -- next step was to

Page 51

ROBERT A. HUTCHINS

1       ROBERT A. HUTCHINS
2   quantify the damages according to the statute.
3       Q   On page 2 of your report, in the first
4   paragraph under heading 1.4, you write, quote, "I have
5   assumed that the plaintiffs will be found liable for
6   the allegations contained in the answer and
7   counterclaims."  And the plaintiffs obviously is my
8   clients, which we'll just refer to collectively as
9   Xylem Inc.
10          What assumptions have you made about the
11  extent of liability in this case; more specifically,
12  what goods and services of Xylem Inc. will be deemed
13  infringing?
14          MR. LaBRIOLA:  Objection as to form.
15          THE WITNESS:  Well, as I -- I described
16      how I went about doing the calculation in my
17      report, but it -- in general, I've assumed
18      that US -- I prepared actually several
19      alternative calculations, but in general I've
20      assumed that it would be based on Xylem
21      Inc.'s US sales.
22      Q   (BY MR. SHAUGHNESSY)  Is it fair to say,
23  then, that you assume that Xylem Inc. will be found
24  liable for -- for using the name Xylem in connection
25  with each and every good and service that it sells in

Page 52

ROBERT A. HUTCHINS

1       ROBERT A. HUTCHINS
2   the United States?
3       A   I assume they will be found liable for using
4   the name Xylem Inc. and selling products under that
5   name, yes.
6       Q   Okay.  But all -- all products, correct?
7       A   Based on the information I have, yes.
8       Q   Would you need to change your opinion if
9   Xylem Inc. were found liable just for using the name
10  Xylem in connection with a subset of the goods that it
11  sells in the United States?
12          MR. LaBRIOLA:  Objection to the extent
13      it calls for a legal conclusion.
14          THE WITNESS:  Well, I would assume I
15      would need to change the calculation or the
16      infringing sales base if there's only a
17      portion outside of the alternative
18      calculations that I've already used here that
19      are deemed to be infringing.
20      Q   (BY MR. SHAUGHNESSY)  So I take it that's --
21  that's a yes, if -- if some but not all of Xylem Inc.'s
22  uses of the term Xylem are found to be infringing, you
23  would need to revise, for instance, the royalty base
24  that you use in your reasonable royalty calculation,
25  correct?

Page 53

ROBERT A. HUTCHINS

1       ROBERT A. HUTCHINS
2           MR. LaBRIOLA:  Same objection.
3           THE WITNESS:  That's a possibility, yes.
4       Q   (BY MR. SHAUGHNESSY)  Now, pages 3 through 11
5   of your report all fall under the heading that you call
6   "Brief Overview"; is that correct?
7       A   Yes, just the exception that a new section
8   starts on page 11 as well, but yes.
9       Q   Right.  Right.  But section 2.0 of your
10  report is devoted to an overview of the facts as you
11  understand them, correct?
12      A   That's correct.
13      Q   Am -- am I correct in saying that the facts
14  that you set forth under heading 2 are -- are things as
15  to which you have no personal knowledge, but you've
16  either been told them or seen them in documents?
17      A   That's correct, yes.  I have no personal
18  knowledge of the facts discussed in section 2.0.
19      Q   And the -- the facts set forth in section 2.0
20  really aren't part of your expert opinion; they're
21  really just a factual background to your expert
22  opinion; is that fair?
23      A   No.
24      Q   Okay.  In what respect are they part of your
25  expert opinion?

Page 54

ROBERT A. HUTCHINS

1
2   A   Well, for example, the discussion about the
3   Xylem spin-off informs my -- my opinion as to when the
4   hypothetical negotiation would have occurred.
5       There's also a discussion about the
6   co-existence agreement with NA that I discussed later
7   on as well in my royalty rate analysis.
8   Q   What I'm trying to get at is do you expect to
9   be the person at trial who establishes that a spin-off
10  occurred, when it occurred, or are you simply building
11  on evidence that you expect other people to establish?
12      MR. LaBRIOLA: Objection as to form.
13      THE WITNESS: I -- I don't believe so.
14  I'm not sure what I would be asked to testify
15  about.
16  Q   (BY MR. SHAUGHNESSY) I -- I take it you have
17  conducted no independent investigation of the facts
18  that are set forth from pages 3 through 11; is that
19  correct?
20      MR. LaBRIOLA: Objection as to form.
21      THE WITNESS: Well, some of the facts
22  come from my independent research; so to that
23  extent, I guess I have undertaken an -- an
24  independent investigation of some of the
25  facts cited here, plus I've obviously

Page 55

ROBERT A. HUTCHINS

1
2   reviewed all the documents cited supporting
3   the facts.
4   Q   (BY MR. SHAUGHNESSY)  At the top of page 5,
5   the second and third lines, you state that Xylem Group
6   is projecting net sales of $8.2 million and a net
7   profit of $220,000 for the year 2012.  Do you see that?
8   A   I do.
9   Q   Have you done anything to ascertain whether
10  eight months into 2012 Xylem Group is on track to meet
11  those projections?
12  A   Not since the date of my report, no.
13  Q   Up to June 20th, had you done anything to
14  ascertain whether Xylem Group was on track to meet the
15  projections?
16  A   Other than I believe the $8.2 million figure
17  is a combination of actual results to a certain point
18  in time plus projected results -- results thereafter.
19  Q   At the top of page 7 of your report, there is
20  a few sentences about a presentation created by a
21  company called Lippincott.  What is the relevance of
22  that discussion to your opinion in this case?
23  A   So, in general, it -- it just informs my
24  understanding of the evaluation process that ITT or WCO
25  went through at this time, as well as it also informs

Page 56

ROBERT A. HUTCHINS

1
2   my understanding of the value of the premium that ITT
3   and WCO placed on selecting the -- the name Xylem over
4   the alternative choices, given the fact that it was
5   identified as having a higher level of difficulty than
6   other names.
7   Q   So you believe the -- the facts about how
8   the -- the name Xylem was characterized is -- is
9   relevant to the value of the -- the Xylem name?
10  A   Certainly from Xylem Inc.'s perspective, yes.
11  Q   Well, how -- how do you process that fact?  I
12  mean, explain to me how that fact feeds into your
13  ultimate opinion in this case.
14      I mean, I can observe that I -- I don't see
15  any subsequent discussion of -- of these facts in
16  the -- the later portion of your report.  I mean, first
17  of all, am I correct about that?
18  A   I'm not sure.
19  Q   Okay.  Well, in that case, just explain to
20  me, in -- in your own words, how the characterization
21  of the Xylem name as high difficulty in the US feeds
22  into your ultimate opinion in this case?
23  A   Well, I guess first off, it doesn't affect my
24  calculation of the -- the statutory damages based on
25  the defendant's profits and the -- defendants being

Page 57

ROBERT A. HUTCHINS

1
2   Xylem Inc., in that context.  But it -- it does play
3   into my assessment of -- in the royalty rate analysis
4   of the potential for switching to a noninfringing
5   alternative.
6   Q   Explain that.
7   A   Well, there was obviously a premium
8   associated with going forward with the name Xylem
9   despite the higher level of risk associated with that.
10      And in fundamental financing economic
11  principles is if you -- the higher level of risk, you
12  would expect to generate higher levels of returns with
13  that.  So they would -- they would have expected the
14  name Xylem to have produced incremental returns above
15  and beyond selecting an alternative name.
16  Q   Have you seen any evidence that Xylem Inc. or
17  then ITT conducted any financial analysis along those
18  lines?
19  A   No, but it's just basic economic principles.
20  Q   Do you know what the level of preference was
21  for Xylem versus the number two name?
22  A   Well, as I note in the -- on page 7 of my
23  report, it was identified as a top priority name by
24  Ms. McClain, who was the president, CEO at the time.
25  And -- and it's my understanding also from --

Page 58

ROBERT A. HUTCHINS

1    ROBERT A. HUTCHINS
2    Ms. McClain was deposed yesterday and she emphasized
3    the -- her affinity towards the name Xylem as opposed
4    to alternatives.
5        Q   Do you attach any quantitative value to the
6    preference for Xylem above the number two name?
7        A   No. It's more of a qualitative observation
8    than a quantitative observation, and weighing the
9    parties' bargaining positions and the import of
10   switching to the noninfringing alternative,
11   particularly from Xylem Inc.'s perspective.
12       Q   What is your understanding of the -- the
13   risk, the nature of the risk that was the subject of
14   the high difficulty characterization?
15       A   Well, in the paragraph on the top of page 7,
16   I -- I point out as -- at least that in a more detailed
17   assessment of the potential risk, Lippincott outlined
18   in red Xylem -- Xylem Group's Class 11 registration of
19   the '362 trademark.
20       Q   I guess my question was unclear. Risk of
21   what was the subject of Lippincott's characterization?
22           MR. LaBRIOLA: Objection as to form.
23           THE WITNESS: They -- they didn't define
24       any -- any more specifically than what you
25       see in the quote there, from what I recall.

Page 59

ROBERT A. HUTCHINS

1    ROBERT A. HUTCHINS
2        Q   (BY MR. SHAUGHNESSY) In the third paragraph
3    on that same page, in the first sentence, you refer to
4    a potential risk with respect to using the name Xylem.
5    Do you see that?
6        A   Yes.
7        Q   What is your basis for believing the risk
8    that was under consideration related to using the name
9    Xylem as opposed to, for instance, the risk of not
10   being able to secure a registration for the name Xylem?
11           THE WITNESS: Could you read that back,
12       please?
13           (Whereupon, the record was read by the
14       court reporter as follows:
15       "QUESTION: What is your basis for
16       believing the risk that was under
17       consideration related to using the name Xylem
18       as opposed to, for instance, the risk of not
19       being able to secure a registration for the
20       name Xylem?")
21           MR. LaBRIOLA: Objection, calls for a
22       legal conclusion.
23           THE WITNESS: Based on my review of the
24       documents, I believe the risk that they were
25       discussing here relates to the fact that

Page 60

ROBERT A. HUTCHINS

1    ROBERT A. HUTCHINS
2        there were other organizations or companies
3        that were using the name Xylem already.
4        Q   (BY MR. SHAUGHNESSY) Again, the -- the
5    existence of prior users of the name Xylem was
6    considered to present what type of risk to ITT, if it
7    adopted that name?
8            MR. LaBRIOLA: Objection to the extent
9        it calls for a legal conclusion.
10           THE WITNESS: I don't recall the --
11       specifically stating what the risk was other
12       than perhaps the Lippincott presentation,
13       which identified as being high difficulty for
14       the US market.
15       Q   (BY MR. SHAUGHNESSY) And did you -- do you
16   have an understanding of what difficulty refers to;
17   difficulty in doing what?
18           MR. LaBRIOLA: Objection, calls for a
19       legal conclusion.
20           THE WITNESS: I don't recall seeing
21       that.
22       Q   (BY MR. SHAUGHNESSY) At the bottom of the
23   text on page 7, you refer to Mr. Pratt from Baker &
24   McKenzie having written that the most expensive
25   purchase he had made for a blocking trademark was 3

Page 61

ROBERT A. HUTCHINS

1    ROBERT A. HUTCHINS
2    million euros. Do you see that?
3        A   I do, yes.
4        Q   What is the relevance of that piece of
5    evidence or -- or that fact to your analysis?
6        A   Well, I probably say it's the -- the
7    statement that precedes what you just read, in part
8    which is that the -- the price very much depends on the
9    parties' bargain, which is essentially at the center of
10   the hypothetical negotiation, as well as it's an -- an
11   indication, at least from advisors to WCO or ITT as to
12   what the potential price for the NA trademark or the --
13   the NA transaction might be.
14       Q   In conducting your analysis, did you put any
15   weight at all on the 3 million euros figure?
16       A   I don't believe so, no.
17       Q   Taking Mr. Pratt at his word, concerning his
18   experience, the -- the $45 million figure you offer as
19   one of your opinions for a perpetual license in this
20   case is, what, about 12 times more than the -- the most
21   expensive purchase Mr. Pratt had been involved in?
22           MR. LaBRIOLA: Objection as to form,
23       mischaracterizes witness -- witness's
24       testimony.
25           THE WITNESS: It -- it's the actual

Page 62

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  royalty rate is dependent, as Mr. Pratt
3  recognizes, on the parties' bargaining
4  position. And the $45 million is a function
5  of my analysis of the parties' bargaining
6  position, taking into account my market
7  approach analysis, my income approach
8  analysis, and the Georgia-Pacific factor
9  analysis.
10  Q   (BY MR. SHAUGHNESSY) I understand that. I
11  just want to be -- be clear on what -- what's probably
12  a very simple point, which is, what, 3 million euros
13  nowadays is, what, about $3-and-a-half million; is that
14  correct?
15  A   That sounds about right.
16  Q   And so your $45 million figure is about,
17  what, about 12 times more than the 3 million euro
18  figure that Mr. Pratt alluded to?
19  MR. LaBRIOLA: Objection and
20  mischaracterizes witness's testimony.
21  THE WITNESS: I think mathematically
22  that's correct, but I don't think that's a
23  relevant comparison at all.
24  Q   (BY MR. SHAUGHNESSY) At the top of page 10
25  of your report, you allude to the fact that Mr. Jimenez

Page 63

1  ROBERT A. HUTCHINS
2  then of ITT requested that another entity's financial
3  statements be pulled immediately. Do you see that?
4  A   Yes.
5  Q   How is that fact relevant to your opinion in
6  this case?
7  A   I think it's only relevant in general to the
8  extent that it's just -- provides an indication of the
9  process that WCO/ITT was going through in evaluating
10  how to resolve the risk issues or the issues they had
11  flagged with respect to going forward with the name
12  Xylem.
13  Q   Well, how -- how is that process relevant to
14  your opinion?
15  A   I don't think it's directly relevant. Again,
16  it just informs my understanding of the process they
17  went through.
18  Q   Is a negotiation counterparty's financial
19  status relevant to the negotiating dynamic between the
20  parties?
21  A   I'm not sure what you mean by "financial
22  status"?
23  Q   Their size, profitability, financial
24  strength, capitalization.
25  A   I wouldn't say it's irrelevant, but if you're

Page 64

1  ROBERT A. HUTCHINS
2  trying to value a particular piece of intellectual
3  property, it's not as relevant as what the value of the
4  property that the subject of the negotiation is from
5  both parties' perspective.
6  Q   Well, one of the factors that's relevant to
7  valuing intellectual property in a negotiation between
8  two parties is what use the intellectual property owner
9  can make of its property, correct?
10  A   Yes, as well as what the infringer is using
11  the property for, correct.
12  Q   And the use that the property owner can make
13  of, say, a patent or a trademark depends, in part, on
14  how well capitalized that entity is, correct?
15  A   Sure, that would be a -- a factor that would
16  affect their ability to grow, but those variables are
17  taken into account in my analysis.
18  Q   Were you surprised to see that ITT, when it
19  was going through its process, was taking into account
20  the financial status of people that it might have to
21  negotiate with?
22  A   I don't think I looked at it that way.
23  Q   Well, I mean, just were you surprised or not
24  surprised?
25  MR. LaBRIOLA: Objection as to form.

Page 65

1  ROBERT A. HUTCHINS
2  THE WITNESS: I didn't have a reaction
3  one way or the other. I didn't think it
4  would be -- the size of the company would be
5  relevant as to whether or not you need to
6  take a -- a license or enter into some sort
7  of agreement.
8  Q   (BY MR. SHAUGHNESSY) But if you did enter
9  negotiations, would it be relevant to consider as part
10  of the negotiation process on ITT's side?
11  MR. LaBRIOLA: Objection, asked and
12  answered.
13  THE WITNESS: Yes, as it would be to
14  consider what ITT's use of the product was.
15  Q   (BY MR. SHAUGHNESSY) At the top of page 11,
16  in that first paragraph, the second to last sentence,
17  you quote an ITT employee writing "I am a little bit
18  confused to find out there are many Xylem companies on
19  the net." Do you see that?
20  A   Yes.
21  Q   How is that fact relevant to your opinion?
22  A   I don't think it's directly relevant to my
23  analysis of what the royalty rate would be, other than
24  just an indication that there was knowledge that Xylem
25  existed, Xylem Group existed, was in the market.

17

Page 66

ROBERT A. HUTCHINS

1
2     Q    At the -- at the top of page 12 of your
3  report, you quote Section 1117A of Title 15 of the US
4  Code concerning the recoverable damages in Lanham Act
5  trademark cases.  Do you see that?
6     A   I do, yes.
7     Q    I'm very aware that you're not a lawyer, but
8  since you quote the statute, I -- I figure I can -- can
9  ask you about what you -- what you quoted, but am -- am
10  I correct that the -- the statute itself makes no
11  mention of reasonable royalty as a measure of recovery
12  in Lanham Act cases, correct?
13     A   It does not specifically reference reasonable
14  royalty, but I would note that it does say "If the
15  court shall find that the amount of the recovery based
16  on profits is either inadequate or excessive, the court
17  may, in its discretion, enter" such judge- -- "enter
18  judgement for such sum as the court shall find to be
19  just according to the circumstances of the case."
20     Q    Before you got involved in this case, did you
21  have any understanding as to whether reasonable royalty
22  was or was not a permissible measure of damages in
23  Lanham Act cases?
24     A   I was aware of that before this case, yes.
25     Q    And how -- how were you aware of that?

Page 67

ROBERT A. HUTCHINS

1
2     A    Just from my general practice of trying to
3  stay current of -- current on the trends and legal
4  opinions that affect the type of work that I do.
5     Q    Are you aware of any cases that have held
6  that reasonable royalty is not an appropriate measure
7  of damages in trademark cases?
8     A   I do not know.
9     Q    In the -- the text that immediately follows
10  your quotation from the statute, you -- you write, "it
11  is also my understanding" 'courts have recognized --
12  "it is my understanding that 'courts have recognized
13  where damages are difficult to measure, an appropriate
14  measure of damages includes an approximation of the
15  royalties the defendant would have had to pay,'" and
16  I'll end the quote there.  It goes on, but you -- you
17  see that, and you're quoting from a case, correct?
18     A   Yes.
19     Q    Is it your belief that this case involving
20  Xylem Group and Xylem Inc. is -- is a case where
21  damages are difficult to measure?
22     A   I don't believe I reached that conclusion.
23  I'm simply preparing an alternative measure.
24     Q    So that -- that comment is more in the spirit
25  of if the trier of fact finds the damages are difficult

Page 68

ROBERT A. HUTCHINS

1
2  to measure, I'm offering reasonable royalty as an
3  alternative?
4       MR. LaBRIOLA: Objection as to form.
5     Q   (BY MR. SHAUGHNESSY) Is that correct?
6       MR. LaBRIOLA: Objection as to form.
7       THE WITNESS: Yeah, in fact, I think I
8     say that in my summary, that if the court
9     concluded that the more appropriate measure
10     of damages be -- would be a reasonable
11     royalty, this is what the damages would be,
12     or I'm paraphrasing, but that's in general,
13     yes.
14     Q   (BY MR. SHAUGHNESSY) I take it it's -- it's
15  not your view that there is something about this case
16  that makes it especially difficult to measure damages
17  compared to the ordinary run of trademark cases that
18  you see?
19     A   No, in -- in fact, I quantified the damages,
20  yes.
21     Q    Okay.  If you can turn to page 13, the
22  heading 4.1 regarding Xylem's damages, you write,
23  quote, "I am currently unaware of any evidence that
24  indicates that Xylem has lost sales due to Xylem Inc.'s
25  activities."  Do you see that?

Page 69

ROBERT A. HUTCHINS

1
2     A   I do.
3     Q    And obviously you wrote this as of June 20th.
4  Is that still a correct statement?
5     A   I have not seen any information that would
6  change that statement, that's correct.
7     Q    Have you seen any financial documents
8  pertaining to Xylem Group?
9     A   Yes.
10     Q    What financials of theirs have you seen?
11     A   Well, I cite -- I cite a couple of documents,
12  financial documents back on page 5 that are essentially
13  financial statements or income statements, if you will.
14  There's some other financial documents, the payment
15  confusion summary I reference in -- on page 13 as well.
16     Q    Okay.
17     A   There might be some other ones also, but...
18     Q    Fair enough.  Are you aware that in calendar
19  year 2011, Xylem Group had a loss of more than
20  $200,000?
21     A   Yeah, I specifically state that on page 5,
22  yes.
23     Q    And I -- I take it, you do not believe that
24  that loss had anything to do with Xylem Inc., correct?
25     A   Well, I guess, as I say -- state on page 13,

Page 70

ROBERT A. HUTCHINS

1  there's no evidence they lost -- there's no -- Xylem
2  lost sales due to Xylem Inc., but there are other
3  factors related to this litigation that could have
4  contributed to that loss.
5     Q   Such as?
6     A   Legal expenses, one example.
7     Q   But have -- have you made any determination
8  as an -- an accountant as to whether legal expenses had
9  anything to do with the loss?
10    A   No, I've not.
11    Q   And have -- have you seen enough to -- to
12 understand that in some months in calendar year 2011
13 Xylem Group failed to meet its internal projections for
14 those months?
15    A   I don't recall looking at that.
16    Q   So I -- I take it from that answer, you have
17 no view on whether Xylem Group's failure to meet
18 projections had anything to do with Xylem Inc.'s
19 alleged infringement?
20    A   I have no opinion on that, no.
21    Q   In the second sentence under heading 4.1, you
22 write, quote, "This is consistent with my understanding
23 that Xylem and Xylem Inc. do not directly compete
24 against each other." Is that still your understanding

Page 71

ROBERT A. HUTCHINS

1  as of today?
2     A   Yes.
3     Q   You use the phrase "do not directly compete."
4  Are you aware of any indirect competition between the
5  parties?
6     A   Only to the extent, as I explained further in
7  that same paragraph, that they do appear to sell
8  through the same channels and to some of the same
9  customers. And there has been several examples of
10 payment-related confusion.
11    Q   Okay. But do you regard that as competition?
12    A   I wouldn't regard it as direct competition.
13 I would regard it as competing in the same sales
14 channels or distributing to the same sales channels is
15 probably a better way to phrase it.
16    Q   For instance, are you aware of any Xylem Inc.
17 products that are functional substitutes for Xylem
18 Group products or vice versa?
19    A   No, I'm not.
20    Q   So they -- they really don't compete at all;
21 they co-exist in some sales channels, correct?
22       MR. LaBRIOLA: Objection as to form.
23       THE WITNESS: Well, they don't directly
24       compete; they sell --

Page 72

ROBERT A. HUTCHINS

1     Q   (BY MR. SHAUGHNESSY) Well, do they --
2     A   -- to the same sales channels.
3     Q   Do they indirectly compete?
4     A   Only to the extent that they're competing for
5  the purchasing dollars of their customers.
6        MR. SHAUGHNESSY: Why don't we stop
7        there.
8        THE VIDEOGRAPHER: Marks the end of
9        video 1. Going off the record. The time is
10       11:10.
11 (Whereupon, there was a brief recess.)
12       THE VIDEOGRAPHER: Marks the beginning
13       video number 2, deposition of Robert
14       Hutchins. Back on the record. The time is
15       11:24.
16    Q   (BY MR. SHAUGHNESSY) In the second paragraph
17 on page 13 of -- you state, "It is my understanding
18 that the plaintiff's actions have presented obstacles
19 to Xylem's expansion plans," and then you go on to give
20 a little more detail. What -- what is the source of
21 your understanding on that point?
22    A   That would have been from my initial meeting
23 with Mr. Weinstein, as well as I'd say it's been
24 supplemented now by my review of his deposition

Page 73

ROBERT A. HUTCHINS

1  transcript, which was taken after my report was filed.
2     Q   Do you know anything about Xylem Group's
3  expansion plans beyond what you write in the second
4  sentence of that paragraph?
5        MR. LaBRIOLA: Objection as to form,
6        asked and answered -- well, I guess not asked
7        but answered.
8        THE WITNESS: That was my
9        understanding -- limited understanding at the
10       time I filed my report, but my read of
11       Mr. Weinstein's deposition, there was a much
12       more robust discussion about expansion plans
13       and new products and strategic alternatives
14       that they were pursuing and considering.
15    Q   (BY MR. SHAUGHNESSY) What were Xylem Group's
16 expansion plans before July 2011 when ITT announced
17 Xylem as the name of its water company?
18    A   I don't know specifically prior to that date
19 other than to reference what was in Mr. Weinstein --
20 Weinstein's deposition.
21    Q   In the years from 2006 to 2011, did Xylem
22 Group expand the number of product categories it
23 offered?
24    A   I recall there's some testimony about that,

Page 74

ROBERT A. HUTCHINS

1 and I don't recall the specifics of it, but I recall
2 there was testimony about switching out products,
3 introducing new products, retiring old products.
4    Q   I'm -- I'm focusing on categories, you know,
5 treating vanities as a category and sinks as a
6 category. Are you aware of Xylem Group introducing any
7 new categories of products between 2006 and 2011?
8    A   Again, I -- I recall from Mr. Weinstein's
9 deposition discussion about some new products they were
10 trying to introduce. I don't recall what the time
11 frame was. Or any -- new types of products or product
12 categories.
13    Q   So far as you're aware, has Xylem Group
14 created projections of future revenues for any product
15 categories that it was contemplating but decided not to
16 pursue because of Xylem Inc.'s actions?
17        MR. LaBRIOLA: Objection as to form.
18        THE WITNESS: I have not seen any
19    product-line specific projection, no.
20    Q   (BY MR. SHAUGHNESSY) So I take it you're in
21 no position to say whether Xylem Group lost or forewent
22 any revenue as a result of its failure to expand?
23    A   I -- I have not analyzed that issue.
24    Q   Okay. And is it also fair to say that none

Page 75

ROBERT A. HUTCHINS

1 of your damages calculations are based on an attempt to
2 approximate losses relating from -- or relating to a --
3 a failure to expand?
4    A   I would say there was no quantitative
5 calculation in my report with respect to that topic,
6 but it is a factor considered in my overall assessment
7 of the royalty rate.
8    Q   How does that factor into your royalty rate?
9    A   Well, it's a recognition of the -- the type
10 of the license that, in my view, Xylem would have
11 required in order to enter into a license agreement
12 with Xylem Inc.
13    Q   Okay. Can -- can you explain, and
14 specifically with reference to the failure to expand?
15    A   Sure. On -- on page 25, under
16 Georgia-Pacific factor number 3, I state, "In order to
17 eliminate future confusion and potential expansion
18 issues, Xylem would be interested in granting an
19 exclusive license to Xylem Inc., as well as agreeing to
20 operate under a new brand name." And there's other
21 sentences there as well, but...
22    Q   But what is the relevance specifically of the
23 potential -- potential expansion issues, say, what --
24 what if Xylem Group had no intent to expand, are -- are

Page 76

ROBERT A. HUTCHINS

1 you saying that's the difference between its demanding
2 an exclusive license or demanding that the license be
3 exclusive and not demanding that it be exclusive?
4    A   No.
5    Q   Okay. In fact, Xylem -- Xylem Group's 2011
6 revenue was less than its 2006 revenue. Is that a
7 familiar fact?
8    A   I don't think I've seen that, but it
9 certainly does not surprise me, given the market that
10 Xylem is in and the economic collapse that occurred.
11        In fact, it's rather -- it's an indication of
12 the -- their business model and the quality of their
13 management team that they are -- one of the survivors
14 of -- of the great recession.
15    Q   In your analysis, did you see any evidence
16 whatsoever that Xylem Group expanded after 2006?
17    A   I didn't look at that issue, no. In fact, I
18 would note it probably would have been a difficult time
19 to try to and expand given the economic conditions.
20    Q   And even from 2006 to 2007?
21    A   Certainly.
22    Q   Let me now focus on section 4.2 of your
23 report regarding Xylem Inc.'s sales and profits.
24    A   Okay.

Page 77

ROBERT A. HUTCHINS

1    Q   First of all, have -- have you done anything
2 to update your numbers or your analysis on this point?
3    A   I have not.
4    Q   Now, you recognize, I take it, that the
5 profits calculation has to take account of the extent
6 of Xylem Group's rights, correct? For instance, you
7 exclude nonUS revenues because Xylem Group has no
8 trademark rights outside the US, correct?
9    A   It's my understanding that --
10        MR. LaBRIOLA: Objection as to form.
11        THE WITNESS: -- that the calculation of
12    damages would be based on the territory where
13    the trademark was -- was granted or issued.
14    Q   (BY MR. SHAUGHNESSY) Okay. But that would
15 call for excluding countries outside the US and its
16 territories, correct?
17        MR. LaBRIOLA: Objection as to form.
18        THE WITNESS: That's my understanding,
19    that's what I attempted to do, exclude nonUS
20    sales.
21    Q   (BY MR. SHAUGHNESSY) In the table on page
22 14, you give numbers for Xylem Inc.'s total US
23 infringing sales and infringing profits. And then you
24 break the numbers out by US residential, US water

Page 78

ROBERT A. HUTCHINS

1 infrastructure, and US supplied water. Do you see
2 that?
3
4 A   Yes, I do.
5 Q   Why did you break it out that way?
6 A   Well, as I said earlier in my report, you
7 know, at the time I was preparing these calculations or
8 these analyses, discovery was still ongoing, so I
9 prepared several alternative calculations of infringing
10 sales and infringing profits.
11 Q   But why -- why, for instance, did you give a
12 separate figure for US residential?
13 A   To -- because that was a -- a segment that I
14 had sales data to quantify for -- or quantifying
15 infringing sales and infringing profits for. And to
16 the extent that that is the relevant market for
17 measuring this infringing sales, I wanted to capture
18 that in my analysis.
19 Q   And as we talked about earlier, if the trier
20 of fact were to decide that not all US residential
21 sales, for instance, were infringing but only some
22 subset of those sales were infringing, that would call
23 for some revision to the numbers you present, correct?
24 MR. LaBRIOLA: Objection to the extent
25 it calls for a legal conclusion.

Page 79

ROBERT A. HUTCHINS

1
2 THE WITNESS: If the appropriate sales
3 base was further defined by the find -- fact
4 finder, then, yes, I would need to revise
5 the -- the calculation that's shown in table
6 1.
7 Q   (BY MR. SHAUGHNESSY) And I take it you have
8 not made any analysis and aren't prepared to offer any
9 opinions on which are infringing sales and which are
10 not infringing sales; is that fair?
11 MR. LaBRIOLA: Objection, calls for a
12 legal conclusion.
13 THE WITNESS: I am not offering any
14 legal conclusions, legal opinions.
15 Q   (BY MR. SHAUGHNESSY) So someone else is
16 going to decide what's infringing and what's not
17 infringing, correct?
18 A   That would be my understanding.
19 Q   Have you made any analysis of whether or to
20 what extent the Xylem name has played a causal role in
21 bringing about any of the sales or profits that are
22 captured by the numbers in table 1?
23 MR. LaBRIOLA: Same objection to the
24 extent it calls for a legal conclusion.
25 THE WITNESS: I'm not sure if I follow

Page 80

ROBERT A. HUTCHINS

1
2 the question.
3 MR. SHAUGHNESSY: Well, why don't you
4 read it, and then you can tell me if you
5 understand it.
6 (Whereupon, the record was read by the
7 court reporter as follows:
8 "QUESTION: Have you made any analysis of
9 whether or to what extent the Xylem name has
10 played a causal role in bringing about any of
11 the sales or profits that are captured by the
12 numbers in table 1?")
13 Q   (BY MR. SHAUGHNESSY) Do you understand that?
14 A   So the question is did the use of the Xylem
15 name cause these sales?
16 Q   Correct.
17 A   I have not done that analysis. It's my
18 understanding that these are the -- these are the
19 infringing sales or sales that are made under the Xylem
20 name.
21 Q   But, for instance, you -- you understand that
22 before the business was named Xylem, it was ITT Water
23 and made millions and millions of dollars to sales
24 under that name, correct?
25 A   Yes, that's right.

Page 81

ROBERT A. HUTCHINS

1
2 Q   And since it's been named Xylem Inc., it's,
3 for the most part, continued to make sales to the same
4 sorts of customers in roughly the same amounts,
5 correct?
6 MR. LaBRIOLA: Objection as to form.
7 THE WITNESS: I believe they have
8 increased sales slightly but -- similar
9 amounts, but it's my understanding from the
10 statute that it's not, you know, calculate
11 the damages based on incremental sales; you
12 calculate based on total sales, which is what
13 is reflected in table 1.
14 Q   (BY MR. SHAUGHNESSY) But if, for instance,
15 the court decides that the inquiry is whether the sales
16 are attributable to the infringing mark, I take it you
17 have done anything to analyze that question?
18 A   I -- I have not analyzed whether the Xylem
19 mark caused any increase of sales.
20 Q   Okay. Let's turn to your reasonable royalty
21 analysis, which will be the focus of most of the rest
22 of the day.
23 And am I correct that the focus of your
24 analysis is to place a value on an asset, namely Xylem
25 Group's trademark and the name Xylem?

Page 82

ROBERT A. HUTCHINS

1
2    A    That's -- in general, that's correct as --
3  expressed as a reasonable royalty rate, which applying
4  the framework that I have used countless times in both
5  patent infringement litigation as well as to value not
6  only intellectual property assets but nonintellectual
7  property assets.
8    Q    As part of your work on this case, did you
9  investigate how much money Xylem Group has spent to
10  promote and publicize and advertise the Xylem name?
11    A    I reviewed their financial statements and to
12  the extent -- I believe there were some disclosures of
13  marketing expenditures and PR expenditures on there.
14    Q    Do you recall what the quantities were as you
15  sit here?
16    A    I do not.
17    Q    Did those expenditures factor into your
18  opinion at all?
19    A    I would say they -- they -- they would have
20  factored in, again, not directly, but in terms of
21  weighing the parties' relative bargaining positions and
22  the value that they placed on the mark.
23    Q    Well, explain to me how Xylem Group's
24  expenditures factored into your analysis?
25    A    Well, I don't think you can do that in

Page 83

ROBERT A. HUTCHINS

1
2  isolation.  You'd have to look at the entire analysis
3  to really understand how all the pieces fit together.
4      But one of the things that -- that I discuss
5  is the fact that the type of agreement would
6  essentially transfer the -- the trademark to Xylem,
7  Inc. and Xylem would begin operating under a new name.
8    Q    Explain to me how that relates to the extent
9  of Xylem Group's advertising expenditures.
10    A    Well, it's -- Xylem would have to -- spend --
11  incur additional costs to promote its new name as well
12  as just essentially change its name.
13    Q    Are -- are you familiar with the -- the
14  concept that's used in reference to trademarks of the
15  strength of a trademark?
16    A    I've heard that term before, yes.
17    Q    Okay.  What's your understanding of what it
18  means?
19    A    In general, the --
20      MR. LaBRIOLA:  Let me just -- objection
21    to the extent it calls for a legal
22    conclusion.
23      THE WITNESS:  In general, I would say it
24    weighs or applies to recognition of the
25    trademark.

Page 84

ROBERT A. HUTCHINS

1
2    Q    (BY MR. SHAUGHNESSY)  Did you make any
3  inquiry in connection with your analysis in this case
4  of -- of how strong or well recognized Xylem Group's
5  trademark is?
6    A    I did not.
7    Q    As part of your work in this case, did you
8  investigate how Xylem Group uses and has used the
9  trademark Xylem in connection with its business?
10    A    On page 4, I -- under section 2.2, there is a
11  discussion of my understanding of how Xylem uses its --
12  the -- the trademark, as well as I would supplement
13  that with Mr. Weinstein's deposition testimony.
14    Q    Is it your understanding that all of Xylem
15  Group's products are sold under the Xylem brand name
16  and trademark?
17    A    It's my understanding that was
18  Mr. Weinstein's deposition testimony.
19    Q    Okay.  Are you aware of Xylem Group, as part
20  of its business, contracting for the manufacture of
21  vanities and perhaps other goods and supplying them to
22  companies under those other companies' private labels?
23    A    Yes, that's my understanding.
24    Q    And what is your understanding of how, if at
25  all, the Xylem name is used in that part of the

Page 85

ROBERT A. HUTCHINS

1
2  company's business?
3    A    I don't recall what Mr. Weinstein's
4  deposition testimony was with respect to that, so I --
5  I'm not sure.
6    Q    And just to be clear about a point that I --
7  I think you did make, Mr. Weinstein didn't testify
8  until after you prepared your report, correct?
9    A    That is correct.
10    Q    And so the -- the opinions that you express
11  in your report were created with -- without the benefit
12  of Mr. Weinstein's deposition testimony, correct?
13    A    I did not have that to rely upon, that
14  testimony, that's correct.
15    Q    Do you know how or where, in other words, in
16  what sort of media, Xylem Group promotes its products
17  under the Xylem name?
18    A    Again, I recall testimony from Mr. Weinstein
19  on that issue; I just don't recall specifically where
20  he -- what he said.
21    Q    And any facts on that point did not play a
22  role in your analysis because you didn't have those
23  facts at the time of your analysis, correct?
24    A    I believe there were a -- some trade
25  publications that were provided to me -- yes, in

ROBERT A. HUTCHINS

1  Exhibit B, I list the Supply House Times Magazine, and
2  it's my understanding that they -- Xylem was
3  advertising in those magazines or at least they're --
4  they were identified in those magazines.
5       MR. LaBRIOLA: What page are you on?
6       THE WITNESS: I'm sorry, Exhibit B, page
7  2.
8       Q   (BY MR. SHAUGHNESSY) On page 15 of your
9  report, you note that the -- the framework for your
10  reasonable royalty analysis is premised on the -- the
11  assumption that Xylem Inc. recognized the validity of
12  Xylem Group's claims, correct?
13      A   Yes, which is -- a standard assumption under
14  the Georgia-Pacific factors, and it is one made in all
15  cases applying those factors.
16      Q   Under heading 5.1, you discuss the date of
17  the hypothetical negotiations in your analysis. And
18  you say "A reasonable date to assume the negotiation
19  would have occurred is in October 2011." Do you see
20  that?
21      A   Yes.
22      Q   Now, are you assuming that that is the date
23  of first infringement, or are you independently
24  vouching for the fact that that was the date of first

ROBERT A. HUTCHINS

1  infringement?
2       MR. LaBRIOLA: Objection as to form.
3       THE WITNESS: In my opinion, that is the
4  appropriate date to use for the hypothetical
5  negotiation based on the facts outlined in
6  section 2.0, as well as supplemented by my
7  understanding of Ms. McClain's testimony
8  yesterday -- deposition testimony
9  yesterday.
10      Q   (BY MR. SHAUGHNESSY) Okay. When in October
11  2011 would the negotiation have occurred?
12      A   I don't have a specific date, and --
13      Q   It could have been as early as October 1st,
14  in your view?
15      A   I -- it would have been shortly before the --
16  the spin-off was consummated, so I don't think it would
17  have been in early October. In my view based on the
18  facts and circumstances relevant to this particular
19  matter, the negotiation would have occurred closer to
20  the same of the spin-off, which was the end of October
21  2011.
22      Q   Tell -- tell me the basis for your opinion
23  that the appropriate date for the hypothetical
24  negotiation is late October 2011.

ROBERT A. HUTCHINS

1       A   Well, as I discuss on -- on page -- page 11,
2  under section 2, the last two paragraphs, the spin-off
3  was not contemplated -- or not consummated until
4  October 31st, 2001 [sic].
5       The board didn't approve the spin-off until
6  early October 2011. It's my understanding that WCO/ITT
7  was not engaged in commerce or selling products under
8  the Xylem name prior to the completion of the actual
9  spin-off. It's my understanding that Ms. McClain has
10  also confirmed that was the case.
11      It's my understanding that -- from
12  Ms. McClain's testimony that -- that WCO continued to,
13  and I'll paraphrase -- continued to operate as WCO --
14  or ITT until the spin-off was complete.
15      So those are -- I might have left out a
16  couple of facts, but those are the basis that I'm
17  relying on or the reasons why I believe the negotiation
18  would have occurred some point before -- shortly before
19  the spin-off.
20      Q   What is your understanding of what
21  constitutes an infringement for purposes of
22  establishing the date of first infringement for
23  purposes of your analysis?
24      A   Well, not -- not offering a -- a legal

ROBERT A. HUTCHINS

1  opinion with that -- with regards to that question, but
2  it's my understanding that infringement would not occur
3  until certainly for purposes of measuring damages until
4  you started selling product using the name.
5       Q   What's the basis for that statement?
6       MR. LaBRIOLA: Objection to the extent
7  it calls for a legal conclusion.
8       THE WITNESS: If you're not selling
9  products using the name, the infringing name,
10  then I don't see how you could be infringing.
11      Q   (BY MR. SHAUGHNESSY) Okay. Does that
12  complete your answer?
13      MR. LaBRIOLA: Subject to the same
14  objection.
15      THE WITNESS: I think also for the other
16  reasons I stated in my prior answer as to
17  how -- how WCO/ITT was conducting business
18  prior to the consummation of the spin-off.
19      Q   (BY MR. SHAUGHNESSY) Well, you -- you
20  understand that ITT announced Xylem as the name of the
21  new water company on July 14th, 2011?
22      A   Yes.
23      Q   And on or about July 14th, 2011, the -- the
24  company sent letters to customers announcing Xylem as

Page 90

ROBERT A. HUTCHINS

1    the new name of the company?
2        MR. LaBRIOLA: Objection as to form.
3        THE WITNESS: I believe that's
4    correct.
5        Q    (BY MR. SHAUGHNESSY) And the WCO entity was
6    actually renamed Xylem Inc. with the Indiana Secretary
7    of State on July 14th, 2011; is that a familiar fact to
8    you?
9        A    That does sound correct, yes, but they
10   weren't selling any products prior to that point in
11   time under the infringing name.
12       Q    And the Xylem Inc. made at least one filing
13   with the Securities Exchange Commission under the name
14   Xylem Inc. in August 2011; is that something you're
15   familiar with?
16       A    Yes.
17       Q    And the Wall Street Journal, on July 15th,
18   2011, published an article noting that the new name of
19   the ITT water company was Xylem Inc., correct?
20       MR. LaBRIOLA: Objection,
21   mischaracterizes the article.
22       Q    (BY MR. SHAUGHNESSY) Well, tell -- tell me
23   what you understand about that article.
24       A    I believe it announced that ITT was spinning

Page 91

ROBERT A. HUTCHINS

1    off its water business, and the new name would be
2    Xylem. I don't believe it said the -- it was selling
3    any products under the name currently or conducting
4    business as a separate entity called Xylem Inc. or
5    marketing products to customers under the name Xylem
6    Inc. or that the spin-off had actually been completed
7    as of that day.
8        Q    Had you seen Mr. Slattery's demand letter to
9    ITT at the time you prepared your report?
10       A    I don't believe so, unless it was included as
11   an exhibit to the declaratory judgment or the answer
12   and counterclaim.
13       Q    But you've subsequently seen that letter?
14       A    Yes.
15       Q    Well, regardless of whether you had seen the
16   letter as of the time of your report on June 20th, were
17   you aware that Xylem Group had sent a demand letter to
18   ITT in July 2011?
19       A    Yes. On page 11, I write, "On July 20th,
20   2011, counsel for the defendant, Xylem Group, notified
21   ITT that its intended spin-off to a company named Xylem
22   Inc. would infringe a registered trademark of" -- "of
23   Xylem and likely cause [sic] or cause confusion or
24   misstate or to deceive customers into believing an

Page 92

ROBERT A. HUTCHINS

1    association exists between Xylem and Xylem Inc."
2        Q    After seeing Mr. Slattery's letter, did that
3    cause you to alter your opinion that the infringement
4    began in late October 2011?
5        A    No, not based on the other facts and
6    circumstances that I've discussed earlier.
7        Q    Now, if you are incorrect that infringement
8    requires the alleged infringer to be selling product
9    under the contested name, then your conclusion as to
10   the date of first infringement will be wrong, correct?
11       MR. LaBRIOLA: Objection,
12   mischaracterizes the witness's testimony.
13       THE WITNESS: That wasn't the only basis
14   I cited for concluding when the hypothetical
15   negotiation would have occurred.
16       Q    (BY MR. SHAUGHNESSY) Okay. Well, what --
17   what other factors are relevant to when the
18   hypothetical -- hypothetical negotiation occurs?
19       A    Well, as I explained earlier and discussed --
20   some of the facts are discussed in section 2.0, you
21   know, the spin-off was not consummated until October
22   31st, 2011. They -- Xylem Inc. was not operating as a
23   separate entity -- or was not operating and marketing
24   and selling products under the name Xylem Inc. until

Page 93

ROBERT A. HUTCHINS

1    the consummation of the spin-off. In fact, there's --
2    there's a document where they specifically state that
3    the new Xylem name would not be used in -- by ITT until
4    the spin-off was complete.
5        There's other statements in the SEC filings
6    where they -- they document more details with respect
7    to the -- the -- the steps they went through to
8    consummate the transaction, all of which were in the
9    October -- October time frame as well. I don't recall
10   all those dates either, but all those facts are what I
11   rely upon in concluding that the date of the
12   hypothetical negotiation would have occurred in late
13   October 2011, as supplemented now by my understanding
14   of Ms. McClain's testimony, which is consistent with my
15   understanding of the facts.
16       Q    Well, Ms. McClain certainly wasn't testifying
17   about when infringement occurred, correct?
18       A    I don't believe so.
19       Q    But if you are wrong in believing that all
20   the factors you enumerate are relevant to when an
21   infringement occurs, then your opinion about the date
22   of the first infringement is incorrect, correct?
23       MR. LaBRIOLA: Objection.
24       THE WITNESS: The date of the first

Page 94

ROBERT A. HUTCHINS

1
2  infringement. So infringement occurs
3  prior -- if I understand your question,
4  infringement occurs prior to the actual use
5  in commerce of the infringing name; is that
6  the premise?
7  Q   (BY MR. SHAUGHNESSY) Take that as a
8  for-example, yes.
9       MR. LaBRIOLA: Objection as to form.
10      THE WITNESS: Because I said I'm not
11  sure how you can -- why there would be
12  damages if there was no infringing sales.
13  Q   (BY MR. SHAUGHNESSY) Well, what -- what if
14  the issue is just tradename infringement rather than
15  trademark infringement?
16      MR. LaBRIOLA: Objection to the extent
17  it calls for a legal conclusion.
18      THE WITNESS: Well, the way that I
19  calculated sales was based on when the --
20  when they began selling products under the
21  name Xylem, not when they publicly disclose
22  that they were going to spin off the water
23  company business into a new entity that would
24  be called Xylem Inc.
25  Q   (BY MR. SHAUGHNESSY) But that's -- that's a

Page 95

ROBERT A. HUTCHINS

1
2  separate consideration from when you determine the
3  first infringement began?
4       MR. LaBRIOLA: Objection as to form.
5       THE WITNESS: I'm not sure if I follow
6  that question.
7  Q   (BY MR. SHAUGHNESSY) Start -- start with the
8  basics. Where are you getting your notion of what
9  constitutes an infringement?
10      MR. LaBRIOLA: Objection to the extent
11  it calls for a legal conclusion.
12      THE WITNESS: Well, my general
13  experience in intellectual property matters,
14  including patent infringement damages cases
15  as well as trademark infringement cases.
16  Q   (BY MR. SHAUGHNESSY) In the hypothetical
17  scenario that -- that you rely on for your reasonable
18  royalty analysis, does Xylem Group send a demand letter
19  on July 20th, 2011?
20  A   They -- they could have.
21  Q   And at what point does Xylem Inc. or ITT
22  acknowledge the validity of Xylem Group's claim?
23      MR. LaBRIOLA: Objection as to form.
24      THE WITNESS: That would occur in the
25  context of the hypothetical negotiation. So

Page 96

ROBERT A. HUTCHINS

1
2  when the hypothetical negotiation occurs,
3  you're assuming that ITT/WCO has assumed that
4  the trademark is valid and will be infringed
5  if it's used.
6  Q   (BY MR. SHAUGHNESSY) So in -- in your
7  scenario, ITT announces the name, spends money
8  investing in the name, and then decides Xylem Group has
9  a valid claim and conducts a negotiation with Xylem
10  Group?
11  A   Based on the framework of my understanding of
12  when the hypothetical negotiation is supposed to occur.
13  I would probably also add maybe another -- another fact
14  that is referenced in my report, but I failed to
15  mention was the fact that the plaintiffs, ITT/Xylem
16  Inc., filed a declaratory judgment on October 26, 2011.
17  Q   Actually, they initially filed an -- an
18  earlier case, correct, in mid August 2011 in White
19  Plains, New York?
20  A   That does sound familiar, yes.
21  Q   So how -- how does that factor into your
22  analysis?
23  A   Well, it's just another indication that the
24  hypothetical negotiation would not have occurred on
25  July 14th, 2011.

Page 97

ROBERT A. HUTCHINS

1
2  Q   Well, would it have occurred on August 18th,
3  2011?
4  A   In my opinion, based on the weight of all the
5  other evidence and facts that I discussed earlier, I do
6  not think so.
7  Q   Have you revised or modified your view as to
8  how much ITT had spent on rebranding costs as of the
9  time of the hypothetical negotiation?
10  A   No, I -- I know Mr. Yerman references a
11  figure of $3 million; but in my opinion, the
12  hypothetical negotiation, in my experience, working on
13  numerous patent infringement cases, does not occur in a
14  vacuum. The facts relevant does not occur in vacuum.
15  There's a contract that's referred to as the Book of
16  Wisdom that allows you to look at facts that occur
17  after the negotiation, not to mention several of the
18  factors actually require you to consider facts ex-post
19  of the negotiation as well. So I -- I don't think you
20  can necessarily put a hard stop on a particular number
21  in the construct of the hypothetical negotiation.
22  Q   Well, based on what you now know, how much in
23  rebranding costs had ITT incurred as of October 30th,
24  2011?
25  A   Well, if I recall from Mr. Yerman's schedule,

Page 98

ROBERT A. HUTCHINS

1   it was 8 million or so. But from my review of his
2   deposition transcript, he wasn't sure whether or not
3   that included all of the cost. He wasn't sure what was
4   actually in that schedule, so I -- at a minimum,
5   it's -- it looks like it's $8 million.
6   Q   You believe it's 8 million rather than 3
7   million?
8   A   If I could see a document, I could answer
9   that, but...
10  Q   So why would you consider rebranding costs in
11  excess of what the company had incurred as of the date
12  of the hypothetical negotiation?
13       MR. LaBRIOLA: Objection as to form.
14       THE WITNESS: Again, relying on the Book
15  of Wisdom construct, you don't conduct a
16  hypothetical negotiation in -- in a complete
17  vacuum.
18  Q   (BY MR. SHAUGHNESSY) Well, what does that
19  mean?
20  A   You're allowed to incorporate ex-post facts
21  and events into your analysis.
22  Q   Well, the parties wouldn't have incorporated
23  those into their analysis at the time of the
24  hypothetical negotiation, would they?

Page 99

ROBERT A. HUTCHINS

1   A   In this --
2       MR. LaBRIOLA: Objection as to form.
3       THE WITNESS: In the construct of a
4   hypothetical negotiation, they would have.
5   Q   (BY MR. SHAUGHNESSY) How could they have?
6       MR. LaBRIOLA: Objection to the extent
7   it calls for a legal conclusion.
8       THE WITNESS: That's how the
9   hypothetical negotiation works. For example,
10  what is it, Georgia-Pacific factor 8 asks you
11  to look at the -- or 11 asks you to look at
12  the extent of the infringer's use of the
13  product. That requires you to consider facts
14  after the date of the hypothetical
15  negotiation.
16  Q   (BY MR. SHAUGHNESSY) Right, but
17  Georgia-Pacific isn't a set of facts about what happens
18  in the hypothetical negotiation; it's a set of
19  plus-and-minus factors that you apply once you've done
20  the thought exercise of the hypothetical negotiation,
21  correct?
22       MR. LaBRIOLA: Objection.
23  Q   (BY MR. SHAUGHNESSY) Because hypothetical
24  negotiation is one of the Georgia-Pacific factors,

Page 100

ROBERT A. HUTCHINS

1   isn't that right?
2       MR. LaBRIOLA: Objection to the extent
3   it calls for a legal conclusion.
4       THE WITNESS: It's not a -- I don't
5   think it's a factor -- it's not one of the 15
6   factors that are listed. It's the construct
7   that the analysis, the royalty rate analysis
8   is undertaken.
9   Q   (BY MR. SHAUGHNESSY) I mean, is -- is it
10  your belief as you sit here that hypothetical
11  negotiation is not one of the Georgia-Pacific factors?
12  A   There are 15 specifically cited
13  Georgia-Pacific factors, and not -- none of them --
14  Q   Do you list them in your report?
15  A   Yes.
16  Q   Where are they?
17  A   They start on page 23 and continue through
18  page 30. There's a table that -- on page 32 that
19  provides a brief description of them.
20  Q   Well, it provides a description of 1 through
21  13. Do you know what 14 and 15 are?
22  A   Yes. Number 14 is listed on page 30, the
23  opinion of qualified experts. Number 15 is also listed
24  on page 30 --

Page 101

ROBERT A. HUTCHINS

1   Q   And that's a --
2   A   -- which is --
3   Q   -- a hypothetical negotiation, correct?
4   A   Yes, you're correct, I -- I apologize. I was
5   thinking of the date of the negotiation.
6   Q   Okay. So regardless of whether the finder of
7   fact can consider subsequent events, at the time of the
8   hypothetical negotiation, it is not proper to consider
9   subsequent expenditures, is it?
10  A   I would not agree with that.
11  Q   Well, first of all, what's -- what's your
12  basis for not agreeing with it?
13  A   Well, as I mentioned Earlier, the Book of
14  Wisdom is one construct that can be employed. And
15  again, some of the factors themselves require you to
16  look at ex-post facts. Factor 11, for example,
17  requires you to assess the extent to which the
18  infringer has made use of the invention and any
19  evidence probative of that use.
20  Q   Well, if I hear you correctly, it really
21  doesn't matter when the hypothetical negotiation would
22  have occurred because you could take into account the
23  supposed $15 million in branding costs even if the
24  negotiation hypothetically would have occurred July

Page 102

ROBERT A. HUTCHINS

1
2   13th, 2011, correct?
3       MR. LaBRIOLA: Objection as to form.
4       THE WITNESS: I wouldn't agree with
5   that.
6       Q   (BY MR. SHAUGHNESSY) Okay. Well, why can
7   you consider the full 15 if the negotiation occurs on
8   October 30th but not if the hypothetical negotiation
9   occurs on July 13th?
10      MR. LaBRIOLA: Objection, misstates the
11  witness's testimony.
12      THE WITNESS: I didn't -- I wasn't
13  talking about July 15th. I'm -- I'm confused
14  what the question is.
15      Q   (BY MR. SHAUGHNESSY) Okay. Well, let's --
16  let's back up.
17      You've told me, I think, that if you assume
18  the hypothetical negotiation takes place on October
19  30th, it is still permissible to consider rebranding
20  expenses that Xylem Inc., in fact, incurred after
21  October 30th, correct?
22      A   To a certain degree, there are limits to
23  that, yes.
24      Q   Well, to what degree and what are the limits?
25      A   I don't think you can specifically -- it's

Page 103

ROBERT A. HUTCHINS

1
2   more of a judgment call. I mean, I think there are --
3   are time frames that you wouldn't want to go beyond, in
4   terms of looking at what additional information you
5   would want to consider in the analysis.
6       Q   Well, what -- what time frame do you believe
7   is reasonable?
8       A   Well, I think it depends on the specific
9   factor you're looking at. It depends on the facts and
10  circumstances of the case. But certainly looking at
11  costs that were incurred a month or two after the
12  negotiation, I would think that would be relevant.
13      Q   But in the hypothetical scenario, do those
14  costs get incurred?
15      A   They could be.
16      Q   So is it your view that if the date of the
17  hypothetical negotiation were July 13th, it would be
18  improper to consider the full $15 million in rebranding
19  costs?
20      A   I would not disagree with that. I think the
21  facts and circumstances as of July 13, if that is the
22  date of the hypothetical -- hypothetical negotiation
23  are very different than what existed as of October --
24  end of October 2011.
25      Q   Well, how are they different?

Page 104

ROBERT A. HUTCHINS

1
2       A   Well, as I discussed earlier, WCO had begun
3   investing resources and rolling out the brand,
4   developing the name, starting the changeover. They
5   began developing their website. They began -- you
6   know, they worked towards the consummation of the -- of
7   the spin-off itself.
8       So there's -- a lot occurred between July
9   13th and October 31st, 2011, which is why I think that
10  the -- the rebranding cost that occurred after
11  October -- for a period after October 2011 would be --
12  still be relevant to a hypothetical negotiation in
13  October of 2011 but not be as relevant to one in July
14  of 2011.
15      Q   For purposes of your analysis, do you assume
16  that all of the rebranding costs -- and I think in some
17  places you may say 13 million, in some places you may
18  say 15 million -- did you assume that all of those are
19  expenses incurred in the United States?
20      A   The level of detail was not available to
21  disaggregate the expenditures by country.
22      Q   So did you, in the absence of that
23  information, assume that all of the expenses were
24  incurred in the United States?
25      A   I did not make an assumption either way.

Page 105

ROBERT A. HUTCHINS

1
2       Q   To the extent that expenses are incurred
3   outside the United States, is it -- are those expenses
4   relevant to the hypothetical negotiation?
5       A   They could be, yes.
6       Q   Well, in -- in what circumstances could they
7   be relevant?
8       A   Hypothetically speaking, if Xylem Inc. wanted
9   to operate under multiple brand names depending on the
10  country, then they would not necessarily have to
11  rebrand in ex-US countries.
12      Q   So in that circumstance, it would not be
13  appropriate to consider the entire $13 million at the
14  time of the hypothetical negotiation?
15      A   In that hypothetical, where they're wanting
16  to operate under multiple brand names in the US and
17  nonUS countries, I would think that you could exclude
18  the rebranding cost spin-offs outside the US.
19      Q   And did you draw any conclusions or make any
20  assumptions about ITT's position on that issue in this
21  case?
22      MR. LaBRIOLA: Objection as to form.
23      THE WITNESS: I -- I did not construct
24  that -- work -- work from that hypothetical
25  in my analysis. I would only note that Xylem

Page 106

ROBERT A. HUTCHINS

1 ROBERT A. HUTCHINS
2 was the preferred name of the CEO, and it
3 would be an interesting structure to have a
4 spin-off where a significant segment of your
5 sales are operated under one brand name, and
6 the other segments are operated under a
7 different brand name.
8     I think also it would be inconsistent
9 with the -- the intention of the selection of
10 the name Xylem. And as I note when I -- it's
11 in one of the factors of their Xylem -- Xylem
12 Inc.'s intention to promote itself as a
13 single-branded firm.
14     Q   (BY MR. SHAUGHNESSY) For purposes of your
15 analysis, do you make any assumptions about what
16 portion of the $13 million in rebranding costs
17 represent sunk costs?
18     A   I don't -- the information is not available
19 to quantify that. I specifically state that I
20 recognize that -- that -- that not all of the costs
21 would be sunk cost; it would have to be reincurred
22 again if they had to rebrand. I know Mr. Yerman states
23 otherwise. And I assume that they're all sunk cost,
24 but I -- I do not make that assumption.
25     Q   Explain to me, perhaps for the second or

Page 107

1 ROBERT A. HUTCHINS
2 third time, why you believe it is relevant and
3 appropriate to consider rebranding costs incurred after
4 the date of the hypothetical negotiation?
5     MR. LaBRIOLA: Objection, asked and
6 answered.
7     THE WITNESS: Well, as I explained
8 before, it's my understanding that there is
9 no explicit requirement to ignore ex-post
10 facts under the Book of Wisdom. And, in
11 fact, some of the Georgia-Pacific factors
12 require you to specifically assess what
13 happened after the hypothetical date of
14 negotiation.
15     Q   (BY MR. SHAUGHNESSY) Well, from the point of
16 view of the parties conducting the hypothetical
17 negotiation, explain how costs not yet incurred factor
18 into the negotiation and the arrival at a royalty?
19     THE WITNESS: Could you repeat that,
20 sorry? Can you read that back, please?
21     (Whereupon, the record was read by the
22 court reporter as follows:
23     "QUESTION: Well, from the point of view
24 of the parties conducting the hypothetical
25 negotiation, explain how costs not yet

Page 108

1 ROBERT A. HUTCHINS
2 incurred factor into the negotiation and the
3 arrival at a royalty"")
4     THE WITNESS: Well, again, I -- the
5 hypothetical negotiation is a construct that
6 you work from. It does not -- as I said
7 earlier, it does not require you to ignore
8 ex-post events. So this information would
9 have been -- it's known because it actually
10 happened.
11     Q   (BY MR. SHAUGHNESSY) But to -- to note the
12 obvious, it wouldn't be known to the parties at the
13 time of the hypothetical negotiation, would it?
14     A   It could have been.
15     Q   Well, they wouldn't -- the -- the costs would
16 not yet have been incurred, correct?
17     A   They could have been booked already.
18     Q   Well, is there some rule you follow about
19 concluding whether they've been booked or not booked
20 for purposes of conjuring this hypothetical
21 negotiation?
22     MR. LaBRIOLA: Objection to form.
23     THE COURT REPORTER: Conjuring?
24     MR. SHAUGHNESSY: Conjuring, yeah.
25     THE WITNESS: There are no bright-line

Page 109

1 ROBERT A. HUTCHINS
2 tests that -- that say what to include and
3 exclude, if that's your question.
4     Q   (BY MR. SHAUGHNESSY) Would you agree that,
5 from the point of view of the parties to the
6 hypothetical negotiation, particularly the licensee,
7 the putative licensee, costs that have not yet been
8 incurred stand in a different posture than costs that
9 actually have been incurred?
10     A   If you ignore the Book of Wisdom and ignore
11 any ex-post facts as part of the hypothetical
12 negotiation in the evaluation of the royalty rate,
13 which is my understanding is not the appropriate way to
14 conduct the analysis, then, I don't think you can look
15 at it in that type of vacuum.
16     Q   Have you conducted any analysis of whether
17 the name Xylem has produced any incremental revenue or
18 profit for Xylem Inc. beyond what would have been
19 experienced using the company name Fluance?
20     MR. LaBRIOLA: Objection as to form.
21     THE WITNESS: I have not analyzed
22 whether there would -- whether Xylem Inc.
23 experienced incremental sales above and
24 beyond what it would have realized if it had
25 selected its next best alternative, which my

## Page 110

ROBERT A. HUTCHINS

1 understanding was Fluance.

2 Q  (BY MR. SHAUGHNESSY)  Going back to the date

3 of the negotiations, the middle of page 15, in the

4 paragraph under 5.1, you say, "A reasonable date to

5 assume the negotiations would have occurred was in

6 October 2011." Is that date an assumption on your part

7 or an opinion on your part?

8 MR. LaBRIOLA: Objection as to form.

9 It's my opinion based on the facts and

10 circumstances that's when the date would have

11 occurred, but it's my understanding that is

12 a -- the actual date is something for the

13 fact finder to decide.

14 Q  (BY MR. SHAUGHNESSY) Okay.  So it's -- if

15 you had to do it over again, would you strike the word

16 "assume" and put in something more definite?

17 A  No, because ultimately it is going to be the

18 finder of facts' decision.

19 Q  But do you intend to testify to the trier of

20 fact that you, Robert Hutchins, believe the appropriate

21 date is October 2011 as opposed to some other date?

22 A  That would be my understanding, yes.

23 Q  In section 5.3, you talk about your market

24 approach, which involves looking at transactions in

## Page 111

ROBERT A. HUTCHINS

1 which ITT acquired three entities and associated

2 trademarks; is that an accurate generalization?

3 A  Well, I also discuss the -- my -- the

4 research I conducted to try and find comparable

5 licenses through what's called Royalty Source and

6 Royalty Stat in addition to my analysis of the three

7 acquisitions ITT undertook and the values that they

8 assigned to the trademarks they acquired.

9 Q  Thanks for that amendment.

10 You -- you did look at available databases

11 that collect information on licensing transactions, and

12 you weren't able to identify any that you regarded as

13 comparable to the trademark involved here, correct?

14 A  That's correct.

15 Q  Do you regard the trademarks involved in the

16 Nova, Godwin, and YSI transactions as comparable to the

17 Xylem mark?

18 A  No, and I -- I don't state that in my report.

19 Q  And, in fact, you don't believe that either,

20 correct?

21 A  Right, they provide an indication of value --

22 value to prices that ITT was paying for trademarks.  So

23 it gives me at least a quantitative number to work

24 from.

## Page 112

ROBERT A. HUTCHINS

1 Q  Again, just to be clear, you do not regard

2 the Nova, Godwin, YSI trademarks or trademark

3 portfolios as comparable to the trademark that's at

4 issue in this case, correct?

5 A  That's correct.

6 Q  Do you regard the Xilema mark, which we'll

7 talk about later, as comparable to the Xylem mark?

8 A  I would say that mark would be more

9 comparable, yes.  But, as I explain, that the terms of

10 that agreement are not probative of the value of the

11 trademark at the time of the hypothetical negotiation.

12 Q  Put it this way, if -- if you had seen the

13 Xilema transaction in Royalty Source, would you have

14 regarded that as comparable for purposes of your market

15 approach?

16 MR. LaBRIOLA: Objection as to form.

17 THE WITNESS: Probably, yes.

18 Q  (BY MR. SHAUGHNESSY) Now, you discuss the

19 analysis you went through to essentially back out

20 royalty rates from the valuations that were attributed

21 to the collection of trademarks involved in the three

22 transactions, correct?

23 A  I think that's correct, but I mean, what I

24 did is described in detail in section 5.3.4.  But in

## Page 113

ROBERT A. HUTCHINS

1 general, I -- because I didn't have the purchase price

2 allocation reports, I went through an effort to try and

3 reverse engineer, based on the values assigned to those

4 trademarks, what the implied royalty rate was.

5 Q  But since June 20th, you have seen the

6 valuation analyses done in one case by

7 PricewaterhouseCoopers and in the other two cases by

8 Ernst & Young, correct?

9 A  I have, yes.

10 Q  And -- and you -- you now know what the

11 actual royalty rates were that were used for purposes

12 of arriving at those analyses, correct?

13 A  That's correct, and it -- it provides further

14 support for how conservative my reasonable royalty rate

15 is.

16 Q  So I take it from that comment that you have

17 not increased your royalty rate or your royalty amount

18 in view of the higher royalty rates that were employed

19 in those three transactions?

20 A  That's correct.

21 Q  Is it safe to say that the -- that the

22 considerable efforts you applied to come up with these

23 implied royalty rates are really irrelevant now that we

24 have before us the -- the actual royalty rates that

Page 114

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  were used?
3      MR. LaBRIOLA: Objection as to form.
4      THE WITNESS: I wouldn't say they're
5  irrelevant, no.
6      Q  (BY MR. SHAUGHNESSY) Of what continuing
7  relevance are your implied royalty rates that you
8  derived?
9      A  Well, I think what the purchase price reports
10 provide are further validation of the methodology I
11 used to reverse engineer the royalty rates. And,
12 again, it provides further support for how conservative
13 my attempts to reverse engineer the royalty rates were.
14     Q  Under -- understood, but the -- the implied
15 royalty rates that you come up with really are of no
16 significance, now that we have the actual royalty
17 rates, correct?
18     MR. LaBRIOLA: Objection, asked and
19 answered.
20     THE WITNESS: Yeah, I wouldn't say it's
21 of no significance, because I use the -- the
22 methodology to come up with the -- an
23 estimate of what a minimum royalty rate could
24 be based on those values, and as described in
25 detail how I apply that to my overall

Page 115

1  ROBERT A. HUTCHINS
2  analysis.
3      Q  (BY MR. SHAUGHNESSY) So, for instance, you
4  saw that the outside accountants used more conservative
5  revenue projections and higher discount rates, and
6  that's the main reason they came up with higher royalty
7  rates than you did, correct?
8      A  Not necessarily. I ran through multiple
9  revenue projections, multiple discount rate scenarios
10 to reverse engineer into the rates, the implied royalty
11 rates.
12     Q  So as -- as between the -- the royalty rates
13 that were arrived at by the outside accountants and the
14 royalty rates that you came up with, do -- do you have
15 a view as to which are more accurate?
16     A  I have no reason to dispute the royalty rates
17 that the external accountants relied upon to value the
18 trademarks, just as I have no reason to dispute the
19 accuracy of the analysis that I undertook, either.
20     Q  At the time that you wrote your report,
21 did -- did you make any assumptions about how many
22 trademarks were involved in the three transactions you
23 relied on?
24     A  Based on my review of the publicly available
25 information, it appeared to me that there were multiple

Page 116

1  ROBERT A. HUTCHINS
2  brands. And you couldn't specifically tell how many
3  had trademarks, but I assume that there were multiple
4  trademarks acquired under each -- as part of each
5  acquisition.
6      Q  And seeing the reports from the outside
7  accountants, and the -- the IP schedules associated
8  with those transactions has allowed you to confirm,
9  that, in fact, there were numerous trademarks involved
10 in each of those transactions, correct?
11     MR. LaBRIOLA: Objection as to form.
12     THE WITNESS: Yes.
13     Q  (BY MR. SHAUGHNESSY) Have you seen the --
14 the IP schedules for each of those transactions?
15     A  Yes.
16     Q  And would you --
17     A  I'm sorry, what I think are the IP schedules,
18 yes.
19     Q  And would you agree with me that in the case
20 of Nova, you know, there are more than 80 trademarks
21 involved, did you review it enough to agree with that
22 statement?
23     A  I -- I -- I don't know how many were on
24 there.
25     Q  And same with the -- with the other two

Page 117

1  ROBERT A. HUTCHINS
2  acquisitions, you know there were multiple trademarks;
3  you're just in no position to agree or disagree with a
4  particular number?
5      A  That's correct. And that's -- since my
6  assumption -- I assume there were multiple trademarks,
7  that's why I did not select the maximum rate in my
8  analysis. I went on the most conservative side,
9  recognizing that there would be multiple trademarks or
10 based on the assumption that there would be multiple
11 trademarks that were acquired. So I specifically took
12 that into account in -- in the -- my royalty rate
13 analysis.
14     Q  Explain to me how you believe the royalty
15 rates applied to value the trademarks in the three
16 transactions are relevant to this case.
17     A  Well, as I said earlier, I think they provide
18 an indication of -- at least from WCO's perspective as
19 to what value they were placing on trademarks and how
20 much they were paying for trademarks.
21     So it's an indication of, at least from
22 WCO/Xylem Inc.'s perspective, how they would have
23 viewed a possible -- what -- what they would view as a
24 possible reasonable royalty rate.
25     Obviously there's quite a few adjustments you

ROBERT A. HUTCHINS

1 have to make to account for the factors that I discuss
2 in my report, so it's not just simply looking at a
3 single number in that valuation report and saying
4 that's what the value of the '362 trademark is.
5   Q   Well, how does it factor into your thinking
6 that the -- the values and -- and the rates that were
7 attributed to the trademarks in the three transactions
8 really involve entire portfolios of trademarks, not a
9 single trademark as we have in this dispute?
10   A   Well, again, that's why I state it's my
11 opinion the appropriate royalty range for the Xylem
12 trademark would fall below the above minimum range for
13 the following reasons, and I list several reasons. One
14 of those being because there are multiple trademarks,
15 and there's other factors as well.
16     So I take that into account in trying to
17 provide a very conservative number for what a potential
18 royalty rate would be.
19   Q   But in either before or after you provided
20 your report, have you done any analysis of the royalty
21 rates that were used in the three transactions to come
22 up with the per-trademark rate that it works out to?
23   A   Well, the valuations themselves were not done
24 on a per-trademark rate or basis. For example, I know

ROBERT A. HUTCHINS

1 the YSI valuation was done on the entire portfolio.
2     And, in fact, I think there -- I believe
3 they -- the rate they use is 4 percent, which was
4 obviously below the maximum that I calculate in table
5 3, but it's above the mean that I calculate as well.
6   Q   But -- but again, did you -- first, can we
7 agree there's only one trademark at issue in this case,
8 correct?
9   A   That's my understanding, yes.
10   Q   Did you use -- and let's take the YSI
11 transaction -- did you attempt to calculate the
12 per-trademark rate that it works out to?
13   A   I don't think you can do that in that -- you
14 cannot do that with that information.
15   Q   Why, because you don't know the number of
16 trademarks?
17   A   Well, they don't -- they don't do the
18 calculation by trademark.
19   Q   But if you know the number of trademarks, you
20 could do the calculation, couldn't you?
21   A   I don't think that would be appropriate.
22 That would not be an appropriate way to --
23   Q   Why not?
24   A   -- to look at it.

ROBERT A. HUTCHINS

1   Because there could be different values
2 associated with different trademarks.
3   Q   Well, you could come up with an average, an
4 arithmetic average, couldn't you?
5   A   Sure, but it wouldn't be relevant.
6   Q   Well, explain to me why it wouldn't be
7 relevant.
8   A   Because the value of each trademark could
9 vary.
10   Q   And -- and you don't think that would be at
11 least as relevant as the value of the entire portfolio?
12   A   No. That's why I don't use the value of the
13 entire portfolio as part of my analysis -- as part of
14 my royalty rate evaluation.
15   Q   You don't use it as a point of reference in
16 your analysis?
17   A   I -- I adjust down from it.
18   Q   Well, you start -- you start with the number,
19 do you not?
20   A   I start with the value assigned to the
21 trademark -- or the -- the portfolio, yes.
22   Q   And then you -- you back out an implied
23 royalty rate, and we also now have the actual royalty
24 rate --

ROBERT A. HUTCHINS

1   MR. LaBRIOLA: Object --
2   Q   (BY MR. SHAUGHNESSY) -- correct?
3   MR. LaBRIOLA: Objection as to form.
4   Q   (BY MR. SHAUGHNESSY) Don't -- don't you
5 think all of that qualifies as using the royalty rate
6 from the YSI transaction in your analysis?
7   MR. LaBRIOLA: Objection as to form.
8   THE WITNESS: Well, I use the -- I
9 try -- I attempted to reverse engineer from
10 what the royalty -- royalty rate would be
11 based on that value. I'm not sure if I
12 follow your question.
13   Q   (BY MR. SHAUGHNESSY) And then you use that
14 as a point of departure to arrive at your royalty rate
15 for this case, correct?
16   A   I use the results of that analysis to provide
17 a starting point for what a royalty rate would be, yes.
18   Q   But that starting point is the royalty rate
19 for an entire portfolio of many different trademarks,
20 correct?
21   MR. LaBRIOLA: Objection,
22 mischaracterizes the witness's testimony.
23   THE WITNESS: Well, again, after looking
24 at that -- the purchase price allocations, it

Page 122

1        ROBERT A. HUTCHINS
2      provided further support for how conservative
3      my analysis was, or at least the royalty
4      rates that I selected were.
5        Q   (BY MR. SHAUGHNESSY)  Okay.  Let -- let me
6      just ask you to do some arithematic.  Let's use the --
7      I forgot if it was PWC or Ernst & Young, it doesn't
8      matter, but they use a 4 percent royalty rate for the
9      YSI transaction.  Is that your recollection as well?
10       A   Yes.
11       Q   Let -- let me ask you to assume that the
12     trademark -- trademark portfolio for YSI included
13     approximately a hundred different trademarks, if you
14     include registrations in different countries as being
15     multiple trademarks.  I'm not asking you to vouch for
16     that assumption; just assume it.
17         If -- if that's true, the average rate for
18     that portfolio is .04 percent per trademark, correct?
19       A   It sounds like that would be the math, but
20     again, that's -- I would not agree with -- that that's
21     a relevant comparison to my analysis.
22       Q   Because some of the values would be higher
23     and some would be lower?
24       A   Some could be zero.
25         MR. SHAUGHNESSY:  Why don't we break

Page 123

1        ROBERT A. HUTCHINS
2      there.
3         THE VIDEOGRAPHER:  Marks the end of
4      video 2, going off the record.  The time is
5      12:43.
6    (Whereupon, there was a lunch recess.)
7         THE VIDEOGRAPHER:  Marks the beginning
8      of video 3, deposition of Robert Hutchins.
9      Back on the record.  The time is 1:44.
10       Q   (BY MR. SHAUGHNESSY)  Mr. Hutchins, the
11     trademarks that were involved in the Nova, the Godwin,
12     and the YSI transactions were, at least in the
13     aggregate for -- for each of those companies,
14     well-known in their respective markets; is that
15     correct?
16       A   That's -- that's my understanding.  I think I
17     reference that in my report, yes.
18       Q   And in acquiring those companies and those
19     trademarks, ITT obtained outright ownership of those
20     trademarks, not simply a license, correct?
21       A   That would be my understanding, yes.
22       Q   And among the differences between outright
23     ownership and a license, is that outright ownership
24     confers the right to sublicense the marks, correct?
25       A   That's correct, but you could also have an

Page 124

1        ROBERT A. HUTCHINS
2      exclusive license that has sublicense rights as well.
3        Q   Another difference between ownership and
4      licensing is that the -- the owner of the mark has an
5      unfettered right to expand into new markets with the
6      trademark without seeking or needing to seek the
7      consent of a third-party, correct?
8         MR. LaBRIOLA:  Objection as to form.
9         THE WITNESS:  That -- in general, that
10       sounds correct to me, but I think it would be
11       consistent with the exclusive license, too.
12       Q   (BY MR. SHAUGHNESSY)  But in an exclusive
13     license, any expansion of use would have to be
14     consistent with an agreement between the licensee and
15     the licensor, correct?
16       A   That would be my understanding.
17       Q   Have you done any investigation into how
18     well-known or how well-recognized Xylem Group's
19     trademark was in the ITT water business's various
20     markets as of October 2011?
21       A   I have not investigated how well-known Xylem
22     Group's trademark was in ITT's business, that's
23     correct.
24       Q   And to -- to summarize your implied royalty
25     rate analysis, you derived various rates, but the --

Page 125

1        ROBERT A. HUTCHINS
2      the range ran from, if I recall correctly, 0.63 percent
3      up to 5.1 percent; is that accurate?
4        A   A spread across the three acquisitions, looking
5      at table 3, yes.
6        Q   You've read Mr. Yerman's report, you told us,
7      correct?
8        A   I have.
9        Q   And did you see that he characterized your
10     reference to the $13 million in rebranding costs as, in
11     effect, the employment of so-called cost methodology
12     for valuing a trademark; do you recall that?
13       A   I do recall that discussion.
14       Q   And do you believe that's a fair
15     characterization?
16       A   I didn't characterize it as that, no.
17       Q   And do you think it's improper or inaccurate
18     to characterize it that way?
19       A   I don't have an opinion one way or the other.
20       Q   But you do rely on your report on what you
21     call the -- the market approach, namely looking at
22     royalty rates involved in other transactions, correct?
23       A   Could you be more specific?  I'm sorry.
24       Q   Sure.  Well, you -- you have a section,
25     section 5.3 of your report that begins on page 16 that

Page 126

1          ROBERT A. HUTCHINS
2   you characterize as the market approach to valuing the
3   trademark at issue here; is that right?
4       A   Section 5.3, yes, that's -- contains my
5   analysis of the -- the two steps or procedures I
6   performed under the market approach.
7       Q   And those two steps were first consulting
8   available databases to see if there were any comparable
9   trademarks, correct, on step 1?
10      A   Yes.
11      Q   And step 2 was, in the absence of any
12  comparable trademarks from the databases, to look at
13  the three acquisitions that the ITT water business
14  made, correct?
15      A   Correct, to get an indication of prices that
16  ITT's water business -- business was paying for -- for
17  trademarks, yes.
18      Q   And then beginning on page 20, you also set
19  forth what you refer to as the income approach to
20  valuation; is that right?
21      A   Yes.
22      Q   Okay. And then in section 5.5, beginning on
23  page 22, you have a discussion of the Georgia-Pacific
24  factors. Do you see that?
25      A   I do, yes.

Page 127

1          ROBERT A. HUTCHINS
2       Q   Now, what is the relationship between your
3   discussion of the Georgia-Pacific factors and the
4   market approach and the income approach that you set
5   forth?
6          MR. LaBRIOLA:  Objection as to form.
7          THE WITNESS:  Well, I -- I think that
8       all three analyses are reconciled in the
9       conclusion section of my report, and they're
10      all used to inform my overall opinions with
11      respect to the reasonable royalty rate.
12      Q   (BY MR. SHAUGHNESSY) Do you regard your
13  discussion of the Georgia-Pacific factors as a -- a
14  third distinct method at arriving at value here?
15      A   I wouldn't say it's distinct because there
16  are some factors that I would say overlap with both the
17  market approach and the income approach, so it's -- I
18  probably view it more as a blended approach. Again,
19  this is -- it's a -- it's an approach that I've used
20  many times to value intellectual property.
21      Q   Is -- is there any respect in which you
22  regard the Georgia-Pacific factors as representing a
23  distinct approach from the other two?
24      A   Well, certainly, the hypothetical negotiation
25  construct is something that is not specifically part of

Page 128

1          ROBERT A. HUTCHINS
2   the market approach for the income approach. I'll at
3   least point to that, to it's not -- I guess you could
4   argue that the date of infringement is similar to the
5   date of the valuation date that would be applicable
6   under the market approach and the income approach.
7   Those two might be a little bit dissimilar, but they
8   could be similar as well.
9       Q   Well, let -- let me approach this way:
10  You -- you begin your discussion of the Georgia-Pacific
11  approach on page 22 by saying -- it's actually the
12  second sentence -- that the hypothetical negotiation
13  may be modified upward or downward based on assessment
14  of the Georgia-Pacific factors.  Do you see that?
15      A   Yes.
16      Q   That suggests to me, and correct me if I'm
17  wrong, that you start with a hypothetical negotiation
18  result that you get independent of the Georgia-Pacific
19  factors and then you look at the Georgia-Pacific
20  factors to adjust the outcome of that hypothetical
21  negotiation result upward or downward, as the case may
22  be; is that a fair interpretation?
23      A   I don't view it that way.
24      Q   So you -- you view the hypothetical
25  negotiation as something that emerges from the

Page 129

1          ROBERT A. HUTCHINS
2   Georgia-Pacific analysis?
3       A   It's just -- it's part of the entire
4   analysis.
5       Q   To be clear, I think you were -- you were a
6   moment ago, the analysis that you set forth under the
7   market approach and the income approach are not
8   directed at the results of a hypothetical negotiation;
9   is that accurate?
10      A   They're -- they're directed at determining
11  what a -- a reasonable royalty rate would be in the
12  construct of a hypothetical negotiation.
13      Q   Now, under income approach, you note at the
14  bottom of the text on page 21, "It also can be said
15  that their aggregate value equals the value of the
16  business enterprise," and you're citing a published
17  book in that, and you're referring to the aggregate
18  value of the tangible, intangible, and monetary assets
19  of the business, correct?
20      A   Yes.
21      Q   And that's really a -- a truism, is it not?
22  I mean that's, the definition of enterprise value; that
23  it's the value of all the assets, correct?
24      A   I guess less the debt, yes.
25      Q   And that holds true for Xylem Group as well

33

Page 130

ROBERT A. HUTCHINS

1      as Xylem Inc., correct?
2      A   Yes.
3      Q   And so does it also hold true that the value
4  of Xylem Group's Xylem trademark cannot exceed the
5  enterprise value of Xylem Group as an entire business?
6      A   From Xylem Group's perspective, that's
7  correct, but that's not the analysis that I undertake
8  here for purposes of determining what a reasonable
9  royalty rate would be to the parties involved in the
10 negotiation.
11     Q   Well, have you undertaken any effort in
12 connection with your work in this case to ascertain
13 what the enterprise value of Xylem Group is as a whole?
14     A   I have not, no.
15     Q   Did you see Mr. Yerman's discussion in his
16 report of that subject?
17     A   Yes.
18     Q   And he said, I believe, that he -- he is
19 unable to see how the value could be greater than 3.3
20 million plus some amount for a control premium, do --
21 do you recall reading that?
22     A   I recall that, yes.
23     Q   Do you disagree with that?
24     A   I -- I haven't studied it, so I don't have an

Page 131

ROBERT A. HUTCHINS

1  opinion. I would just add that it's -- I don't think
2  it's the only relevant -- or that relevant to the
3  hypothetical negotiation between the two parties in
4  this instance.
5      Q   Well, at the time of the hypothetical
6  negotiation, let's assume that Xylem Group was worth $5
7  million, say, as a going concern. Wouldn't it have
8  been economically rational for ITT simply to buy Xylem
9  Group outright, lock, stock, and barrel?
10     A   Could have been, yes.
11     Q   And did you factor that into your analysis?
12     A   It's factored into the assessment of the
13 parties' bargaining positions, as well as coming up
14 with the -- the ultimate rate based on -- the ultimate
15 royalty rate based on the ranges that I work from or
16 a -- a measure, as well as the Georgia-Pacific factor
17 analysis.
18     Q   But where in your report do you discuss that
19 analysis of ITT having the option to simply buy Xylem
20 Group outright?
21     A   I don't -- I don't specifically discuss that,
22 no.
23     Q   If it's true that the value of the Xylem
24 trademark is $45 million, then that necessarily

Page 132

ROBERT A. HUTCHINS

1  implies, does it not, that the value of Xylem Group as
2  an enterprise is something more than $45 million;
3  again, ignoring debt for the time being, but isn't that
4  correct?
5      A   I don't --
6      MR. LaBRIOLA: Objection as to form.
7      THE WITNESS: I don't agree with that.
8      Q   (BY MR. SHAUGHNESSY) Why is that not
9  correct?
10     A   Because you -- that's mischaracterizing the
11 $45 million.
12     Q   How does it mischaracterizes the $45 million?
13     A   Again, the -- what I did was I prepared a
14 calculation based on the statutory damages, then I
15 prepared an alternative measure of damages if the fact
16 finder concluded that a more appropriate way to measure
17 damages was based on a reasonable royalty rate.
18     And I concluded based on all the analyses
19 detailed in my report that the two parties at the
20 negotiation would have agreed to a -- a -- a reasonable
21 royalty rate of 0.45 percent.
22     Then I prepared an alternative calculation of
23 where I applied the 0.45 percent times Xylem Inc.'s
24 projected revenues, US revenues, and the result of that

Page 133

ROBERT A. HUTCHINS

1  was the $45 million figure referred to.
2      And that's under the assumption that there is
3  no injunction and that, in essence, the parties are
4  forced to agree to -- if you will, forced to agree to a
5  fully paid-up license. And the $45 million in, what it
6  represents is effectively the -- the estimated damages,
7  the present value of the estimated damages based on the
8  0.45 percent royalty over the life of the trademark.
9      Q   So in what respect is that economically
10 different from the value of the trademark?
11     A   I think in this context, it's -- it's --
12 that's what it's attempting to -- to measure, is the
13 value of the trademark, not just to Xylem Group, but to
14 Xylem Inc.
15     Q   They have to be the same number, don't they?
16     A   I -- I don't think so.
17     Q   In order for there to be a transaction, don't
18 the parties have to ultimately come to the same
19 valuation?
20     A   Well, and that's where the 0.45 percent
21 royalty rate comes into it, yes.
22     Q   If I understand your report correctly, you're
23 saying that in a hypothetical negotiation, Xylem Group
24 would have demanded and Xylem Inc. would have given