Page 134

ROBERT A. HUTCHINS

1  terms in which there was an exclusive license in
2  perpetuity and there would have been a fully paid-up
3  license for $45 million, correct?
4      MR. LaBRIOLA: Objection as to form.
5      THE WITNESS: It's not exactly
6  correct.
7      Q  (BY MR. SHAUGHNESSY) How is it wrong?
8      A  Well, again, as I just explained, the 0.45
9  percent is used as an alternative measure of damages.
10 That's the rate that the parties have agreed to as a --
11 as a measure of damages in lieu of statutory damages.
12     Q  How do you expect to present your testimony
13 at trial? I mean, you -- you understand, do you not,
14 that when you testify, no decision will have been made
15 on an injunction, correct?
16     MR. LaBRIOLA: Objection to the extent
17 it calls for a legal conclusion.
18     Q  (BY MR. SHAUGHNESSY) Do -- do you have an
19 understanding on how these things work?
20     A  I would assume that would be the case, there
21 would not be an injunction in place.
22     Q  So how -- how do you expect to present your
23 testimony; just alternatively it's either a royalty for
24 a finite amount of time or a perpetual royalty?

Page 135

ROBERT A. HUTCHINS

1      MR. LaBRIOLA: Same objection.
2      THE WITNESS: Well, I'd also present the
3  statutory -- well --
4      Q  (BY MR. SHAUGHNESSY) Right.
5      A  -- I don't know exactly what I'll be asked to
6  testify about, but I would presumably testify about the
7  topics and the damage measures that I presented in
8  my -- in my report.
9      Q  But focusing just on the -- the royalty
10 issue, do you expect to offer essentially alternative
11 opinions; here's the amount if an injunction is
12 imposed; here's the amount if an injunction is not
13 imposed?
14     MR. LaBRIOLA: Objection.
15     THE WITNESS: I -- I don't know what I
16     would be asked to testify about, but my
17     report covers both of those topics, so I
18     would be prepared if I'm asked to testify
19     about both of those topics, along with
20     statutory damages.
21     Q  (BY MR. SHAUGHNESSY) In your hypothetical
22 negotiation, presumably Xylem Inc.'s goal would have
23 been to secure the right to use the Xylem name in
24 perpetuity, correct?

Page 136

ROBERT A. HUTCHINS

1      A  Yes.
2      Q  And that would have called for a perpetual
3  license from Xylem Group?
4      A  Correct.
5      Q  So in that hypothetical negotiation, the
6  parties wouldn't have just decided on a rate; they
7  would have decided on a full payment for that perpetual
8  right, correct?
9      A  I don't agree with that.
10     Q  Why do you not agree with that?
11     A  Again, for the reasons I discussed earlier,
12 the -- what I was attempting to derive from the
13 hypothetical negotiation as well as the income approach
14 analysis, the market approach analysis, the
15 Georgia-Pacific factor analysis and the reconciliation
16 of all those results is what a royalty rate would be
17 for purposes of measuring the damages based on the
18 infringing sales base.
19     And I presented an alternative calculation in
20 addition to that that expressed that in terms of what
21 those damages would be based on that royalty rate if
22 damages were extended into perpetuity.
23     Q  In your discussion of the income approach,
24 you note that the trademark portfolios that ITT

Page 137

ROBERT A. HUTCHINS

1  acquired as part of the three transactions account for
2  2.7 percent of the market value of Xylem Inc. Am I
3  understanding that correctly?
4      A  As of November 1st, 2011, that's correct.
5      Q  And then in the last paragraph of text above
6  heading 5.5, you write, "While this does not suggest or
7  indicate that Xylem Inc. expects the use of the Xylem
8  name will generate 2.7 percent of its total future
9  economic income, it is evidence of the economic value
10 that a trademark can provide to its owner." I'll just
11 stop there.
12     I mean, do -- do you understand that to be a
13 disputed issue; that trademarks can, in some
14 circumstances, provide value to their owner?
15     A  Do I understand it to be a disputed issue?
16 Well, looking at Mr. Yerman's report, I think he
17 disputes there's any value to the Xylem trademark, so I
18 would think that is -- it is a dispute issue as to
19 whether or not trademarks have value.
20     Q  Well, do you understand Mr. Yerman to be
21 disputing that trademarks can have value or just that
22 particular trademark at issue here has value?
23     A  I think it was more specific to the trademark
24 here.

Page 138

ROBERT A. HUTCHINS

1
2    Q   And does the 2.7 percent figure as to the
3  value of the trademarks in the three acquisitions say
4  anything about the value of the Xylem name?
5    A   Not directly, and I know Mr. Yerman commented
6  that he didn't see how I used this information, which I
7  think he -- is not a correct statement.  It
8  specifically discussed what I used the 2.7 percent for
9  in my conclusion section.
10   Q   And explain in your own words how you process
11  that 2.7 percent in arriving at your bottom line
12  opinion.
13   A   It was used as a reasonableness check on the
14  royalty rate.  It's described in more detail in my --
15  the conclusion section.  That's generally what the
16  purpose of it was.
17   Q   And how does it function as a reasonableness
18  check?
19   A   Well, the discussion on page 33, and
20  essentially I say that in my opinion, the value of the
21  '362 trademark as the date of the hypothetical
22  negotiation should be significantly less than 2.7
23  percent of Xylem Inc.'s total expected economic income.
24   Q   Any other way in which the 2.7 percent feeds
25  into your opinion?

Page 139

ROBERT A. HUTCHINS

1
2    A   I think that's the primary way, yes.
3    Q   So it's a -- it's a ceiling, if you will, on
4  the reasonable number?
5        MR. LaBRIOLA:  Objection as to form.
6        THE WITNESS:  That's a -- that's a fair
7  characterization.
8    Q   (BY MR. SHAUGHNESSY)  Does it feed in at all
9  to your arrival at the specific royalty rate that you
10  come up with, 0.45?
11   A   Okay.  It -- it does, in the sense that,
12  again, it serves as a reasonableness check to make sure
13  that the -- if I take a royalty rate, the expected
14  income generated from the stream of -- of cash flows
15  from the royalty rate does not exceed 2.7 percent.
16   Q   So the way it feeds in, if I'm understanding
17  you correctly, is you looked at .45, saw that it was
18  less than 2.7, and decided that it was in a zone of
19  reasonableness?
20       MR. LaBRIOLA:  Objection as to form.
21       THE WITNESS:  Not that simple.  It was,
22  again, another check on the analysis.  I
23  didn't -- in my opinion, the royalty rate
24  that was selected should not generate income
25  that exceeded 2.7 percent.  So if I had

Page 140

ROBERT A. HUTCHINS

1
2  picked a royalty rate that resulted in that
3  situation, then I would not have concluded
4  that was the appropriate royalty rate to use
5  or I would have concluded that was not the
6  appropriate royalty rate to use.
7    Q   (BY MR. SHAUGHNESSY)  In -- in the sentence
8  after the one I read a moment ago you wrote, quote "In
9  fact even if the Xylem brand accounted for only .09
10  percent of Xylem Inc.'s expected economic income, the
11  estimated market value of the mark would be
12  approximately 45.4 million as of October 31st, 2011."
13  Do you see that?
14       MR. LaBRIOLA:  Are you reading page 22?
15       MR. SHAUGHNESSY:  22, yeah.
16       THE WITNESS:  Yes, I see that.
17   Q   (BY MR. SHAUGHNESSY)  Have you conducted any
18  analysis to determine whether the Xylem brand accounts
19  for 0.9 percent of Xylem Inc.'s expected income?
20   A   No, it was just an example of how to express
21  the 2.7 percent with respect to Xylem -- with respect
22  to the '362 trademark.
23   Q   Okay.  Let's talk about the Georgia-Pacific
24  factors.  As we discussed earlier, in -- in the last
25  sentence of text that begins on page 22, you -- you

Page 141

ROBERT A. HUTCHINS

1
2  say, "The hypothetical negotiation may be modified
3  upward or downward based upon an assessment of the
4  Georgia-Pacific factors."
5        Now, where do you set forth the hypothetical
6  negotiation that you then modify upward or downward
7  based on the Georgia-Pacific factors.
8        MR. LaBRIOLA:  Objection as to form.
9        THE WITNESS:  Well, I think the -- the
10  conclusion reconciling the income approach
11  analysis, the market approach analysis, the
12  Georgia-Pacific factor analysis, it is all
13  referenced in the conclusion section of my
14  analysis; but in -- in general, you start
15  with the -- the range that I discuss on page
16  33 of 0.2 percent to 0.6 percent.  And then I
17  evaluate the Georgia-Pacific factors and
18  determine whether or not they would have
19  influenced the rate towards the higher end of
20  the range, the middle of the range, or the
21  lower end of the range.
22   Q   (BY MR. SHAUGHNESSY)  Okay.  Then let's --
23  let's focus on page 33 before we get deeply into the
24  Georgia-Pacific factors.
25       How do you come up with the 0.2 percent?

Page 142

ROBERT A. HUTCHINS

1    A   Well, it's -- it's described there on page
2  33. And essentially what I did, the details of the
3  calculation are in Exhibits 7.1 to 7.8. But
4  essentially I established as a floor of the value of
5  the mark as $15 million in rebranding costs incurred
6  through the second quarter of 2008. And then I assume
7  that -- or I concluded that the -- the royalty rate
8  used in connection with the hypothetical --
9  hypothetical negotiation would have been 0.2 percent,
10 which results in an average total value of 27.9
11 million, because the minimum rate, in my opinion,
12 should be below the rebranding cost -- I'm sorry,
13 reverse that. The minimum -- the minimum rate should
14 result in a value that is in excess of the re --
15 rebranding cost.
16    Q   What is that? What's your basis for saying
17 that?
18    A   Because I do not believe that the cost
19 invested in rolling out the brand is representative of
20 what the market value of the brand would be.
21    Q   What's the basis for saying that?
22    A   Well, the cost approach is not an approach
23 that is commonly used in valuing trademarks. And I
24 think in this instance, the -- looking as just simply

Page 143

ROBERT A. HUTCHINS

1  the cost invested does not take into account or reflect
2  what the market value of the brand would be.
3    Q   The whole purpose of this analysis is to
4  determine the market value, correct? I mean, you're --
5  you're not appealing to something outside your analysis
6  that represents the Platonic ideal of the market value;
7  you, Robert Hutchins, are charged with coming up with
8  the market value, correct?
9    A   As expressed as a royalty rate, yes.
10    Q   And so as part of that, how do you get to the
11 conclusion that the minimum royalty rate should
12 generate a value for the mark that is twice what Xylem
13 Inc. and ITT spent on rebranding in the first -- in --
14 in calendar 2011?
15    A   Well, keep in mind, too, that the -- the --
16 the $27.9 million value is based on the expected future
17 income of the -- the mark, so it's the value looking
18 forward as opposed to the cost or the rebranding costs
19 that have occurred which is the investment to date.
20        So I'm estimating what the value is going
21 forward assuming that Xylem Inc. continues to invest in
22 the brand, to continue to develop the brand in -- and
23 build its recognition.
24    Q   Okay. You said the value -- the --

Page 144

ROBERT A. HUTCHINS

1    MR. SHAUGHNESSY: Well, read the answer
2  back, please.
3    (Whereupon, the record was read by the
4  court reporter as follows:
5    "ANSWER: Well, keep in mind, too, that
6  the -- the -- the $27.9 million value is
7  based on the expected future income of the --
8  the mark, so it's the value looking forward
9  as opposed to the cost or the rebranding
10 costs that have occurred which is the
11 investment to date.
12    "So I'm estimating what the value is
13 going forward assuming that Xylem Inc.
14 continues to invest in the brand, to continue
15 to develop the brand and build its
16 recognition.")
17    Q   (BY MR. SHAUGHNESSY) You say 27.9 is based
18 on the expected future value of the mark. As I read
19 your report, the 27.9 million is just derived from
20 applying point 2 percent to future US revenues,
21 correct?
22    MR. LaBRIOLA: Objection as to form.
23    THE WITNESS: Discounted back to present
24 value, correct.

Page 145

ROBERT A. HUTCHINS

1    Q   (BY MR. SHAUGHNESSY) I understand, but you
2  earlier told me you did not undertake any effort to
3  determine the specific contribution of the Xylem mark
4  as such to the company's revenues, correct?
5    A   Well, if I said that, then you're right,
6  because I specifically looked at that in this context,
7  so --
8    Q   Well, then tell me everything you did in this
9  case to determine specifically the incremental
10 contribution of the Xylem name in itself to the
11 company's future revenues?
12    A   Well, we're not talking about the incremental
13 contribution; we're talking about the allocation of the
14 income. And really this is applying a royalty rate of
15 0.2 percent to their projected revenue stream.
16    Q   Okay. So the -- the base is the projected
17 revenue stream of every product they sell in the United
18 States, correct?
19    A   Yes.
20    Q   Okay. But -- and the 0.2 percent is your
21 attempt to place a value on the contribution of the
22 Xylem name?
23    A   Correct.
24    Q   Okay. And how do you get to the .2 percent?

Page 146

ROBERT A. HUTCHINS

1  
2     A   Well, again, it's -- as I discuss here in
3  this paragraph, you know, it's -- it's my opinion
4  that -- and my previous answer, it's my opinion that
5  the minimum value associated with the brand should
6  exceed the $15 million that was incurred in rebranding
7  cost up through the second quarter of 2012.
8     Q   Well, not only exceed but double, correct?  I
9  mean, the real number is 13, not 15; can we agree on
10 that?
11    A   Not through the second quarter 2012.
12    Q   Well, elsewhere you say 13, don't you?
13    A   I'm sorry, it was through the first quarter.
14 13 is through the fourth quarter.
15    Q   Oh, through -- through the first quarter.  So
16 you're already into 2012?
17    A   The $15 million, yes.
18    Q   Now, why do you believe the minimum royalty
19 rate should exceed the rebranding costs through the
20 first quarter of 2012?
21    A   Well, as I stated before, that doesn't take
22 into account the future investments in the brand that
23 will be made, the future expectations for value that
24 will be created from the brand.  That's simply the
25 measure of the cost incurred as of that date.  So it's

Page 147

ROBERT A. HUTCHINS

1  
2  not looking forward; it's looking -- the 15 million is
3  looking backwards.
4     Q   Okay.  Does that complete your answer?
5     A   I would probably have to incorporate my
6  earlier answers but, yes.
7     Q   You understand that the ITT water business
8  had to come up with a new name for the case, for this
9  spin-off, correct?  This wasn't a project they
10 undertook in an effort to boost their revenues; they --
11 they didn't have the option of continuing to use the
12 ITT name.  Do you understand that?
13        MR. LaBRIOLA:  Objection as to form.
14        THE WITNESS:  I would assume that to be
15    the case.
16    Q   (BY MR. SHAUGHNESSY) So what assumptions did
17 you make in coming up with the opinions set forth in
18 this paragraph about ITT's -- or now Xylem Inc.'s
19 future investment in the Xylem name?
20    A   I assume that they would continue to invest
21 in building brand recognition consistent with their
22 strategy.  And there's a -- a quote in here in my
23 report somewhere about having a -- a company focused
24 around one brand.
25    Q   Why did you come up with .2 percent rather

Page 148

ROBERT A. HUTCHINS

1  
2  than .11 percent?
3     A   Again, because it -- in my opinion, the
4  minimum rate should be significantly or really higher
5  than the cost invested to date.  And .2 percent -- a
6  .02 percent royalty generated a result that exceeded
7  the cost invested to date for the reasons I discussed
8  earlier.
9     Q   Why do you think the -- the minimum royalty
10 rate should generate a value higher than the costs
11 incurred to date in rebranding?
12        MR. LaBRIOLA:  Objection, asked and
13    answered.
14        THE WITNESS:  Yeah, it is -- I explained
15    before the 15 million only represents the
16    investment to date in the brand, so it's the
17    costs incurred to date.  It doesn't represent
18    what the value of the brand is going to be
19    from additional investments going forward,
20    and the -- the expected revenue, projected
21    revenues of Xylem Inc. moving forward as
22    well, in addition to the other factors I
23    discussed earlier.
24    Q   (BY MR. SHAUGHNESSY) Well, how do you know
25 what the future value is going to be?  Isn't that what

Page 149

ROBERT A. HUTCHINS

1  
2  you're supposed to be finding out?
3        MR. LaBRIOLA:  Objection as to form.
4        THE WITNESS:  I'm not sure if I follow
5    that question.
6        MR. SHAUGHNESSY:  Well, can you read
7    the -- read his last answer back, please, not
8    this one, but the last substantive answer.
9        (Whereupon, the record was read by the
10    court reporter as follows:
11    "ANSWER:  THE WITNESS:  Yeah, it is -- I
12    explained before the 15 million only
13    represents the investment to date in the
14    brand, so it's the costs incurred to date.
15    It doesn't represent what the value of the
16    brand is going to be from additional
17    investments going forward, and the -- the
18    expected revenue, projected revenues of Xylem
19    Inc. moving forward as well, in addition to
20    the other factors I discussed earlier.")
21    Q   (BY MR. SHAUGHNESSY) Well, how do you know
22 what the additional investments going forward are going
23 to be?
24    A   I don't know specifically what the dollar
25 amount of the investment is going to be, that's

Page 150

ROBERT A. HUTCHINS

1 correct.
2
3    Q   Well, how can you come up with your .2
4 percent number based, in part, on future value if -- if
5 you don't know what the future investments in the mark
6 are going to be?
7    A   Well, I'm assuming they will continue to
8 invest in the mark, consistent with statements made by
9 Ms. McClain.
10    Q   Well, how -- how much will they invest in
11 calendar 2012?
12    A   I don't know that.
13    Q   Do you know about future years?
14    A   I do not.
15    Q   Am I accurate in saying the point 2 percent
16 number is what produces the $27.9 million number, not
17 vice versa?
18    A   Yes, correct.
19    Q   The point -- well, strike that.
20    The 27.9 million, the number that you get
21 through application of your 0.2 percent figure is
22 almost twice the $15 million that Xylem Inc. has
23 already invested in rolling out the name.
24    What caused you to come up with a royalty
25 rate that would yield a value almost twice the

Page 151

ROBERT A. HUTCHINS

1
2 investment in rolling out the name?
3    A   Well, as I --
4    MR. LaBRIOLA: Objection as to form.
5    THE WITNESS: As I discussed earlier,
6 the 15 million only represents the investment
7 to date.
8    Q   (BY MR. SHAUGHNESSY)  And when you say "to
9 date," you mean as we sit here, correct?
10    A   No.
11    Q   Okay.  What is the cut-off date?
12    A   I believe Q1 2012.
13    Q   Okay.  And continue.
14    A   I'm sorry, I lost my train of thought.
15    MR. SHAUGHNESSY: Can you read the
16 answer back or read the question and the
17 answer, please.
18    (Whereupon, the record was read by the
19 court reporter as follows:
20    "QUESTION: The 27.9 million, the number
21 that you get through application of your 0.2
22 percent figure is almost twice the $15
23 million that Xylem Inc. has already invested
24 in rolling out the name.
25    "What caused you to come up with a

Page 152

ROBERT A. HUTCHINS

1
2 royalty rate that would yield a value almost
3 twice the investment in rolling out the name?
4    "ANSWER: Well, as I --
5    "MR. LaBRIOLA: Objection as to form.
6    "THE WITNESS: As I discussed earlier,
7 the 15 million only represents the investment
8 to date.
9    "QUESTION: And when you say 'to date,'
10 you mean as we sit here, correct?
11    "ANSWER: No.
12    "QUESTION: Okay.  What is the cut-off date?
13    "ANSWER: I believe Q1 2012.
14    "QUESTION: Okay.  And continue.
15    "ANSWER: I'm sorry, I lost my train of
16 thought.")
17    THE WITNESS: So the 15 million
18 represents the investment in -- or the
19 rebranding costs incurred through Q1 2012.
20    It doesn't take into account additional
21 investments that would be made after that
22 date; whereas, the 27.9 million is looking
23 prospectively at what the -- based on the
24 revenue stream or the US sales, what the --
25 what the -- the value would be of additional

Page 153

ROBERT A. HUTCHINS

1
2 investments, as well as value of the --
3 market value of the brand.
4    Q   (BY MR. SHAUGHNESSY)  But again, the 27.9 is
5 produced by the .2 so if you had picked .1, you would
6 have gotten, you know, 13.-something million, correct?
7    A   Right.
8    Q   And -- and that 13.1 would have also been
9 based on future income stream, correct?
10    A   Yes.
11    Q   Okay.  So my saying -- my answer -- or my
12 question, excuse me, is why did you pick a royalty rate
13 that got you to 27.9 instead of a royalty rate that got
14 you to 23 or a royalty rate that got you to 17 or a
15 royalty rate that got you to 280?
16    MR. LaBRIOLA: Objection as to form.
17    THE WITNESS: Again, the -- in my
18 opinion, that would have been a reasonable
19 starting point for the parties, the 0.2
20 percent, based on the rebranding cost and
21 based on what the -- the value that a 0.2
22 percent royalty rate converts to.
23    Q   (BY MR. SHAUGHNESSY)  Forgive me, but it
24 sounds like you're saying I picked 0.2 percent because
25 0.2 percent seemed reasonable.  I want to know the

Page 154

1        ROBERT A. HUTCHINS
2   basis as an expert for your reasoning to arrive at 0.2
3   percent as opposed to a lower figure or a higher
4   figure.
5       A   Well, the -- the basis for that was because,
6   in my opinion, the minimum royalty rate should be set
7   at a value that is in excess of the rebranding cost.
8       Q   Okay. And if you had set it at .13, that
9   would have basically gotten you to the rebranding costs
10  plus or minus?
11        MR. LaBRIOLA: Objection as to form.
12      Q   (BY MR. SHAUGHNESSY)  Is that fair?
13      A   It's probably about right.
14      Q   Okay. So why didn't you pick 1.5, why didn't
15  you pick .3, why didn't you pick 5.9?
16      A   Well, again, looking at the minimum rate, I'm
17  trying to get a rate that's reasonably -- that's
18  reasonably close to what the investment is to date,
19  taking into account the fact that this is a prospective
20  or forward-looking analysis. So there will be
21  additional value that's going to be created going
22  forward, which is why the minimum value, in my opinion,
23  is to exceed the rebranding cost incurred to date.
24      Q   Well, in a -- in a hypothetical negotiation,
25  why would Xylem Inc.'s expectation of investing

Page 155

1        ROBERT A. HUTCHINS
2   additional monies in the mark in effect accrue to Xylem
3   Group's benefit through a higher rate rather than to
4   Xylem Inc.'s benefit through a lower rate?
5        MR. LaBRIOLA: Objection as to form.
6       Q   (BY MR. SHAUGHNESSY)  Let -- let me ask it
7   this way:  What if Xylem Inc. arrived at the
8   negotiation and said, "Look, we're not going to spend
9   another penny on this Xylem name," in -- in your view,
10  that would have yielded a lower rate, correct?
11      A   Yes, if they -- if they elected to make no
12  more investments in the brand, yes.
13      Q   And any investments that Xylem Inc. makes in
14  the brand are coming out of Xylem Inc.'s own pocket,
15  correct?
16      A   As well as the benefits they derive from that
17  investment, yes.
18      Q   So what you're saying is Xylem Inc.'s
19  decision to continue to invest in the -- the mark will
20  drive up the royalty rate that Xylem Inc. would be
21  willing to pay in a hypothetical negotiation?
22      A   Because the investment that it's make -- it's
23  intending to make will result in higher returns,
24  returns in excess of that investment. So the net
25  benefit to Xylem Inc. would exceed whatever the

Page 156

1        ROBERT A. HUTCHINS
2   investment would be.
3       Q   Do you have any basis to say that the
4   economic value of the name to Xylem Inc. is even $15
5   million?
6        MR. LaBRIOLA: Objection as to form.
7        THE WITNESS: What I looked at was the
8   construct of the hypothetical negotiation
9   between the parties in this suit. I have not
10  looked at -- done a separate valuation of the
11  brand name to Xylem Inc.
12      Q   (BY MR. SHAUGHNESSY)  Well, in the
13  hypothetical negotiation that you envision, at what
14  degree of future expenditure on the mark does Xylem
15  Inc. contemplate?
16      A   As far as I'm aware, that information is not
17  available.
18      Q   In that case, how are you in any position to
19  say that the -- the value of the mark is anything more
20  than $15 million?
21      A   I'm assuming that, as I said earlier, I'm
22  assuming that they will continue to invest in building
23  the brand name recognition.
24      Q   But you don't know how much they'll invest?
25      A   No, I -- no, I do not. And I don't think

Page 157

1        ROBERT A. HUTCHINS
2   I've seen anything where they publicly disclosed how
3   much they expect to invest, either.
4        MR. LaBRIOLA: Are you at a good
5   stopping point?
6        MR. SHAUGHNESSY: Sure.
7        THE VIDEOGRAPHER: Going off the record.
8   The time is 2:36.
9   (Whereupon, there was a brief recess.)
10        THE VIDEOGRAPHER: Back on the record.
11  The time is 2:55.
12      Q   (BY MR. SHAUGHNESSY)  Mr. Hutchins, I want to
13  stay on page 33.
14        In your report, is there any mention or
15  discussion or derivation of your 0.2 percent royalty
16  rate before page 33?
17      A   I don't believe so.
18      Q   And likewise, with what you discuss as the
19  maximum royalty rate in the first paragraph on page 33
20  of 0.6 percent, is there any discussion or derivation
21  of that before page 33?
22      A   I think there's a discussion of the rates
23  related to the 0.6 percent in the section of my report
24  where we were discussing the acquisitions.
25      Q   Where you -- in my -- well, let's just turn

Page 158

ROBERT A. HUTCHINS

1  to it so we don't need to speculate.
2        And if I'm reading it correctly, on page 20,
3  you have three bullet points where, without saying I
4  think the maximum rate should be 0.6 percent, you say
5  that the appropriate royalty range falls below the
6  minimum range that you derived from looking at the
7  three acquisitions; is that correct?
8     A   That's what it says, yes.
9     Q   Okay.  So you actually don't -- don't discuss
10  why you think 0.6 is the appropriate maximum royalty
11  rate, but you sort of qualitatively indicate why it
12  should be below the minimum that you derive from the
13  transactions; is that fair?
14     A   That's fair.
15     Q   Now, in the last sentence of the second
16  paragraph on page 33, you say, "In my opinion, the
17  value of the '362 trademark to Xylem Inc. should also
18  exceed the $15 million Xylem Inc. spent on rebranding
19  and marketing between Quarter 3, 2011 and Quarter 1,
20  2012."  Do you see that?
21     A   Yes.
22     Q   What is the basis for that opinion?
23     A   Again, this is along the lines of what we
24  discussed earlier, but the 15 million just simply

Page 159

ROBERT A. HUTCHINS

1  represents the rebranding costs incurred through that
2  point of time.  It's not a reflection of additional
3  investments as well as what the -- the value that would
4  be assigned -- or the value attributable to the -- the
5  mark, the Xylem would be.
6     Q   Why should the amount that Xylem Inc. spent
7  on rebranding have any bearing on how much it would be
8  willing to pay in a hypothetical royalty negotiation?
9     A   Well, it's one of the -- the factors I list
10  back on page 31.  It's just an indication -- at the
11  time of the negotiation -- or it's an indication of how
12  much Xylem Inc. or the entity up until the spin-off had
13  invested in developing that brand and had moved away
14  from the available alternatives, primarily being
15  Fluance.
16        So it's a -- a factor that the Xylem Inc.
17  entity would have to consider in terms of how many
18  additional costs they would have to incur above and
19  beyond the $13 million to introduce to switch names.
20     Q   Well, even if Xylem Inc. were to consider
21  that, why would that necessarily suggest a value
22  exceeding $15 million?
23     A   Well, again I don't think that -- the $15
24  million is just a -- a cost figure.  I don't equate

Page 160

ROBERT A. HUTCHINS

1  that with being representative of what the market value
2  would be.
3     Q   Right, but you do consider that a floor on
4  the market value, correct?
5     A   That's fair.
6     Q   And why do you consider it a floor on
7  market value?
8     A   Again, because market value is looking
9  forward prospectively.  So that's what the -- had been
10  invested to date, but I don't think it reflects the
11  additional value that would be realized going forward.
12     Q   Again, the question -- which I respectively
13  don't think you've answered yet, is why is it even a
14  floor, why -- why would Xylem Inc. regard it as being a
15  floor?
16     A   A floor on the market value?
17     Q   Yes.
18     A   Well, if -- I guess if it's -- if they do not
19  consider there will be any return on their investment,
20  then I'm not sure if it would be a -- prudent
21  economically to continue to invest in the brand, then.
22     Q   Well, explain how what you just said relates
23  to it being a floor on the value of the mark?
24     THE WITNESS:  Could you read that back,

Page 161

ROBERT A. HUTCHINS

1  please.
2        (Whereupon, the record was read by the
3  court reporter as follows:
4        "QUESTION:  Well, explain how what you
5  just said relates to it being a floor on the
6  value of the mark?")
7        THE WITNESS:  Well, because as I said
8  earlier, if they truly don't expect to earn
9  any returns on their investment and all
10  they're going to -- the only value that
11  they're going to get is absent any return, so
12  it's only equal to what they invest in it.
13  And that's why I'm saying it would be a
14  floor.
15     Q   (BY MR. SHAUGHNESSY)  Well, why would the
16  amount they invest even be equal to what they expect to
17  get from it?
18     A   Well, if they did not expect to get a return
19  on their investment, then under basic fundamental
20  economic and financial principles, it's not clear why
21  they would continue to make an investment, why they
22  would have made an investment to begin with.
23     Q   Well, you earlier agreed with me that they
24  really had no choice but to change their name, correct?

Page 162

ROBERT A. HUTCHINS

1
2     A   Right, but they had a choice on how much to
3   spend.
4     Q   Does it matter to your opinion what the
5   nature of the expenditures were?
6     A   That --
7     Q   I mean, does it matter whether it was
8   invested in signage or Wall Street Journal articles or
9   trade show displays or other sorts of rebranding
10  expenditures?
11    A   That their -- that it doesn't represent a
12  floor based on the type of expenditure?
13    Q   I'm saying is it relevant to your use of it
14  as a floor what the nature of the expenditures was?
15    A   It -- it certainly could be, yes.
16    Q   And have you investigated what the nature of
17  the expenditures was?
18    A   The amount of expenditures that I reference
19  in my report come straight out of their public filing.
20  So whatever is disclosed in their public filings,
21  that's the extent of my understanding of what's
22  including in the $15 million.
23    Q   And does that allow you to determine whether
24  it all should be counted toward being a floor on the
25  market value?

Page 163

ROBERT A. HUTCHINS

1
2     A   There's not -- there's certainly not enough
3   detail to go through and parse out what might be a
4   unnecessary expense versus a necessary expense, if
5   that's what you're asking.
6     Q   And just to be clear, your opinion is that
7   the rebranding expenditures that ITT and Xylem Inc.
8   incurred all the way through March 31st of 2012 can be
9   considered in arriving at the -- the royalty rate that
10  the parties would have agreed on in a hypothetical
11  negotiation in late October 2011; is that correct?
12    A   For purposes of estimating the minimum, yes.
13    Q   Would your opinion change if you had to
14  assume that the rebranding costs at the time of the
15  hypothetical negotiation and -- and that -- all that
16  could be considered by the parties at the time of the
17  hypothetical negotiation was $3 million rather than $15
18  million?
19       MR. LaBRIOLA: Objection as to form.
20       THE WITNESS: It would certainly --
21    under that assumption, if they had only spent
22    $3 million and you could not consider any
23    ex-post facts in the analysis, then clearly,
24    based on the way I did the calculation, the
25    minimum rate would be lower than 0.2

Page 164

ROBERT A. HUTCHINS

1
2   percent.
3     Q   (BY MR. SHAUGHNESSY)  If the number was 3
4   million, is it fair to say it would be a fifth of the
5   number that you set forth?
6     A   I -- I have to look at it more closely, but
7   it would be lower.
8     Q   But I mean just doing the arithmetic, you
9   assumed rebranding expenditures of 15 million and came
10  up with a royalty rate of 2.2 percent. If the
11  rebranding expenditures were one-fifth of 15 million,
12  wouldn't it follow, based on your logic, that the --
13  the royalty rate should be one-fifth of 2 percent?
14    A   Not necessarily just -- you have to look at
15  the math because we're getting into such small
16  fractions, that you might have to -- going from
17  one-fifth of the .2 percent results in a number that's
18  significantly less than 3 million. And going to
19  something that's, you know, 10 percent less results --
20  you'd have to do -- change it to something that's 10
21  percent less in order to get a number above 3 million.
22       THE COURT REPORTER: Say that last part
23    again, for me. You'd have to go --
24       THE WITNESS: You'd have to -- you'd
25    have to change it to something that's less

Page 165

ROBERT A. HUTCHINS

1
2   than 10 percent in order to get a number
3   above 3 million. So it just depends on -- on
4   how the math would work. I just don't know
5   what the actual calculation would look like.
6     Q   (BY MR. SHAUGHNESSY)  Now, you've told me
7   that, in your view, in the hypothetical negotiation as
8   of late October 2011, it's fair to consider rebranding
9   expenditures incurred as much as five months later in
10  March of 2012, correct?
11    A   In evaluating the minimum royalty rate, yes.
12    Q   So would it also be permissible if we were
13  conducting this hypothetical negotiation in July of
14  2011 to consider rebranding expenditures that occurred,
15  say, in December 2011, five months after July?
16    A   We already discussed this, but I think the
17  facts and circumstances in July, early July in 2011 are
18  significantly different facts than the facts and
19  circumstances in October 2011, so I would have to
20  reevaluate what I would think would be appropriate to
21  consider in that hypothetical negotiation since now
22  you're dating back to early July of 2011.
23    Q   Okay. Well, go through that exercise for me.
24  How would you evaluate it?
25    A   I -- I don't know if I can answer that

Page 166

ROBERT A. HUTCHINS

1
2  question.
3      Q   Well, presumably, you're willing to -- to
4  assume that a company of Xylem Inc.'s size had a plan
5  as of July 2011 for its rebranding extending months
6  into the feature, correct?
7      A   I'm willing to assume that; is that what're
8  you're asking me?
9      Q   Yeah.
10     A   Yes, I would assume it was a plan in place,
11 yes.
12     Q   So it would have been possible for Xylem Inc.
13 or at the time ITT water management in July of 2011 to
14 forecast their likely rebranding expenditures over the
15 next five months, correct?
16     A   I don't think that's unreasonable, no.
17     Q   So given that, why would it not be reasonable
18 in a hypothetical negotiation construct to impute to
19 the parties consideration of those future rebranding
20 expenses?
21     A   Well, again, I would need to do a much more
22 thorough analysis, but in -- in general, as I said
23 earlier, the facts and circumstances are materially
24 different in July 2011.
25     What you're talking about in July 2011 is an

Page 167

ROBERT A. HUTCHINS

1
2  expectation of costs to be incurred, not actual costs
3  that had been incurred.  We know what the actual costs
4  were incurred based on -- you're assuming we're working
5  from a -- a projection.
6      Q   Well --
7      A   We also know that in July 2011, there was --
8  would have been -- they hadn't made those investments
9  at least up until October 2011.  There's no dispute
10 that, through the hypothetical negotiation, they
11 invested a significant amount of funds in rolling out
12 the brand.  They went through a lot of effort to
13 communicate to the market what the new brand name was.
14     So it would have been a substantial
15 about-face in October 2011 to switch names to
16 another -- to an alternative name where I would think
17 that, in July 2011, it would have been an easier -- not
18 an easy transition but a simpler transition to an -- to
19 an alternative name.
20     Q   So if I heard you correctly, your view is
21 that even before the official spin-off on October 31st,
22 ITT had incurred already by that point substantial
23 expense in promoting the Xylem name?
24     A   Or at least rebrand -- the rebranding costs,
25 yes.

Page 168

ROBERT A. HUTCHINS

1
2      Q   But as of October 30th, say, of 2011, many of
3  the costs that are included in the $15 million that you
4  cite were yet in the future and not yet incurred,
5  correct?
6      A   If I --
7      MR. LaBRIOLA:  Objection as to form.
8      THE WITNESS:  If I recall, $2 million in
9  rebranding costs were incurred in the first
10 quarter of 2012.  So 13 million were incurred
11 through the fourth quarter of 2011.  And
12 again, I have the quarterly costs summarized
13 in Exhibit 2.7 of my report.
14     MR. LaBRIOLA:  What page is that?
15     THE WITNESS:  Exhibit 2.7.  It's well in
16 the back.  It looks like this, Steve
17 (indicating).
18     MR. LaBRIOLA:  Okay.
19     Q   (BY MR. SHAUGHNESSY)  Through the end of
20 September 2011, according to your Exhibit 2.7, the
21 rebranding costs were $3 million, correct?
22     A   That's what they disclose, yes -- that's what
23 it -- Xylem Inc.'s predecessor disclosed, yes.
24     Q   And then in the fourth quarter, there was $10
25 million; is that right?

Page 169

ROBERT A. HUTCHINS

1
2      A   Yes.
3      Q   Have -- have you subsequently seen anything
4  that breaks it down by month?
5      A   There's an -- there's an exhibit in
6  Mr. Yerman's report that breaks it down by month.  But
7  from what I understand from his testimony is he wasn't
8  sure what costs were included in there, if they were
9  all the costs.  He couldn't define what -- what actual
10 costs were in there.
11     Q   Do you know what amount of the $10 million in
12 the fourth quarter was before October 31st and what
13 amount was after October 31st?
14     A   The -- the information I had available to me
15 did not break it out by month.  I know Mr. Yerman's
16 exhibit does break it out by month.
17     Q   Is that breakout by month relevant to your
18 analysis?
19     A   I mean, I wouldn't say it's irrelevant, no.
20 I mean, it's information I would consider, sure.
21     Q   You said one of the differences between
22 October 31st and -- and July of 2011 is that in July
23 the rebranding was in the future; whereas, in October
24 at least some of it had been incurred, correct?  Did I
25 understand you correctly on that?

Page 170

1    ROBERT A. HUTCHINS
2        THE WITNESS: Could you read that back
3    so I -- could you read that back?
4        "QUESTION: You said one of the
5    differences between October 31st and -- and
6    July of 2011 is that in July the rebranding
7    was in the future; whereas, in October at
8    least some of it had been incurred, correct?
9    Did I understand you correctly on that?")
10       THE WITNESS: Yes, that's correct.
11       Q   (BY MR. SHAUGHNESSY)  What else would you
12   need to analyze in order to answer my question of
13   whether it would be appropriate if the hypothetical
14   negotiation were assumed to take place in July for the
15   parties to consider future rebranding costs through the
16   end of 2011?
17       A   Sitting here right now, I -- I can't think of
18   other issues I'd want to consider.
19       Q   And so having articulated what you need to
20   consider, are you in a position to say yes or no
21   whether it would be appropriate if the negotiation were
22   assumed to take place in July 2011 to impute to the
23   parties consideration of rebranding expenses through
24   the end of 2011?
25       MR. LaBRIOLA: Objection as to form.

Page 171

1    ROBERT A. HUTCHINS
2        THE WITNESS: I don't think I
3    articulated everything I would consider.  I
4    just -- sitting here right now, I don't know
5    what else I would need to look at in -- and
6    evaluate to answer that question.
7        Q   (BY MR. SHAUGHNESSY)  What else could there
8    possibly be?
9        A   I don't know.
10       Q   I take it you're -- you're not willing to --
11   to rule out unequivocally the -- the notion that a
12   hypothetical negotiation in July would take into
13   account rebranding expenses through the end of the
14   year?
15       MR. LaBRIOLA: Objection as to form.
16       THE WITNESS: Again, sitting here right
17   now without the opportunity to undertake the
18   level of analysis I did in forming my
19   opinions, I can't give you a specific
20   opinion.
21       I would think that there would be a -- a
22   less of a weight, certainly less of a weight
23   placed on the actual rebranding costs
24   incurred, if the negotiation occurred in
25   early July 2011.

Page 172

1    ROBERT A. HUTCHINS
2        Q   (BY MR. SHAUGHNESSY)  Is consideration of the
3    amount that Xylem Inc. spent on rebranding through the
4    first quarter of 2012 dictated by any of the
5    Georgia-Pacific factors?
6        A   Certainly, there's no factor that says
7    consider rebranding costs, but it's -- as part of the
8    hypothetical negotiation, you consider the parties'
9    bargaining position and how that would affect their --
10   their assessment of what a reasonable royalty rate
11   would be.
12       Q   I'm trying to understand how you use the
13   Georgia-Pacific factors in this case.  It appears to
14   me, and then I'll ask you if -- if it's a fair
15   characterization that you came up with your range of --
16   of a royalty between .2 percent and .6 percent, and
17   then applied the Georgia-Pacific factors to determine
18   where, within that range, the appropriate royalty
19   should fall; is that accurate?
20       A   Yeah, I think that's a fair summary.  I
21   derive the -- the range -- the possible range of
22   royalty rates and used the factors my assessment of the
23   factors to determine whether the rate should be
24   adjusted downward from that range or within that range,
25   upward within that range or essentially neutral in that

Page 173

1    ROBERT A. HUTCHINS
2    range.
3        Q   Just to be clear, your .2 percent minimum
4    royalty rate is not based on any comparable
5    transactions; is that right?
6        A   That's correct.
7        Q   That's not based on the market approach or
8    the income approach?
9        A   No, it's -- as I describe, it's based on what
10   I believe the minimum rate should be based on the
11   rebranding cost incurred.
12       Q   And does it matter to -- to that opinion,
13   based on the rebranding cost incurred, whether or to
14   what extent Xylem would have had to reincur those costs
15   if it switched to a different name?
16       A   For the minimum rate?
17       Q   Yes.
18       A   No.
19       Q   And does it matter to what extent the 15
20   million represents sunk costs as opposed to nonsunk
21   costs?
22       A   It matters in the context of evaluating Xylem
23   Inc.'s bargaining perspective or position and what
24   their perspective will be with -- with respect to a
25   rate, what the ultimate rate would be.

Page 174

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2     Q   Well, does it affect your determination of
3  the minimum royalty rate of .2 percent?
4     A   Whether there's sunk costs?
5     Q   Yes.
6     A   No.
7     Q   So even if the entire 15 million represented
8  costs that could be profitably used with respect to
9  a -- another name, your view is that the 15 million
10 should drive the determination of the minimum royalty
11 rate?
12    A   In the context I use it in, which assumes
13 that there will be a license agreement entered into for
14 the '362 trademark, I don't think that's relevant.
15    Q   You acknowledge that the existence of
16 noninfringing alternatives is an important
17 consideration in valuing intellectual property,
18 correct?
19    A   Yes.
20    Q   And explain to me how you factored in the
21 existence of noninfringing alternatives here?
22    A   Again, as -- there's a series of bullet
23 points listed on page 31, and I reference the fact that
24 Xylem Inc. could have chosen its next best alternative
25 name Fluance and avoiding the '362 trademark.

Page 175

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2     So I recognize that that's an option they
3  could have pursued; however, I would not have put a
4  significant -- I would not have put much weight on that
5  option in October of 2011.
6     Q   Why is that?
7     A   Again, for the various reasons we discussed
8  earlier, with respect to everything that had happened
9  since the initial announcement of the spin-off.
10    Q   Going to page 23, where you discuss
11 Georgia-Pacific factor 1, you say it's your
12 understanding that Xylem, meaning Xylem Group, has not
13 licensed its trademark to any third parties, correct?
14    A   Yes.
15    Q   And I believe elsewhere you say it's your
16 understanding that Xylem Group had a policy not to
17 license its trademarks; is that right?
18    A   Yes.
19    Q   Okay. Is that still your understanding?
20    A   Yes, as supplemented by my review of
21 Mr. Weinstein's deposition.
22    Q   So there's no track record here of other
23 licensing transactions that Xylem Inc. has entered into
24 with respect to the Xylem mark or any other trademark,
25 correct?

Page 176

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2     A   That's my understanding.
3     Q   On page 24, you address Georgia-Pacific
4  factor 2, which concerns the rates paid by the licensee
5  for the use of other patents comparable to the
6  patent-in-suit, and obviously we're talking about
7  trademarks here. And you -- you agreed with me earlier
8  that the Xilema trademark is comparable for purposes of
9  Georgia-Pacific factor 2, correct?
10    MR. LaBRIOLA:  Objection as to form.
11    THE WITNESS:  I would agree it's -- it's
12 comparable for factor number 2, or at least
13 relevant for factor number 2.
14    Q   (BY MR. SHAUGHNESSY) In the paragraph that
15 begins with the word "first" toward the end, you --
16 well, it's in -- it's in the latter part of the
17 paragraph that is your second point, you say Xylem
18 incurred $13 million in rebranding and marketing costs
19 during the last six months of 2011. And then you go on
20 to say, "After announcing its new name, Xylem Inc.
21 incurred significant costs in rolling it out, and these
22 sunk costs would not have been a factor considered
23 during negotiations with NA." Do you see that?
24    A   I do.
25    Q   What allows you to characterize those as sunk

Page 177

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  costs?
3     A   I believe what I was trying to communicate is
4  those are essentially costs that had been incurred.
5     Q   So you didn't mean sunk costs in the
6  technical sense?
7     A   No.
8     Q   At the bottom of page 24, you say that you
9  have seen no evidence that NA was considering pursuing
10 the option of seeking an injunction if it didn't reach
11 an agreement with Xylem Inc.  Do you see that?
12    A   I do discuss that, yes.
13    Q   Is it your understanding that NA would have
14 been unable to seek an injunction against Xylem Inc.?
15    A   No, it's just my understanding I haven't seen
16 anything saying that was -- they were considering
17 pursuing that option absent an agreement.
18    Q   Well, for purposes of Georgia-Pacific factor
19 2, does the -- the relevance of another licensing
20 transaction depend on the licensor in that other
21 transaction having previously announced an intention to
22 sue the licensee absent an agreement?
23    THE WITNESS:  Could you read that back,
24 please.
25    (Whereupon, the record was read by the

ROBERT A. HUTCHINS

1 court reporter as follows:

2 "QUESTION: Well, for purposes of

3 Georgia-Pacific factor 2, does the -- the

4 relevance of another licensing transaction

5 depend on the licensor in that other

6 transaction having previously announced an

7 intention to sue the licensee absent an

8 agreement.")

9 MR. LaBRIOLA: Objection as to form.

10 THE WITNESS: I don't think there's

11 anything in this factor that precludes you

12 from evaluating any relevant issue, so I'm

13 not sure if I follow that question.

14 Q (BY MR. SHAUGHNESSY) The fact that NA did

15 not announce an intention to sue Xylem Inc. does not

16 make the NA transaction irrelevant for purposes of

17 Georgia-Pacific factor 2, correct?

18 A I agree with that, what I'm trying to do is

19 contrast the situation involving this matter with the

20 situation involve -- involving the negotiation between

21 WCO or Water IP Holdings and NA.

22 Q Your opinion depends critically on when the

23 hypothetical negotiation take place, correct?

24 MR. LaBRIOLA: Objection as to form.

ROBERT A. HUTCHINS

1 THE WITNESS: I wouldn't say critically.

2 It obviously doesn't affect my calculation of

3 statutory damages -- or actually, it could if

4 the infringement date was actually in July

5 2011, then we need to roll back the damages

6 from November of 2011 to July 2011. So it

7 would affect the statutory damages as well.

8 It would -- I -- I believe it also would

9 affect my royalty rate calculation if you

10 roll back negotiation date to July 2011 --

11 2011, sorry.

12 Q (BY MR. SHAUGHNESSY) If you rolled back the

13 negotiation date to July, your royalty rate would be

14 lower, correct?

15 A Again, I -- I haven't undertaken that

16 analysis, but I would not disagree that it would be

17 lower, although we're already at 0.45 percent. There's

18 not a lot of room to go below that.

19 Q What makes you say that, there are no

20 royalties in the hundredths of a percent that you've

21 ever heard of?

22 A I don't think that would be relevant in this

23 situation.

24 Q Why do you say that?

ROBERT A. HUTCHINS

1 A This is a -- this is a a -- an agreement for

2 the name of a -- this is an agreement that would

3 involve the name of a company. I don't know what the

4 other agreements you're referring to are, but -- but I

5 do not think a royalty in the -- whatever percent you

6 said would be the appropriate way to measure damages in

7 this instance.

8 Q Well, have -- have you done some marketplace

9 survey of royalty rates involving corporate names to

10 see what the lowest number is out there?

11 A In this matter?

12 Q No, no. For -- well, for any purpose, have

13 you ever done a survey of royalty rates for corporation

14 names?

15 A I've never personally done a survey for that,

16 no. I've seen information about, but I've never done a

17 survey.

18 Q What information have you seen?

19 A Journal articles, academic literature,

20 studies done by licensing groups that type information.

21 Q And do any of those materials say that the --

22 the rate has never been in the hundredths of a percent?

23 A I can't -- I don't know.

24 Q At the top of page 25, you write,

ROBERT A. HUTCHINS

1 "Furthermore, unlike Xylem, NA was not operating under

2 the brand name Xilema or Xylem." Do you see that?

3 A Yes.

4 Q First of all, what -- what do you mean "NA

5 was not operating under the brand name Xilema"? Let's

6 just focus on that?

7 A Well, unlike Xylem Inc., which was

8 positioning itself under -- for corporate purposes as

9 using the brand name Xylem, NA, my understanding, used

10 the name Xilema for a specific product, not for the

11 entire company.

12 Q Why is that relevant?

13 A Well, it's relevant because the mark that's

14 the subject of the negotiations in this matter applies

15 to a much broader spectrum of Xylem Inc.'s business

16 than the mark that was the subject of the negotiations

17 with NA.

18 Q In the second paragraph of the first full

19 paragraph on page 25, in the second sentence, you say

20 "Unlike NA, Xylem had been expanding over the last

21 several years even despite the economic climate." Do

22 you see that?

23 A Yes.

24 Q What is the factual basis for that statement?

Page 182

ROBERT A. HUTCHINS

1
2     A   It would have been the initial meeting we --
3   I had with Mr. Weinstein.
4     Q   When you use the word "expanding," what do
5   you mean?
6     A   They had plans for expansion.  Their goal was
7   to expand.
8     Q   Correct me, but the -- the way you phrased it
9   seemed to indicate that they had, in fact, been
10  expanding as opposed to simply hoping to expand.  Do
11  you think you mean something different?
12    A   That's probably not a -- a good way to phrase
13  it.  It -- certainly my understanding of their -- the
14  expansion plans was -- at the time I wrote this report
15  was more limited to the discussions with Mr. Weinstein,
16  which was more about opportunities to expand.
17    Q   So in the several years before the
18  hypothetical negotiation would have taken place, are
19  you aware of any expansion that Xylem Group, in fact,
20  accomplished?
21    A   I -- no, I'm not aware of that.  I believe
22  what this is contrasting, though, is Xylem's
23  opportunities going forward, their hopes -- their
24  expectations to grow the business going forward with
25  what was -- had happened -- or what the situation was

Page 183

ROBERT A. HUTCHINS

1
2   with NA.  And as Mr. Winkle describes -- Mr. VanWinkle,
3   sorry, what he observed was NA was being -- getting
4   compensated for their opportunity lost to expand the
5   use of Xilema, which have not expanded in 20 years.
6         So that's the -- the contrast that I was
7   trying to draw there.  Granted the wording was not as
8   precise as it should have been.
9     Q   What would have been the terms of the
10  hypothetical license between Xylem Inc. and Xylem Group
11  other than the royalty rate and the geographic scope
12  and the exclusive license aspect?
13        MR. LaBRIOLA:  Objection to the extent
14    it calls for a legal conclusion.
15        THE WITNESS:  I think those would have
16    been the key terms that would have driven the
17    economics of the deal.
18    Q   (BY MR. SHAUGHNESSY)  Would there have been
19  quality control provisions?
20    A   There could have been.
21    Q   What would have been their nature?
22    A   I don't know.
23    Q   Wouldn't the nature of the quality control
24  provisions have a bearing on the economic terms of the
25  license?

Page 184

ROBERT A. HUTCHINS

1
2     A   Not if Xylem Group is granting an exclusive
3   license to Xylem Inc. and has elected to start
4   operating under a new brand name.
5     Q   Is it your belief that Xylem Group would have
6   retained ownership of the mark or would it have given
7   an outright assignment of the mark to Xylem Inc.?
8         MR. LaBRIOLA:  Objection to the extent
9     it calls for a legal conclusion.
10        THE WITNESS:  It could have been
11    structured in -- in either way, I would
12    suppose.  I'm sure there's other ways it
13    could be structured as well.  But the
14    economic rights transferred would have been a
15    full transfer of the economic value of the
16    mark to Xylem Inc.
17    Q   (BY MR. SHAUGHNESSY)  Is -- is that what
18  Georgia-Pacific contemplates?
19    A   Again, there's no bright line test that says
20  what -- what the type -- or the terms of the license
21  agreement has to be.
22    Q   Well, does -- does Georgia-Pacific
23  contemplate an outright assignment of patents?
24    A   It could.  I mean, it's -- if -- if it's an
25  exclusive license, there's not much difference

Page 185

ROBERT A. HUTCHINS

1
2   economically between assignment of the patent and an
3   exclusive license.
4         So, again, I don't think that the
5   Georgia-Pacific factor says the terms of the agreement
6   have to be X and nothing else.  I certainly have never
7   seen anything that would support such a bright-line
8   test with respect to the terms of the agreement.
9     Q   Why do you believe that the outcome of a
10  hypothetical negotiation between Xylem Group and Xylem
11  Inc. would have been an exclusive license that
12  transferred the entire economic value to Xylem Inc.?
13    A   Well, as I state in Georgia-Pacific factor
14  number 3, I believe the -- Xylem Group would have
15  been -- would have wanted to enter into an exclusive
16  license in order to eliminate future confusion as well
17  as eliminate any issues with expansion plans going
18  forward.
19    Q   Well, that's what Xylem Group would have
20  wanted.  What makes you think that that would have been
21  the outcome of the negotiation?
22    A   Well, that's what's factored into the royalty
23  rate.
24    Q   Well, how does that play?  I mean, if -- if
25  that was Xylem Group's ask and Xylem Inc. didn't want

47

## Page 186

ROBERT A. HUTCHINS

1 it, wouldn't that have given Xylem Inc. an opportunity
2 to seek a lower royalty rate?
3     A   Sure. That's why the rate is not at the
4 maximum, the maximum of the range.
5     Q   Would the hypothetical license have allowed
6 Xylem Inc. to sublicense the mark?
7     A   It could have, yes.
8     Q   Well, doesn't that affect the economic terms
9 of the deal?
10    A   In general, it could, but in this context, I
11 don't see how it would affect the royalty rate.
12    Q   Why do you believe it would not have affected
13 the royalty rate?
14    A   Well, again, because Xylem Group is electing
15 to transfer its economic interest in the mark so it can
16 pursue new opportunities, eliminate the confusion that
17 exists under a new brand name.
18        So the extent that Xylem Inc. wants to
19 sublicense it to other parties, that would almost seem
20 to increase the value of the mark to Xylem Inc. if they
21 think they can generate additional revenue from
22 sublicensing it, but I don't see that scenario. It's
23 hard to envision that scenario playing out, that they
24 would license others to use their -- the '362

## Page 187

ROBERT A. HUTCHINS

1 trademark.
2     Q   Would the hypothetical license have included
3 an indemnity from Xylem Group to Xylem Inc. against
4 claims by third parties?
5        MR. LaBRIOLA:  Objection, calls for a
6 legal conclusion.
7        THE WITNESS:  It could.
8     Q   (BY MR. SHAUGHNESSY)  How would that have
9 affected the economic terms?
10        MR. LaBRIOLA:  Same objection.
11        THE WITNESS:  Again, I -- I don't think
12 that would affect the economic terms.
13    Q   (BY MR. SHAUGHNESSY)  Why not?
14    A   I don't -- I'm not -- who's giving indemnity?
15 I'm sorry.
16    Q   Xylem Group to Xylem Inc.
17    A   Xylem Group is indemnifying in Xylem Inc.?
18 That -- I'm sorry, I misheard your question.  I -- I'm
19 not aware of it.  I can't envision that being something
20 that would be in the agreement.  If anything, if it's
21 in the agreement, it's going -- it would significantly
22 change the royalty rate, and it would increase it.
23    Q   The top of page 26, you say that in this
24 hypothetical negotiation, Xylem Group would also have

## Page 188

ROBERT A. HUTCHINS

1 to consider the costs of developing and building a new
2 brand name.  Do you see that?
3        MR. LaBRIOLA:  I'm sorry, what page are
4 you again?
5        MR. SHAUGHNESSY:  Top of page 26.
6        THE WITNESS:  Yes.
7     Q   (BY MR. SHAUGHNESSY)  How does that factor
8 into your opinion?
9     A   Again, it's a -- it factors into my
10 conclusion with respect to Georgia-Pacific factor 3,
11 just a recognition that there will be additional costs
12 Xylem will have to incur in order to change brand
13 names.
14    Q   What cost would it have had to incur?
15    A   Essentially to establish a new name, roll out
16 a new name.
17    Q   I mean, what's the dollar amount?
18    A   I don't know.
19    Q   Factor 4, we talked about it.  You agree, I
20 take it, that there is no established royalty rate for
21 Xylem Group's trademark, correct?
22    A   Yes.  I guess that's more factor 1, but
23 there's -- this one is dealing with their policy, but
24 they are related.  I don't -- I don't disagree with

## Page 189

ROBERT A. HUTCHINS

1 that.
2        There's no -- Xylem does not have an
3 established policy of licensing its intellectual
4 property rights.  And I would say Mr. Weinstein
5 certainly confirmed that in his deposition.
6     Q   Page 27 under factor 6, you say you are not
7 aware of any evidence that the '362 trademark promotes
8 sales of other Xylem Inc. products nor generates any
9 derivative sales for Xylem.  Do you see that?
10    A   Yes.
11    Q   And as we talked about earlier you're not in
12 any position to say that the '362 trademark promotes
13 sales of any products for Xylem Inc., correct?
14    A   Yes, I did not undertake an analysis to
15 determine what incremental sales Xylem Inc. has
16 realized from using the Xylem mark.
17    Q   Well, under the sentence I just read, you
18 say, "Thus, factor 6 is neutral with respect to the
19 hypothetically negotiated royalty rate."
20        What -- why is it not tending to reduce the
21 hypothetically negotiated royalty rate?
22    A   Well, I think it doesn't -- it's neutral
23 because it doesn't enhance value.  It doesn't decrease
24 value.  So the value that is derived from the mark

48

Page 190

ROBERT A. HUTCHINS

1   ROBERT A. HUTCHINS
2   itself, not from convoyed sales or sales of unrelated
3   products.
4       Q   In your view, could the Georgia-Pacific
5   factor 6 ever tend to reduce the hypothetical rate?
6       A   It could, sure.
7       Q   In what circumstances could it tend to reduce
8   the rate if; it detracted from sales of other goods?
9       A   I can't think of an example.
10      Q   Under factor 7 concerning the duration of the
11  patent -- excuse me, the duration of the patent, here
12  the trademark, you said the agreement would be
13  structured as a fully paid-up license.
14          Wouldn't that, in effect impose on Xylem Inc.
15  the risk of Xylem Group's insolvency going forward?
16          MR. LaBRIOLA:  Objection as to form.
17          THE WITNESS:  I -- no, I don't see
18      why.
19      Q   (BY MR. SHAUGHNESSY)  Well, just -- just to
20  be clear, when you say "fully paid up," that's as
21  distinct from a running royalty, correct?
22      A   Yes, that's correct.
23      Q   So if it were structured as a perpetual
24  license, the fully paid-up royalty would be, by your
25  calculation, 45 million, correct?

Page 191

ROBERT A. HUTCHINS

1       A   Based on the royalty rate of 0.45 percent and
2   Xylem Inc.'s projected US revenues, that's what the
3   math would show.
4       Q   And a fully paid-up license means that the
5   licensor receives the lump sum on day one, correct?
6       A   That's one option, sure.
7       Q   What are other options?
8       A   There could be staggered payments, could be
9   milestone payments.  I mean...
10      Q   If Xylem Group retained rights to the mark
11  and -- and it were structured as a strict license,
12  would you agree with me that if Xylem Group were to go
13  out of business, there'd be nothing for Xylem Inc. to
14  be licensing?
15      A   Well, I'm assuming that it's an exclusive
16  license where Xylem Group transfers its economic rights
17  to Xylem Inc., so I don't -- I don't see how -- number
18  one, I don't know see how they will be exposed to
19  solvency issues -- Xylem Inc. would be exposed to
20  solvency issues with respect to Xylem Group; and in
21  turn, I don't think that the -- in bankruptcy -- it's
22  my understanding that the mark just doesn't disappear,
23  and license agreements just don't disappear either.
24          And I'd also note that, you know, because I

Page 192

ROBERT A. HUTCHINS

1   recognize that this is a fully -- would be structured
2   as a fully paid-up license, it would reduce the royalty
3   rate.  So it has a negative effect on the overall
4   royalty rate.
5       Q   At the bottom of page 27, you quote
6   Georgia-Pacific factor 8 as being the established
7   profitability of the product made under the patent, its
8   commercial success and its current popularity.
9           Would you agree with me that here we should
10  read that as the established profitability of the
11  product marketed under the trademark; is that fair?
12      A   Yes.  Yes.
13      Q   Do you recall Mr. Yerman's criticisms of how
14  you interpreted and applied factor 8?
15      A   I -- I don't actually.
16      Q   In a nutshell, he said you were looking at
17  the wrong party under factor 8, that what
18  Georgia-Pacific factor 8 pertains to is the established
19  profitability of the licensor's product, not the
20  licensee's product.  Does that refresh your
21  recollection?
22      A   It does sound familiar, but I don't see where
23  it says "licensor" in that factor.
24      Q   Well, it -- it doesn't, but, for instance,

Page 193

ROBERT A. HUTCHINS

1   have you recently read the Georgia-Pacific case itself
2   and how the court in that case applied that factor?
3       A   I -- it's been awhile since I looked at that
4   case.
5       Q   Well, let me ask you to assume that the
6   proper way to apply that factor is to look at the
7   licensor's established profitability rather than the
8   licensee's established profitability.
9           If that's the proper interpretation of the
10  factor, would you agree with me that instead of
11  increasing the hypothetically negotiated royalty rate,
12  as you say on page 28, it would, in fact, tend to
13  decrease the hypothetically negotiated royalty rate.
14      A   Well, I -- I just want to point out first
15  that I do actually reference Xylem Group's financial
16  profitability in this factor as well.  I also reference
17  Xylem Inc.'s financial data as well as a comment from
18  Ms. McClain.
19          But if you're telling me that there's a
20  bright-line test for this factor that says you have to
21  ignore the established profitability of the product
22  made under the trademark, even if the trademark is made
23  by the license -- or the products are made under the --
24  by the infringer, then I would agree it would not

Page 194

ROBERT A. HUTCHINS

1 increase the rate. I would think that it would
2 certainly be -- at a minimum, it would be a neutral, or
3 more likely, it would reduce the rate.
4    Q  Well, you -- you quote Xylem Group -- or you
5 cite Xylem Group's gross profit margin, but that --
6 that's not the complete picture of Xylem Group's
7 profitability as an enterprise, correct?
8    A  No, I -- I cite -- I cite the gross profit
9 for both entities.
10    Q  In fact, Xylem Group has lost money most of
11 the last several years, correct?
12    A  That's my understanding, which, again, as I
13 said earlier, the fact that they have been able to
14 survive the downturn is an indication of -- of their --
15 their management team's ability to weather such
16 significant storms.
17    Q  At the bottom of page 28, you say that you
18 view Georgia-Pacific factors 9 and 10 as not relevant
19 in this case. And do you recall Mr. Yerman's criticism
20 of your opinions on that?
21    MR. LaBRIOLA:  I'm sorry, you're on 9 or
22 10?
23    MR. SHAUGHNESSY:  Both, since he deals
24 with them together.

Page 195

ROBERT A. HUTCHINS

1    MR. LaBRIOLA:  I don't -- I'm not sure
2 if I -- I don't see where I said factor 10
3 was irrelevant.
4    Q  (BY MR. SHAUGHNESSY)  Okay. Factor 9, then.
5 Do you recall Mr. Yerman's criticism of your statement
6 on that point?
7    A  Again, I don't recall a specific criticism.
8 I know there were several that were very misleading,
9 and I don't -- you -- if I could see his report, I
10 could be -- more than happy to look at it.
11    Q  We don't need to focus on -- on his report.
12 I mean, do you -- do you agree that factor 9, to some
13 extent, gets at the availability of noninfringing
14 alternatives?
15    A  Yes.
16    MR. SHAUGHNESSY:  And why don't we break
17 there for the new tape.
18    THE VIDEOGRAPHER:  Marks the end of
19 video 3. Going off the record. The time is
20 3:54.
21 (Whereupon, there was a brief recess.)
22    THE VIDEOGRAPHER:  Marks the beginning
23 video 4, deposition of Robert Hutchins. Back
24 on the record. The time is 4:11.

Page 196

ROBERT A. HUTCHINS

1    Q  (BY MR. SHAUGHNESSY)  At the bottom of page
2 28, with respect to factor 10, you -- you say it is
3 your understanding that Xylem Group promotes all of its
4 products and its company under the '362 trademark. Do
5 you see that?
6    A  Yes.
7    Q  Based on having reviewed Mr. Weinstein's
8 deposition, have you revised your understanding on
9 that?
10    A  If I recall, I -- I thought his deposition
11 was that all the products were sold under the Xylem
12 name, but I -- I'm not -- I'm not sure what you're
13 referring to specifically in his deposition.
14    Q  Okay. Do -- do you recall him testifying, as
15 I believe you noted your agreement earlier today, that
16 a significant portion of Xylem Group's products are, in
17 fact, not branded as Xylem but are branded under the
18 private labels of various purchasers?
19    A  I do recall that testimony, yes, that they
20 were -- a portion of their sales were not under the
21 Xylem brand name, but I do recall other testimony where
22 he testified that all of the sales were under the Xylem
23 umbrella, if you will.
24    Q  So do you view the -- the fact that Xylem

Page 197

ROBERT A. HUTCHINS

1 Group sells a significant proportion of its product
2 under private label brands as inconsistent with the
3 sentence that I paraphrased a moment ago on page 28?
4    A  In light of that testimony, the word
5 "promotes" might not be the correct word; but yeah, I'd
6 have to think about -- I'm not sure how -- I'd have to
7 look back at his testimony to see how that might a --
8 affect the rewording, if at all, of that sentence.
9    Q  You quote that the Georgia-Pacific factor 10
10 in italics in the last clause of that factor refers to
11 the benefits to those who have used the invention here,
12 that would be the benefits to those who would have used
13 the trademark.
14    Have you conducted any analysis of the
15 benefits to Xylem Group of its using the name Xylem?
16    A  I -- I apologize, I -- I got distracted.
17    Q  Oh.
18    A  I went back to look at something related to
19 that last sentence.
20    Q  That's fine. Let me just --
21    A  I just wanted to point out, there's no cite
22 for the factor number 10 on page 28, but it comes from
23 a -- a sentence back in section 2.2, which is -- which
24 is cited to the answer and counterclaim, so that's --

Page 198

ROBERT A. HUTCHINS

1  that's where the -- that information was based upon.
2  Q  Okay.
3  A  I -- I apologize for getting distracted on
4  your question.
5  Q  That's quite okay.  I'll just start over.
6  A  Okay.
7  Q  You -- you quote in italics Georgia-Pacific
8  factor 10, and the last clause of that factor refers to
9  the benefits to those who used the invention here,
10  obviously it should be understood as the benefits to
11  those who have used the trademark.
12      Have you undertaken any analysis of the
13  benefits that have accrued to Xylem Group from using
14  the name Xylem?
15  A  I have not.
16  Q  Under factor 11, the extent to which the
17  infringer has made use of the invention, you say it's
18  your understanding that Xylem Inc. conducts business
19  throughout the world as Xylem.
20      In your view, are Xylem Inc.'s activities
21  outside the US relevant to the reasonable royalty
22  calculation?
23  A  Certainly not directly to the quantification
24  of the royalty damages.  I limited it to US infringing

Page 199

ROBERT A. HUTCHINS

1  sales.  I'm just noting that the extent of the use of
2  the name Xylem by Xylem Inc., it isn't just limited to
3  the US; it's -- my understanding, it's the company-wide
4  or worldwide brand.
5  Q  Do you think in the hypothetical negotiation,
6  Xylem Inc. would be willing to pay a higher amount
7  because it uses it outside the US as well as inside the
8  US?
9  A  Again, not directly.  I think indirectly, to
10  the extent they wanted to -- as Ms. McClain says,
11  "Operate under the backdrop of one company focused
12  around water," I think it would be relevant to having
13  a -- the same brand name for the US operations as for
14  ex-US operations.
15  Q  Does it factor into your opinion what the
16  extent is of Xylem Inc.'s operations and sales outside
17  the US?
18  A  I know what the worldwide sales were, but I
19  also know what their US sales are.  Again, I -- it does
20  not directly factor into the royalty rate, but as I
21  said indirectly, I think it would be part of Xylem
22  Inc.'s consideration with the intention of operating as
23  a backdrop of one company focused around water, that
24  they would want to have the same name for US operations

Page 200

ROBERT A. HUTCHINS

1  as ex-US operations.
2  Q  What is your understanding of how Xylem Inc.
3  uses the mark today?
4  A  Well, as I -- as I reference here in factor
5  11, it's my understanding that Xylem markets most of
6  its legacy products as a Xylem brand, but as -- as well
7  as the -- the -- as well as a product brand.
8  Q  Does the -- the Xylem mark appear on the
9  physical products themselves?
10  A  I do not believe so, no.
11  Q  Okay.  Does that factor into your analysis?
12  A  Back on page 20, one of the bullet points
13  I -- I reference or cite is the fact that Xylem Inc.
14  continues to use a trademark to acquire the
15  acquisitions of Godwin, YSI, and Nova, as support for
16  why I would think that the -- the royalty rates would
17  fall below -- the implied royalty rates in my
18  calculation, the royalty rate relevant for the
19  hypothetical negotiation would fall below the minimum.
20  So I -- I do take into account or understand that
21  they're marketing or selling their products with the
22  product branded name.
23  Q  In your discussion on page 29 of factor 11,
24  though, you say that that factor tends to increase the

Page 201

ROBERT A. HUTCHINS

1  hypothetically negotiated royalty rate, correct?
2  A  Yes.
3  Q  Why is that?
4  A  Given the fact that at least the vast
5  majority of their US sales, which in the fourth quarter
6  of 2011 and first quarter of 2012 totaled 591 million,
7  the fact of the use as measured in terms of sales is --
8  is quite material.
9  Q  Does the fact that the name does not appear
10  on the physical products tend to mitigate that
11  consideration?
12  A  Again, I think that was one of the reasons
13  why I selected the top end of the royalty rate range
14  was based on that factor -- based on that factor that
15  you describe, so it -- I would agree that it would
16  reduce the potential royalty rate overall, at least the
17  range that I'm using.  It's taken into account in that
18  aspect of the analysis.
19  Q  On page 30, at the top, you discuss factor
20  13, the portion of the realizable profit that should be
21  credited to the invention as distinguished from
22  nonpatented elements, et cetera.  Obviously, again,
23  we're talking about trademarks.
24      You've told me more than once that you

Page 202

ROBERT A. HUTCHINS

1  haven't done anything to determine what portion of
2  Xylem Inc.'s profit should be credited to the
3  trademark, correct?
4     A  That's -- that's correct.  And as I concluded
5  here, that -- this factor would -- should reduce the
6  overall royalty rate.
7     Q  In the second paragraph -- well, the first
8  paragraph after the quotation of factor 13, you say
9  that the -- you -- well, you say "I would expect that
10  the portion attributable to its brand name would
11  increase."  And what you're referring to there is
12  portion of Xylem Inc.'s profits, correct?
13     A  That is correct, yes.
14     Q  Okay.  First of all, in the -- in the first
15  sentence, you say "I would expect that only a very
16  small portion of its actual profits should be credited
17  to its brand name."
18        How can you say that there's any portion of
19  its profits that should be credited to its brand name
20  given that you have not analyzed that issue?
21     A  Again, it is more of a general statement that
22  as we looked -- talked about earlier, that trademarks
23  generate value as we saw from the valuations of the
24  three companies that were acquired.

Page 203

ROBERT A. HUTCHINS

1     And that's really all that's saying, is it's
2  recognizing that the -- the trademark in its use by
3  Xylem Inc. is in its infancy; that at the most, it
4  would just be a very -- I would expect at most it would
5  be only a small portion of the actual profits under the
6  premise that trademarks have value.
7     Q  So it sounds like you're at least slightly
8  modifying the statement to be at most only a very small
9  portion; is that fair?
10        MR. LaBRIOLA:  Objection as to form.
11        THE WITNESS:  I guess I'm not sure if I
12     see the difference.  I would -- I say I would
13     expect that only a very small portion of its
14     actual profits should be credited to its
15     brand name.  I'm not sure if I see the
16     distinction.
17     Q  (BY MR. SHAUGHNESSY)  My question is are you
18  ruling out the possibility that the amount attributable
19  to its use of the brand name is zero?
20     A  So am I ruling out that the use of the Xylem
21  mark by Xylem Inc. is -- there's no value to it; is
22  that --
23     Q  That it's responsible for no profits to this
24  point.

Page 204

ROBERT A. HUTCHINS

1     A  Am I ruling that out?
2        MR. LaBRIOLA:  Objection as to form,
3     just because it's a double negative.
4        THE WITNESS:  What I'm trying to say
5     here is that recognizing that WCO went into
6     the spin-off into an existing customer base,
7     existing revenue stream, that to the extent
8     that there is value associated with the
9     trademark, that only a small portion of that
10     should be credited to any actual profits of
11     Xylem Inc. currently.
12     Q  (BY MR. SHAUGHNESSY)  Okay.  But what -- what
13  I take from that is that you are saying there is some
14  positive but unquantified portion of the profits that
15  are attributable to the Xylem mark.  And I want to
16  know, first of all, if -- if that is your view, what's
17  the basis for it in your analysis?
18     A  I would measure the -- measure from the
19  perspective if there's value to the mark, the value
20  comes from the profits that are derived from its use.
21        So if there's zero value to it, despite the
22  fact that they're investing to build out this brand,
23  then I would expect there would be no profits
24  associated with the mark, which would be inconsistent

Page 205

ROBERT A. HUTCHINS

1  with a decision to invest in rebranding.
2     Q  Well, if -- if the fact that a company
3  invests in assets necessarily means the asset generates
4  profits, then there would be no such thing as an
5  unprofitable company, correct?
6     A  Sure.  But that's why sometimes investments
7  do not turn out as expected, but that's when companies
8  stop making that investment.  That's -- that's what
9  would be the prudent business decision, is to no longer
10  invest in that asset.
11        If you're continuing to -- to build a company
12  focused around water and focused around a band -- a
13  brand, and you continue to invest in that brand, then
14  the expectation from a rational economic perspective
15  would be that there has to be value to that brand.
16     Q  But again, sometimes companies throw good
17  money after bad, don't they?
18     A  Sure.
19     Q  And have you conducted any investigation of
20  whether, up to this point, the Xylem name has
21  contributed even a penny to Xylem Inc.'s profits?
22     A  No, I -- I think I said that earlier, that
23  I've not gone through an analysis to calculate what the
24  incremental sales and incremental profits attributable

Page 206

ROBERT A. HUTCHINS

1    to the Xylem Inc.'s use of the Xylem name would be or
2    was.
3        Q   At the bottom of page 33 and the top of page
4    34, you say that in your opinion the two most relevant
5    Georgia-Pacific factors are factor 13 and factor 8. Do
6    you see that?
7        A   I do say that, and I should clarify that
8    factor 8 is actually factor 11, which is the
9    description that you see in -- back in the table on
10   page 32.
11       Q   Okay. Well, that's -- that's a rather
12   significant difference, isn't there?
13       A   I don't think so.
14       Q   Okay. When -- when did you decide that it is
15   really factor 11 rather than factor 8?
16           MR. LaBRIOLA: Objection as to form.
17           THE WITNESS: Well, I always -- it's
18       just a typo. I understood it based on the
19       description that it was factor 11. When I
20       did my analysis, I just incorrectly typed the
21       number 8 instead of the number 11.
22       Q   (BY MR. SHAUGHNESSY) Well, you did it twice,
23   correct?
24       A   Correct. Both factor 8 and factor 11

Page 207

ROBERT A. HUTCHINS

1    increase the royalty rate.
2        Q   But not if you misinterpreted what factor 8
3    means, correct?
4           MR. LaBRIOLA: Objection as to form.
5        Q   (BY MR. SHAUGHNESSY) Factor 8, in fact,
6    focuses on Xylem Group rather than Xylem Inc., then I
7    think you agreed with me that it would tend to decrease
8    the rate?
9           MR. LaBRIOLA: Objection,
10       mischaracterizes the witness's testimony.
11          THE WITNESS: I believe what I said
12       earlier was if there is, in fact, a bright
13       line test that requires you to ignore the
14       economic evidence of the infringer's use of
15       the product, and only look at the owner's use
16       of the product, then I don't know exactly how
17       it would affect, but I would certainly
18       believe it would at least be reduced to a
19       neutral and probably is more likely to a
20       decrease.
21       Q   (BY MR. SHAUGHNESSY) Well, now that I
22   understand the significance of factor 11, let me ask
23   you to go back to page 23 and revisit that a little
24   bit.

Page 208

ROBERT A. HUTCHINS

1        Do you understand that in the marketplace of
2    goods, the name Xylem is always used by Xylem Inc. in
3    conjunction with product names of much longer standing?
4           THE WITNESS: Could you read that back,
5       please.
6           (Whereupon, the record was read by the
7       court reporter as follows:
8       "QUESTION: Do you understand that in
9       the marketplace of goods, the name Xylem is
10      always used by Xylem Inc. in conjunction with
11      product names of much longer standing?")
12          MR. LaBRIOLA: Objection as to form.
13          THE WITNESS: That's my understanding,
14      and that's something I accounted for in my
15      analysis.
16       Q   (BY MR. SHAUGHNESSY) How do you account for
17   it under factor 11?
18       A   It's -- well, initially this is a very
19   complicated and complex analysis. You can't account
20   for every single variable over and over again. So
21   factor 11 is just focusing on the extent of the
22   infringer's use of the -- the trademark. So it's just
23   quantifying the -- the total sales of the products.
24       To understand how -- to your question, how I

Page 209

ROBERT A. HUTCHINS

1    factored in the knowledge that the product brands were
2    still used with the Xylem name goes back to our
3    discussion earlier about my assessment of the implied
4    royalty rates and the indication of what Xylem Inc. or
5    WCO, or ITT prior to that, the prices they were paying
6    for trademarks.
7        So you have to look at multiple parts of the
8    report to understand how the pieces fit together, which
9    is what I try and do in the conclusion section.
10       But I understand it is a very complicated
11   analysis. There's a lot of information in here, as is
12   always the case in -- in these types of reports.
13       Q   So on page 33, you -- you set forth a minimum
14   rate of .2 percent and a maximum rate of .6 percent,
15   correct?
16       A   Yes.
17       Q   And neither the minimum nor the maximum are
18   derived from marketplace transactions, correct?
19       A   I think the -- the maximum is a derivative of
20   actual transactions and actual prices that were paid
21   for marks, but I'm not saying they're comparable marks,
22   which is why I -- I certainly don't use the -- the
23   values assigned to the portfolios in the purchase price
24   allocation reports that I wasn't provided until after

Page 210

ROBERT A. HUTCHINS

1   Mr. Yerman's report, so I -- I just am not sure if I
2   could fully agree that it's not based on market-type
3   market information, at least the maximum.
4        Q   Well, you -- you can't point to any
5   marketplace transaction that you believe is relevant
6   that had a .6 percent royalty rate?
7        MR. LaBRIOLA:   Objection as to form.
8        THE WITNESS:   I certainly can't identify
9   a comparable marketplace transaction that has
10  a 0.6 percent rate, that's correct.  As part
11  of the complexities of these analyses is
12  you're working with data that is -- is --
13  is -- that you have to derive information
14  from in order to understand how the relevant
15  metrics that the parties would have been
16  working with at the time of the hypothetical
17  negotiation.
18       Q   (BY MR. SHAUGHNESSY)  Is it your
19  understanding in the hypothetical negotiation that
20  Xylem Group would have been aware of the royalty rates
21  that ITT effectively used in the three transactions?
22       A   It's my understanding that the way the
23  hypothetical negotiation works is that essentially it's
24  an open book for both parties.  So to answer your

Page 211

ROBERT A. HUTCHINS

1   question, Xylem Group would have been aware of those
2   valuations.
3        Q   The only relationship between .6 percent and
4   any marketplace transactions is that .6 percent is
5   lower than the royalty rates you derive from the three
6   acquisitions, correct?
7        A   It's -- that's -- it's lower than any of the
8   implied royalty rates that I calculated.  It's
9   substantially lower, substantially lower than the
10  actual rates used in the purchase price allocation
11  reports.  It's also substantially lower than my reverse
12  engineering of what the maximum rates would be.  So
13  it's -- there's a significant discount I'm taking that
14  has now been confirmed with the actual valuations that
15  were provided to me after my report was -- was
16  completed.
17       Q   You didn't engage in any arithmetic or
18  algebraic manipulations to come up with the .6; for
19  instance, it's not the median or the mean or the mode
20  or the square of -- of any of the marketplace
21  transactions you looked at, correct?
22       A   Yeah, there is no quantitative formula as --
23  which is quite often the case in these situations.
24  It's based on -- on judgment and based on the facts,

Page 212

ROBERT A. HUTCHINS

1   based on the circumstances, based on the parties'
2   negotiating positions.
3        There's a lot of information that goes into
4   evaluating that, but it's very rare when you can
5   actually apply a mathematical formula to come up with
6   what a specific could be.
7        Q   How did you arrive at .6 percent as the
8   maximum rather than, say, .5 or .4?
9        A   Well, again, I -- I looked at the lowest end
10  of the range of rates in my implied royalty rate
11  analysis, and I looked at the fact that these minimums
12  were well below the maximums and the means and the
13  medians of my implied royalty rate analysis.  So I was
14  comfortable that using something slightly below the
15  lowest royalty rates in that implied royalty rate
16  analysis would take into account the fact that some of
17  the factors I cite in my report, but particularly the
18  fact that there were multiple trademarks, they had --
19  involved in the acquisitions, there were -- and these
20  were existing companies with larger revenue bases.  And
21  now it's been validated how conservative my assumption
22  is based on the actual purchase price allocations.
23       Q   Explain to me the reasoning you engage in to
24  get from .63 percent, which was the lowest of the rates

Page 213

ROBERT A. HUTCHINS

1   that you derived, to .6 percent rather than .5 percent
2   or .4 percent?
3        A   Well, again, I was trying -- my -- what I was
4   trying to do was use a rate that was close to the
5   maximum -- the minimum royalty rate.  Again, there's no
6   mathematical formula you can apply to make, in this
7   instance, at least, to particularly say you go from
8   0.63 to 0.6 percent.
9        In addition, I would add that the effect on
10  the royalty rate and the damages of using 0.63 or 0.6
11  as your maximum or even 0.5 -- 0.15 as your minimum, I
12  haven't done the math, but it wouldn't materially
13  change the -- the royalty rate itself or the -- the
14  measure of royalty -- royalty rate damages that I
15  calculated.
16       Q   You acknowledge that the royalty rates from
17  the three transactions are not comparable to the
18  situation here, correct?
19       A   Yes, and that's why I -- I don't use the
20  maximum rates, correct.
21       Q   Why -- why do you pay any attention to them
22  at all?
23       A   Again, as I discussed earlier, it's -- a data
24  point that I have available as an indication of value

54

Page 214

1       ROBERT A. HUTCHINS
2   and prices that ITT and WCO were placing and paying for
3   trademarks. So it gives me an -- some insight into --
4   at least from ITT's and WCO's and Xylem Inc.'s as their
5   successors what value they were placing on trademarks
6   and how much they were willing to -- to pay to acquire
7   trademarks.
8       Q   But very different trademarks, correct?
9       A   Sure, and that -- that's exactly why I did
10  not use the maximum rates.
11      Q   Well, but what is your reasoning for even
12  using the minimum rate if it's a set of noncomparable
13  trademarks?
14      A   Well, again, it gives us -- it gives me a
15  data point to identify what the potential range of
16  royalty rates would be based on actual transactions
17  that occurred, actual transactions that involved one of
18  the parties who would be participating in the
19  hypothetical negotiations.
20      Q   But you -- you think there's something about
21  the fact that ITT was a party to the transaction that
22  makes it more relevant than, say, the value of the
23  Coca-Cola trademark or the IBM trademark?
24      MR. LaBRIOLA: Objection as to form.
25      THE WITNESS: It's certainly more

Page 215

1       ROBERT A. HUTCHINS
2   relevant than the value of the Coca-Cola
3   trademark.
4       Q   (BY MR. SHAUGHNESSY) Even though you chose a
5   maximum royalty rate that was slightly below the -- the
6   minimum royalty rates you derived from the three
7   transactions, you agree that the rates you would derive
8   from those three transactions influenced your selection
9   of the maximum royalty rate, correct?
10      MR. LaBRIOLA: Objection as to form.
11      THE WITNESS: It certainly gave me the
12  range to work from, so it would influence the
13  minimum and the maximum possible rates, so I
14  would agree with that. But, again, going
15  from .60 --.63 to 0.6 would not have a
16  material effect on the overall damages.
17      Q   (BY MR. SHAUGHNESSY) I'm not sure you
18  answered why you chose .6 as opposed to .5.
19      MR. LaBRIOLA: Objection, asked and
20  answered.
21      THE WITNESS: Well, again, what I say on
22  page 33 is that "In my opinion a rate
23  slightly below" 0. -- sorry, "a rate slightly
24  below 0.63 percent serves as a conservative
25  approximation of the high end of the

Page 216

1       ROBERT A. HUTCHINS
2   reasonable royalty rate range. As such, I
3   will set the maximum rate for the
4   hypothetical" -- "hypothetical negotiations
5   at 0.60 percent," so...
6       Q   (BY MR. SHAUGHNESSY) I see that. And I want
7   to know how you get there, what -- what reasoning do
8   you employ to get there?
9       MR. LaBRIOLA: Objection, asked and
10  answered.
11      THE WITNESS: Again, it's -- it's -- as
12  I stated earlier, there is no mathematical
13  formula you can employ in this situation to
14  say it should be 0.63 or 0.60. It's based on
15  judgment. It's based on what I'm trying to
16  do, which is working with the information I
17  have, doing a very complicated and complex
18  analysis and working with the best data I can
19  find to come up with an estimate of what a
20  potential royalty rate range would be using
21  data points that are certainly -- were --
22  come from the documents that I -- documents
23  that I had available to me.
24      So going again -- going from 0.63 to
25  0.60 is just another conservative assumption

Page 217

1       ROBERT A. HUTCHINS
2   or conservative assumption I'm making. I
3   could have used 0.63, and it would have had
4   an immaterial effect on my overall royalty
5   rate.
6       Q   (BY MR. SHAUGHNESSY) Again, why not .5? I
7   mean, did you go through the mental exercise of
8   thinking maybe .5, but, no there are better reasons to
9   use .6?
10      A   Well, again, the reason I use and I elected
11  to use the 0.6 is based on the implied royalty rate
12  analysis I conducted and the fact that those were the
13  minimum values that -- that were derived from that
14  calculation.
15      So I wanted to try and keep it close to -- as
16  close to that range of data points as -- as -- as I had
17  available to me.
18      Q   Are you basing your opinions on page 33 in
19  any part on your prior experience in valuing
20  trademarks?
21      A   I'm basing my opinion and my analysis on the
22  work I've done over the past 20 years and analyzing the
23  issue of damages and preparing reasonable royalty rate
24  analyses, analyzing the valuation of intellectual
25  property, analyzing the Georgia-Pacific factors. So it

Page 218

ROBERT A. HUTCHINS

1   is -- it's all my past experience over the last 20
2   years in the multiple times that I've undertaken these
3   types of analyses certainly are -- inform my overall
4   conclusions and -- and opinions.
5       Q   Have you ever undertaken a valuation of
6   trademarks for nonlitigation purposes?
7       A   I believe I have, yes.
8       Q   How often?
9       A   At least once or twice.
10      Q   Have you ever undertaken a hypothetical
11  royalty analysis, whether for litigation or not for
12  litigation involving a trademark?
13      A   Not involving a trademark, but I don't see
14  the distinction between the type of intellectual
15  property in the framework that the Georgia-Pacific
16  factor lays out as well as the framework that I use
17  under the income approach and the market approaches.
18      This is a standard analysis that you would
19  apply, certainly in any patent infringement case, and
20  it's -- certainly these are the types of factors and
21  information you would consider in valuating any type of
22  intellectual property.
23      Q   In your 34-page report, what is the analysis
24  that -- the explicit analysis that sets forth your
25

Page 220

ROBERT A. HUTCHINS

1   report that -- that takes into account how I arrived at
2   that.
3       Q   The other parts being your implied royalty
4   analysis?
5       A   Certainly that part, yes.
6       Q   And what about the -- the .2 percent minimum
7   royalty; is there any part of your report other than
8   the third paragraph on page 33 that constitutes the
9   analysis leading up to that number?
10      A   I -- yeah, I think that, with respect to the
11  minimum, I think that's where the -- the majority of
12  the information and analysis would reside, is in the
13  discussion on page 33.
14      Q   Well --
15      A   Again, taking into account there's a lot of
16  other facts and information that go into -- to the
17  overall analysis that is part of reaching the
18  conclusions I reach.
19      Q   But specifically with reference to the .2
20  percent number, is there any other part of the report
21  that explains how you get to the .2 percent number?
22      A   I don't think so.
23      Q   So this is really the heart of your report,
24  is it not?  I mean, the -- the bracketed range

Page 219

ROBERT A. HUTCHINS

1   basis for the .6 percent minimum royalty rate?  Let me
2   ask it this way:  Is it anywhere other than the first
3   paragraph of page 33?
4       A   I would -- it's -- it certainly is discussed
5   here, but I would also add it's related to my -- my
6   implied royalty rate calculations.
7       Q   But the -- the inference from the implied
8   royalty rate calculations to the .6 percent minimum --
9   maximum royalty rate is addressed only in the first
10  paragraph on page 33, correct?
11      MR. LaBRIOLA:  Objection as to form.
12      THE WITNESS:  What was the word
13  inference, I'm sorry?
14      Q   (BY MR. SHAUGHNESSY)  Yeah.
15      A   Inference.  I would say that's -- this is the
16  portion of my report on page 32, 33 where I reconcile
17  all the information that I've looked at and pull it
18  together.  And this is the point where I am going about
19  and saying what I think the maximum rate would be and
20  the minimum rate would be.
21      So if your question is is this the point
22  where I first reference 0.6 percent, I think that's the
23  first time in my report that sentence appears, but it
24  certainly isn't the only data point or part of the
25

Page 221

ROBERT A. HUTCHINS

1   between .2 percent and .6 percent is what you then
2   subject to the Georgia-Pacific analysis, correct?
3       MR. LaBRIOLA:  Objection as to form.
4       THE WITNESS:  I wouldn't agree it's the
5   heart of the report, no.
6       Q   (BY MR. SHAUGHNESSY)  Okay.  Why do you
7   disagree with that characterization?
8       A   It's the reconciliation and -- in the
9   conclusion section of my report where I take all the
10  information I looked at, the income approach, the
11  market approach, the implied royalty rate calculations,
12  the Georgia-Pacific factors, looking at the bargaining
13  positions of the party, the -- my -- my understanding
14  of the facts of the case, and take that bulk of
15  information and try to reconcile it in this section.
16      So this is not the heart -- my conclusion
17  section certainly is not the heart of my report.  It's
18  the summary of my report.
19      Q   Is it accurate to say that you do not arrive
20  at your ultimate royalty rate of .45 percent through
21  any quantitative method?
22      MR. LaBRIOLA:  Objection as to form.
23      THE WITNESS:  That is correct, but
24  again, this is not a situation where you can
25

Page 222

ROBERT A. HUTCHINS

1    apply mathematical formulas to calculate a
2    specific number. It's based on an evaluation
3    of all the information that we've been
4    talking about today.
5        Q   (BY MR. SHAUGHNESSY) An exercise of judgment
6    on your part --
7        A   Sure.
8        Q   -- correct?
9        A   Which would be exactly what would occur in
10   any hypothetical negotiation.
11       Q   In your Exhibits 8.1 to 8.8, you engage in
12   various calculations. Using the .45 percent royalty
13   rate to generate the minimum value of the '362
14   trademark as $45 million, do you see that stated at the
15   bottom of page 34?
16       A   I do, in the context of the hypothetical
17   negotiation, that's correct. That's what it states.
18       Q   What is the basis for the discount rates and
19   long-term growth rate that you use in Exhibit 8.8?
20       A   The long-term growth rate, one of the sources
21   I looked at for that, again, this is the long-term
22   growth rate for the US sales aspect of Xylem Inc., was
23   information that was contained in an investor
24   presentation where they were providing guidance to

Page 223

ROBERT A. HUTCHINS

1    analysts.
2        The discount rates are just, you know,
3    assumptions based on my experience of what would be an
4    appropriate discount rate given the -- the risk levels
5    associated with Xylem Inc.'s business model, business
6    operations.
7        Q   On Exhibit 8.7, what's the basis for the
8    various growth rate scenarios that you set forth there?
9        A   Again, I -- I think some of that information
10   would have come from information I derived from the
11   investor presentations. They don't usually go -- they
12   don't provide guidance long-term, you know, and it's
13   also set up because I know -- I understand there's some
14   uncertainty in projecting any projections. That's why
15   I run, you know, multiple scenarios at multiple
16   different growth rates, and multiple different discount
17   rates to take into account that -- to at least to
18   account for some of that uncertainty.
19       Q   Now, I see, for instance, on Exhibit 8.6,
20   8.5, you actually cite sources. You don't cite any
21   sources for Exhibits 8.7 and 8.8. Is there a reason
22   for that?
23       A   Not specific -- not that I can think of, no.
24       Q   Did you use the mid-year convention to

Page 224

ROBERT A. HUTCHINS

1    discount the amounts in years 1 through 5 in Exhibits
2    8.2 to 8.6?
3        A   I typically do, and I'm pretty sure I did in
4    this instance, but without going back and looking at
5    the actual formula, I can't say with a hundred percent
6    certainty, but that is my standard practice, is to use
7    the midpoint convention.
8        Q   And how many periods did you discount the
9    terminal value in those same exhibits?
10       A   Back to the beginning of year 1, which is --
11   what would be the standard approach.
12       Q   Do you have any reason to believe that as of
13   July 2011, the name Fluance was more valuable to Xylem
14   Inc. than the name Xylem?
15       A   I have no reason to believe that, and, in
16   fact, I would think the opposite; that is, Xylem would
17   be more valuable than Fluance, which is why they would
18   want them to go to forward with Xylem despite what
19   they identified as risk areas with pursuing that name
20   as opposed to Fluance.
21       Q   Have you conducted any economic analysis of
22   whether Xylem was more valuable and promised greater
23   benefits to the company than the name Fluance?
24       A   I have not conducted any analysis in that

Page 225

ROBERT A. HUTCHINS

1    regard. I would rely on the judgment of ITT and WCO,
2    the people involved in making that decision to pick the
3    name this they felt would generate the most value for
4    the company spun out of ITT.
5        Q   And again, you didn't see any economic
6    analysis by the company of Xylem versus Fluance versus
7    any other name, did you?
8        A   No specific economic analysis, other than it
9    was the -- certainly the preferred choice and certainly
10   the preferred -- preferred choice of Ms. McClain.
11       Q   ITT actually engaged in negotiations with NA
12   in June and July 2011, correct?
13       A   I -- I know they did. I just can't remember
14   if it was late June or started in July but that time
15   frame sounds right.
16       Q   And given that actual marketplace experience,
17   why do you believe that June, July 2011 is not the
18   appropriate time frame for a hypothetical negotiation
19   of the sort you did in this case?
20       MR. LaBRIOLA: Objection, asked and
21   answered.
22       THE WITNESS: Yeah, the -- as I
23   explained in my report and discussed earlier,
24   the date of the hypothetical negotiation is

Page 226

ROBERT A. HUTCHINS

1
2 based on the fact -- fact and circumstances
3 relevant to the matter at issue.
4     So for all the reasons we talked about
5 earlier, in my opinion, the hypothetical
6 negotiation in this instance, the appropriate
7 date would have been October of 2011.
8     Q   (BY MR. SHAUGHNESSY) Wasn't ITT facing the
9 very same facts and circumstances as to Xilema as it
10 would have faced if it had chosen to negotiate with
11 Xylem Group?
12     MR. LaBRIOLA: Objection as to form.
13     THE WITNESS: I mean, they certainly had
14 identified NA as an issue, and they elected
15 to go with -- try and negotiate with NA.
16 It's my understanding they identified Xylem
17 Group as an issue, but for some reason they
18 did not elect to go negotiate with them.
19     So that brings us into the environment
20 we're in, and brings us into the construct of
21 the hypothetical -- hypothetical negotiation,
22 and the assessment of when that occurred is
23 based on the facts and circumstances relevant
24 to Xylem and Xylem Inc. or WCO or ITT.
25     Q   (BY MR. SHAUGHNESSY) But my question is

Page 227

ROBERT A. HUTCHINS

1
2 aren't those the same facts and circumstances that were
3 at play with the owner of the Xilema mark?
4     MR. LaBRIOLA: Objection as to form.
5     THE WITNESS: Not -- no, they're not.
6     Q   (BY MR. SHAUGHNESSY) Why are they not the
7 same?
8     A   As far as I understand, ITT and WCO did not
9 negotiate with Xylem Group in June or July 2011.
10     Q   But if they had elected to, wouldn't the
11 negotiation have occurred in the same time frame as the
12 negotiation with Xilema?
13     MR. LaBRIOLA: Objection, asked and
14 answered.
15     THE WITNESS: If they had -- instead of
16 ignoring Xylem Group, if I understand you,
17 elected to negotiate with Xylem Group, and
18 enter into a royalty agreement before the
19 spin-off occurred, I'm not sure what we'd be
20 doing here, then.
21     I don't -- I guess I don't understand
22 the construct. If there's a license
23 agreement that they would have entered into
24 prior to the spin-off; is that what you're
25 asking me?

Page 228

ROBERT A. HUTCHINS

1
2     Q   (BY MR. SHAUGHNESSY) Well, Xylem -- well,
3 ITT believed it needed to get a coexistence agreement
4 with NA, correct?
5     A   It -- it did get one, yes.
6     Q   And it believed it needed to get one before
7 it announced its name on July 14th, 2011, correct?
8     A   That's my understanding.
9     Q   If ITT was considered an infringer as of July
10 14th, 2011, then your opinion is of little relevance to
11 this case, correct?
12     MR. LaBRIOLA: Objection as to form.
13     THE WITNESS: Well, I think as we
14 discussed earlier, I would need to change the
15 start date of my calculation of the statutory
16 damages, so I think that would still be
17 relevant.
18     And I would agree it would -- if the
19 hypothetical negotiation occurred prior to
20 the announcement, I would agree that it would
21 change the royalty rate. And again --
22     Q   (BY MR. SHAUGHNESSY) Dramatically, correct?
23     MR. LaBRIOLA: Objection as to form.
24     THE WITNESS: I -- I don't know the
25 impact, because I haven't done that analysis.

Page 229

ROBERT A. HUTCHINS

1
2 But as I said earlier, the royalty rate we're
3 using -- I'm using to calculate the damages
4 is only 0.45 percent, so I think it would go
5 down from that. How much, I -- I can't tell
6 you right now without undertaking the same
7 level of analysis and the same complexity of
8 analysis that I did in reaching the opinions
9 that I -- that are stated in my report.
10     Q   (BY MR. SHAUGHNESSY) Well, the facts would
11 all be the same except one, namely the date of the
12 infringement, correct?
13     MR. LaBRIOLA: Objection as to form.
14     THE WITNESS: I wouldn't agree with
15 that.
16     Q   (BY MR. SHAUGHNESSY) What facts would be
17 different?
18     A   I think we talked about this before as well,
19 but by October 2011, they had already -- WCO/ITT had
20 started investing in the brand, they had committed to
21 the Xylem name, they had communicated that to the
22 public markets, they communicated that to their
23 customer base. They were -- they had gotten board
24 approval in early October 5th to change. There's other
25 SEC regulatory issues they went through in October

Page 230

ROBERT A. HUTCHINS

1    2011, which are referenced in their SEC filings that
2    had occurred since July 2011.
3        So I think the -- the facts that existed in
4    July -- I'm sorry, in October of 2011 are materially
5    different than the world and the facts that existed in
6    July of 2011.
7        Q  But you have all the facts relevant to both
8    time frames, don't you?
9        A  I -- I think I -- I certainly have all the
10   facts that I'm aware of that are cited in my report
11   that are relevant to that time frame.
12        Now, but the issue is I haven't undertaken an
13   analysis assuming that the date of infringement
14   occurred before the actual spin-off occurred, before
15   they actually started selling products under the Xylem
16   name, so I would need to undertake, in order to measure
17   what the royalty -- royalty rate would be, I would need
18   to undertake the same type of analysis, the same
19   complexity in my analysis that I did in reaching the
20   conclusions that I did in my report.
21        Q  Well, the part about the three transactions
22   would be unchanged, correct?
23        A  Yes.
24        Q  The -- the section on the income approach

Page 231

ROBERT A. HUTCHINS

1    would be unchanged, correct?
2        A  No, there would be a change here.
3        Q  What would be change?
4        A  Well, I wouldn't know what the market value
5    was as of July 2011. So I wouldn't be able to
6    calculate what the expected income associated with the
7    acquired trademarks would have been as a percentage of
8    the market value.
9        Q  Well, but is the November 1st valuation date
10   significant to your analysis in this report? I mean,
11   that just happens to be the first day the stock traded,
12   but since you don't really do anything with the 2.7
13   percent number, it doesn't really matter what the
14   valuation date is?
15        A  I know that's what Mr. Yerman referenced --
16   states in his report, but I don't agree with that
17   characterization. I think that's incorrect.
18        Q  What, that you don't do anything with the 2.7
19   million?
20        A  Right, I think --
21        Q  You told me that you just used it as a
22   reality check to make sure your ultimate number wasn't
23   greater than that percentage value?
24        MR. LaBRIOLA: Objection,

Page 232

ROBERT A. HUTCHINS

1    mischaracterizes the witness's testimony.
2        Q  (BY MR. SHAUGHNESSY)  Correct?
3        A  I mean, I know we went through a lengthy
4    discussion about that, but clearly from that
5    discussion, it's -- there's no doubt that I use that
6    2.7 percent in my analysis despite what Mr. Yerman
7    alleges in his report.
8        Q  Well, am I incorrect in summarizing that you
9    used it simply as a check to make sure that the number
10   you came up with was not more than 2.7 percent of the
11   value of the company?
12        A  Yeah, I -- I used it to make sure that my
13   royalty rate was reasonable in light of the other
14   acquired trademarks, which, again, I guess I -- maybe I
15   have a different definition of used, but I certainly
16   used that 2.7 percent in my analysis. And the -- the
17   question was you didn't use that at all, and that's --
18   maybe that's where I -- maybe I misheard the question.
19        Q  Is the specific valuation date really
20   significant to the way you use the -- the 2.7 percent?
21   Do you really think it would make much difference if
22   you used March 1st, 2012 or some date in 2011?
23        A  I'd have to know what the market value was at
24   that point in time.

Page 233

ROBERT A. HUTCHINS

1        Q  Well, if your analysis of the hypothetical
2    royalty were -- hypothetical negotiation were taking
3    place in mid July 2011, your analysis of
4    Georgia-Pacific factor 1 would be unchanged, correct?
5    It's page 23.
6        A  Yes.
7        Q  I take it under factor 2, you'd have to give
8    more weight to the NA transaction, correct?
9        A  Again, I -- I have to reassess this entire
10   factor.
11        Q  Exactly -- well, I'm asking you to do that.
12   I mean, do you need to go somewhere in order to do the
13   thinking, or are you able as you sit here to say yes,
14   it would be more relevant than -- than I say it is on
15   page 24?
16        A  Again, doing this on the fly, yeah, I would
17   certainly think that the first point I'm discussing
18   with respect to the coexistence agreement would need to
19   be updated -- no, I'm, sorry the first point would be
20   the same -- no, I'm sorry, it would be -- need to be
21   revised.
22        The second point -- I mean, that's factually
23   correct, but I would need to reweigh how that would
24   factor into my analysis. I think the third point,

## Page 234

ROBERT A. HUTCHINS

1
2 again doing this on the fly, seemed to still remain or
3 still be valid in July of 2011. The fourth point in
4 doing this on the fly looks like it would still be
5 valid as well as the fifth point.
6    Q    Okay. And I take it Georgia-Pacific factor 3
7 would be unchanged if the negotiation were assumed to
8 take place in July of 2011?
9        MR. LaBRIOLA: Objection,
10 mischaracterizes the witness's testimony.
11       THE WITNESS: Again, I would need to
12    think harder about each one of these factors,
13    as I did when I did my initial report, as
14    opposed to just sitting here and trying to
15    reevaluate the entire situation in a very
16    different factual world. But I -- I don't
17    think the terms of the agreement would change
18    materially.
19    Q    (BY MR. SHAUGHNESSY) Okay. Factor 4
20 wouldn't change either, correct?
21       MR. LaBRIOLA: Which page are you on?
22       MR. SHAUGHNESSY: Oh. Page 26.
23       THE WITNESS: That's correct. That
24    would not change.
25    Q    (BY MR. SHAUGHNESSY) Factor 5 wouldn't

## Page 235

ROBERT A. HUTCHINS

1
2 change?
3    A    Yes, that would not change.
4    Q    Factor 6 wouldn't change?
5    A    No.
6    Q    Factor 7 wouldn't change?
7    A    No.
8    Q    Factor 8 wouldn't change?
9    A    It would not, no.
10    Q    Factors 9 and 10 wouldn't change?
11    A    No.
12    Q    Would factor 11 change?
13    A    No.
14    Q    Would factor 12 change?
15    A    No.
16    Q    Would factor 13 change?
17    A    No.
18        Again, that's not everything that's
19 considered.
20    Q    I understand. Do you intend to -- or have
21 you formulated any responses to Mr. Yerman's criticism
22 of your report?
23    A    Certainly no written responses. I have
24 observations regarding his reports. Some of them I've
25 mentioned here today earlier, which are he

## Page 236

ROBERT A. HUTCHINS

1
2 mischaracterizes or makes several misleading statements
3 regarding what I allegedly ignored and did not do, and
4 obviously there's some fundamental disagreements that
5 are key to both his opinion and are -- are important to
6 my opinion as well.
7    Q    Give me an example.
8    A    Well, for example, the -- the date of the
9 hypothetical negotiation --
10       THE COURT REPORTER: The what?
11       THE WITNESS: Date of the hypothetical
12    negotiation, he assumes it would have
13    occurred even prior to the announcement of
14    the spin-off.
15        Another issue is he assumes that it
16    would have been a -- the parties would have
17    entered into a coexistence agreement as
18    opposed to my assumption that it would be an
19    exclusive license between the two parties.
20    Q    (BY MR. SHAUGHNESSY) Well, how do you
21 resolve that conflict? Why do you think you're right
22 and he's wrong?
23       MR. LaBRIOLA: As to which portion that
24    he just told you he was wrong on?
25       MR. SHAUGHNESSY: The coexistence

## Page 237

ROBERT A. HUTCHINS

1
2 agreement versus exclusive license.
3       THE WITNESS: Well, I -- my -- my
4    opinion and -- my opinion is correct.
5    Q    (BY MR. SHAUGHNESSY) And his opinion is
6 wrong because it's not the same as your opinion?
7       MR. LaBRIOLA: Objection as to form.
8       THE WITNESS: It's not consistent with
9    the facts as I understand them. His opinion
10    is not.
11    Q    (BY MR. SHAUGHNESSY) How is it inconsistent
12 with the facts?
13    A    Again, it -- I think we talked about this
14 before, but, you know, in order for Xylem Group to
15 eliminate the payment confusion -- or I'm sorry, the
16 confusion, to address any issues with future expansion
17 plans, they would have wanted to grant an exclusive
18 license to Xylem Inc. I think that's the -- that's how
19 those problems would have been resolved. And they
20 would have wanted to rebrand themselves as a new
21 company. So that's -- that's how I -- in my opinion
22 the agreement would have been structured.
23    Q    Is your view about Xylem Group's preference
24 for an exclusive license based on any discussions
25 you've had with anyone at Xylem Group?

**Page 238**

ROBERT A. HUTCHINS

A   No, it's not. It's based on the economics of the situation as well as, again, the issues that have been raised in the case.

Q   What -- what are the economics of the situation with respect to the confusion? I mean, I thought I understood you to -- to say that Xylem Inc. -- excuse me Xylem Group hasn't suffered any economic consequences of the confusion?

A   Well, I think the major area of concern certainly as expressed to me during our meeting and as expressed in Mr. Weinstein's deposition was the future impact that this is going to have a -- some sort of a coexistence-type of arrangement it would have on Xylem Group's ability to expand. I think that's the major economic concern certainly going forward of having two Xylems coexisting in the US market.

Q   You don't think that could have been addressed in a coexistence agreement as opposed to an exclusive license?

A   I -- I don't think that would be economically the appropriate way to address Xylem Group's concerns.

Q   You've read the NA agreement, correct?

A   Yes.

Q   And do you agree with me that the -- the

**Page 239**

ROBERT A. HUTCHINS

upshot is that ITT agreed to stay out of NA's field, and NA agreed to stay out of ITT's field, correct?

A   I guess I'm not sure if I follow that characterization of the agreement.

Q   Well, do you think it would have been impossible for ITT and Xylem Group to agree on a coexistence agreement that allowed each firm to operate in the field it wanted to operate in?

A   Would it have been possible? I guess it would have been possible; but in my opinion, you still have to address the economic issues, and that is what I'm trying to do in the Georgia-Pacific factor analysis.

Q   Have you done any economic analysis of the value to Xylem Group of its potential future expansion?

A   No, I've not.

Q   I interrupted you when you were enumerating points of disagreement between you and Mr. Yerman and you had mentioned the date of the hypothetical negotiation, the coexistence agreement versus exclusive license. Are there other points of disagreement?

A   I'm sure there are several other. And again, not without looking at his report or being provided a copy of it, I just -- I can't recall all of the areas

**Page 240**

ROBERT A. HUTCHINS

of disagreement.

Q   Your .2 minimum royalty rate does not come from any marketplace transactions, correct?

A   Not directly, no. I mean --

Q   Well --

A   -- it's a function of the rebranding costs that have been incurred to date.

Q   When you say in -- you say not directly. That compels me to ask how does it derive from market transactions indirectly?

A   Well, that's what I was saying, is it's derived from the assumption that the minimum value of the trademark or the -- the mark is equivalent to what W -- W -- water -- ITT and Xylem Inc. have spent in promoting the brand.

Q   But it's -- it's not derived from any other licensing transactions?

A   No, not from a licensing transaction. It's derived from the best available information that I have.

Q   If ITT had acknowledged the validity of Xylem Group's infringement claim as of July 13th -- let me start over.

If ITT had acknowledged as of July 13th that

**Page 241**

ROBERT A. HUTCHINS

the water company's use of Xylem would infringe Xylem Group's rights, do you believe that ITT would have gone on to incur costs associated with renaming itself Xylem?

MR. LaBRIOLA: Objection.

THE WITNESS: Can you break that -- there was a lot in there. Could you break that down for me?

Q   (BY MR. SHAUGHNESSY)   Sure. Let me ask you to assume that on July 13th, 2011 ITT water company management acknowledged to themselves that any use of the Xylem name by the water company would infringe Xylem Group's rights; in other words, they had exactly the same attitude toward the validity of Xylem Group's claim that were supposed to impute to the parties to the hypothetical negotiation. Are you with me so far?

A   So we're assuming that WCO recognizes that Xylem Group's claim is valid and that they will infringe, willingly infringe that claim, that trademark; is that what we're assuming?

Q   Well, that they would infringe, if they adopted that name as the name of the water company.

A   So they would knowingly infringe --

Q   Well, again, it's all -- it's all from the

Page 242

```
1            ROBERT A. HUTCHINS
2   perspective ex ante of July 13th, that they would
3   infringe if they proceeded to call themselves Xylem.
4      A   So this is only as of a date in time, there's
5   no --
6      Q   Right.
7      A   -- ex-post information.
8      Q   Right.
9      A   We're assuming that WCO recognizes Xylem
10  Group's trademark as valid, and that at some point when
11  they actually --
12         MR. LaBRIOLA: Well, he hasn't asked the
13  rest of the question.
14     Q   (BY MR. SHAUGHNESSY) Yeah, I just --
15         MR. LaBRIOLA: He's only part way.
16     Q   (BY MR. SHAUGHNESSY) I just want -- I just
17  want you to get that assumption in place.
18         MR. LaBRIOLA: He's at the comma.
19     Q   (BY MR. SHAUGHNESSY) On July 13th --
20     A   I'm sorry, I was trying to understand the
21  infringing part.
22     Q   On July 13th, water company management
23  recognizes and acknowledges that any future use of
24  Xylem by them would -- would infringe Xylem Group's
25  rights. Are -- are you with me so far?
```

Page 243

```
1            ROBERT A. HUTCHINS
2         MR. LaBRIOLA: Let me just place an
3   objection that you're assuming a legal
4   conclusion on future use infringing as of
5   July 13.
6      Q   (BY MR. SHAUGHNESSY) You -- are you with me
7   on that assumption?
8      A   So we're assuming July 13th WCO recognizes
9   it's valid and recognized that they will infringe.
10     Q   Would infringe.
11     A   Would infringe.
12     Q   My question is if they had that state of mind
13  on July 13th, do you really think they would have
14  proceeded to incur $15 million in rebranding costs?
15         MR. LaBRIOLA: Objection as to form.
16         THE WITNESS: Sure.
17     Q   (BY MR. SHAUGHNESSY) Knowing that it's good
18  money after bad?
19         MR. LaBRIOLA: Objection as to form.
20         THE WITNESS: Yeah, I -- I don't have
21  any insight as to why they did what they did,
22  but I can certainly -- I can see reasons why
23  they would do it.
24     Q   (BY MR. SHAUGHNESSY) Are you aware in any of
25  the case law concerning Georgia-Pacific, which I take
```

Page 244

```
1            ROBERT A. HUTCHINS
2   you pay some attention to; is that correct?
3      A   Absolutely.
4      Q   Are you aware of anything in that case law
5   that says that sunk costs relating to the infringing
6   conduct should be taken into account as part of the
7   hypothetical negotiation?
8         MR. LaBRIOLA: Objection to the extent
9   he's asking for a legal conclusion.
10        THE WITNESS: I mean, I -- I can't speak
11  for every patent infringement case, but
12  certainly design-around alternatives, those
13  types of things are taken into account.
14     Q   (BY MR. SHAUGHNESSY) Do you have any plans
15  to do additional work relating to this case?
16     A   I -- currently I've not been asked to do
17  anything else, so currently I do not have any plans
18  other than probably updating my damage calculation as
19  time moves forward.
20         MR. SHAUGHNESSY: Okay. That's all I
21  have. Thanks, Mr. Hutchins.
22         THE WITNESS: Thank you.
23         MR. LaBRIOLA: I may have some
24  questions, but why don't we take a break.
25         THE VIDEOGRAPHER: Going off the record.
```

Page 245

```
1            ROBERT A. HUTCHINS
2   The time is 5:30.
3   (Whereupon, there was a brief recess.)
4         THE VIDEOGRAPHER: Back on the record.
5   The time is 5:53.
6            EXAMINATION
7   BY MR. LaBRIOLA:
8      Q   Mr. Hutchins, what I'd like to have you do is
9   if you would turn to that portion of your report which
10  contains your bio.
11     A   Okay.
12     Q   And Mr. Shaughnessy asked you specifically
13  about some of the trademark consulting and expert work
14  that you have done in the past but did not ask you
15  about the IP cases that you've worked on in the past.
16         And first, do I understand that you believe
17  that the work and analysis you have done in providing
18  damages, expert -- or damages analysis and expert
19  testimony in patent cases is also relevant to your
20  qualifications to render the opinions that you've
21  rendered in this report?
22         MR. SHAUGHNESSY: Objection, leading.
23         THE WITNESS: I -- I would certainly
24  agree that the work I do with patent
25  infringement cases, which I've probably done
```

Page 246

ROBERT A. HUTCHINS

1
2      20 to 25 different cases over the years
3      is --
4      Q   (BY MR. LaBRIOLA) I'll tell you what, hold
5      your answer a minute. Let me just rephrase the
6      question --
7      A   Sure.
8      Q   -- taking into his account his objection.
9          Would you walk through your bio on -- on any
10     of the matters that Mr. Shaughnessy did not ask you
11     about and tell me if any of those have relevance to
12     your qualifications to render an opinion in the report
13     that you have set forth.
14     A   Sure. What you see on Exhibit A is -- is --
15     are selected examples of the various intellectual
16     property litigation assignments I have worked on over
17     the past 15-plus years, I would estimate.
18         And the majority of the cases I have been --
19     worked on involve patent infringement disputes. And in
20     patent infringement disputes, they require -- or
21     they -- you're always required or you always undertake
22     a reasonable royalty analysis, and that's based on the
23     framework of the Georgia-Pacific factor case, which is
24     the same framework I -- I used here.
25         And in addition, it also takes into account

Page 247

ROBERT A. HUTCHINS

1
2      the same types of information in any analysis we're
3      trying to assess the value of intellectual property in
4      the patent infringement case, a trademark case, a trade
5      secret case, you would want -- you would want to look
6      at the guidelines under the income approach, the market
7      approach, exactly what I did here.
8          So all of the -- my experience certainly with
9      respect to my analysis of -- of royalty rates and
10     the -- and my patent infringement cases is directly
11     relevant to the analysis I did in this particular
12     matter.
13         I'd also add that there is a whole other
14     subset of damages-related work that I've done in
15     general commercial litigation matters, which, again,
16     the damages are -- are damages. So those -- you know,
17     understanding how you go about measuring damages,
18     understanding how you -- you assess the economic harm,
19     all of those are relevant issues regardless of if it's
20     a patent infringement case or if it's a breach of
21     contract case or a trademark case. The heart -- the
22     focus of what my -- a lot of the work I do is on the
23     quantification of damages and economic harm.
24     Q   If you would, in looking at the first page of
25     Exhibit A, that begins with litigation assignments,

Page 248

ROBERT A. HUTCHINS

1
2      would you just walk through each of the patent
3      infringement matters that you have identified and
4      describe briefly whether or not you believe that the
5      work in the matters you have identified here are
6      relevant to your qualifications to render the opinion
7      that you have set forth in Exhibit 90 and that you have
8      testified to here today?
9      A   Sure. So the first bullet point on -- on
10     Exhibit A is discussing a patent infringement dispute
11     in a pharmaceutical industry, and my work involved the
12     calculation of damages in the form of lost profits as
13     well as royalty rate damages; again, using the
14     Georgia-Pacific -- Pacific framework as well as the
15     other -- the same methodology used in this instant --
16     instance.
17         The second bullet point is another patent
18     infringement dispute. That one was assessing not a
19     royalty rate, but more what the potential exposure of
20     the infringement was from a -- a damages perspective
21     and just in general economic harm. And that was more
22     done for purposes of settlement to try and -- to advise
23     the client what the potential damages might be.
24         The third one is -- was also another case in
25     patent infringement dispute in the pharmaceutical

Page 249

ROBERT A. HUTCHINS

1
2      industry, and that was similar to the last one I
3      discussed, which was analyzing the potential damages
4      and settlement options in that particular matter. And
5      again, that required an assessment of the economic cost
6      of one party's actions and how it affected the other
7      party, which is very similar to what we're looking at
8      here.
9          The next bullet point is another patent
10     infringement case in the pharmaceutical industry, and
11     this one also looked at the assessing the risk exposure
12     and possible settlement options due to potential -- or
13     due to -- the alleged infringement of the generic
14     company's actions. And again, it was focused on
15     quantifying the economic harm and the damages -- the
16     potential damages that would have accrued to the patent
17     or in that case.
18         The next dispute or engagement is another
19     patent infringement dispute involving DJ Equipment.
20     And that analysis I did not quantify lost profits, but
21     I did calculate a reasonable royalty rate and royalty
22     damages; again, using the same framework that I -- I
23     used in this instance.
24         The next case is another patent infringement
25     case in the whole lighting industry, and that was

Page 250

ROBERT A. HUTCHINS

1
2  another calculation or analysis that did not require a
3  lost profits calculation but did require a reasonable
4  royalty rate analysis and royalty -- calculation of
5  royalty damages.
6       The next one is another patent infringement
7  dispute in the roofing industry. And again, that one
8  actually did involve the calculation of lost profits as
9  well as a reasonable royalty rate and damages.
10      The next one was another patent infringement
11 dispute in the computer industry, and that -- the
12 damages I analyzed in that matter was -- involved the
13 calculation of a reasonable royalty rate and royalty
14 damages.
15      Q   And again, on the second page of Exhibit A --
16      A   Yes.
17      Q   -- under "Litigation Matters"?
18      A   Yes. The next matter was a patent -- patent
19 infringement -- actually a trademark infringement
20 dispute in the medical device industry. That one did
21 involve a calculation of lost profits, reasonable
22 royalties on the patent infringement case and -- and
23 trademark damages. Actually, I forgot about that one.
24 That was based on a royalty rate. So that was one
25 where we would have gone through and done a similar

Page 251

ROBERT A. HUTCHINS

1
2  Georgia-Pacific factor analysis for determining what
3  the royalty rate was and -- on the trademark damages.
4       The next case is a patent infringement
5  dispute in the printing industry. And that one
6  involved the calculation of -- at least my part -- role
7  in that involved the calculation of convoyed sales, as
8  well as the calculation of a reasonable royalty rate
9  and royalty damages.
10      The next one is a patent infringement dispute
11 in the snow-blow -- snow-blowing equipment industry.
12 That one involved several different types of damage
13 calculations including a lost profits calculation, a
14 reasonable royalty rate calculation, price erosion
15 calculations, and -- and -- I guess different
16 scenarios, different alternatives to those types of
17 calculations.
18      The next matter is another patent
19 infringement case, and that's in the office chair
20 industry. And that one involved the quantification of
21 lost profits and reasonable royalty damages and price
22 erosion damages.
23      The next one is a trade secrets mis- --
24 misappropriation case, and that one involved a
25 calculation of -- of damages surrounding a group -- a

Page 252

ROBERT A. HUTCHINS

1
2  former group of employees 'decision to leave the
3  company and start a competing firm.
4       Next one is another trade secrets matter in
5  the biotechnology industry. That one, I believe, was
6  just simply a -- a quantification analysis of the --
7  the lost profits. I don't believe that one involved a
8  royalty rate analysis.
9       The next one is -- I served as an expert in a
10 legal malpractice dispute. And that one involved
11 allegations that corporate counsel failed to transfer
12 certain intellectual property assets. So my role was
13 to value the assets in that particular matter, you
14 know, using the same type of analysis I did in this
15 instance.
16      The next example engagement is -- was a
17 royalty dispute between a licensor and a licensee.
18 That was also in the biotech industry. And the -- our
19 work in that matter involved analyzing whether or not
20 essentially whether or not the licensee had
21 underreported the royalties that were due the licensor.
22      Q   Okay. You're now on the third page of
23 Exhibit A?
24      A   On the third page, that is a trade secret
25 misappropriation dispute between a -- a drug company

Page 253

ROBERT A. HUTCHINS

1
2  and a competitor. And that one involved the
3  reconstruction of financial data to quantify the costs
4  incurred to develop the trade secrets.
5       The next example is a trademark infringement
6  dispute, and that one involved the quantification of
7  the sales base, the infringing sales base.
8       Next example is a trademark infringement
9  dispute, and that involved analyzing and responding to
10 the trademark owner's value assessment, as well as
11 preparing a separate valuation of the trademark.
12      The final example engagement under the
13 "Litigation" section is another trademark
14 infringement -- infringement dispute. That involved a
15 shopping mall in the United Kingdom, and our task was
16 to -- to analyze the cost incurred by the alleged
17 infringer in rolling out its new brand; so, in other
18 words, how much cost did they spend to essentially
19 develop and market their brand.
20      Q   With regard to the nonlitigation assignments
21 that you have listed in Exhibit A, are there any there
22 that you believe speak to your qualifications to render
23 your opinion in this case?
24      A   Well, I think all of these are just relevant
25 to my general experience in assessing economic value.

Page 254

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2  These are not litigation assignments, so there's no
3  damage calculations here, but certainly they involve an
4  evaluation and valuation of intellectual property
5  assets. Again, using the same type of framework I used
6  in this particular matter.
7     Q   In any of the matters in which you have
8  rendered an opinion as an expert, have you ever been
9  the subject of a Daubert challenge?
10    A   Not to my knowledge.
11    Q   Mr. Shaughnessy asked you about areas --
12 without -- without handing you the Yerman report or the
13 Yerman deposition, areas where you would disagree with
14 his opinions.
15    Do you recall reading Mr. Yerman's report
16 where he quantifies damages at, I believe, 400,000?
17    A   Yes.
18    Q   Okay.
19    A   That's my understanding as to his opinion
20 with regards to damages, his $400,000.
21    Q   Do you agree or disagree with that?
22    A   That's a --
23    MR. SHAUGHNESSY:  Object to the question
24 to the extent it's a supplemental report,
25 supplemental opinion, but I can't prevent you

Page 255

ROBERT A. HUTCHINS

1  from asking it or answering it.
2     THE WITNESS:  That's --
3     Q   (BY MR. LaBRIOLA)  Well, you were asked
4  whether there were areas of his report to which you
5  disagree.  That was not one that I heard you discuss.
6  And so my question is do you agree or disagree with
7  that area of Mr. Yerman's report?
8     A   Well, that -- that would be another -- I
9  can't believe I forgot to mention that one, but that
10 certainly would be another disagreement I have with
11 Mr. Yerman's analysis in regard to the total damages.
12    Q   All right.  As to the big picture of why,
13 please tell us why.
14    MR. SHAUGHNESSY:  Same objection.
15    THE WITNESS:  Well, it's not -- it's not
16 clear how he actually arrives at his damages.
17 It seems he goes through the Georgia-Pacific
18 factor analysis like I did, but there's no
19 discussion of the effect on the damages or
20 the royalty rate or his final number.  He
21 doesn't say if it increases or decreases or
22 how he incorporates that analysis or
23 reconciles that analysis with his final
24 conclusions.

Page 256

ROBERT A. HUTCHINS

1  ROBERT A. HUTCHINS
2     He also, from my read of it, he places
3  almost all the weight or a large portion of
4  the weight on the value of the mark to Xylem
5  Group and discounts the value of the mark to
6  Xylem Inc., which I think is a -- a
7  fundamental disconnect from what would need
8  to be done in the -- in the context of a
9  hypothetical negotiation.  It isn't just the
10 value of the licensor; you need to look at
11 the value of the licensee as well.
12    He also, from my read, seemed to place a
13 lot of weight on the NA agreement, which, as
14 I discuss in my report, I don't think is
15 probative of the value of the mark.
16    Q   (BY MR. SHAUGHNESSY)  Why do you not think
17 it's probative of the value of the mark?
18    A   Well, again, the specifics are in my report,
19 but in -- in general, a couple of examples.  You know,
20 one is it wasn't a license to -- the name of NA or the
21 name of a company.  It was a license to a -- a product
22 line that NA offered in a segment of its business.
23    So it's a very different type of intellectual
24 property or -- or license or property that -- that
25 you're licensing that we'd be talking about in this

Page 257

ROBERT A. HUTCHINS

1  instance.
2     In addition to -- I mean, one of the -- as --
3  as I discuss in the report, the -- it was entered into
4  prior to the announcement, which I think is a very
5  different factual situation than we have in -- in this
6  analysis -- or in my analysis.  And I think those are a
7  couple of the points I -- I addressed in my report.
8     Q   Okay.  During the last break, you had an
9  opportunity to, did you not, to look briefly at
10 Mr. Yerman's data set forth in his report as to the
11 amount of money spent on the Xylem brand?
12    A   Yes, I did.
13    Q   Okay.  And Mr. Shaughnessy had asked you
14 questions about what those numbers were.  Do you have
15 any clarification that you wish to provide in terms of
16 what Mr. Yerman set forth as to what those numbers
17 were?
18    A   Yes, I -- I do, actually.  And as I mentioned
19 during my earlier testimony, I thought the number
20 was -- through October was, based on Mr. Yerman's
21 schedule, was much higher than $3 million.  And I went
22 backed and looked at his schedule, and I think it's --
23 again, I don't have an exact number, but it's closer to
24 $9 million through October 2011.

Page 258

1    ROBERT A. HUTCHINS
2    MR. LaBRIOLA: Thank you. I have no
3    additional questions.
4         FURTHER EXAMINATION
5    BY MR. SHAUGHNESSY:
6    Q   Mr. Hutchins, in your royalty rate analysis,
7    the royalty base that you use is the entirety of Xylem
8    Inc.'s United States revenues, correct?
9    A   Yes.
10   Q   Would you agree with me that from its
11   founding in 2005 through the end of 2011, Xylem Group's
12   aggregate revenues did not equal $45 million?
13   A   What was the time period, I'm sorry?
14   Q   From when Xylem Group started through the end
15   of 2011.
16   A   I -- I don't know that.
17   MR. SHAUGHNESSY: Let's mark this as 92.
18   (WHEREUPON, Exhibit 92 was marked for
19   identification.)
20   THE WITNESS: Thank you.
21   Q   (BY MR. SHAUGHNESSY) Is Exhibit 92 something
22   you've seen before?
23   A   It is not. I -- not this document. I've
24   seen the income statement for fiscal year 2011, but
25   I've not seen this specific document.

Page 259

1    ROBERT A. HUTCHINS
2    Q   Would you agree with me, I'm not asking you
3    to vouch for the accuracy of the underlying facts, just
4    to interpret the document as an accountant, that it
5    shows Xylem Group's aggregate revenues from 2005
6    through fiscal year 2011 as being a little more than
7    $44 million?
8    A   Assuming the totals are added correctly,
9    that -- the number that's reflected as the total sales
10   and in the total column is $44.5 million.
11   Q   Going back to your list of your litigation
12   assignments, in Exhibit A to your report, I think I
13   count that in only three of the matters in which you
14   did a reasonable royalty analysis in a patent case were
15   you the expert; in other words, the -- the lead
16   professional on the engagement; is that correct?
17   And for the ones that I count are on the
18   first page of litigation assignments; the bottom bullet
19   point, the second to bottom, and the fourth to bottom
20   bullet point.
21   A   That looks correct, yes.
22   Q   And in all the other cases, you were
23   supporting another professional, either someone from
24   Navigant or someone externally; is that correct?
25   A   Yes.

Page 260

1    ROBERT A. HUTCHINS
2    Q   And in those cases, were you, you know,
3    essentially the -- the number two person on the
4    engagement?
5    A   I was not the testifying expert, but I
6    certainly would -- did the bulk of the analysis and
7    lead the team that did the bulk of the analysis.
8    Q   Did you make the final call on what to
9    include or exclude from the analysis?
10   A   The -- the -- the final call would be the
11   expert's decision, but done in consultation with
12   myself.
13   Q   With reference to the rebranding costs that
14   ITT incurred in connection with the Xylem rebranding in
15   October 2011, do you have any information on when in
16   the month they were incurred?
17   A   Not -- that schedule doesn't -- the document
18   you're looking at does not provide that level of
19   detail.
20   Q   And is it your testimony, just to be clear,
21   that the hypothetical negotiation would have occurred
22   on October 30th, 2011?
23   A   I don't -- I don't cite a specific date, but
24   I -- my testimony is it would have occurred sometime
25   before -- shortly before the spin-off.

Page 261

1    ROBERT A. HUTCHINS
2    Q   Well, is October 1st shortly before the
3    spin-off?
4    A   I would not characterize it that way.
5    Q   How -- how far back does shortly before the
6    spin-off go?
7    A   I would say maybe a week.
8    MR. SHAUGHNESSY: That's all I have.
9    Thank you, Mr. Hutchins.
10   THE WITNESS: Thank you.
11   MR. LaBRIOLA: Why don't we go off the
12   record for just a minute.
13   THE VIDEOGRAPHER: Okay. Going off the
14   record the time 6:17.
15   (Whereupon, there was a brief recess.)
16   THE VIDEOGRAPHER: Back on the record.
17   The time is 6:18.
18   FURTHER EXAMINATION
19   BY MR. LaBRIOLA:
20   Q   Now, Mr. Hutchins, if you would, would you
21   take Exhibit 92, please, which is the ordinary income
22   expenses from 2001 through 2011.
23   Is this information relevant, in your
24   opinion, to the analysis that you've done in Exhibit 90
25   and your testimony today?

Page 262

ROBERT A. HUTCHINS

1     A   No, it's not. I mean, in fact, we discussed
2   this type of information extensively earlier during the
3   day with respect to Xylem's profitability and solvency,
4   so I -- I would refer back to that testimony as to
5   really why this information is -- is not relevant to
6   the analysis that I did in this particular matter.
7     Q   And was the information in Exhibit 92 -- this
8   type of information a -- well, let me ask you this:
9   Did you ever request this type of information from
10  Xylem Group?
11    A   I -- I did request financial statements, and
12  their financial statements were provided at least
13  for -- I believe it was 2011 for 2012 projected 2012,
14  but --
15    Q   But --
16    A   -- not -- I didn't request any going back
17  this far in time.
18    Q   And -- and why would you not want to look at
19  information going back before 2011?
20    A   I mean -- I guess there was no reason -- no
21  harm in looking at it, I would say, but it just isn't
22  relevant for the purposes of determining what the
23  royalty rate would be in this matter in October of
24  2011.

Page 263

ROBERT A. HUTCHINS

1     Q   All right. Help me understand why.
2     A   Well, Xylem Group's sales in 2005, I -- I
3   don't see how they have any bearing on what the -- the
4   facts and circumstances as they existed in October
5   2011, the -- the parties' bargaining position at the
6   time of the negotiation, the -- the analysis of the
7   implied royalty rate analysis I did with respect to the
8   acquisitions done by ITT and WCO. It doesn't have any
9   relevance to -- to my analysis of the
10  Georgia-Pacific -- Pacific factors. To the extent it
11  does, it would be de minimis.
12        So there's -- for those reasons, and I'm sure
13  there's more, financial data going back to 2005 is --
14  is not probative of what the parties would have
15  negotiated in October 2011.
16        MR. LaBRIOLA: Thank you. I have no
17  additional questions.
18        FURTHER EXAMINATION
19  BY MR. SHAUGHNESSY:
20    Q   You don't think Xylem Group's historical
21  revenues are relevant to Georgia-Pacific factor 8
22  concerning the established profitability of the product
23  made under the trademark, its commercial success, and
24  its current popularity?

Page 264

ROBERT A. HUTCHINS

1     A   Well, that's why I said there's -- the -- the
2   relevance of this data going back that far would be --
3   to the extent it is relevant, I was thinking of that
4   factor specifically, it's -- it's de minimis, the data
5   in 2005 is -- is de minimis.
6     Q   Well, what about 2006?
7     A   I would still think it would be de minimis.
8     Q   You don't think that goes to the commercial
9   success of products sold under the Xylem brand?
10    A   Well, I think what's more relevant is the
11  2011 and 2012 data.
12    Q   Okay. Well, you didn't see the 2011 data,
13  did you?
14    A   I did.
15    Q   You saw it in a different form?
16    A   Yeah, I cite it in my report.
17    Q   And you don't think the -- whether that
18  represented growth or lack of growth over 2010 was
19  relevant?
20    A   Again, if it had -- whatever relevance it
21  did, it would be de minimis.
22    Q   Well, you -- did you make the judgment while
23  you were doing your analysis that it was de minimis or
24  you're making that judgment now?

Page 265

ROBERT A. HUTCHINS

1     A   I would say I -- I made that analysis -- that
2   judgment at the time I did my analysis.
3     Q   What -- what do you conclude from Exhibit 92
4   about the commercial success and current popularity of
5   products sold under the Xylem brand?
6     A   I would say I -- I reach the same conclusion
7   that is discussed in factor 8.
8     Q   Well, you don't mention historical revenues
9   in your discussion of factor 8, do you?
10    A   I do.
11    Q   Of Xylem Group?
12    A   Yes.
13    Q   Where?
14    A   First sentence.
15    Q   That's not referring to historical revenues,
16  is it?
17    A   2011, I guess, would be historical revenues.
18    Q   Well, you refer to gross profit margin,
19  correct? It has nothing to do with historical
20  revenues?
21    A   That's right, that's not -- that's -- that's
22  right. I know I -- I referenced the revenues in the
23  overview section in 2011.
24    Q   What do you conclude about the commercial

Page 266

ROBERT A. HUTCHINS

1    ROBERT A. HUTCHINS
2    success and current popularity of the Xylem brand from
3    Exhibit 92?
4        A   It doesn't change my opinion that overall
5    this -- the factor -- this -- the overall assessment of
6    this factor tend to increase the hypothetically
7    negotiated royalty rate. I mean, there is -- as
8    evidenced by the sales, there has been -- the
9    product -- the brand has experienced commercial
10   success.
11       Q   But you -- you call a total of $44 million in
12   sales over seven years commercial success?
13           MR. LaBRIOLA: Objection as to form.
14           THE WITNESS: Certainly.
15       Q   (BY MR. SHAUGHNESSY) What -- what are you
16   comparing it to?
17       A   Starting -- it's a startup company, going
18   through a very difficult economic climate, and it's
19   still is, A, in business and, B, has been able to
20   generate significant sales levels --
21       Q   And you compare --
22       A   -- for a -- for a startup company.
23       Q   And you compare Xylem Inc. to -- excuse me,
24   Xylem Group to comparable companies in the same
25   business?

Page 267

1    ROBERT A. HUTCHINS
2        A   No.
3            MR. SHAUGHNESSY: Okay. That's all I
4    have. Thank you.
5            THE WITNESS: Thank you.
6            MR. LaBRIOLA: I have a few additional
7    questions.
8            FURTHER EXAMINATION
9    BY MR. LaBRIOLA:
10       Q   If you would just add together under the
11   Xylem brand the 2005 and 2006 fiscal years. If my math
12   is correct, those two numbers come to less than $6,000
13   for way back when, correct?
14           MR. SHAUGHNESSY: Object, leading.
15           MR. LaBRIOLA: All right. Let me --
16   is.
17       Q   (BY MR. LaBRIOLA) Give -- give me the rough
18   sum of Xylem brand for 2005 and 2006.
19       A   2005, the sales are $3,810; 2006, they were
20   $2,378, so they're a little bit more than $6,000 in
21   total sales in those two years.
22       Q   All right. Now, carry that across and look
23   at fiscal year 2011, under the Xylem brand, what are
24   the sales for 2011?
25       A   $4.3 million, so they've -- they've grown

Page 268

1    ROBERT A. HUTCHINS
2    significantly since 2006.
3        Q   All right. What -- just roughly, what is the
4    rate of growth from 2005 of $3,810 to 4.3 million --
5    well, let's not leave out the change, 4 --
6    $4,324,470.87 in 2011?
7        A   I -- I have to do the best I can to calculate
8    that rate of growth in my head. That's a substantial
9    rate of growth. I mean, well over, you know, a
10   thousand percent, I would expect.
11       Q   Does that indicate to you one way or the
12   other whether or not that shows from 2005 to 2011 that
13   the Xylem brand has been a commercial success?
14       A   Yes, it does.
15           MR. LaBRIOLA: No further questions.
16           MR. SHAUGHNESSY: Nothing. Thanks.
17           THE VIDEOGRAPHER: Marks the end of
18   video 4. Going off the record. The time is
19   6:27.
20           (Deposition concluded at 6:27 p.m.)
21                  --oOo--
22
23
24
25

Page 269

1    ROBERT A. HUTCHINS
2            C E R T I F I C A T E
3    STATE OF GEORGIA:
4    COUNTY OF FULTON:
5
6        I, SHARON A. GABRIELLI, HEREBY CERTIFY that
7    the foregoing deposition was taken down by me in
8    stenotype, and the questions and answers thereto were
9    transcribed by means of computer-aided transcription,
10   and that the foregoing represents a true and correct
11   transcript of the testimony given by said witness.
12       I FURTHER CERTIFY that I am not kin or
13   counsel to the parties in the case; am not in the
14   regular employ of counsel for any of said parties; nor
15   am I in any way financially interested in the result of
16   said case.
17       IN WITNESS WHEREOF, I have hereunto set my
18   hand this 6th day of September, 2012
19
20
21   _____
22           SHARON A. GABRIELLI, RPR
23           CCR-B-2002
24
25