## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **ITT CORPORATION and XYLEM, INC.,** | |
| **Plaintiffs/Counterclaim Defendants,** | |
| **v.** | **1:11-cv-03669-WSD** |
| **XYLEM GROUP, LLC,** | |
| **Defendant/Counterclaim Plaintiff.** | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on (1) Defendant's Motion for Partial Summary Judgment [78], (2) Defendant's Motion to Exclude Testimony of Michael B. Mazis, Ph.D. [76], (3) Plaintiffs' Motion for Partial Summary Judgment as to Damages [70], (4) Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69], (5) Defendant's Motion to Exclude Testimony of Robert N. Yerman [75] and (6) Defendant's Motion to Exclude Certain Testimony of Philip G. Hampton, II [77].

## I.     BACKGROUND

### A.     The parties

Plaintiff ITT Corp. ("ITT") is a "global multi-industry high-technology engineering and manufacturing organization with operations in more than sixty countries" which provides products and services in the "global defense and security; water technology; and highly engineered industrial products" markets. [1, ¶ 2].

Plaintiff Xylem, Inc. is an ITT subsidiary that was created and spun off in 2011 to own and operate ITT's water-technology business.  [Id. ¶ 3; 184-1, ¶ 4]. Xylem, Inc. is an S&P 500 company with annual revenue of approximately $3.8 billion, over 60% of which derives from operations outside the United States. [171, ¶ 5; 184-1, ¶ 5].  Xylem, Inc. sells to wholesale plumbing distributors and retail chain stores including Ferguson and Home Depot.  [78-2, ¶¶ 130-36; 173, ¶¶ 130-36].  As part of its rebranding and marketing process, Xylem, Inc. spent $15 million in the third quarter of 2011 and the first quarter of 2012.  [230-3, at 33; 230-1, at 13].

Defendant Xylem Group, LLC, ("XG" or "Defendant") is a Georgia limited liability company in the business of designing and selling bathroom furniture and fixtures.  [13, ¶ 4].  Its products include vanities, sinks, faucets and fittings.  XG

has fourteen (14) employees and had sales revenue of $8,075,836.53 in 2011.  XG pays to be listed in plumbing trade publications, attends tradeshows and spent roughly $46,000 on marketing and public relations in 2011.  [78-2, ¶¶ 1-3, 18-20, 22; 173, ¶¶ 1-3, 18-20, 22].  XG's total equity was valued at approximately $3 million in 2009.  (June Weinstein Dep., 171:22-172:16).

XG sells to wholesale plumbing distributors, including 39 distributors who also purchase from Xylem, Inc. (the "Overlapping Customers").  In particular, XG sells to Ferguson, which operates showrooms in common buildings with separate sections for commercial and residential products and customers.[1]  [78-2, ¶¶ 130-35; 173, ¶¶ 130-35].  From November 1, 2011, through July 31, 2012, XG's sales to the Overlapping Customers totaled $1,454,456.00, approximately 24.01% of XG's 2011 revenue on an annualized basis.  [78-2, ¶ 136; 173, ¶ 136] [171, ¶¶ 155-56; 184-1, ¶¶ 155-56].   Home Depot and Ferguson accounted for approximately 76% of XG's sales to the Overlapping Customers.  [171, ¶ 152; 184-1, ¶ 152].

Sales to the Overlapping Customers constitute only a small portion of Xylem, Inc.'s sales in the United States.  From November 1, 2011, through July 31, 2012, Xylem, Inc.'s sales to the Overlapping Customers totaled $8,280,116.32,

---

[1] XG argues any customer can enter either of these sections and thus there is consumer overlap in XG's and Xylem, Inc.'s products.  [78-2, ¶¶ 133-34; 78-1, at 10-11].

approximately 1.4% of its United States sales for that period.  [78-2, ¶ 137; 173, ¶ 137] [171, ¶ 170; 184-1, ¶ 170].

XG first began using the name "Xylem" in interstate commerce in 2005.  On December 12, 2006, XG obtained Registration No. 3,183,362 from the United States Patent and Trademark Office for the XYLEM mark.  In November 2011, XG obtained four registrations for the XYLEM mark in the State of Georgia. [78-2, ¶¶ 4-10].  Plaintiffs do not dispute the validity of XG's trademark registrations.  [173, ¶¶ 4-10].

B.    The Xylem dispute

On January 12, 2011, ITT announced its intention to separate itself into three separate publicly-traded companies: a manufacturing company, a water-technology company, and a defense and security company.  [78-2, ¶ 23; 173, ¶ 23].

In March 2011, ITT hired Lippincott, a brand consulting company, to consult with ITT regarding the naming of its water-technology company. Lippincott recommended seventeen possible trade names and trademarks.  ITT's executives narrowed the proposed names to seven, including "XYLEM."  ITT had Baker & McKenzie, an international law firm which served as ITT's outside trademark counsel, conduct a worldwide trademark search for each of the seven

marks it intended to consider to identify any legal issues associated with any of the seven proposed names.  [78-2, ¶¶ 25, 27-31; 173, ¶¶ 25, 27-31].

On May 26, 2011, Baker & McKenzie presented ITT's executives with its trademark search results and provided its opinion regarding the registrability of each of the seven marks in the countries where ITT's water-technology company expected to do business.  (Hampton Report ¶ 16; Gardner Report at 3-4). Baker & McKenzie reported that there may be "high difficulty" in obtaining trademark protections for the "Xylem" mark in the United States because the "XYLEM" mark was owned by XG for use in the United States, and that the mark was for a water-technology business similar to ITT's business.  (Hampton Report ¶¶ 18-19; Gardner Report at 3-4).

A few days later, on June 2, 2011, Lippincott presented to ITT's executives a "summary of full legal, linguistic and URL evaluations" using information from the Baker & McKenzie report along with information from other sources (the "June 2nd Lippincott Report").  (Hampton Report ¶ 20).

On July 14, 2011, after discussions with ITT's executives and its counsel, and after ITT's review of the June 2nd Lippincott Report, ITT announced its new water-technology company would be named Xylem, Inc.  (Hampton Report ¶ 21); [78-2, ¶ 100; 173, ¶ 100].

5

On July 20, 2011, XG sent a cease-and-desist letter to ITT alleging that its use of "Xylem" would infringe on XG's registered XYLEM mark.  XG also objected to ITT's use of the new Xylem mark for its new water-technology company.  (Gardner Report at 5); [78-2, ¶ 106; 173, ¶ 106].

On October 26, 2011, Plaintiffs filed their Complaint [1] seeking a declaratory judgment that their use of the Xylem name and mark does not infringe on XG's registrations, or otherwise violate XG's rights in the Xylem name and mark.  [1, at 8].

On December 12, 2011, XG filed its Answer and Counterclaim [13].  In its counterclaim, XG alleges that ITT and Xylem, Inc. engaged in tradename and trademark infringement and unfair competition and had diluted XG's tradename and trademarks.  XG's claims were asserted under the Lanham Act, Georgia state law and New York state law.  [13, ¶¶ 73-87].  On September 23, 2012, XG filed its Amended Counterclaim [67].  XG removed its dilution claim and New York state-law claims in its Amended Counterclaim.  XG, in its Amended Counterclaim, seeks injunctive relief, damages, attorney's fees and costs, prejudgment interest and punitive damages.  [67, at 13-15].

On October 1, 2012, XG filed its Motion for Partial Summary Judgment on the issue of infringement [78].  In support of its motion, XG presents evidence that

Plaintiffs' use of the Xylem name and mark has infringed the Xylem registrations. XG alleged, among other evidence, that Plaintiffs' use of "Xylem" caused actual customer confusion in the United States.  For example, between November 2011 and September 2012, XG received (i) at least 58 checks intended for Xylem, Inc., (ii) at least 38 phone calls regarding Xylem, Inc.'s products, and (iii) 23 emails and faxes intended for Xylem, Inc.  In the same period, Xylem, Inc. received at least 8 checks intended for XG.  [78-2, ¶¶ 138-164].  Plaintiffs do not dispute that these instances of actual confusion occurred, but contend they are *de minimis*.  [173, ¶¶ 138-164; 172, at 11-14].

Plaintiffs also present survey evidence from Mazis purporting to show there was little likelihood of customer confusion regarding its use of the Xylem name and mark.  [170-8].  XG moves to exclude Mazis's expert opinion on the ground that it is not reliable, including because the surveyed population was not representative of the relevant market.  [76, at 1-2; 177, at 6-8].

XG also seeks payment of a reasonable royalty, and in doing so, presents the expert opinion of Robert A. Hutchins, CPA.  Hutchins opines that a reasonable royalty based on a hypothetical licensing agreement between XG and Plaintiffs would have resulted in a minimum royalty amount to XG of $45 million.  [230-3, at 34].  Plaintiffs offered the rebutting expert opinion of Robert N. Yerman.

Yerman opines that a hypothetical licensing agreement would have resulted in a royalty worth no more than $3.3 million plus a control premium, which he claims is equivalent to the approximate value of XG's total equity.  [218-1, at 14]  The parties moved to exclude each other's expert opinions on damages [69] [75].

In a separate expert opinion supporting Plaintiffs' valuation of a reasonable royalty between XG and the Plaintiffs, Philip G. Hampton, II opines that the value of a licensing agreement between XG and Plaintiffs "would have been significantly less than $250,000" because ITT had paid Novedades Agricolas, a Spanish company, only $250,000 to avoid a conflict with what Hampton considers to be a "stronger" mark than the mark at issue in this litigation.  [77-2, at 10-11].  XG moves to exclude that portion of Hampton's expert opinion [77].

On October 1, 2012, Plaintiffs filed their Motion for Partial Summary Judgment against XG on the issue of damages [70].  Plaintiffs allege that "XG cannot recover damages for lost sales," that they "cannot recover damages measured by a reasonable royalty", and that "there is no legal basis for punitive damages."  [70-1 at 5-16].  XG opposes the motion and estimates that its lost sales in November 2011 and December 2011 were at least $93,790.85.  [145-2, ¶¶ 1-2].

## II.    DISCUSSION

### A.    Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id. at 1282.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Xylem Group, LLC's Motion for Partial Summary Judgment on Liability for Infringement [78]

XG requests the Court to find as a matter of law that Plaintiffs have (1) infringed Xylem Group's trademark pursuant to 15 U.S.C. § 1114 and O.C.G.A. § 10-1-450, (2) engaged in unfair competition pursuant to 15 U.S.C. § 1125 and O.C.G.A. § 23-2-55, and (3) violated the Georgia Deceptive Trade Practices Act pursuant to O.C.G.A. § 10-1-372(a)(2)-(3). Xylem Group also seeks an injunction preventing Xylem, Inc.'s further use of the Xylem mark within the United States. [78, at 2].

Plaintiffs oppose the motion, arguing that "there are many genuine issues of material fact as to liability." [172, at 3]. First, Plaintiffs argue that "XG's trade name and mark are weak," entitling XG to "only a narrow scope of protection."[2] [Id. at 4-6]. Second, Plaintiffs argue that XG's and Xylem, Inc.'s marks are "distinguishable." [Id. at 8]. Third, Plaintiffs argue that XG's and Xylem, Inc.'s products are "significantly different" while their consumer overlap is "insignificant." [Id. at 8, 11]. Fourth, Plaintiffs claim that the confusion between XG's and Xylem, Inc.'s use of the Xylem name and mark is *de minimis* and

---

[2] To the extent Plaintiffs argue that consumer confusion is over the Xylem trade name rather than the XYLEM trademark, the Court notes that both are protected under the Lanham Act, albeit under different sections. 15 U.S.C. § 1114 covers infringement of a federally registered trademark, while 15 U.S.C. § 1125(a) more broadly covers "any word, term, name, symbol, or device" that "is likely to cause confusion." See Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1186 (11th Cir. 1985). Because XG asserts claims under both sections of the Lanham Act, the Court will address them separately. The Court notes further that a trade name may infringe on a registered trademark if the two are similar enough to cause consumer confusion. Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 835 (11th Cir. 1983); Citibank, N.A. v. Citibanc Group, Inc., 724 F.2d 1540, 1542 (11th Cir. 1984). Plaintiffs' reliance on Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1163 (11th Cir. 1982) for the proposition that "[t]rade names . . . are not protected by the Lanham Act" is a legal error. See Am. Television & Commc'ns v. American Commc'ns & Television, Inc., 810 F.2d 1546, 1548 n.1 (11th Cir. 1987) (noting but not overturning Safeway's legal error on whether the Lanham Act protects trade names). The analysis of "likelihood of confusion" is the same under both sections of the Lanham Act. Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1345 (11th Cir. 2012); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001).

insufficient to support that Plaintiffs engaged in tradename or trademark

infringement.  [Id. at 1, 12, 19].

> 1. *Trademark infringement under the Lanham Act, 15 U.S.C.*
>    *§ 1114*

To prove infringement under 15 U.S.C. §1114 of the Lanham Act,[3] the

holder of a registered trademark must show (1) that the infringer used the mark in

---

[3] Section 1114 provides, in pertinent part:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1).

commerce, without the trademark holder's consent, and (2) that the use was likely to cause confusion.  Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Keep, Dodge, LLC, 605 F.3d 931, 934 (11th Cir. 2010).  The parties do not dispute that XG held a registered trademark in the United States and do not dispute that Plaintiffs used the Xylem name and mark in commerce despite having received a cease-and-desist letter from XG.  [173, ¶¶ 33-58, 86-95, 106].  Once a mark has been registered for five years with the Patent & Trademark Office and "become 'incontestable,' its validity is presumed . . . .  [I]ts validity cannot [then] be challenged on the grounds [sic] that it is merely descriptive."  Dieter v. B&H Indus., 880 F.2d 322, 328 (11th Cir. 1989); Frehling Enters. v. Int'l Select Grp., Inc., 192 F.3d 1330, 1336 (11th Cir. 1999) (citing Wilhelm Pudenz, GmbH v. Littlefuse, Inc., 177 F.3d 1204, 1208 (11th Cir.1999).  Whether Plaintiffs' use of the Xylem name and mark infringes XG's trademark depends on whether the use is likely to cause confusion.

Seven factors apply in this circuit to determine whether customer confusion is likely to occur under the Lanham Act.[4]  The factors are (1) type of mark, (2)

---

[4] The Court is aware that various circuits have adopted different factors for the likelihood-of-confusion analysis.  See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:19 (4th ed. 2013).  The seven factors discussed below are the well-established factors in the Eleventh Circuit.

similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media, (6) defendant's intent, and (7) actual confusion.  Of the seven factors, the type of mark and the evidence of actual confusion are the most important.  Caliber, 605 F.3d at 935 (citing Frehling, 192 F.3d 1330 at 1335); Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1186 (11th Cir. 1985); Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685 F. Supp. 2d 1360, 1377 (N.D. Ga. 2010). "[N]o single factor is dispositive, but greater weight is given to the type of mark and evidence of actual confusion."  Dieter, 880 F.2d at 326.

"The likelihood of confusion is a question of fact."  Wielding Services, Inc. v. Forman, 509 F.3d 1351, 1361 (11th Cir. 2007).  To award summary judgment in a case where these factors are required to be weighed, the Court must consider the evidence in a light most favorable to the non-moving party and must conclude that no reasonable jury could reach a contrary result.  See Caliber, 605 F.3d at 935. Determining whether a likelihood of confusion exists "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'"  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 649 (11th Cir.2007).  "[T]he district court must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate

fact decision." Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 840
n.17 (11th Cir. 1983).  Even in a case where the "type of mark and evidence of
actual confusion are the most weighty of considerations," and the seven
likelihood-of-confusion factors "typically inform a court's determination of the
likelihood of confusion," a court must still "take into account the unique facts of
each case." Custom, 508 F.3d at 650 (internal quotation marks omitted) (citing
Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc., 132 F. App'x 348, 350 (11th
Cir. 2005)).  That is because "each case presents its own complex set of
circumstances and not all of these factors may be particularly helpful in any given
case . . . .  The ultimate question remains whether relevant consumers are likely to
believe that the products or services offered by the parties are affiliated in some
way." Id. at 650 (quoting Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.,
931 F.2d 1100, 1107 (6th Cir.1991)) (internal quotation marks omitted).

    With this analytical framework, the Court evaluates the seven
likelihood-of-confusion factors.

                    i.    Type of mark

    "There are four recognized types of mark, ranging from weakest to
strongest: generic, descriptive, suggestive and arbitrary.  The stronger the mark, the
greater the scope of protection accorded it." Caliber, 605 F.3d at 938 (quoting

Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1240 (11th Cir. 2008)).  "An

arbitrary or fanciful mark bears no logical relationship to the product or service it

is used to represent, [e.g., Kodak].  A suggestive mark refers to some characteristic

of the goods, but requires a leap of the imagination to get from the mark to the

product, [e.g., Penguin Refrigerators].  A descriptive mark identifies a

characteristic or quality of the service or product, [e.g., Vision Center]."  Id. at 939

(alteration in original) (quoting Welding Servs. v. Forman, 509 F.3d 1351, 1357-58

(11th Cir. 2007)).  A generic name refers to "a particular genus or class of which

an individual article or service is but a member."  It is the "term by which the

product or service itself is commonly known" and "depicts the product or service

as a whole, rather than any particular feature, quality, or characteristic of the

whole."  Welding, 509 F.3d at 1358 (citations omitted) (internal quotation marks

omitted).  Whether a name is generic depends on the use of the term, not the term

itself.  "A word may be generic of some things and not of others: 'ivory' is generic

of elephant tusks but arbitrary as applied to soap."  Id. at 1358 (quoting Soweco,

Inc. v. Shell Oil Co., 617 F.2d 1178, 1183 (5th Cir.1980).  The "generic use of a

word may not be registered as a trademark."  Id. (citing  Park 'N Fly, Inc. v. Dollar

Park & Fly, Inc., 469 U.S. 189, 194 (1985)).

     Important in gauging the strength of a mark is "the degree to which third

parties make use of the mark."  The less third parties use the mark, "the stronger it is, and the more protection it deserves."  <u>Frehling</u>, 192 F.3d at 1336 (citing <u>John H. Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 974-75 (11th Cir.1983)).

XG argues that its registered XYLEM mark is "at least suggestive, if not arbitrary" because the mark has become incontestable, and because "Xylem is a real word referring to a type of tissue in plants that moves water from the roots to the leaves."  XG acknowledges that its products—vanities, sinks and faucets—"are part of the process of moving water from its source to the end user," but argues that the characteristics of the products "require an effort of the imagination by the consumer to be understood," supporting that it is at least suggestive.  [78-1, at 4-5].

Plaintiffs generally argue that XG's trademark is "weak."  Plaintiffs acknowledge that XG's XYLEM mark "is the subject of a now-incontestable registration" and that registration "creates a presumption of strength."  Plaintiffs argue, however, that XG's trademark enjoys only "conceptual strength" rather than "commercial strength."  Plaintiffs cite third-party use by Kohler Company, which "has been using XYLEM for three years as a trademark for floor tile," as support for their argument that XG's XYLEM mark's commercial strength is "abysmal at best."  [172, at 5-6].  Plaintiffs did not respond to XG's argument that its XYLEM mark is "at least suggestive" and requires "an effort of the imagination by the

consumer" to connect the products to the trademark.[5]

The Court finds that the XYLEM mark is at least suggestive, because it takes a leap of the imagination to connect the plant tissue "xylem" to XG's products, even though the two share a water-transport function.[6]  In evaluating this factor, the Court determines that the type of the mark weighs significantly in favor of XG.

### ii.    Similarity of mark

Similarity of mark is determined by "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed."  Caliber, 605 F.3d at 939 (quoting E. Remy Martin & Co. v. Shaw-Ross Intl Imps., Inc., 756 F.2d 1525, 1531 (11th Cir. 1985)).

XG argues that the words of the marks, the sound, and the "dominant focus" of the marks are "identical."  [78-1, at 5-6].  Plaintiffs do not contest the similarity of the words contained in the marks but argue that "the graphic rendering[s]" of the

---

[5] Plaintiffs do not argue the mark is generic or descriptive.

[6] That "Xylem" has been used by third parties must be weighed against the non-descriptiveness of the mark.  John H. Harland Co., 711 F.2d at 975 (explaining that both the descriptiveness of the mark and the extent of third-party use "should be considered when analyzing the strength of a particular trademark").  The third-party use in this case does not erode the strength of the mark as found by the Court.

marks are "distinguishable."  They argue that Xylem, Inc.'s mark always appears in conjunction with its product-line names, e.g., Goulds or Bell & Gossett, and that the mark is only used by itself when in reference to Xylem, Inc. as a corporate entity.  [171, ¶¶ 184-85; 172, at 7-8].

The Court finds, after considering their appearance, sound and the totality of impression, that the marks used by Xylem, Inc. and XG are substantially similar. Both marks prominently contain the word "Xylem."  Even though the smaller, captioned words underneath "Xylem" are different in the two marks, the overall impression of the two is so similar that a customer not familiar with the distinction would likely attribute both marks to the same source.  See [78-2, ¶ 11; 171, ¶¶ 184, 193].  The use of product-line names in conjunction with "Xylem" in Xylem, Inc.'s mark does not discredit the overall impression that both are Xylem products.  This factor also weighs in favor of XG.

iii.    Similarity of products

Whether there is a similarity of products requires the "determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties."  Caliber, 605 F.3d at 939-40 (quoting Frehling, 192 F.3d at 1338).  In our circuit, the test is "not whether the goods could be distinguished,

19

as they could be by any [consumer], but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods."  Frehling, 192 F.3d at 1338.

XG argues that "it is reasonable for a consumer to believe that some of Xylem, Inc.'s goods would be produced by a manufacturer of vanities, sinks, faucets, and fittings" because Xylem, Inc. produces "circulator pumps," "valves" and "products relating to the treatment of water and wastewater."  [78-1, at 7].

Plaintiffs argue that the products are not similar because Xylem, Inc. produces "highly engineered" products whereas XG produces "bathroom vanities, sinks, faucets, and fittings."  [172, at 8-9].

The Court finds that the distinction between "highly engineered" and bathroom products is a distinction of the products.  The proper test is whether consumers could attribute the products to a single source.  Frehling, 192 F.3d at 1338.  The two companies make some subset of products that are functionally similar.  Even though Xylem, Inc. specializes in highly engineered and industrial products and XG specializes in home bathroom products, the functional similarity of some of the products could mislead consumers into attributing both types of these subset products to a single source.  These are, however, differences in a large portion of the products manufactured by XG and Xylem, Inc., making it unclear in

20

which party's favor the similarity-of-products factor weighs.

iv.     Similarity of retail outlets and customers

The similarity of the parties' retail outlets and customers "takes into consideration where, how, and to whom the parties' products are sold." Caliber, 605 F.3d at 940 (quoting Frehling, 756 F.2d at 1339).  XG argues that both XG and Xylem, Inc. "sell to at least 39 of the same wholesale plumbing distributors," and the volume of sales to the Overlapping Customers is significant.  [78-1, at 10]. Xylem, Inc. argues that the extent of the overlap is "insignificant" because "the majority of the overlap involves just two large, nationwide entities."  [172, 13].

The Court finds that there is overlap to some degree, of retail outlets and regular retail customers.  Plaintiffs concede the existence of sales overlap but argue that it is not significant.  This factor, like the previous one, cannot conclusively be found to weigh in favor of any of the parties.

v.     Similarity of advertising media

The "similarity of advertising" factor "looks to each party's method of advertising." Caliber, 605 F.3d at 940.  XG argues that "both parties have appeared in [certain] trade journals . . . [and] other magazines, participate[d] in trade shows, [maintained] a web presence, and distribute[d] small promotional products."  [78-1, at 11-12].  Plaintiffs argue that "XG's president and majority

owner [has] admit[ted]" that "XG does not advertise and never has" at a deposition.  They argue further that XG began advertising "at nominal cost" to "bolster [XG]'s position in this litigation."  [172, at 14-15].

The record shows that XG spent roughly $46,000 on marketing and public relations in 2011, and that Plaintiffs spent $15 million in two quarters in rebranding and marketing.  The evidence is consistent with both parties' contentions that there is overlap in advertising, even if small.  See [171, ¶¶ 22, 129-39; 184-1, ¶¶ 22, 129-39].  The Court concludes that this factor weighs slightly in favor of XG.

### vi.    Intent of the allegedly infringing party

The intent factor looks to whether the allegedly infringing party "adopted a plaintiff's mark with the intention of deriving a benefit from the [trademark holder's] business reputation."  Caliber, 605 F.3d at 940.  While the record shows that Plaintiffs knew of XG's trademark and the possibility of infringement prior to their decision to adopt and use the new Xylem mark, the Court cannot find that Plaintiffs intended, to any material degree, to derive a benefit from XG's business reputation.  From the third quarter of 2011 to the first quarter of 2012, Plaintiffs spent $15 million in rebranding and marketing to promote Xylem, Inc.'s brand after it was established as a separate subsidiary.  [230-3, at 33; 230-1, at 13].

These marketing expenses exceed, and are nearly double, XG's entire U.S. sales revenue in 2011.  [78-2, ¶ 3; 173, ¶ 3].  The Court finds that Plaintiffs intended, albeit to some slight degree, to benefit from XG's reputation and goodwill by confusing XG customers and inducing them to buy Xylem, Inc.'s products.  The Court concludes that this factor slightly favors XG.

vii.    Actual confusion

Actual consumer confusion is "the best evidence" of likelihood of confusion. "All potential consumers of the relevant product or service, including middlemen, can inform the inquiry, and the ultimate consumers deserve special attention." Caliber, 605 F.3d at 936-37 (citations omitted).  The rule courts usually apply is that infringement occurs when "there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent' buyers." John H. Harland Co., 711 F.2d at 979 n.22 (quoting 2 McCarthy, supra, § 23:27, at 87-88 (1973)). "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, while confusion of actual customers of a business is worthy of substantial weight."  Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1167 (11th Cir. 1982) (citations omitted). "There is no absolute scale as to how many instances of actual confusion establish the existence of [actual confusion]."  Caliber, 605 F.3d at 937 (internal quotation

23

marks omitted) (quoting AmBrit, Inc. v. Kratt, Inc., 812 F.2d 1531, 1543 (11th Cir. 1986). "While the [Eleventh Circuit has] no hard-and-fast rule, under [its] standard the quantum of evidence needed to show actual confusion is relatively small." Id. at 937-38 (internal quotation marks omitted) (quoting Jellibeans, 716 F.2d at 845); World Carpets, Inc. v. Dick Littrell's New World Carpet, 438 F.2d 482, 489 (5th Cir. 1971); see Safeway, 675 F.2d at 1167 (finding that two instances of actual confusion were sufficient evidence of actual confusion).

The Court finds that a level of actual confusion of customers resulted from Xylem, Inc.'s adoption of the Xylem name and its use of its Xylem mark. XG documented at least 127 instances in which actual confusion occurred: XG received (i) 58 checks intended for Xylem, Inc., (ii) 38 phone calls regarding Xylem, Inc.'s products, and (iii) 23 emails and faxes intended for Xylem; Xylem, Inc., on the other hand, received 8 checks intended for XG. [78-2, ¶¶ 138-164]. Plaintiffs do not dispute that these instances of confusion occurred. [173, ¶¶ 138-164]. Plaintiffs argue, instead, that the actual confusion is *de minimis* and the confusion that occurred is insufficient to support a "likelihood of confusion" in a trademark-infringement analysis. See [172, at 11-14].

In our circuit, "very little proof of actual confusion would be necessary to prove the likelihood of confusion." World, 438 F.2d at 489; see Roto-Rooter Corp.

v. O'Neal, 513 F.2d 44, at 46 (confusion by four individuals held to be significant evidence of actual confusion).  In Safeway, the Court considered the "kinds of issues confused and degree of confusion" involved and the weight to be given to the actual confusion shown.  Safeway, 675 F.2d at 1167.  The Safeway court concluded that where the incidents of actual confusion were small, and a supplier and a customer were confused, the confusion was deemed significant because customers and suppliers are the type of people who ought not to be confused.  Id. at 1167.  Here, XG has documented over 100 instances of actual confusion resulting from misdirected checks, phone calls, faxes and emails.  They come from people who ought not to have been confused, including customers and others with whom Defendant conducts its business.  The Court finds that this actual confusion among the people weighs in XG's favor.[7]

viii.   Weighing of the seven factors of "likelihood of confusion"

The Court, having considered each of the seven factors, now considers the overall balance of them.  Custom, 508 F.3d at 649.  It does so based on the

---

[7] What is not known is whether the actual confusion involving the products and sales merchants could be viewed as actual confusion where XG and Xylem, Inc. products sales are made using different sales outlets and to different customers.

undisputed facts of this case.  The Court finds that while the factors may tip in favor of XG on whether Xylem, Inc.'s use of the Xylem name and mark created confusion, including actual confusion, the facts here are unique in that the market and product overlap is limited, and the marketing activity disparate.  While XG appears, based on its registration and an analysis of the seven factors, to have a stronger factual and legal argument in favor of "likelihood of confusion," in viewing the evidence in the light most favorable to Plaintiffs, the Court cannot find that no reasonable juror would find there is no confusion created by Xylem, Inc.'s use of the Xylem name and mark.  The issue of infringement is required to be decided by a jury.[8]

2.  *Whether ITT Corp. may be held liable for Xylem, Inc.'s alleged use of the Xylem name and mark*

It is well-established that "liability for trademark infringement can extend beyond those entities that actually perform the acts of infringement."  <u>Mini Maid Services Co. v. Maid Brigade Systems, Inc.</u>, 967 F.2d 1516, 1522 (11th Cir. 1992)

---

[8] Plaintiffs submitted the affidavit of Michael B. Mazis to support their argument that there is an absence of a likelihood of confusion and that XG's motion for partial summary judgment should be denied.  The Court already has determined based on its analysis of the seven factors that the issue of infringement is required to be decided by a jury.  As a result, it is not necessary now to decide whether Mazis's opinion is admissible.  XG's motion to exclude is denied but without prejudice to allow it to be filed as a motion *in limine* under the Court's Local Rules.

(citing Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982)); see

Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231

(11th Cir. 2007) (finding a distributor liable for trademark infringement committed

by merchant distributees); Bauer Lamp Co., Inc. v. Shaffer., 941 F.2d 1165 (11th

Cir. 1991) (finding contributory infringement where manufacturing is done by a

third party).  "To be liable for contributory trademark infringement, a defendant

must have intentionally induced another to infringe a trademark."  Suntree

Technologies, Inc. v. Ecosense International, Inc., 693 F.3d 1338, 1345 (11th Cir.

2012) (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

Competition § 25:18 at 25-54 (4th ed. 2012)).  "Any liability for contributory

infringement will necessarily depend upon whether or not the contributing party

intended to participate in the infringement or actually knew about the infringing

activities."  Suntree, 693 F.3d at 1345 (quoting Mini, 967 F.2d at 1522).

　　　The Court next decides whether ITT may be held liable for Xylem, Inc.'s

use of the Xylem name and mark.  The record here shows that ITT and its

management knew that the XYLEM mark had been registered by XG as XG's

trademark in the United States.  ITT was warned by its outside counsel,

Baker & Mackenzie LLP, that it was unlikely that ITT could successfully register

the Xylem name in the United States because of XG's prior registration.  Despite

these warnings, ITT chose to name its subsidiary Xylem, Inc. and allowed

Xylem, Inc. to embark on its business activities, including the sale of Xylem, Inc.'s

products, which bear the Xylem mark, to the Overlapping Customers.  [173,

¶¶ 33-58, 86-95].  Even if ITT believed that ITT was legally allowed to use the

Xylem name and mark, it did so knowing of XG's registration.  [173, ¶¶ 86-87].  If

Xylem, Inc. is found to have infringed on XG's trademark rights, ITT would be

liable for contributory infringement.  See Suntree, 693 F.3d at 1345; see Mini, 967

F.2d at 1522.

###### 3.   *Unfair Competition under federal law, 15 U.S.C. § 1125*

To prevail on a claim for federal unfair competition under 15 U.S.C.

§ 1125(a),[9] a movant must show (1) that the movant had enforceable trademark

---

[9] Section 1125 provides, in pertinent parts:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

rights in the mark or name, and (2) that the respondent made unauthorized use of the mark or name such that consumers were likely to confuse the two.  Custom, 508 F.3d at 647 (quoting Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir.1997)); Crystal Entm't & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1320 (11th Cir. 2011).

XG registered its XYLEM mark under the Lanham Act and has enforceable rights in the mark and the Xylem name.  See Jellibeans, 716 F.2d at 835 (enjoining the use of "Lollipops" as a trade name because it infringes on the "Jellibeans"

---

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The statute authorizes injunctive relief, as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Id. § 1125(c)(1).

29

service mark); <u>Citibank, N.A. v. Citibanc Grp., Inc.</u>, 724 F.2d 1540 (11th Cir. 1984) (enjoining the use of "Citibanc" as a trade name and mark because they infringe on Citibank's trade name and mark).  The first prong of the 15 U.S.C. § 1125(a) analysis is therefore satisfied.

The "likelihood of confusion" analysis under 15 U.S.C. § 1125(a) is the same as that under 15 U.S.C. § 1114.  <u>See</u> <u>Custom</u>, 508 F.3d at 648; <u>Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.</u>, 833 F.2d 1484, 1488 (11th Cir. 1987).

Because the Court finds that a "likelihood of confusion" under 15 U.S.C. § 1125(a) is in genuine dispute and required to be decided at trial, summary judgment of XG's claim for unfair competition under the Lanham Act is required to be denied.

4.    *Trademark infringement under Georgia law, O.C.G.A.*
       *§ 10-1-450*

Registration of a service mark or trademark is a prerequisite for relief under O.C.G.A. § 10-1-450.[10]  <u>Diedrich v. Miller & Meier & Assocs., Architects &</u>

---

[10] Section 10-1-450 provides, in pertinent part:

[A]ny person who shall:

(1) Use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trademark or

Planners, Inc., 334 S.E.2d 308, 311 (Ga. 1985).

Trademark-infringement claims under O.C.G.A. § 10-1-450 adopt the same

"likelihood of confusion" analysis as federal trademark-infringement claims under

the Lanham Act.  See Ackerman Security Systems, Inc. v. Design Security

Systems, Inc., 412 S.E.2d 588, 589 (Ga. Ct. App. 1991).

XG has registered its trademark in the State of Georgia, and the fact is not

disputed by Plaintiffs.  [78-2 ¶¶ 7-10; 173 ¶¶ 7-10].  Because the Court finds that

whether there is a likelihood of confusion is required to be determined at trial,

----

service mark registered under this part in connection with the
sale, offering for sale, or advertising of any goods or services
on or in connection with which such use is likely to cause
confusion or mistake or to deceive as to the source of origin of
such goods or services; or

(2) Reproduce, counterfeit, copy, or colorably imitate any such
trademark or service mark and apply such reproduction,
counterfeit, copy, or colorable imitation to labels, signs, prints,
packages, wrappers, receptacles, or advertisements intended to
be used upon or in connection with the sale or other distribution
in this state of such goods or services;

shall be liable to a civil action by the owner of such registered
trademark or service mark for liquidated damages in the amount of
$10,000.00, if such act has been committed with knowledge that the
trademark or service mark has been registered under this part and such
act has been committed without previously obtaining the consent of
the owner thereof . . . .

O.C.G.A. § 10-1-450.

summary judgment on XG's trademark-infringement claim under Georgia law also is required to be denied.

5.     *Unfair Competition under Georgia law, O.C.G.A. § 23-2-55*

Georgia unfair-competition claims under O.C.G.A. § 23-2-55[11] involve the same dispositive questions as trademark-infringement claims under the Lanham Act.  Caliber, 605 F.3d at 935 n.16.  "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition."  Suntree, 693 F.3d at 1345 (quoting Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001)).  Relief under O.C.G.A. § 23-2-55 "depends upon a showing of intent to deceive. However, this intent may be presumed if encroachment is done with knowledge of the prior right." Giant Mart Corp. v. Giant Disc. Foods, Inc., 279 S.E.2d 683, 685 (Ga. 1981).

The record shows that Plaintiffs adopted the Xylem name and mark with full knowledge of XG's registered trademark in the United States and continued with their use despite having received a cease-and-desist letter from XG.  [173,

---

[11] Section 23-2-55 provides: "Any attempt to encroach upon the business of a trader or other person by the use of similar trademarks, names, or devices, with the intention of deceiving and misleading the public, is a fraud for which equity will grant relief."  O.C.G.A. § 23-2-55.

¶¶ 33-58, 86-95, 106].  Because the Court finds that a "likelihood of confusion" is in genuine dispute and required to be decided at trial, summary judgment of XG's claim under O.C.G.A. § 23-2-55 also is required to be denied.

6. *Georgia Deceptive Trade Practices Act pursuant to O.C.G.A. § 10-1-372(a)(2)-(3)*

To obtain relief under Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372,[12] the movant is "not required to show that [it] suffered monetary damages or that the [respondent] intended to cause confusion or misunderstanding

---

[12] Section 10-1-372 provides, in pertinent part:

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; [or] . . .

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

O.C.G.A. § 10-1-372(a)-(b).

to the public." Eckles v. Atlanta Tech. Grp., Inc., 485 S.E.2d 22, 24 (Ga. 1997).

Relief also "would not be dependent upon [the movant's] registration of [its] trade

name." What the movant needs to establish is "that the use of a name causes

confusion to others [who are] using reasonable care." Id. at 24 (quoting Future

Prof'ls, Inc. v. Darby, 470 S.E.2d 644, 646 (Ga. 1996); Giant, 279 S.E.2d at 777-

78.

Whether confusion occurs under Georgia Deceptive Trade Practices Act,

O.C.G.A. § 10-1-372, requires the same "likelihood of confusion" analysis found

in trademark-infringement claims under the Lanham Act. See Ackerman Sec. Sys.,

Inc. v. Design Sec. Sys., Inc., 412 S.E.2d 588, 589 (Ga. Ct. App. 1991); Amstar

Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 265 (5th Cir. 1980).

Because the Court finds that a "likelihood of confusion" is in genuine

dispute and required to be decided at trial, summary judgment of XG's claim under

O.C.G.A. § 10-1-372 also is required to be denied.[13]

---

[13]  Because the Court has determined that Plaintiffs' liability for Defendant's
counterclaims is required to be decided at trial, the Court does not reach
Defendant's request for injunctive relief. The Court notes that the granting of an
injunction is not automatic upon a showing of infringement. "[T]he decision
whether to grant or deny injunctive relief rests within the equitable discretion of
the district courts." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394 (2006).
A movant seeking a permanent injunction "must satisfy a four-factor test before a
court may grant such relief." The movant must demonstrate: (1) that it has
suffered an irreparable injury, (2) that remedies available at law, such as monetary

C.     Plaintiffs' Motion for Partial Summary Judgment on Damages [70]

ITT and Xylem, Inc. move for partial summary judgment on the issue of

damages.  Plaintiffs argue that, as a prerequisite to a recovery for trademark

infringement, XG must prove that it is entitled to recover the infringer's profits

attributable to the infringement, any damage sustained by the trademark owner and

the cost of the action.  See Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d

1562, 1564 (11th Cir. 1986).  Plaintiffs allege that XG seeks "damages for lost

sale" and "damages measured by a reasonable royalty," which, according to

Plaintiffs, are not proper recoveries for an alleged trademark infringement as a

matter of law.  Plaintiffs argue that they are thus entitled, as a matter of law, to

summary judgment on damages XG alleges.  To the extent XG is entitled to

recover based on a reasonable royalty, Plaintiffs alternatively allege that XG

cannot prove the amount of the royalty claimed because the opinion offered by

---

damages, are inadequate to compensate for that injury, (3) that, considering the
balance of hardships between the plaintiff and defendant, a remedy in equity is
warranted, and (4) that the public interest would not be disserved by a permanent
injunction.  Id. at 391; Remy Martin, 756 F.2d at 1530 n.13; Buchanan v. U.S.
Postal Serv., 508 F.2d 259, 266 (5th Cir.1975); N. Am. Med. Corp. v. Axiom
Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008) ("Although eBay dealt with
the Patent Act and with permanent injunctive relief, a strong case can be made that
eBay's holding necessarily extends to the grant of preliminary injunctions under
the Lanham Act.").  The Court will determine whether to grant injunctive relief if
XG prevails on its infringement claim at trial.

XG's expert, Hutchins, is inadmissible.  Plaintiffs further allege that "there is no

legal basis for punitive damages."  [70-1, at 4-5, 13, 15].

Plaintiffs claim that the "only theory of damages that XG . . . advance[s] is

based on a reasonable royalty."  [70-1, at 5].  Plaintiffs argue that the "reasonable

royalty" damage theory, while common in patent cases, "has been atypical" in

cases for trademark infringement.  A&H Sportswear v. Victoria's Secret Stores,

Inc., 166 F. 3d 197, 208 (3rd Cir. 1999) (en banc).  Plaintiffs argue further that the

"reasonable royalty" theory has been used in trademark cases only where a royalty

is based on a license previously granted and typically where the licenses were held

over beyond the license term.  In these cases, the damages are capable of being

measured by the established royalty rates in the licenses.  In cases where there was

not a prior licensing agreement, Plaintiffs argue that a reasonable royalty may be

used as a basis for damage awards only if the trademark owner had licensed its

trademark to one or more third parties.  In those cases, the third-party license

provides a basis for awarding profits for the infringement.  See Sands, Taylor &

Wood Co. v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992).

Plaintiffs claim, without pointing to any binding authority in this circuit, that

a reasonable royalty may not be used as a measure of damage award because it is

not possible to determine the amount of a reasonable royalty with "reasonable

certainty." [70-1, at 8]. Fundamental to Plaintiffs' theory is that a trademark owner who refuses to license its trademark may never recover damages based on royalty rates that are not established.

XG claims that a reasonable royalty is a valid and permissible basis for awarding damages under the Lanham Act. It offers an expert opinion on what a reasonable royalty would have been between XG and the Plaintiffs. XG also claims it presented evidence of actual damages in the amount of $93,790.85 apart from its reasonable-royalty theory.

1.   *Legal Standard*

Damages for trademark infringement under the Lanham Act may include (1) the infringing party's profits, (2) any damage sustained by the trademark holder and (3) the cost of the action. 15 U.S.C. § 1117(a)[14]; Aronowitz, 513 F.3d at 1241;

---

[14] Section 1117(a) provides:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125 (a) or (d) of this title, or a willful violation under section 1125 (c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or

Ramada, 804 F.2d at 1564.  "Lanham Act damages may be awarded even when they are not susceptible to precise calculations," and the district courts have "wide discretion in determining a just amount of recovery for trademark infringement." Aronowitz, 513 F.3d at 1241 (quoting Ramada 804 F.2d at 1564-65).  Damages sustained by the trademark holder include "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts such as the costs of corrective advertising or injury to business reputation or goodwill." Id. at 1241 (citation omitted) (internal quotation marks omitted).  The trial court may also use a reasonable royalty as a measure of damages.  Howard Johnson Co., Inc. v. Khimani, 892 F.2d 1512, 1519-20 (11th Cir. 1990); Ramada, 804 F.2d at 1565.

> 2.    *Whether Defendant may recover damages for lost sales*

---

deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

Damages for trademark infringement under the Lanham Act may include any damage actually sustained by the trademark holder.  15 U.S.C. § 1117(a); Aronowitz, 513 F.3d at 1241; Ramada, 804 F.2d at 1564.  Plaintiff argues that "there is no evidentiary basis for such damages" because XG "cannot show any decline in its sales or foregone sales that were caused by the alleged infringement." [70-1, at 5].  Those claims are not supported by the record.  The record evidence here is that XG lost sales in November 2011 and December 2011 in an amount that XG estimates to be $93,790.85.  [145-2, ¶¶ 1-2].  The Court cannot conclude that no reasonable juror would find that actual damages were incurred by XG as a result of lost sales in this amount, and there is a genuine issue of material fact whether XG suffered actual damages due to lost sales.  For this reason alone, Plaintiffs' Motion for Partial Summary Judgment as to Damages is required to be denied.

### 3.      *Whether Defendant may recover a reasonable royalty*

The more interesting and significant issue in this case is whether XG can claim and recover damages based on a reasonable royalty.

Plaintiffs do not contest that the Eleventh Circuit has relied on a "reasonable royalty" theory to determine damages under the Lanham Act.  See [70-1, at 5-6]. Plaintiffs argue, however, that a "reasonable royalty" theory of damages is

available only when the royalty amount is "sensible, non-speculative, and grounded in commercial reality," requiring "use of the mark by persons other than the owner [to] . . . demonstrate[] market value."  [70-1, at 6].  Plaintiffs claim that those conditions are not met here because the royalty claimed in this case is too speculative and is based only on a hypothetical royalty rate that cannot be verified based on an established, historical royalty rate.  See [70-1, at 8-10].  The Court disagrees.

The Supreme Court, in Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co., 235 U.S. 641 (1915), discussed when a reasonable royalty may be used as a basis for a damage award resulting from patent infringement.  In Dowagiac, a monopolist inventor refused to license an improvement on grain-drills to third parties and, to maintain its monopoly, sued other manufacturers who copied the inventor's design.  The Supreme Court, recognizing that "there was no established royalty," held that "the only measure of damages" in those cases of infringement was "such sum as under all the circumstances, would have been a reasonable royalty for the defendant to have paid."  235 U.S. at 648-49.  The "reasonable royalty" theory has, from its inception, been a method to estimate hypothetical royalty amounts in the absence of an established royalty.  The Supreme Court, in Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390 (1940), extended the

"reasonable royalty" theory of damages to copyright cases. In <u>Sheldon</u>, the Supreme Court noted that "what is required is not mathematical exactness but only a reasonable approximation," and that "the testimony of those who are informed by observation and experience may be not only helpful but . . . indispensable." 309 U.S. at 408.

The methodology for hypothesizing a licensing arrangement and arriving at a reasonable royalty is well-established. <u>See</u> <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); <u>Ga.-Pac. Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); <u>Am. Tel. & Tel. Co. v. Radio Audion Co.</u>, 5 F.2d 535, 536 (D. Del. 1925). The Eleventh Circuit has consistently used a reasonable royalty as a measure of damages in trademark-infringement cases. <u>See</u> <u>Howard</u>, 892 F.2d at 1519-20; <u>Ramada</u>, 804 F.2d at 1565; <u>Bos. Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg.</u>, 597 F.2d 71, 76 (5th Cir. 1979).

Our circuit has not considered whether a prior license is required to determine a reasonable royalty as the basis for an award of trademark-infringement damages. The Court has critically considered the history of the "reasonable royalty" theory and its purpose in determining whether the theory can apply in a case that does not involve a holdover license or where a license was not previously granted to a third party. The Court concludes that it may.

A careful reading of Dowagiac and Sheldon compel the conclusion that the "reasonable royalty" theory of damages is a viable, if not necessary, measure of protecting the property rights afforded a trademark holder under the Lanham Act. In Dowagiac, the Supreme Court evaluated the royalties due to the holder of intellectual property rights—a patent—which were infringed by a defendant. The Supreme Court found that the patent holder was entitled to use the profits obtained by the infringer as a result of the infringement. Dowagiac, 235 U.S. at 646. In discussing the reasons for allowing the patent holder a recovery for the infringement, the Supreme Court held that "the result to be accomplished is a rational separation of the net profits so that neither party may have what rightfully belongs to the other, and it is important that the accounting be so conducted as to secure this result, if it be reasonably possible." Id. at 647. The Supreme Court stated "it may well be that mathematical exactness [is] not possible," noting that "degree of accuracy is not required but only reasonable approximation, which usually may be attained through the testimony of experts and persons informed by observation and experience. Testimony of this character is generally helpful and at times indispensable." Id. The Supreme Court, recognizing that a patent right was a form of property and that the "infringement was a tortious taking," ruled that "the normal measure of damages was the value of what was taken." Id. at 648.

42

Because the patent holder had elected not to license its patent, it was "permissible [for the plaintiff] to show the value [of its intellectual property rights] by proving what would have been a reasonable royalty."  Id.

In Sheldon, the Supreme Court addressed the same issue in a case involving infringement of another type of intellectual property—copyrights.  Justice Hughes presented the case question as follows: "The questions presented are whether, in computing an award of profits against an infringer of a copyright, there may be an apportionment so as to give to the owner of the copyright only that part of the profits found to be attributable to the use of the copyrighted material as distinguished from what the infringer himself has supplied, and, if so, whether the evidence affords a proper basis for the apportionment decreed in this case." Sheldon, 309 U.S. at 396.  Adopting the reasoning of Dowagiac, the Sheldon court held that the damages may be measured by the value of the intellectual property taken.  Id. at 408-09.

Plaintiffs here try to distinguish the reasoning of these cases and argue that their reasoning does not apply to a third kind of intellectual property—trademarks. Their argument is unpersuasive and would lead to the illogical result that the value added to a product by an infringed trademark could not be recovered.  This result is unreasonable because it would deny to the holder of this type of intellectual

property a recovery while allowing the infringer to unwarrantedly capitalize on its infringing conduct.[15]

The reasoning and rationale in <u>Dowagiac</u> and <u>Sheldon</u> apply in this trademark case.  If XG can prove infringement, XG argues it may seek damages based on the value of the infringed trademark.  Plaintiffs ultimately concede that a reasonable royalty is a viable measure of damages in trademark-infringement cases, but seek to limit it to the narrow set of cases where a plaintiff can point to an established royalty based on an actual license agreement.  Plaintiffs' narrow interpretation is not consistent with the Supreme Court's reasoning in <u>Dowagiac</u> and <u>Sheldon</u> or with the generally accepted use of a reasonable royalty for damage calculations.  Accordingly, the Court finds that Plaintiffs' Motion for Partial Summary Judgment as to Damages is denied.  The Court now turns to whether XG's and Plaintiffs' expert opinions on the value of a reasonable royalty are admissible in this case.

---

[15] Plaintiffs have cited several district court opinions declining to find that a royalty in those cases allowed a recovery for the infringed party.  The Court understands that it will in any given case have to determine whether the royalty claimed is a proper basis for a damage award.  The Court here responds to, and rejects, the Plaintiffs' overarching argument that a reasonable royalty is not an allowable damage theory.

i.    Motions to Exclude Expert Opinions on the Proper
Amount of a Reasonable Royalty

a.    Legal Standard

Expert testimony is admissible if (1) the expert is qualified to testify on the

topic at issue, (2) the methodology used by the expert is sufficiently reliable, and

(3) the testimony will assist the trier of fact.  See Fed. R. Evid. 703; Club Car, Inc.

v. Club Car (Que.) Imp., Inc., 362 F.3d 775, 780 (11th Cir. 2004); Quiet Tech. DC-

8 v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003); see also

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

In assessing reliability, a deciding court may look to (1) whether the expert's

methodology has been tested or is capable of being tested, (2) whether the

technique has been subjected to peer review and publication, (3) the known and

potential error rate of the methodology, and (4) whether the technique has been

generally accepted in the proper scientific community.  McDowell v. Brown, 392

F.3d, 1283, 1298 (11th Cir. 2004); Kumho Tire Co. v. Carmichael, 526 U.S. 137,

149 (1999); see Daubert, 509 U.S. at 593-94.  "A district court has considerable

leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable."  McDowell, 392 F.3d at 1299 (internal

quotation marks omitted) (citation omitted); Kumho, 526 U.S. at 151-152.

Expert testimony will assist the trier of fact "if it concerns matters that are

45

beyond the understanding of the average lay person."  U.S. v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004).  "This condition goes primarily to relevance."  Daubert, 509 U.S. at 591.  Expert testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  Frazier, 387 F.3d at 1262-63.

Expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403 of the Federal Rules of Evidence when "the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury."  Frazier, 387 F.3d at 1263; Fed. R. Evid. 403.

> b. Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69]

Plaintiffs move to exclude Robert A. Hutchins's expert opinion on the reasonable royalty XG is entitled to based on Plaintiffs' alleged infringement.  Plaintiffs offer three arguments why Hutchins's testimony is "unreliable and unhelpful to the trier of fact."  [69, at 1].

First, Plaintiffs argue that the comparable transactions Hutchins used to derive the range of reasonable royalty amounts are not comparable to a hypothetical licensing of XG's trademark.  [230-1, at 4, 9-13].  Hutchins,

acknowledging there are no "comparable licensing transactions" to be used as a basis for a royalty calculation, arrived at his estimates by using three separate transactions in which ITT acquired another company's trademark through a merger and acquisition. [230-3, at 16-17]. Hutchins then "reverse engineer[ed]" a range of "implied royalty rates" for a hypothetical licensing of XG's trademark to Plaintiffs, assuming that the hypothetical transaction would be comparable to ITT's previous acquisitions of three other trademarks. [Id. at 18-19]. Hutchins acknowledges that the "companies acquired by [Plaintiffs] had significantly larger revenue bases and had been in existence for longer periods of time relative to [XG]," and "[Plaintiffs] would be undertaking the cost and risk of developing and building the Xylem name on a global scale." [Id. at 20]. As a result, Hutchins adopted the lower-end of his range of estimates and adjusted the royalty rate downward to reach a conservative estimate. He calculated the range of royalty rates to be "between 0.63 and 1.50 percent" and ultimately "set the maximum rate for the hypothetical negotiations at 0.60 percent." [Id. at 33].

Second, Plaintiffs argue that to the extent Hutchins accounted for the incomparability of the trademarks by adopting a lower-end estimate of a reasonable royalty (and then discounting the royalty rate further), the adjustment was insufficient. [230-1, at 21]. "[L]ike estimating the weight of a fourth grader

47

by weighing a group of NFL linemen," Plaintiffs argue, "the complete lack of comparability between the subject and the reference group is scarcely resolved by selecting a value a bit below the weight of the lightest lineman."  [Id. at 21]. Plaintiffs essentially claim the royalty rate selected was too random.

Third, Plaintiffs argue that Hutchins used false assumptions to arrive at a minimum royalty amount that was too high.  [230-1, at 13-14].  Hutchins set a minimum value of XG's trademark by looking at how much Plaintiffs had spent on "rebranding and marketing" the Xylem brand.  [230-3, at 33].  Plaintiffs argue that Hutchins unreasonably chose October rather than July as the ending month of the rebranding effort, causing the minimum royalty amount to be inflated.  [230-1, at 13-14].

The Court has considered the opinion offered by Hutchins in light of the incomparability of data, the downward adjustment of estimates and the unreasonable use of negotiation dates alleged by the Plaintiffs.  The Court has performed the analysis set out in Rule 702 of the Federal Rules of Evidence and the reliability analysis set out in Daubert and Kumho.  Plaintiffs do not challenge Hutchins's qualification or the methodology of comparable analysis.  They also do not argue that his comparable analysis is not generally accepted in the accounting community in which Hutchins operates.  Plaintiffs' argument is that the opinion is

not sufficiently reliable.  Although the Court recognizes that the assumptions on which Hutchins's opinion is based can be subject to criticism, it is for the trier of fact to determine the credibility and persuasiveness of Hutchins's opinion, and then to determine whether XG has met its burden of proof for damages.  That is, the defects alleged by Plaintiffs affect the weight of Hutchins's opinion rather than its admissibility.  See Daubert, 509 U.S. at 596; Quiet, 326 F.3d at 1341.  Plaintiffs' Motion to Exclude the Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty is denied.

          c.      Defendant's Motion to Exclude Testimony of Robert N. Yerman [75]

XG moves to exclude Robert N. Yerman's expert opinion on the reasonable royalty that would have resulted from a hypothetical negotiation between the parties.  XG bases its motion on two grounds.

First, XG argues that Yerman's estimate lacks reliability because Yerman "starts with an accepted methodology" but "reaches an unsubstantiated conclusion that cannot be tested or duplicated through peer review."  XG argues that Yerman "never identifies why" the negotiated amount "would be no more than $400,000" after he started with "monetary values ranging from approximately $284,000 to $3.3 million."  [75-1, at 3, 8].  An examination of Yerman's report reveals that he based his number on XG's total equity value and an actual licensing agreement

ITT entered into with Novedades Agricolas, a Spanish company, regarding the Xilema trademark.  [218-1, at 14, 29].

Second, XG argues that Yerman's estimate "will not assist the trier of fact" because what he did to arrive at the estimate is "no different than what the jury will be asked to do."  XG essentially argues that Yerman offered no expert insight and formed his estimate as any layman would.  [75-1, at 8-9].  Expert testimony will assist the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."  Frazier, 387 F.3d at 1262.  The requirement "goes primarily to relevance."  Daubert, 509 U.S. at 591.  Yerman's estimate was based on an actual licensing agreement between ITT and Novedades Agricolas.  His estimate was proffered to rebut Hutchins's estimate relied upon by XG, and it is relevant to the jury's determination of what a reasonable royalty would have been between Plaintiffs and XG.  XG does not challenge Yerman's analytical method. XG argues only that Yerman's conclusions are not subject to verifiable testing and have not been subject to peer review.  The arguments are unpersuasive.  It is for the trier of fact to determine, after considering the opinion and other evidence, what amount of damages should result in recovery.  The defects alleged by XG affect the weight of Yerman's opinion rather than its admissibility.  See Quiet, 326 F.3d at 1341; Daubert, 509 U.S. at 596.  XG's Motion to Exclude Testimony of

Robert N. Yerman is denied.

        d.     Defendant's Motion to Exclude Certain Testimony of Philip G. Hampton, II [77]

XG next moves to strike a paragraph of Philip G. Hampton, II's expert opinion on the valuation of a hypothetical coexistence agreement[16] between Plaintiffs and XG.  XG argues that "ITT has not met its burden in qualifying Hampton as an expert in the realm of coexistence agreement valuations" because Hampton's expertise related solely to the trademark registration process as a result of his former role as an Assistant Commissioner for Trademarks at the United States Patent and Trademark Office.  [77-1, at 2; 77-2, at 2].

An examination of Hampton's report shows that he is not testifying to the absolute value of a hypothetical coexistence agreement between Plaintiffs and XG. Hampton instead opines on the relative value of a coexistence agreement in light of another existing coexistence agreement between ITT and Novedades Agricolas, which he understood to have had a value of "about $250,000."  Based on his determination that "Novedades had (and has) a much stronger trademark position

---

[16] A trademark coexistence agreement is an agreement made by two parties to use a similar trademark for marketing purposes without interfering in each other's enterprises. Agreements of this nature are often made when parties only require a regional use of their trademarks, and when one party's use of a trademark will not harm another party's business.

vis-a-vis a Xylem trademark than Xylem Group," Hampton concludes that XG's hypothetical coexistence agreement, if based on Novedades Agricolas's coexistence agreement, would have been valued at an amount "significantly less than $250,000." [77-2, at 10-11].

The relative strength of a trademark position is a subject-matter on which Hampton is qualified to testify based on his experience at the United States Patent and Trademark Office. The Court, however, having considered the opinion and the basis for it, determines that it would not be helpful to the trier of fact and would tend to mislead the jury. See Fed. R. Evid. 403. XG's Motion to Exclude Certain Testimony of Philip G. Hampton, II is granted.

4.    *Whether Defendant may recover punitive damages*

Plaintiffs argue that XG is not entitled to punitive damages under Georgia state law. To the extent Plaintiff argues that XG is not entitled to punitive damages under the Lanham Act, the issue is premature. The Court "may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages" under 15 U.S.C. § 1117(a). Such a discretionary award "may not be punitive, and must be based on a showing of actual harm." Babbit Elecs., Inc. v. Dynascan Corp., 38 F. 3d 116, 1183 (11th Cir. 1994).

If Plaintiffs argue that XG is not entitled to punitive damages under Georgia

state law, O.C.G.A. § 51-12-5[17], the motion is granted.  Section 51-12-5(b)

specifically provides that "[t]his Code section shall apply only to causes of action

for torts arising before July 1, 1987."  In any event, this issue is required to be

decided only if there is an award of damages in this action for trademark

infringement.

      D.    <u>Appropriateness of Injunctive Relief</u>


**III.  CONCLUSION**

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary

Judgment [78] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude

Testimony of Michael B. Mazis, Ph.D. [76] is **DENIED WITHOUT**

**PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary

Judgment as to Damages [70] is **GRANTED IN PART AND DENIED IN**

---

[17] XG bases its punitive-damage claim on O.C.G.A. §§ 10-1-373(c), 51-12-5.
(Am. Countercl. [67] at 15).  O.C.G.A. § 10-1-373(c) provides only that "[t]he
relief provided in this Code section is in addition to remedies otherwise available
against the same conduct under the common law or other statutes of this state."

PART.  It is **GRANTED** with respect to Defendant's counterclaim for punitive

damages under Georgia law.  It is **DENIED** with respect to all other claims.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude the

Opinions of Robert A. Hutchins, CPA, as to a Reasonable Royalty [69] is

**DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude

Testimony of Robert N. Yerman [75] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Certain

Testimony of Philip G. Hampton, II [77] is **GRANTED**.

**SO ORDERED** this 5th day of August, 2013.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE